IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| MOREHOUSE ENTERPRISES, LLC | ) | |
| d/b/a BRIDGE CITY ORDNANCE, ELIEZER | ) | |
| JIMENEZ, GUN OWNERS OF AMERICA, INC., | ) | |
| and GUN OWNERS FOUNDATION, | ) | |
| | ) | Case No. _____ |
|    Plaintiffs, | ) | |
| | ) | |
|       v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES; UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE; and | ) | |
| GARY M. RESTAINO AS THE ACTING | ) | |
| DIRECTOR OF ATF, | ) | |
| | ) | |
|    Defendants. | ) | |
| | ) | |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF ................................ 1

   JURISDICTION AND VENUE ........................................................................................ 5

   PARTIES ........................................................................................................................ 5

     I.    Background. ........................................................................................................ 10

       a.   Statutory History. ............................................................................................. 122

       b.   ATF Adopts a Regulatory Definition of "Frame or Receiver." .......................... 13

       c.   ATF Feigns Ignorance of Modern Firearms. ..................................................... 14

       d.   ATF's Newly Adopted Definition Immediately Proves Unworkable. .............. 177

       e.   ATF Acts Arbitrarily and Capriciously. ............................................................. 18

       f.   ATF Faults the Courts for Faithfully Applying the Regulation ATF Promulgated. …………………………………………………………………………..22

   2

     II.    New Regulatory Definition – "Frame or Receiver"**Error!   Bookmark   not defined.**

       a.   The NPRM Would Have Regulated Most Gun Parts As "Firearms." ............... 28

       b.   The Final Rule Now Concedes that Most Firearms Have One Frame or Receiver. …………………………………………………………………………..31

       c.   However, under the Final Rule, Some Firearms Will Still Have Multiple Frames or Receivers. ..................................................................................................... 33

       d.   The Final Rule Creates Precedent from Nonprecedential Classification Letters.39

       e.   Conclusion. .......................................................................................................... 42

     III.   The Final Rule Adopts a Vague, Standardless Definition of the Statutory Term "Readily," and Applies it to Ban 80% Frames and Receivers, Including when Sold As So-Called "Weapon Parts Kits." ............................................................................... 444

       a.   Section 921(a)(3)(A)'s "Readily" Language Has No Application to when an Item Becomes a Frame or Receiver under Section 921(a)(3)(B). ............................... 50

       b.   ATF's New Application of "Readily" to 80% Frames and Receivers Represents an Unexplained Change by the Agency. ............................................................. 55

       c.   The Final Rule Unlawfully Applies "Readily" to So-Called "Weapons Parts Kits." …………………………………………………………………………..59

       d.   The Cases Cited by ATF Do Not Support the Final Rule's Attack on "Weapon Parts Kits." ..................................................................................................... 655

       e.   The Final Rule's New Classification of 80% Frames and Receivers and "Weapon Parts Kits" as "Firearms" Reverses Countless ATF Classification Letters to the Contrary. …………………………………………………………………………..69

   9

        i.    ATF Acknowledges the GCA Does Not Regulate Gun Parts. ..................... 70

ii.    ATF Acknowledges the GCA Does Not Regulate 80% Frames and Receivers. ................................................................................................ 70

iii.   ATF Acknowledges the GCA Does Not Regulate Parts Kits. .................... 733

f.    Not Content with Targeting "Weapon Parts Kits," the Final Rule Reverses Course for All 80% Receivers. ................................................................................. 766

g.    ATF's Definition Produces Absurd Results. .................................................. 777

h.    ATF's Definition is Standardless. .................................................................. 788

i.    ATF's Attempt to Explain "Clearly Identifiable" Is Incomprehensible Gobbledygook. ............................................................................................... 799

IV.   ATF Has No Statutory Authority to Regulate What it Calls "Privately Made Firearms." ................................................................................................................... 833

a.    ATF Has No Authority to Require Serialization of Privately Made Firearms.. 866

b.    No Federal Statute Requires All Firearms to Be Serialized. ........................... 877

c.    The Final Rule Fails to Adequately Address GOA/GOF Comments. ............... 90

d.    The Final Rule Creates an Entirely New Federal Crime. ................................. 922

e.    The Final Rule Creates a New Category of Federal Firearms License. ........... 933

f.    The Final Rule Requires Registration of PMFs. ............................................. 966

V.    The Final Rule's Definition of "Complete Muffler or Silencer Device" Reads Design and Intent Out of the Statute. ....................................................................... 999

a.    The Final Rule's Removal of "Design" and "Intent" from the Statute Is "Designed and Intended" to Target Solvent Traps. ........................................................ 1055

b.    ATF's Definition of "Silencer Frame or Receiver" Conflicts with the Statute. 1122

VI.   "Voluntary Classification of Firearms." ........................................................... 1166

a.    ATF's Existing Classification System Is Horribly Flawed. ........................... 1166

b.    The Final Rule Codifies ATF's Flawed Classification System .................... 12020

VII.  The Final Rule Adopts an Unlawful Record Retention Policy. ....................... 13030

a.    The Final Rule's Permanent Recordkeeping Requirement Violates the APA. 13030

b.    The Final Rule's Permanent Recordkeeping Requirement Violates 18 U.S.C. § 926(a)(3). .................................................................................................... 137

VIII. Causes of Action and Prayer for Relief ……………………….…………… 141
FIRST CAUSE OF ACTION (VIOLATION OF APA 5 U.S.C. § 706(2)(A)), ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW ……………………………………………………………………………..141
1
SECOND CAUSE OF ACTION, (VIOLATION OF APA 5 U.S.C. § 706(2)(C)), IN EXCESS OF STATUTORY JURISDICTION OR AUTHORITY ...................................................... 1422

THIRD CAUSE OF ACTION (VIOLATION OF APA 5 U.S.C. §§ 553(b) and 706(2)(D)) WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW ............................... 1422

FOURTH CAUSE OF ACTION, VIOLATION OF APA 5 U.S.C. § 706(2)(B)) CONTRARY TO CONSTITUTIONAL RIGHT, POWER, PRIVILEGE OR IMMUNITY ........................ 1433

FIFTH CAUSE OF ACTION (CONSTITUTION ARTICLE I, SECTIONS 1 AND 7) SEPARATION OF POWERS ................................................................................................ 1444

SIXTH CAUSE OF ACTION (FIFTH AMENDMENT DUE PROCESS) VOID FOR VAGUENESS.................................................................................................................... 1455

SEVENTH CAUSE OF ACTION (SECOND AMENDMENT) RIGHT TO KEEP AND BEAR ARMS....................................................................................................... 1466

EIGHTH CAUSE OF ACTION (VIOLATION OF APA 5 U.S.C. § 706(2)(A)) NOT IN ACCORDANCE WITH LAW (NYSRPA v. BRUEN) ........................................................... 1499

NINTH CAUSE OF ACTION (VIOLATION OF 18 U.S.C. § 926) NO NATIONAL GUN REGISTRY ........................................................................................................................ 15050

TENTH CAUSE OF ACTION (VIOLATION OF FIRST AMENDMENT) FREEDOM OF SPEECH.............................................................................................................................. 1511

Now come Plaintiffs, by and through Counsel, and for their Complaint state as follows:

1.   Plaintiffs bring this action seeking a preliminary injunction to preserve the status quo, followed by a declaratory judgment and permanent injunctive relief restraining Defendants from enforcing various parts of an omnibus rulemaking[1] issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") of the U.S. Department of Justice on April 26, 2022, 2021R-05F, 87 FR 24652, and effective on August 24, 2022, entitled "Definition of 'Frame or Receiver' and Identification of Firearms" ("Final Rule").   As grounds therefor, Plaintiffs allege the following:

## JURISDICTION AND VENUE

2.   The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

3.   Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

## PARTIES

4.   Plaintiff Eliezer Jimenez ("Jimenez") is a firearms owner residing in Grants Fork, North Dakota, an American citizen, and is a member of Gun Owners of America, Inc.  Plaintiff Jimenez is eligible to possess firearms under state and federal law, and is an avid Second Amendment supporter who makes his own firearms from parts, including manufacturing complete frames and receivers from unfinished frames and receivers.  Plaintiff Jimenez buys his parts, including unfinished frames or receivers, tools, jigs, and other items to assist him in making firearms, from online retailers.  Given the breadth of the Final Rule, as explained further below, the ruling directly

---

[1] https://www.govinfo.gov/content/pkg/FR-2022-04-26/pdf/2022-08026.pdf.

impacts Plaintiff Jimenez by restricting his ability to acquire these parts, and also making it difficult if not impossible to determine what parts he is allowed to purchase online, and from which vendors, without exposing himself to potential criminal liability for undefined crimes, such as structuring.  Additionally, the Final Rule mandates of serialization of his privately made firearms when he takes his firearms to a gunsmith to be Cerakoted or otherwise to have them repaired, accessorized, etc.  *See* Affidavit of Eliezer Jimenez, Exhibit "60."

5.   Plaintiff Morehouse Enterprises, LLC d/b/a Bridge City Ordnance ("Bridge City") holds an active Federal Firearms License ("FFL"), deals in firearms, and is otherwise an entity regulated by federal law administered Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives. Plaintiff Bridge City is located in Valley City, North Dakota.  Plaintiff Bridge City currently is required to store FFL records for twenty years, or until the company ceases to be an FFL.  If the Final Rule is not enjoined prior to the effective date, Plaintiff Bridge City will be required to store FFL records *indefinitely*.  Plaintiff Bridge City, as explained further below and due to the Final Rule, also will be required to "mark" or engrave privately made firearms that it acquires, or on which it performs gunsmithing work.  *See* Affidavit of Tanner Morehouse, Exhibit "27."

6.   Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976, to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including residents of the district of North Dakota.  Many of these gun owners, like the individual plaintiffs, will be irreparably harmed by the ATF's sweeping

Final Rule, should it be allowed to go into effect on August 24, 2022.  *See* Affidavit of Kailey Patterson, Exhibit "61."

7.   Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOF was formed in 1983, and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country and within this district who, like the individual plaintiffs, will be irreparably harmed by the Final Rule, should it be allowed to go into effect on August 24, 2022. *See* Affidavit of Kailey Patterson, Exhibit "61."

8.   Many of the irreparable harms to GOA and GOF's members and supporters, which will be caused by implementation of the Final Rule, are alleged herein by GOA and GOF in a representational capacity on behalf of the interests of their members and supporters.

9.   Together, the members and supporters of GOA and GOF represent a diverse group, consisting not only of individual gun owners, but also industry partners comprised of members of the firearms community and industry, including but not limited to: licensed firearm importers, licensed firearm manufacturers, licensed firearm dealers, licensed firearm collectors, special occupational taxpayers who deal in National Firearms Act ("NFA") firearms, manufacturers of NFA firearms including silencers, and licensed gunsmiths, manufacturers, distributors, and retailers of unregulated firearm parts (including "80% frames and receivers") and solvent traps, and providers of technology, equipment, and software to manufacture homemade firearms.  *See* Affidavit of Kailey Patterson, Exhibit "61" at ¶7.

> a.   Members and supporters of GOA/GOF include recipients of ATF "classification letters" opining as to ATF's interpretation of various statutes, and providing ATF's

position on the legal status of various products.  As of August 24, 2022, many of these classifications may be revoked by the Final Rule, "grandfathered" by the Final Rule, or changed by the Final Rule.  *Id*. at ¶8.

b.   GOA/GOF's members and supporters also include law-abiding gun owners across the country who lawfully purchase, transfer, possess, own, customize, accessorize, and utilize all manner of firearms, including those regulated by both the National Firearms Act and the Gun Control Act.  Such persons include makers of homemade firearms (termed "privately made firearms" by the Final Rule) who purchase, transfer, possess, own, customize, accessorize, and utilize raw materials, firearm parts, 3D printers, and unfinished firearm frames and receivers in order lawfully to construct their own firearms.  *Id*. at ¶9.

c.   In other words, GOA/GOF's members and supporters are representative of many of those affected by the Final Rule, which has a ubiquitous and negative effect on the firearms community and the administration of federal gun control laws.  *Id*. at ¶ 10.

d.   Indeed, for each of the portions of the Final Rule challenged herein, GOA/GOF has numerous members and supporters who will be irreparably harmed by the Final Rule if it is allowed to go into effect on August 24, 2022.  In addition to the individual plaintiffs named herein, GOA and GOF bring this action on behalf of their members and supporters across the country, who will experience the same or similar irreparable harms.  Each of these persons and entities would have standing to challenge the promulgation and implementation of the Final Rule in their own right.  Protection of these rights and interests is germane to GOA/GOF's mission,

which is to preserve and protect the Second Amendment and the rights of Americans to keep and bear arms, including against overreach by unelected and unaccountable anti-gun bureaucrats. Litigation of the challenges raised herein does not require participation of each of GOA/GOF's individual members and supporters, and GOA/GOF are capable of fully and faithfully representing the interests of their members and supporters without participation by each of these individuals and entities. Indeed, GOA and GOF routinely litigate cases throughout the country on behalf of their members and supporters. *See Gun Owners of America, Inc., et al. v. Merrick B. Garland*, U.S. Supreme Court, No. 21-1215 (petition for certiorari pending).

10. In different ways and to varying degrees, each of these members and supporters of GOA/GOF will be irreparably harmed if the Final Rule goes into effect. Some will be subjected to ever encroaching, illegal and unconstitutional infringements of their right to keep and bear arms. Some will be conscripted into federal service to keep illegal records of privately made firearms on behalf of the federal government – records that are not required by any federal law. Some will have to dramatically change the nature of the way they do business, including the nature and types of products that they can offer for sale, in ways that Congress never intended, much less legislated. Some companies may have to close their doors entirely.[2] If the Final Rule

---

[2] *See* Regulatory Impact Analysis at 32 (estimating that "the remaining 42 non-FFLs will end up dissolving their businesses.").

takes effect, tens (if not hundreds) of millions of dollars of sales could be lost,[3] and hundreds (if not thousands) may lose their jobs.[4]

11. Due to the sweeping, omnibus nature of the Final Rule, which touches virtually every corner of the firearms community, it is hard to imagine who will *not* be harmed by the lawless and unconstitutional regulatory changes promulgated by ATF as part of the Final Rule.

12. Defendant U.S. Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.  DOJ is the agency responsible for enforcing federal firearms laws.

13. Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226.  ATF is delegated authority to enforce federal gun control laws.  *See* 18 U.S.C. Section 926(a); 26 U.S.C. Section 7805(a); 26 U.S.C. Section 7801(a)(2)(A).

14. Pursuant to President Biden's designation dated April 25, 2022, Defendant Gary M. Restaino is the Acting Director of ATF and is responsible for overseeing the agency's promulgation of the regulations challenged herein.

### I.   Background.

15. On May 21, 2021, Defendants published in the *Federal Register* a Notice of Proposed Rulemaking ("NPRM") entitled "Definition of 'Frame or Receiver' and Identification of Firearms," requesting comments.  *See* 86 FR 27720.

---

[3] ATF admits that it does not have any idea about the true scope of the impact of the Final Rule, explaining that "the agency does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, nor can ATF interview all firearm part manufacturers to determine their intended future actions upon publication of the final rule.  ATF can make estimates based on the best available information it can acquire … but it cannot determine with complete specificity the actual outcomes of the final rule."  *See* Regulatory Impact Analysis at 29.
[4] *See* Regulatory Impact Analysis at 42 ("employees will lose their jobs….").

16. Comments were accepted until August 19, 2021.

17. Plaintiffs GOA and GOF submitted extensive comments on the NPRM on June 6, 2021 (Comment ID ATF-2021-0001-44678) available online at: https://downloads.regulations.gov/ATF-2021-0001-44678/attachment_1.pdf.

18. On April 26, 2022, Defendants published in the *Federal Register* a "Final Rule" entitled "Definition of 'Frame or Receiver' and Identification of Firearms" ("Final Rule"). The Final Rule is scheduled to go into effect on August 24, 2022.

19. Several of the changes in the Final Rule, when compared to the NPRM, likely were made on the basis of GOA/GOF's comments. Other substantial flaws in the NPRM that were raised by the GOA/GOF comments were left entirely unaddressed and ignored by Defendants when adopting the Final Rule, meaning the ATF has failed to wrestle with several important issues.

20. At bottom, the Final Rule represents omnibus legislation by a federal administrative agency, seeking to broadly rewrite federal gun control laws to suit a radically anti-gun political agenda.

21. The Final Rule will sow chaos within large segments of the firearms community, from both the perspective of the industry and the perspective of consumers (law-abiding gun owners), including the individual and the members and supporters of the organizational plaintiffs herein.

22. The breadth of the Final Rule is massive in the changes to federal firearms law that it imposes on the American people by regulation (rather than by legislation). The Final Rule represents perhaps the most sweeping gun control scheme since the Gun Control Act of 1968, incorporating many of the restrictions found on the legislative wish lists of the nation's most radical anti-Second Amendment groups, but restrictions which Congress has never seriously considered (much less enacted).

23. These changes cannot be viewed in isolation, as the changes imposed in ATF's omnibus rulemaking work together to bring the nation much closer to an outcome clearly prohibited by the Second Amendment: (i) mandated serialization of all firearms (and some gun parts), enabling ATF to (ii) mandate federal recordkeeping of all firearms, followed by (iii) ATF forced collection of all such records, followed by (iv) entry of those records into a federal database amounting to registration of firearms and their owners.  And, as history has taught all too often, registration leads to confiscation.

### a.  Statutory History.

24. The 1938 Federal Firearms Act ("FFA") defined "firearm" to mean "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, **or any part or parts** of such weapon."  (Pub. L., Ch. 850, June 30, 1938) (emphasis added).

25. In 1965, in discussing a precursor to the Gun Control Act ("GCA"), Senator Thomas J. Dodd of Connecticut explained that "under existing law, the definition also includes weapons 'designed to' expel a projectile or projectiles by the action of an explosive, and firearm mufflers and firearm silencers.  The present definition of this term includes 'any part or parts' of a firearm. It has been *impractical to treat each small part of a firearm as if it were a weapon*."  (Emphasis added.)  Accordingly, Senator Dodd explained the need for a proposed change in that statutory definition as follows: "The revised definition substitutes the words **'frame or receiver'** for the words 'any part or parts.'"[5]  (Emphasis added.)

26. In 1968, Congress amended the "impractical" definition of "firearm" in the "Omnibus Crime Control and Safe Streets Act of 1968" (82 Stat. 1213-2, Public Law No. 90-351 (June 19,

---

[5] https://www.congress.gov/89/crecb/1965/03/22/GPO-CRECB-1965-pt4-10.pdf.

1968)) replacing the FFA's definition of "firearm" with the following:[6] "[t]he term 'firearm' means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; **the frame or receiver** of any such weapon; or any firearm muffler or firearm silencer; or any destructive device." (Emphasis added.)

27. On October 22, 1968, President Lyndon B. Johnson signed into law the Gun Control Act of 1968, whereby Congress finalized its language defining a "firearm" to its current form, which appears in 18 U.S.C. § 921(a)(3), and which reads as follows:[7] "(3) The term 'firearm' means (A) any *weapon* (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) **the frame or receiver** of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.  Such term does not include an antique firearm."  (Emphasis added.)

28. In sum, while the 1938 FFA had defined "any part or parts" of a firearm to be a firearm, the 1968 Gun Control Act substantially narrowed the definition of "firearm" to refer only to the single, most significant portion of the firearm, "the frame or receiver."

29. Moreover, the Gun Control Act explicitly states that it is not its "purpose … to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms…."  GCA of 1968, Pub. L. 90-618, § 101, 82 Stat. 1213.

**b.  ATF Adopts a Regulatory Definition of "Frame or Receiver."**

---

[6] https://www.govinfo.gov/content/pkg/STATUTE-82/pdf/STATUTE-82-Pg197.pdf#page=16.

[7] https://www.govinfo.gov/content/pkg/STATUTE-82/pdf/STATUTE-82-Pg1213-2.pdf.

30. The current definition of "firearm frame or receiver" was first proposed on November 6, 1968 by the Internal Revenue Service within the Department of the Treasury, the federal agency then responsible for enforcing federal gun laws.[8]  *See* 33 FR 16285.[9]

31. The definition for "firearm frame or receiver" was proposed as follows: "Firearm frame or receiver. That part of a firearm which provides housing for the hammer, bolt or breechlock [sic] and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *See* 33 FR 16287.

32. Prior to finalizing that proposed rule, ATF held a short notice and comment period and a hearing which took place on November 21, 1968.[10]

33. On December 14, 1968, the proposed definition of "frame or receiver" was formally adopted. *See* 33 FR 18555[11] (then codified at 26 C.F.R. § 178.11, and today appearing at 27 C.F.R. § 478.11). The only change to the proposed definition of "firearm frame or receiver" was to remove the word "breechlock" and substitute the word "breechblock."

34. That 1968 definition, which has remained unchanged for almost 54 years, reads as follows: "Firearm frame or receiver. That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  27 C.F.R. § 478.11.

### c.  ATF Feigns Ignorance of Modern Firearms.

---

[8] For simplicity's sake, this Complaint at times uses the acronym ATF even though the bureau's predecessor agency may have been involved at the time.

[9] https://www.govinfo.gov/content/pkg/FR-1968-11-06/pdf/FR-1968-11-06.pdf.  On March 31, 1978, the ATF was reorganized and the code sections were renumbered with no change to the definition of "firearm frame or receiver." *See* 43 FR 13537 (definitions renumbered to 27 C.F.R. § 478.11).

[10] On November 29, 2021, GOA/GOF filed a Freedom of Information Act request with ATF, the National Archives and Records Administration, and the Alcohol and Tobacco Tax and Trade Bureau within the Treasury Department, seeking records related to that 1968 rulemaking, including comments that were submitted by the public. Exhibit "1."  NARA and TTB both reported they were unable to find responsive records.  Exhibits "2" and "3."  The ATF is still processing GOA/GOF's request.

[11] https://www.govinfo.gov/content/pkg/FR-1968-12-14/pdf/FR-1968-12-14.pdf.

35. ATF's 1968 definition of "firearm frame or receiver," however, proved to be immediately problematic as an increasing number of firearms were manufactured which did not contain any single "part" which houses all of the requisite parts (hammer, bolt, firing mechanism) contained in ATF's regulatory definition.

36. In the NPRM, ATF played the victim, claiming that when the 1968 regulation defining "frame or receiver" was adopted more than 50 years ago, certain modern firearm designs were not as popular as they are today, and it was only "[y]ears after these definitions were published [that] split/multi-piece receiver firearms … became popular."   NPRM at 27721.  The NPRM further claimed that, at the time the 1968 regulation was adopted, "single-framed firearms … were far more prevalent for civilian … use in the United States than split receiver weapons."  *See* Final Rule at 24654 (acknowledging the claim made by the NPRM).

37. On the contrary, ATF could not plausibly claim ignorance of modern weapons because, *well before* the existing regulation was adopted in 1968, ATF was aware that numerous firearm designs were in wide circulation which did not contain a "frame or receiver" under the 1968 definition.

38.  For example, in 1963 ATF examined and classified a Colt "AR-15 Sports Version Rifle," which utilized a "split/multi-piece receiver firearm."  *See* ATF Letter to Colt's Patent Firearms Manufacturing Company, Inc., Dec. 10, 1963.[12]  Although prior versions of the AR-15 had been fully "automatic rifle[s]" (machineguns), ATF determined that Colt's "Sports Version" AR-15 was "not a 'firearm' in the machinegun category" under the National Firearms Act of 1934 ("NFA"). *Id.*  Similarly, in 1961, ATF examined and classified[13] the "F. N. Browning light rifle, caliber 7.62

---

[12]  Exhibit "4."
[13]  http://www.titleii.com/bardwell/atf_letter79.txt.

mm," an early imported version of the FN FAL rifle which contains a "split" upper receiver and a lower receiver.

39. Likewise, ATF certainly would have been aware of various handguns that were widely available prior to 1968, and which included *both* a frame *and* a slide, of which *neither* fit ATF's 1968 regulatory definition of "frame or receiver."  For example, the Smith & Wesson Model 39, which included both a frame and a slide, was manufactured between 1954 and 1966.  *See* J. Supcia & R. Nahas, Standard Catalog of Smith & Wesson, 2nd Ed. (Krause Publications: 2001), p. 223. Likewise, the Colt Model 1911 handgun, designed by John M. Browning, first entered military service in the same year and had become highly popular with the American public by the end of World War II, long before ATF's 1968 rulemaking.[14]  Finally, the Browning Hi-Power pistol had become ubiquitous long before ATF's 1968 rulemaking.[15]  All of these firearms (existing in 1968) have both a frame and a slide, which contain different parts from ATF's prior "frame or receiver" regulation, and thus no single part which meets the definition by itself.

40. In other words, contrary to ATF's representations in the NPRM, for decades prior to ATF's adoption of its 1968 regulatory definition of "frame or receiver," there were countless examples of "popular … split/multi-piece receiver firearms" in existence.  *See* NPRM at 27721.  These examples, as explained in GOA/GOF's comments, demonstrate that ATF knew (or should have realized) that its 1968 regulatory definition of "frame or receiver" would not apply to *many* of the firearms even then in existence.

41. Apparently sensitive to the comments made by GOA/GOF, the Final Rule pivots away from the claim that ATF could not have been aware of modern firearm designs when it adopted the 1968 regulation.

---

[14] https://www.browning.com/news/articles/history-1911-pistol.html.
[15] https://www.thearmorylife.com/the-story-of-john-brownings-hi-power/.

42. Rather, the Final Rule now *makes precisely the opposite claim*, admitting that "[a]t the time the current definitions were adopted, there were numerous models of firearms that did not contain a part that fully met the regulatory definition of 'frame or receiver,' such as the Colt 1911, FN-FAL, and the AR-15/M-16…."  Final Rule at 24655.

43. Rather than acknowledging that its claims in the NPRM were erroneous, ATF simply changes course 180 degrees in the Final Rule, without further explanation.

### d.  ATF's Newly Adopted Definition Immediately Proves Unworkable.

44. Although apparently cognizant of the fact that its 1968 definition of "frame or receiver" was unworkable from the very outset, ATF has never (until now) seen fit to amend that regulatory definition.  Indeed, the 1968 regulatory definition of "frame or receiver" has been unchanged until ATF's issuance of the Final Rule.

45. On the contrary, rather than amend its longstanding but unworkable definition to better describe what constitutes the "frame or receiver" of a firearm, over the years ATF instead has simply ignored its own regulation, arbitrarily choosing (seemingly to suit the agency's agenda) different parts of different firearms as "the frame or receiver" for a given make and model firearm.

46. Without identifying any operating principle, and thus without rhyme or reason, ATF has classified the "upper" of some types of firearms as "the frame or receiver," but has classified the "lower" of other types of firearms as "the frame or receiver," even though neither upper nor lower contains all the parts required by ATF's 1968 definition.

47. Such erratic classifications apparently have been made by ATF based on field-expedient considerations such as: (i) how various firearms previously had been marked (manufacturer, model, caliber or gauge, city and state, and serial number, *see* 27 C.F.R. § 478.92) by their manufacturers prior to 1968, (ii) how various firearms were marked by European and other

overseas manufacturers and/or marked by importers when imported, and (iii) by considering the utility and practicality of marking various parts (for example, whether a part contains a flat enough surface sufficient for marking).

48. Indeed, an ATF expert testified in a criminal case that "there is no 'objective classification scheme or system in place'" for determining which part of a firearm is "the frame or receiver." Exhibit "5," page 4.

49. Whatever the reasons behind its existing arbitrary classifications, ATF's "frame or receiver" classifications have *never* been based on the 1968 regulatory language because, as noted above, many (if not most) firearms do not fall within that language.

50. Indeed, ATF reports that today, "as many as 90 percent of all firearms now in the United States would not have any frame or receiver subject to regulation under the current definitions." Final Rule at 24655.

51. Unable to provide any rationalizing principle for its existing classification scheme, ATF now claims that its "position has long been that the weapon 'should be examined with a view toward determining if [either] the upper half or lower half of the receiver ***more nearly fits*** the legal definition of 'receiver'….'" *Id*. at 24655 (emphasis added).

52. But "nearly" is not how the law works, especially when it comes to the precise, highly technical, regulatory definition of "frame or receiver."

### e.   ATF Acts Arbitrarily and Capriciously.

53. Choosing for decades not to provide a workable regulatory definition of "frame or receiver," ATF instead has chosen to make classification decisions arbitrarily, as it goes along.

54. In the ATF National Firearms Act Handbook  (April 2009 revision),[16] ATF provides a list of various types of weapons for which it has arbitrarily classified different portions of the firearm to be the "frame or receiver."

55. The examples that ATF provides in its Handbook demonstrate the arbitrariness of the agency's various classifications over the years:

| Model | Receiver |
|---|---|
| French MAT 49 | upper |
| German MP38 & MP40 | upper |
| H&K G3 (all variations) | upper |
| H&K MP5 (all variations) | upper |
| IMI UZI | upper |
| M61 Vulcan | outer housing |
| M134 Minigun | outer housing |
| Maxim MG08 and 08/15 | right side plate |
| SIG AMT | upper |
| SIG STG 57 | upper |
| SIG 550 Series (all variations) | upper |
| Soviet PPsH 41 | upper |
| Soviet PPS 43 | upper |
| Steyr MPi 69 | upper |
| Steyr MPi 81 | upper |
| Thompson submachinegun (all variations) | upper |
| Vickers water cooled machineguns | right side plate |

56. For example, in 2008 (the year before ATF's 2009 Handbook was released), the agency issued ATF Ruling 2008-1,[17] explaining that "[t]he FNC rifle consists of two major assemblies, the upper assembly and the lower assembly" and that, "[s]ince 1981, ATF has classified **the lower assembly** as the receiver for purposes of the GCA and NFA."  (Emphasis added.)

---

[16] https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.
[17] https://www.atf.gov/firearms/docs/ruling/2008-1-fabrique-nationale-herstal-sa-fn-fnc-rifle.

57. Although freely admitting that neither receiver houses all the requisite parts since "[t]he lower assembly houses the … hammer" while "[t]he upper assembly houses a … bolt," ATF decided to "reconsider[] its classification of the lower assembly of the FNC rifle as the receiver," and change its classification, now claiming that "[**t]he upper assembly** of the FNC rifle is ***more properly classified*** as the receiver."  *Id*. at 1-2 (emphasis added).

58. In other words, after admitting that *neither* the upper *nor* lower receiver is accurately classified as a firearm under the regulation, ATF arbitrarily decided to change from one arbitrary decision regulating one part (which ATF admitted does not constitute a "frame or receiver") to another arbitrary decision regulating a different part (which ATF similarly admitted does not constitute a "frame or receiver.").

59. ATF's only reason for its new, changed, yet still arbitrary position was that the upper assembly was "*more* properly classified as the receiver," even though admitting that neither part is *actually* the receiver.

60. As another example, both the AR-15 and the FAL rifles (like the FNC) have hammers which are housed in their lower receivers, and bolts which are housed in their upper receivers.  In other words, neither firearm contains a single part which meets ATF's regulatory definition.

61.  Yet in 1971, ATF classified the *lower receiver* of the M-16 (the fully automatic version of the AR-15) as the "frame or receiver" (*see* Exhibit "6") and, in 1977 classified the *upper receiver* of the FAL to be "the frame or receiver."  *See* Exhibit "7."

62. As with the FNC, ATF's 1971 classification (Memorandum #21208) of the M-16 (AR-15) adopted the lower receiver as the "frame or receiver" because it "***comes closest*** to meeting the definition of frame or receiver in 26 CFR 178.11 although both parts were necessary to function as a 'frame or receiver'…."  *Id*. (emphasis added).

63. This 1971 letter shows that ATF was simply ignoring its regulatory definition only three years after it adopted it.

64. What's more, that 1977 ATF Memo #22334, discussing classification of the FAL rifle, openly admitted that ATF's classification was based neither on the definition in the regulation nor the statute.

65. Instead, ATF explained that "the FN FAL rifle was designed to fire automatically," but "FN FAL rifles have been imported which utilize an upper receiver which was designed and manufactured to fire semi-automatically." Exhibit "7."

66. Thus, ATF's arbitrary determination that the upper receiver of the FAL is "the frame or receiver" was based on the fact that "the design of the upper half of the receiver is the only distinguishing characteristic between those semi-automatic FN FAL rifles … and the true 'sporting' version…." *Id*.

67. In other words, ATF's classification of the FAL rifle was based neither on the *Gun Control Act,* nor on ATF's 1968 regulation. Rather, ATF's classification was based on unrelated considerations grounded in the *National Firearms Act* of 1934.

68. In sum, ATF cannot (and indeed never could) faithfully apply its own 1968 regulation defining "frame or receiver," because many (if not most) firearms do not (and did not) have a single housing that contains all of the requisite parts that ATF chose to include in its regulation.

69. On the contrary, for decades the agency has just created frame or receiver classifications out of whole cloth, completely ignoring its own regulation. For example, as noted above, ATF has classified the "side plate" of certain firearms as the receiver, even though a flat piece of metal does not contain *any* of the requisite parts under the regulation.

70. In so doing, ATF willy-nilly has classified both upper receivers and lower receivers as "firearms," even though it is usually the case that neither of these parts fully meets the regulatory definition of "frame or receiver."

### f.   ATF Faults the Courts for Faithfully Applying the Regulation ATF Promulgated.

71. Unsurprisingly, the courts have found fault with ATF's arbitrary and capricious firearm classification regime.

72. Specifically, the Final Rule references three decisions in which a federal district court found that the "lower receiver" of an AR-15 (the part ATF says is the "receiver") is not a "firearm" at all, because it *lacks* all of the requisite parts that ATF's regulation mandates a firearm "frame or receiver" *must include*. *See* Final Rule at 24655. *See also United States v. Rowold*, 429 F. Supp. 3d 469, 475-77 (N.D. Ohio 2019) ("The language of the regulatory definition in § 478.11 lends itself to only one interpretation: namely, that under the GCA, the receiver of a firearm must be a single unit that holds three, not two components: 1) the hammer, 2) the bolt or breechblock, and 3) the firing mechanism."); *United States v. Jimenez*, 191 F. Supp. 3d 1038, 1041 (N.D. Cal. 2016) ("a receiver must have the housing for three elements: hammer, bolt or breechblock, and firing mechanism."); *United States v. Joseph Roh*, SACR 14–167–JV, Minute Order p. 6 (C.D. Cal. July 27, 2020) (noting of an AR-15 lower receiver that "'[n]o reasonable person would understand that a part constitutes a receiver where it lacks the components specified in regulation')."

73. In none of these cases did ATF pursue an appeal of the district court decision rejecting ATF's classification of the AR-15.  (*Jimenez* was appealed but then voluntarily dismissed by the United States.  *See USA v. Alejandro Jimenez*, 16-10342 (9th Cir. 2016) Docket Entry 2, (filed on Oct. 3. 2016.)

74. On the contrary, in response to the *Jimenez* decision, then-Attorney General Loretta Lynch wrote a letter to then-Speaker Paul Ryan, noting that the AR-15 lower receiver does "***not perfectly fit*** the CFR section definition," and concluding that "this case [*Jimenez*] is not a suitable vehicle for appellate review."[18]  (Emphasis added.)

75. Attorney General Lynch concluded her letter by recommending that "[t]o the extent that [ATF] believes that the definition should encompass the lower receiver of an AR-15 or should otherwise be modified or clarified, the appropriate course is regulatory or administrative action, not an appeal of the district court's decision in this case."

76. Similar to the harmonious conclusions of these three district courts cited in the ATF rulemaking, rejecting ATF's classification of the AR-15 lower receiver as "the frame or receiver" and thus a "firearm," an 8th Circuit panel recently upheld a conviction for a felon-in-possession charge.  *See U.S. v. Luke Joseph Burning Breast*, 8 F.4th 808 (8th Cir. 2021).  There, the court concluded that the jury had sufficient evidence to find that an AR-15 upper receiver (in addition to its serialized lower receiver) had crossed state lines, establishing the requisite "nexus" to sustain a federal charge.  In so holding, all three judges (both majority and dissent) implicitly recognized that establishing a "nexus" for the lower receiver of an AR-15 *alone* would have been insufficient to establish that a "frame or receiver" and thus a "firearm" has been possessed.

77. These four uniform court opinions are manifestly correct in applying the plain language of ATF's current regulatory definition of "firearm frame or receiver" to conclude that the lower receiver of the AR-15 is not a "frame or receiver" under the agency's existing regulation.

78. Yet ironically, ATF *blames the courts* for having faithfully applied the language in the agency's definition of "frame or receiver," claiming that judges have "misinterpreted" the

---

[18] *See* https://www.justice.gov/oip/foia-library/osg-530d-letters/9_8_2016/download.

regulation, on the theory that "the current definitions were never intended to be, or understood to be, exhaustive."  NPRM at 27721-22, *see also* Final Rule at 24655, 24661 (based on a "restrictive application of these definitions … some courts recently have treated the regulatory definition as inflexible," and the Final Rule is needed "so that the courts … no longer misinterpret the term to mean that most firearms in circulation have no parts identifiable as a frame or receiver.").

79. The Final Rule claims that the courts' "narrow interpretation of what constitutes a frame or receiver" based on the existing regulation will "allow persons to avoid obtaining a license" for manufacturing or importing, "allow [] persons to avoid … marking, recordkeeping, and background check requirements," allow "prohibited persons" to obtain firearms, "severely impede[] law enforcement's ability to trace semiautomatic firearms later used in crime," and thus "undermine the intent of Congress…."  Final Rule at 24655.

80. But then, after blaming the courts for this myriad of evils, the Final Rule openly acknowledges what has been obvious since 1968 – that "neither a split nor a multi-piece receiver has a portion of its design that falls within the precise wording of the existing regulatory definition."  Final Rule at 24655.

81. Yet rather than accept fault for its own regulatory shortcomings, ATF instead attempts to justify its having ignored its own regulation, claiming that "existing law and congressional intent recogniz[e] that the definition of 'frame or receiver' need not be limited to a strict application of the regulation."  Final Rule at 24655.

82. Quite to the contrary, as a federal judge has already explained, "ATF is reading out of the regulation express requirements for a receiver.  That is not reasonable."  Exhibit "5" at page 6.

83. The NPRM noted that, "ATF has for many years interpreted the regulatory definition using these factors [the requisite parts in 478.11] as a guide in determining which portion of a weapon model is a firearm frame or receiver." NPRM at 27721.

84. In other words, according to the NPRM, ATF has not believed itself obligated to apply its own regulation faithfully, but instead has constructed a system where the existing regulation is read loosely (or not at all), and with ATF asserting the authority to make classifications (including the accusations of federal felony crimes) based on *whatever ATF wants the law to be*, based on whatever considerations ATF deems appropriate at the time. *See* Final Rule at 24655 (noting that "[t]he NPRM listed the variety of factors ATF has considered when making determinations for firearm classifications under the GCA and NFA regarding which part of a firearm is the frame or receiver.").

85. In other words, ATF views its own regulation (and even the statute Congress enacted) as a type of "best practices" set of guideposts that are to be used fluidly when practicable, but ignored when inconvenient.

86. Its past misdeeds having caught up with it, ATF apparently now seeks to amend the regulatory definition to cover its tracks.

## II.    New Regulatory Definition – "Frame or Receiver."

87. This section challenges the Final Rule's promulgation of the following regulations:

a.   27 C.F.R. § 478.12(a) – Definition of Frame or Receiver (87 FR 24735 to 24738);

b.   27 C.F.R. § 478.12(d) – Multi-piece frame or receiver (87 FR 24739);

c.   27 C.F.R. § 478.12(f) – Frame or receiver classifications based on which part of the weapon was classified as such before August 24, 2022 (87 FR 24739 to 24741);

d.   27 C.F.R. § 478.92(a)(1)(iii) – Multi-piece frame or receiver (87 FR 24741);

    e.  27 C.F.R. § 478.92(a)(1)(v) – Frames or receivers designed before August 24, 2022 (87 FR 24743); and

    f.  27 C.F.R. § 479.102(a)(3) – Multi-piece frame or receiver (87 FR 24747).

88. The Final Rule asserts that the existing regulatory definition of "frame or receiver" has resulted in a situation where "as many as 90 percent of all firearms … in the United States would not have any frame or receiver subject to regulation." *Id*. at 24652.

89. However, rather than acknowledge its responsibility for its regulations having caused this situation, the ATF instead blames the courts and claims that the Final Rule's *new* definition of "frame or receiver" will ensure "that the courts … no longer *misinterpret* the term to mean that most firearms in circulation have no parts identifiable as a frame or receiver." *Id*. at 24661 (emphasis added).

90. Similarly, the NPRM had claimed that the new definition it proposed would "help ensure that the regulatory definition of 'frame or receiver' will not be misinterpreted by the courts" in the future.  NPRM at 27727.

91. However, although the NPRM and the Final Rule are consistent in claiming that promulgation of a brand-new definition of "frame or receiver" will correct the purportedly misguided federal court system, these two documents take *entirely different approaches* to creating a new definition for "frame or receiver."

92. In fact, after receiving widespread and justified criticism (including in comments submitted by GOA/GOF and their members and supporters) of ATF's cockamamie definition of "frame or receiver" originally proposed in the NPRM, the Final Rule made a volte-face, walking back the NPRM's definition and proposing an *entirely different approach* to defining what constitutes a firearm's "frame or receiver" under federal law (explained further in Sections II.a. and II.b., *infra*).

93. As a preliminary matter, then, because the Final Rule is a 180 degree change from the NPRM, it cannot be considered a "logical outgrowth" of the NPRM and must be reconsidered under a new notice and comment proceeding.

94. Indeed, ATF never publicly announced the definition of "frame or receiver" promulgated in the Final Rule, nor did the agency seek comment from the public prior to publishing the Final Rule.

95. Yet it is well established law that "a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation and punctuation omitted).  Likewise, a logical outgrowth "does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005).

96. ATF's "repudiat[ion] of [its] proposed interpretation" of the statute in the Final Rule, and adoption of an entirely new, unrelated, and completely different definition of "frame or receiver" constitutes a gross failure under the APA's Notice requirement and, for that reason, the Final Rule should be subjected to a new round of notice and comment proceedings.

97. The Final Rule's adoption of an entirely new definition of "frame or receiver," using a completely different approach from the NPRM, violates the APA's requirement for notice and comment rulemaking, and has deprived GOA and GOF, along with their members and supporters, of the opportunity to provide valuable input on the Final Rule.  Indeed, the Final Rule numerous

times responds to comments made by GOA/GOF and their members and supporters, and even implements some of their suggestions.  *See* Exhibit "61," Patterson Affidavit at ¶15.[19]

98. In other words, had ATF asked the public prior to promulgating the new definition of "frame or receiver" in the Final Rule, ATF may well have changed the definition (again).

### a.   The NPRM Would Have Regulated Most Gun Parts As "Firearms."

99.   In the NPRM, ATF initially proposed to redefine "the frame or receiver" to be:

*A* part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or other attachments are required to connect those components to the housing or structure. *Any such part* identified with a serial number shall be presumed, absent an official determination by the Director or other reliable evidence to the contrary, to be *a* frame or receiver. For purposes of this definition, the term "fire control component" means a component necessary for the firearm to initiate, complete, or continue the firing sequence, including any of the following: Hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails.  [NPRM at 27741 (emphasis added.)]

100. Of course, it does not take a law degree or a mastery of the principles of statutory interpretation to recognize the obvious disparity between a statute which envisions that each firearm will have *one* single part defined as "*the* frame or receiver" and a regulation which provides that firearms have *multiple* regulated parts, each independently constituting a separate "frame or receiver."

101. In fact, the NPRM expressly acknowledged the history of the Federal Firearms Act which, prior to enactment of the GCA in 1968, had "regulated *all firearm parts*."  NPRM at 27720 (emphasis added).  The NPRM conceded that, with adoption of the GCA, "Congress recognized that regulation of all firearm parts was impractical," and thus the GCA specifically replaced the language "any part or parts" with "the frame or receiver."  *Id.*

---

[19] Tens of thousands of gun owners submitted comments to ATF regarding the NPRM based on templates provided by GOA/GOF.

102. Nevertheless, the NPRM proposed a regulation which would have transformed the nation's federal firearms regulations to a system not unlike the repudiated FFA, wherein all "the major *parts* of a weapon" are regulated and manufacturers must "mark[] these *parts*" and "record[] these *parts* as 'firearms.'"   NPRM at 27722 (emphasis added); *see also* at 27734 (noting "the possibility that a firearm *may have more than one frame or receiver* as defined in this rule….") (Emphasis added).

103. Unsurprisingly, the NPRM received widespread public backlash with respect to its attempt to hijack and rewrite the statutory term "the frame or receiver" to suit ATF's policy agenda, including in comments submitted by Plaintiffs GOA/GOF on behalf of their members and supporters. *See* Exhibit 33.

104. GOA/GOF's comments submitted in response to the NPRM explained that, under the proposed definition of "frame or receiver," most modern firearms would contain numerous frames and receivers, each of which would become a regulated part under federal law. *Id*. at 10.

105. As GOA/GOF explained, applying the NPRM's definition to a rifle like the ubiquitous AR-15 might result in as many as (or more than) ***ten*** regulated frames and receivers (even including its ammunition magazine). *Id*. at 17-22.  Plaintiffs then illustrated their comments with a YouTube video[20] explaining how a popular Glock-style handgun might contain as many as ***sixteen*** frames and receivers under the NPRM's definition.

106. GOA/GOF's comments explained that the NPRM's proposed definition was "patently contrary to the language of the statute and the intent of Congress, which is that each firearm contain only one component frame or receiver." *Id*. at 12.

---

[20] https://www.youtube.com/watch?v=CHhcOki1OnE.

107.  As GOA/GOF explained, firearms are not Russian babushka nesting dolls.  The phrase "the frame or receiver" unambiguously means that a firearm has *either one frame or one receiver*.

108.  Apparently recognizing the writing on the wall and believing that it likely would not get away with its deliberate attempt to "*more broadly define* the term 'frame or receiver' than the current definition" (NPRM at 27727), the Final Rule backs off of the NPRM's expansive definition of "frame or receiver."

109.  After acknowledging GOA/GOF's comment that "firearms like the AR-15 may now include as many as ten frames or receivers," the Final Rule "agrees with commenters that the definition of 'firearm' in 18 U.S.C. Section 921(a)(3)(B) is best read to mean a single part of a weapon or device as being 'the' frame or receiver," and "whereas the proposed rule would have considered any housing or structure for any fire control component a frame or receiver, the final rule focuses these definitions by describing a specific housing or structure for one specific type of fire control component."  *Id*. at 24692-93.  *See also* at 24683 ("the context of the singular terms 'frame' and 'receiver' suggests that a firearm *only has one* frame or receiver.") (emphasis added).

110.  However, even while conceding ATF's egregious error in the NPRM, the Final Rule "disagrees" that the statute "*must* be read to mean that a firearm may not have more than one frame or receiver," and that "it is *possible* that the term 'frame,' for example, could be referring to multiple frames within a handgun, or both a frame and a receiver in a split handgun design."  *Id*. at 24683 (emphasis added).

111.  In other words, according to the Final Rule, the most basic and fundamental definition in the Gun Control Act is ambiguous – open to multiple possible interpretations.

112.  On the contrary, the statute is not unclear as to whether a firearm contains only one frame or receiver, leading to the "on one hand … on the other hand" approach taken in the Final Rule.

*Id.* at 24683.  ATF simply has no discretion to decide how many frames and receivers a firearm contains.  The statute clearly sets the limit – one.

> **b. The Final Rule Now Concedes that *Most* Firearms Have One Frame or Receiver.**

113.  Proposing a definition *entirely different* (and in no way a logical outgrowth) from that proposed in the NPRM, the Final Rule now would define the "frame or receiver" of a firearm appearing in 27 C.F.R. § 478.12, in pertinent part, as follows:

(a) Except as otherwise provided in this section, the term "frame or receiver" means the following—

(1) The term "frame" means the part of a handgun, or variants thereof, *that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component* prior to initiation of the firing sequence (i.e., sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

(2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, *that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent)*, even if pins or other attachments are required to connect such component to the housing or structure.

(3) The terms "variant" and "variants thereof" mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver.  [*Id.* at 24735.]

114.   As the Final Rule explains, this new definition is "intended to describe the specific part of weapons that has traditionally been considered the frame or receiver for almost all firearms, but [is] general enough to accommodate future designs and changes in parts terminology.  The few exceptions, such as the AR-15 rifle and Ruger Mark IV pistol, are grandfathered into the new definitions of those terms and may continue to be marked in the same manner as they have been prior to the effective date of this rule."  *Id.* at 24695.

115.  The Final Rule then provides various examples of how its new definition purportedly comports with *most* frame/receiver classifications that already have been made by ATF (Final Rule at 24735-24738).

116.  Next, the Final Rule creates a new section, 27 CFR § 478.12(f), to read as follows:

*(f)(1) Frame or receiver classifications based on which part of the weapon was classified as such before April 26, 2022.*  Except as provided in paragraph (f)(2) of this section, the terms "frame" and "receiver" shall include the specific part of a complete weapon, including variants thereof, determined (classified) by the Director to be defined as a firearm frame or receiver prior to April 26, 2022.

Any such part that is identified with an importer's or manufacturer's serial number shall be presumed, absent an official determination by the Director[21] or other reliable evidence to the contrary, to be the frame or receiver of the weapon.

The following is a nonexclusive list of such weapons and the specific part determined by the Director to be the firearm frame or receiver as they existed on that date.  [*Id*. at 24739 (emphasis added).]

117.  The Final Rule then provides four such "nonexclusive" examples of types of firearms whose receiver was classified *in conflict with* the Final Rule, and which will continue to be classified in conflict with the Final Rule.  *Id*. at 24740-41.  ATF calls this the "'grandfather' supplement…."  *Id*. at 24693.

118.  However, the Final Rule *does not list all* such examples on ATF's vague and arbitrary "nonexclusive list" of firearm types that will continue to be classified as they were prior to April 26, 2022, some in contradiction to how they would be classified under the Final Rule.

119.  This lack of precision in the Final Rule necessarily will leave the industry, the Plaintiffs, and the public (including members and supporters of GOA/GOF) (*see* Patterson Affidavit at ¶38,

---

[21]  Of course, the Director is *not required* to make such a determination.  Rather, ATF proposes to grant itself the authority to act arbitrarily, without any responsibility to act at all, creating a system whereby ATF can pick and choose when to make an optional "determin[ation]" that a certain part is or is not a firearm.  This invites arbitrary and capricious actions on the part of the agency, permitting it to hand out favorable determinations to preferred firearm models or gun manufacturers, while refusing to do so for disfavored companies or firearms.

¶42) in a position of uncertainty as to how the "frame or receiver" of certain firearms will be classified, as ATF on the one hand claims that "letter rulings are applicable only for the precise sample submitted to ATF" (*id*. at 24691), but also now claims that certain of those same nonprecedential rulings *will* have some sort of precedential value when it comes to what constitutes the frame or receiver of a certain type of firearm (*id*. at 24739).[22]

120. If ATF wished that various of its unspecified *and nonpublic* classification letters, in addition to the "nonexclusive" examples provided in its "grandfather supplement" in the Final Rule, to continue to apply despite their *direct conflict* with the Final Rule's definition of "frame or receiver," then ATF could and should have examined *all* of its existing classification letters, identified *all* such examples, and made *all* such letters publicly available.

121. Instead, the Final Rule serves to sow confusion, with its vague and indeterminate "nonexclusive" list of firearms to which the new definition of "frame or receiver" apparently does not apply.

### c. However, under the Final Rule, Some Firearms Will Still Have Multiple Frames or Receivers.

122. As noted, the NPRM original had proposed the "possibility a firearm may have more than one frame or receiver…." NPRM at 27734. The Final Rule, however, walks back that claim, and promises that "*there should be only one* 'frame or receiver' in a given weapon or device," and

---

[22] Nor does the Final Rule *explain how* the Director will make any voluntary "determin[ation]" as to which portion of a firearm is "the frame or receiver." Presumably, the Director will follow the new regulatory definition. However, the NPRM previously proposed a convoluted, seven-part, non-exclusive test for determining the "frame or receiver," "with no single factor being controlling," and purporting to include "a variety of factors … ATF has considered … [s]ince it began issuing firearm classifications under the GCA…." *Id*. at 27743. These factors in the NPRM, which provided no fixed standards or guideposts, nor any explanation of how each of ATF's seven "factors" will be objectively measured or applied, do not appear in the Final Rule. However, nor does the Final Rule explicitly reject this prior convoluted test, leaving it entirely to speculation how ATF will issue firearm classifications moving forward while reserving unto itself the absolute discretion whether to even render a classification at all.

ATF's promise that "[t]he new definitions under 'frame or receiver' focus on only *one* housing or structural component for a given type of weapon." *Id*. at 24696, 24704 (emphasis added).

123.  Unfortunately, in spite of that promise, it is apparent that some firearms will continue to have *more than one* frame or receiver under the Final Rule, in direct violation of the statutory text it purports to implement. *Id*. at 24696, 24704.

124. **First**, as noted above, the Final Rule's definition in 27 C.F.R. § 478.12(f)(1) contains language that "*[a]ny such part* that is identified with an importer's or manufacturer's serial number *shall be presumed*, absent an official determination by the Director or other reliable evidence to the contrary, *to be the frame or receiver* of the weapon." *Id*. at 24739 (emphasis added).

125.  This language conflicts with the statute and conflicts with the Final Rule's promise that each firearm have only one "frame or receiver" and should be struck.

126.  This language, "presum[ing]" any serialized part of a firearm to be a "frame or receiver," is a remnant from the NPRM, wherein firearms would have multiple frames and receivers, and should be struck.  It has no place in the system established by the Final Rule, wherein firearms have "only one 'frame or receiver.'" *Id*. at 24704.

127.  Indeed, this "presum[ption]" language conflicts with the Final Rule itself, which instructs that:

> a.  If there <u>is no prior ATF classification</u> of a given firearm, then it should be analyzed under the Final Rule, wherein "the frame or receiver" is the "housing" for a certain "primary … component." *Id*. at 24735.

> b.  If there <u>is a prior ATF classification</u> of a given firearm, then the part identified in that classification is "the frame or receiver." *Id*. at 24739.

> c. If there <u>is no prior ATF classification</u> of a given firearm, then "any such [serialized]
> part" should be "presum[ed]" to be a "frame or receiver." *Id.*

128. In other words, the Final Rule <u>dictates two conflicting approaches</u> (subsections (a) and (c) above) for determining "the frame or receiver" of a firearm where ATF has not previously issued a classification. Indeed, it is entirely possible that the part(s) identified pursuant to subsection (c) would differ from the part identified under subsection (a).

129. Moreover, if it is to be "presumed" that "any such [serialized] part" of certain firearms are frames or receivers, that means that certain firearms will be "presumed" to have more than one frame or receiver. Yet this is in direct conflict with the Final Rule's promise that "there should be only one 'frame or receiver' in a given weapon or device." Indeed, there is no need to "presume[]" that "**any such part** … identified with a[] serial number [is] the frame or receiver," because the Final Rule's definition of "frame or receiver" should establish which part is regulated, *regardless* of the presence of a serial number.

130. What is more, many modern firearms contain *several* non-firearm parts which are serialized. For example, many handgun manufacturers serialize *multiple* parts of the firearm, such as a Glock handgun, wherein the frame,[23] barrel, and slide[24] are serialized. Such marking is often a requirement for a particular firearm to be sold in foreign countries, such as in Europe. In Europe, a rifle's bolt is the serialized component, but that would not be the "frame or receiver" under the Final Rule's definition. When imported into the United States, many rifles such as AK-47 variants have serial numbers appearing in *multiple* locations, but that does not make all those parts frames and receivers.

---

[23] https://bit.ly/3O9Pwv1.
[24] https://bit.ly/3N8WgIe.

131.  The serialization of parts by a manufacturer in order to comply with the laws of *other countries* has no bearing on whether such parts constitute "firearms" or "the frame or receiver" under the Gun Control Act.  That would leave it up to the European Union to decide what parts constitute "firearms" under the Gun Control Act.

132.  Even though the Final Rule promises that firearms will not have "as many as ten regulated frames or receivers" (*id*. at 24692), Section 478.12(f)(1)'s "presum[ption]" that multiple parts are frames and receivers will result in just such a scenario, thus undermining the Final Rule (not to mention violating the statutory text).

133.  GOA's and GOF's members and supporters will be unable to know and left guessing as to which "firearm" part(s) are regulated by federal law and which must be recorded in the records of dealers and subject to a background check, due to the Final Rule's "presumption," which conflicts with the Final Rule's promise that each firearm will have only one frame or receiver.  *See* Patterson Affidavit at ¶42.

134.  **Second**, the NPRM, along with its repudiated definition of "frame or receiver," would have also added a definition for a "split or modular frame or receiver," to include as a frame or receiver "more than one part that provides housing or a structure…."  *Id*. at 27743.

135.  However, the Final Rule abandons this definition, as ATF acknowledges that "[b]ecause the final rule focuses on only a single component of a firearm … there is no longer a need for a separate supplement entitled 'split or modular frame or receiver,' and it has not been adopted in the final rule."  *Id*. at 24671; *see also* at 24696, 24704, 24717.

136.  However, in spite of that promise, the Final Rule reinstates the very same concept in what is now called a "multi-piece frame or receiver," defined as "a frame or receiver that may be disassembled into multiple modular subparts…."  *Id*. at 24739.

137.  As an example, the Final Rule describes a firearm with "left and right halves of a frame or receiver." *Id*. at 24671.[25]

138.  The Final Rule claims that, for such "multi-piece" frames and receivers, "each of those subparts must be identified with the same serial number…." *Id*. at 24671.

139.  Apparently, ATF believes that the Final Rule's new "multi-piece" receiver is somehow different from the NPRM's old "split or modular" receiver, apparently not realizing these concepts are identical.

140.  Apparently, ATF thinks that an AR-15 with an *upper* and *lower* receiver is fundamentally different from a handgun with a *left* side and *right* side to its frame.

141.  On the contrary, for the very same reasons that a firearm cannot have a "split or modular" frame or receiver, it cannot have a "multi-piece" frame or receiver.  Under the statute, a firearm has *only one* "frame or receiver."

142.  Nor does the Final Rule's concept of a "multi-piece" frame or receiver make logical sense, as it would be impossible, for example, to use two left halves of a frame to make a firearm, and thereby exclude the serialized right halves. [26]

143.  GOA's and GOF's members and supporters, which include various licensed firearm manufacturers, routinely experiment with and invent new firearms.  *See* Patterson Affidavit at ¶69.  Such firearms may include firearms that have a left and right half which, after implementation of the Final Rule, will be required to be serialized on both halves, in contravention of the statute.

---

[25] For an example of a "left and right" modular firearm, the ATF prepared a PowerPoint slide, attached hereto as Exhibit "40."

[26] ATF claims that "[t]hese clarifications with respect to the markings of a multi-piece frame or receiver are necessary for the final rule; otherwise, multi-piece frames or receivers could be sold or distributed piecemeal in individual subparts and replaced by the end user without any traceable marks of identification."  Final Rule at 24672.  On the contrary, if ATF simply chose one "half" of a multi-piece receiver to be the "frame or receiver", then that part would continue to be marked as the "frame or receiver" notwithstanding a person buying unassembled "piecemeal [other] individual subparts…"

144.  Moreover, as the Final Rule recognizes (*id*. at 24666), firearms with more than one frame or receiver sow confusion not only for law enforcement but also for FFLs, including members and supporters of GOA/GOF.

145.  What's more, ATF's own classifications refute the notion of multiple identical serial numbers on a "multi-piece" frame or receiver.  For example, as ATF explains, "the final rule grandfathers most prior ATF classifications and variants thereof, including 'box-type' … weapons…."  *Id*. at 24697.  Such a "box-type" firearm, described by the Final Rule to include "Vickers/Maxim, Browning 1919, M2, and box-type machineguns and semiautomatic variants," has identical left and right "side plates," yet ATF has arbitrarily chosen the "right side plate" to be the frame or receiver.  *Id*. at 24740-41.

146.  The Final Rule fails to explain why a so-called "multi-piece" frame or receiver (which needs both left and right sides and under the Final Rule must have <u>two</u> serial numbers) is different from a "box-type" firearm (which needs both left and right sides but has <u>one</u> serial number). Indeed, the APA's requirement of "reasoned decisionmaking" requires that "[t]he treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).

147.  **Third**, ATF claims that "the final rule grandfathers ***most***[27] prior ATF classifications…." *Id*. at 24697 (emphasis added).  Meanwhile, the Final Rule also promises that "*there should be only one* 'frame or receiver' in a given weapon or device…." *Id*. at 24696; *see also* at 24696.

---

[27] Elsewhere, the Final Rule says something very different, claiming that "[t]he Department will also grandfather ***all*** prior ATF classifications specifying which single component of a weapon is its frame or receiver." *Id*. at 24694 (emphasis added).  *See also* Final Rule at 24654, 24663.  *See also* Final Rule at 24724 ("***almost all*** firearms ATF previously classified as falling within the definition of 'frame or receiver' prior to issuance of the final rule are grandfathered and may continue to be marked in the same manner as before the effective date of the final rule.").

148.  The problem is that some "prior ATF classifications" conflict with the promise of "only one 'frame or receiver.'"

149.  For example, in July of 2018, ATF sent a classification letter to Safety Harbor Firearms, claiming that its products (bolt-action, .50 caliber upper receivers used on AR-15 lower receivers) were "firearms."  Exhibit "44."  In its letter, ATF claimed that "a bolt-action upper assembly on an AR-type receiver does not change the characteristics of the bolt-action upper assembly such that it is no longer a 'receiver," and asserted that, "when two receivers are assembled together into a firearm, this redesigned firearm contains <u>two</u> firearm receivers."  *Id*. at 2 (emphasis added).[28]

150.  In other words, some of the classification letters the Final Rule purports to "grandfather" directly conflict with the Final Rule (and also the statutory text).

### d. The Final Rule Creates Precedent from Nonprecedential Classification Letters.

151.  The Final Rule claims that "[t]o minimize disruption and cost to the licensed firearms industry as much as possible … this rule grandfathers existing complete frame or receiver designs previously determined by the Director to be the firearm 'frame or receiver' of a given weapon." *Id*. at 24654.

152.  Indeed, the Final Rule creates as a definition Section 478.12(f), grandfathering "[f]rame or receiver classifications based on which part of the weapon was classified as such before April 26, 2022 … including variants thereof…."  *Id*. at 24739.[29]  ATF explains that "[t]he final rule includes a wide variety of examples and pictures to illustrate the frame or receiver of popular

---

[28] Interestingly enough, even though such a firearm (bolt-action .50 caliber upper on an AR-15 lower) contained ***zero*** frames or receivers under the prior existing regulation, ATF was able to conclude that it was comprised of ***two*** receivers – once again making things up as it went along.

[29] This represents a change from the NPRM, which permitted "[l]icensed manufacturers and licensed importers … to identify firearms … of the same design and configuration <u>*as they existed before*</u>" the effective date.  *Id*. at 27748 (emphasis added).  The Final Rule further amends "design and configuration" in "the marking grandfathering provision" to be simply "design."  *Id*. at 24709.

models and variants thereof, as well as examples of particular models previously classified by ATF that are grandfathered…." *Id*. at 24693.

153.  The NPRM explained similarly that, if "ATF has previously determined a specific part to be the frame or receiver," and "[i]f a manufacturer produces or an importer imports a firearm falling within one of these designs as they exist as of the date of publication of a final rule … [t]he manufacturer or importer can then mark without needing to ask ATF for a classification."  *Id*. at 27729.

154.  In other words, the Final Rule takes the position that a *prior ATF classification ruling* as to a particular make and model of firearm now can be *widely relied on by other* manufacturers who manufacture *other* similar variants of that firearm.

155.  This is a complete 180-degree switch from ATF's prior position on the precedential value of classification letters.

156.  Indeed, historically ATF has been adamant that "ATF letter rulings classifying firearms may generally be relied upon [only] by their recipients,"[30] that such "classifications are subject to change," and that such "private letter rulings" may not be relied on by any person other than the requester and for any firearm other than the exact make and model that was submitted for classification.[31]

---

[30] *See* https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download at 41.

[31] This is similar to the U.S. Department of Health and Human Services Office of Inspector General's Advisory Opinions on the Anti-Kickback Statute, of which HHS claims that "no third parties are bound by or may legally rely upon these advisory opinions." *See* https://oig.hhs.gov/compliance/advisory-opinions/process/. And the Center for Medicare and Medicaid Services position on Advisory Opinions is: "Because each opinion applies to specific individuals or entities in specific situations, no third parties are bound by, nor may they legally rely on, an advisory opinion." *See* https://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/advisory_opinions. And of course, the Internal Revenue Service's "written determinations": "Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent." 26 U.S.C. § 6110(k)(3).  *See also Alt. Carbon Res., LLC v. United States*, 939 F.3d 1320, 1327 (Fed. Cir. 2019) ("As to the private letter rulings, the Claims Court noted that these rulings 'by their own terms' say they 'may not be used or cited as precedent' by other taxpayers.").

157.  Now, the Final Rule claims the opposite, "that industry members and others can rely on ATF's prior classifications…."  *Id*. at 24696.

158.  Likewise, in federal court, ATF and the Department of Justice have vigorously argued that private ATF classification letters cannot be introduced by criminal defendants because "[n]one of the letters was addressed to [the defendant]," and "[n]one of the letters relate to the specific firearm at issue in this case. The letters are not precedential.  Rather, each letter relates to specific firearm design specifications and prototypes…."  *See United States of America v. Kelland Wright*, United States District Court, Northern District of Ohio, Civil Action No. 3:18-cr-162, Docket #45;[32] *see also Freedom Ordnance Mfg. v. Brandon*, No. 3:16-cv-00243-RLY-MPB, 2018 U.S. Dist. LEXIS 243000, at *17 (S.D. Ind. Mar. 27, 2018) ("Classification letters — for which there is no requirement in the law for manufacturers to seek — are informal adjudications rather than rules issued through rulemaking, and so they are not precedent"); *see also McCutchen v. United States*, 14 F.4th 1355, 1369 (Fed. Cir. 2021) (adopting ATF's representations about the purported "informal" and "provisional character" of ATF classification letters).

159.  In fact, the Final Rule itself explains that "letter rulings are only applicable for the precise sample submitted to ATF," and cautions that its classifications can be "misapplied (as some have done) to other items that may appear similar, but have legally important differences."  *Id*. at 24691.

160.  In other words, the Final Rule explains why ATF thinks it is a bad idea to do exactly what the Final Rule instructs the industry to do (rely on classification letters for other than "the precise sample submitted").

161.  Now, under the Final Rule, those same, purportedly informal, classification letters that ATF has claimed have no precedential effect, and can engender no reliance interests, are suddenly

---

[32] *See* Exhibit "8."

claimed to definitively govern the classifications not only of existing firearms – but also of similar "variants" of firearms that exist or might be developed in the future, but which were not referenced in any prior classification letter and, in fact, have never been analyzed or classified by ATF.

162.  Prior to the Final Rule, ATF classification letters could be relied on by no one.  After the Final Rule, they apparently must be relied on by everyone.

163.  But again, as noted, ATF does not provide a definitive list of these now-precedential classification letters.

164.  This represents a complete change in ATF's policy (and indeed the federal government's legal position argued to numerous federal courts) about the precedential value of private letter classifications.  Yet the Final Rule does not even acknowledge this change, much less provide a reasoned explanation for the agency's dramatic policy shift as to the precedential value of informal classification letters which it claims can be changed at any time.

### e.  Conclusion.

165.  At bottom, ATF's prior regulation defining "frame or receiver" proved in large part unworkable, because it required that too many different parts **all** be contained in a single part in order for it to be classified as the frame or receiver.  That meant, in practice, many modern firearms contained no identifiable frame or receiver, because no single housing contained **all** the required parts.

166.  Responding to that regulatory snafu, ATF now has promulgated a new definition of "frame or receiver" which it claims is designed to capture most firearms, to define a single part of each as "the frame or receiver," and to disrupt as few existing ATF classifications as possible.

167.  However, in spite of the Final Rule's vast improvement over the NPRM (which would have created billions of new firearms with the regulatory stroke of a pen), the Final Rule is still flawed.

168.  First, the statute is not ambiguous.  Congress was not unclear as to whether a firearm has only one frame or receiver, or whether it might have more than one.  ATF has no discretion to disregard this requirement.  The statute is unambiguous that every "firearm" can have only one "frame or receiver."

169.  Second, ATF promises that some unspecified portion of its existing classification letters, identifying a particular frame or receiver, will be grandfathered under the Final Rule, with similar firearms continuing to be identified in the same way.  However, the agency does not identify specifically which of its (nonpublic) letters continue to be valid and which of its (nonpublic) letters might be modified or overruled by the Final Rule.  Many letters to which the agency refers have never seen the light of day.  The agency should be required to be specific, in order to provide clear guidance to the industry and the public.  Nor does the agency explain how the industry and the public (including numerous members and supporters of GOA/GOF) are expected both *not to rely* on classification letters other than for "the precise sample submitted," but also *to rely on* such letters for other similar "variants" of a submitted sample.

170.  Third, whereas the Final Rule repeatedly promises that each firearm will have only one "frame or receiver," it is evident that will not always be the case, in violation of the statute.  The Final Rule's serialized component "presum[ption]" should be invalidated, as should the definition for a "multi-piece frame or receiver."  Finally, to the extent that existing ATF classification letters conflict with the statute by identifying multiple frames or receivers within a single firearm, it should be made clear that those erroneous letters are overruled.

171. The Final Rule empowers ATF to continue acting arbitrarily and capriciously, in violation of the federal statute defining what constitutes a "firearm." To the extent that the agency has created a Final Rule that *still* conflicts with the statutory mandate of *one* frame or receiver in each firearm, along with *continuing* to violate the APA, the Final Rule should be struck and the agency be sent back to the drawing board.

## III. The Final Rule Adopts a Vague, Standardless Definition of the Statutory Term "Readily," and Applies it to Ban 80% Frames and Receivers, Including when Sold As So-Called "Weapon Parts Kits."

172. This section challenges the Final Rule's promulgation of the following regulations:

a) 27 C.F.R. § 478.11 ("firearm" weapon parts kits);

b) 27 C.F.R. § 478.11 ("readily");

c) 27 C.F.R. § 478.12(c) ("partially complete, disassembled, or nonfunctional frame or receiver");

d) 27 C.F.R. § 478.12(f)(2) ("frame or receiver classifications of partially complete, disassembled, or nonfunctional frames or receivers before August 24, 2022");

e) 27 C.F.R. § 479.11 ("complete weapon"); and

f) 27 C.F.R. § 479.11 ("readily").

173. The Final Rule creates new regulatory definitions for the word "readily" that is found in 18 U.S.C. § 921(a)(3)(A) (which defines a firearm to include "any weapon (including a starter gun) which will or is designed to or may *readily be converted* to expel a projectile by the action of an explosive") and 26 U.S.C. § 5845(b) (defining a machinegun to be a weapon that "can be *readily restored* to shoot…."). *See* Final Rule at 24735 (Section 478.11); at 24747 (Section 479.11).

174. Prior to the Final Rule, ATF regulations have never defined the word "readily."

175. On the contrary, in an October 4, 1976 memorandum, ATF "Assistant Chief Counsel" opined that, "we view the current Bureau procedure in classifying 'firearms' on a case-by-case basis as consistent with the letter and spirit of the Gun Control Act." Exhibit "41" at 0267. ATF concluded that there was "not a sufficient reason to establish a rigid criterion for the phrase 'readily convertible.'" *Id.*

176. Likewise, on August 2, 1978, ATF issued a classification letter which stated that "[w]e regret that we do not have a precise definition of what is 'readily converted' since there are too many variables which must be considered. Therefore, it is our policy to render a classification on these items only on a case by case basis." Exhibit "9."

177. Similarly, over the years federal courts have struggled to interpret and apply the meaning of "readily" within the statutes. In the Final Rule, ATF references nearly a dozen court decisions spanning five decades which have wrestled with the meaning of "readily." *Id*. at 24661 n.43.

178. These cases demonstrate that the term "readily" has proved confusing to judges, with various courts finding that various items are "readily converted" or "readily restored" in times ranging anywhere from as little as 12 minutes, up to and including "an 8-hour working day in a properly equipped machine shop." *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973).

179. Now attempting to fashion a definition of "readily," the Final Rule adopts language from a Sixth Circuit opinion in *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421-22 (6th Cir. 2006).

180. However, the Sixth Circuit in that case was interpreting the phrase "readily restored" in the NFA's definitions (26 U.S.C. § 5845), not "readily be converted" in the GCA's definition of a "firearm."

181. Moreover, the court was not fashioning a test for use by the agency, but merely indicated that it would be appropriate for ATF to consider *various types of factors* when making a determination that a machinegun was "readily restored."

182. Nevertheless, the Final Rule latches on to this language, adopting it nearly verbatim.

183. The Final Rule thus defines "readily" to be:

A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:
(1) Time, *i.e.*, how long it takes to finish the process;
(2) Ease, *i.e.*, how difficult it is to do so;
(3) Expertise, *i.e.*, what knowledge and skills are required;
(4) Equipment, *i.e.*, what tools are required;
(5) Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained;
(6) Expense, *i.e.*, how much it costs;
(7) Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it; and
(8) Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction.  [*Id.* at 24747.]

184. While the Sixth Circuit merely announced certain types of factors that might be appropriate for the agency to consider, adopting the court's language verbatim in a regulation as a standardized test to be used by bureaucrats is something else entirely.

185. As promulgated in an administrative regulation, the Final Rule's definition of "readily" is hopelessly (and indeed unconstitutionally) vague and ambiguous, as it provides no fixed standards, and does not only invite – but in fact *guarantees* – future arbitrary and capricious enforcement by ATF.

186. **First**, ATF's chosen words "fairly" (adverb), "reasonably" (adverb), "efficient" (adjective), "quick" (adjective), "easy" (adjective), and "speedy" (adjective) are all relative terms – inherently malleable, flexible, vague, standardless, and open to infinite interpretation.

46

187.  **Second**, ATF's purported attempts to provide further guidance by providing an eight-part "list" of "factors" that are "relevant in making [the "readily"] determination" is entirely unhelpful, and instead leads to further confusion.

188.  Indeed, ATF's test merely *asks questions*, rather than *answering* any, such as (i) "*how* long," (ii) "*how* difficult," (iii) "*what* knowledge and skills," (iv) "*what* tools," (v) "*whether*" and "*how* easily," (vi) "*how* much," (vii) "the *extent* to which" and (viii) "*whether*."

189.  Whereas the Sixth Circuit explained that it was appropriate for ATF to consider certain types of factors *in theory* when resolving whether a firearm was a machinegun under the National Firearms Act, it is entirely inappropriate for the agency to simply parrot those questions back in the form of an amorphous test under the Gun Control Act without providing any sort of guidance as to ***how*** these factors might actually be applied *in practice*.

190.  Rather, the agency should have provided answers in the form of clear, fixed standards that can be applied objectively by bureaucrats.

191.  Yet none of ATF's eight factors include any fixed numerical or other sort of guideposts.

192.   **Third**, the Final Rule further explains that ATF's eight-factor test is entirely nonbinding, but rather is a "nonexclusive list of factors…." *Id*. at 24699.

193.  Thus, the Final Rule departs from and expands even the test lifted from the Sixth Circuit's opinion in *One TRW, Model M14, 7.62 Caliber Rifle.*

194.  Listing certain factors that might be (but need not be) considered, and then theorizing that other (unstated) factors might also apply does not represent any sort of rigid test, but rather the deliberate *absence* of any test, permitting ATF maximum future latitude to do literally whatever it wants in any situation.

195.  This is precisely the same sort of unmoored and standardless test that landed the ATF in hot water in *Innovator Enters. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C. 2014) (criticizing review of a flash hider as arbitrary and capricious when based on "some (unstated) number of [] characteristics," questioning "where did that list of six characteristics come from?  The agency never explains whether those six characteristics are present in all (or most?) silencers [or] whether there are other common characteristics that do not appear on its list.  And the agency never explains how many characteristics in common are necessary to be classified….").

196.  Likewise, in *Tripoli Rocketry Ass'n v. BATFE*, 437 F.3d 75, 81 (D.C. Cir. 2006), ATF was similarly faulted when "[t]he agency … never provided a clear and coherent explanation for its classification," and "never defines a range of velocities."  As a result, "as a reviewing court, we require some metric for classifying materials not specifically enumerated in the statute, especially when, as here, the agency has not claimed that it is impossible to be more precise in revealing the basis upon which it has made a scientific determination."  In that case, like here, ATF had simply provided an "unbounded relational definition … *much faster*." *Id*.  In response, the court asked, "Ten millimeters per second?  A hundred?  A thousand?" *Id*.

197.  Unsurprisingly, ATF disagrees, claiming its incomprehensible standard of "readily" is "easily understood" and "easy for persons to comprehend," that "[n]o specialized knowledge is required to understand how the term 'readily' is to be applied," and that the industry and the public "are clearly on notice … that those items are regulated if they may readily be converted."  Final Rule at 24678.

198.  ATF further defends its definition of "readily" from claims that the "nonexclusive list of numerous factors, none of which is controlling … includes subjective considerations" and is "impermissibly vague or arbitrary." *Id*. at 24698.  ATF claims that it "disagrees that these factors

should incorporate minimum time limits, percentages of completion, or levels of expertise, or otherwise create thresholds to determine" when something is "readily converted," claiming that to provide objective criteria "would be difficult, if not impossible." *Id*. at 24700.

199. Based on ATF's protestations of difficulty, the Final Rule provides no "metric" or "range" or "precis[ion]" in the open-ended questions it poses. Nor does ATF allege that it has some internal, secret set of metrics, employed behind the curtain, to answer the questions posed by its definition.

200. **Fourth**, after providing a half-dozen relative adjectives and adverbs, followed by an eight-part (nonexclusive) concoction of vague questions with no fixed answers, ATF demurs that this new "definition and factors ... are based on case law...." *Id*. at 24663.

201. Yet if anything, the wide range of legal opinions about the meaning of "readily" shows that federal courts have had difficulty interpreting the statutory term. *See* Final Rule at 24699 (acknowledging the "wide range of what constitutes readily convertible" in the courts).

202. In conclusion, the Final Rule's definition of "readily" creates a system where everything is left to the unquestionable discretion of ATF bureaucrats, using a sort of "facts and circumstances" analysis conducted on a "case-by-case basis." That sort of structure is entirely foreign to the criminal law, where statutes (where people go to federal prison for unlawfully manufacturing, possessing, or transferring firearms) must have precise meaning that can be understood by ordinary persons.

203. Indeed, the individual plaintiffs, along with the members and supporters of Plaintiffs GOA and GOF, will be completely in the dark as to what incomplete and unfinished items and parts constitute firearms under federal law, based on ATF's vague theory that they can be "readily" made into functioning firearms. Such persons will be unable to determine what products they may

manufacture without obtaining a federal firearms license.  They will be unable to determine what incomplete and unfinished items and parts they may sell and transfer without being required to engage in recordkeeping and conduct background checks.  Finally, the Final Rule leaves gun owners in the dark about what items they may purchase, possess, and transfer to others without running afoul of federal laws regulating "firearms."

204.  Not only is the Final Rule's definition of "readily" arbitrary and capricious, but also, because it has significant criminal application, it is unconstitutionally vague under the Due Process Clause of the Fifth Amendment, because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 240 (2012) (citation omitted).

205.  In the Final Rule, ATF proposes to apply its new definition of "readily" in two contexts relevant here: (i) "to explain when a partially complete, disassembled, or nonfunctional frame or receiver is considered a 'frame or receiver' under 18 U.S.C. 921(a)(3)(B)," and (ii) "to explain … when a … weapon parts kit, is considered a 'firearm' under 18 U.S.C. 921(a)(3)(A)."

206.  But regardless of the numerous problems with ATF's definition of "readily," that term was never intended to apply in the way and to the devices that ATF now proposes.

207.  This directly impacts manufacturers and retailers of unfinished frames and receivers and parts kits, many of whom are members and supporters of GOA/GOF, as it is impossible to know at what point an unfinished frame or receiver will be considered an actual firearm under ATF's nonsensical definition of "readily."

> **a.  Section 921(a)(3)(A)'s "Readily" Language Has No Application to when an Item Becomes a Frame or Receiver under Section 921(a)(3)(B).**

208.  Section 921(a)(3) defines "firearm," in pertinent part, as:

> (A) any *weapon* (including a starter gun) which *will* or is *designed* to or may readily be *converted* to expel a projectile by the action of an explosive; [or]
> (B) the frame or receiver of any such weapon.  [Emphasis added.][33]

209.  Adopted as part of the 1968 GCA, the "readily" language in subsection (A) was "[a]dded to the term 'firearm' [to regulate] **weapons** which 'may readily be converted to' a firearm.  The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile…."  Exhibit "10" (emphasis added).

210.  Thus, for a device to be capable of "readily be[ing] converted" into a firearm, it must first be a "weapon."

211.  An unfinished, so-called "80% receiver"[34] – something that ATF acknowledges is merely a *precursor* to being a finished firearm frame or receiver (and thus a firearm) – is not a weapon. *See* Final Rule at 24684 (admitting that "the aggregation of parts in a kit may not yet function as a weapon," but arguing that they are "clearly identifiable as an instrument to expel live ammunition….").  Rather, not being even fully manufactured, and certainly not assembled or operable, such a device cannot fire live or even blank ammunition.  It cannot be used as a "weapon"

---

[33]  The GCA also states that "No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary."  18 U.S.C. § 923(a).  The GCA also affixed penalties, including fines and prison time, for various violations of the Act, including the catch-all provision, "[w]homever violates any provision of this chapter… shall be fined not more than $5,000 [since updated], or imprisoned not more than five years, or both…"  18 U.S.C. § 924(a).

[34] The term "80% frame or receiver" adopted herein is considered by ATF to be a colloquial term used within the firearms industry to denote a product that is an incomplete and unfinished firearm frame or receiver.  An 80% receiver is not a "firearm" under the GCA because it has not yet reached a stage of manufacture to be classified as such by ATF.  ATF has often called 80% receivers "blanks" or "castings."

Yet in spite of ATF's reservations about the terminology, 80% frames and receivers have become increasingly popular within the firearms community by those who wish to lawfully manufacture their own privately made firearm, but without having to do so from scratch.  Rather, an 80% receiver can be purchased and, with additional tools, labor and skill, can be fashioned  by the end user into a complete and finished firearm frame or receiver.  Then, with the purchase of the remaining firearm parts, the then-finished frame or receiver can be assembled into a functional firearm.  As ATF's website explains, "a license is not required to make a firearm solely for personal use."  https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use

in any sense of the word (other than maybe throwing it at someone).  On the other hand, even a blank firing or starter gun can be used as a "weapon" through threats and intimidation (*i.e.*, by pointing it at someone).

212.  Nor has an 80% receiver ever been a "weapon" of any sort.

213.  Likewise, the word "convert" means to "cause to change in form, character, or function" – *i.e.*, from a "starter pistol" firing blank cartridges into a "firearm" firing live ammunition.

214.  Of course, the completion of an 80% receiver into a "firearm" is not "conversion" of another type of existing "weapon" into a "firearm," but rather the "manufacture" of raw materials into a "frame or receiver" of a firearm (still not a weapon).

215.  What is more, even though the term "readily" appears in Section 921(a)(3)(**A**), the Final Rule blatantly proposes to use that language "to explain when a partially complete, disassembled, or nonfunctional frame or receiver is considered a 'frame or receiver' under 18 U.S.C. 921(a)(3)(**B**)…." *Id*. at 24678.

216.  On the contrary, the term "readily" clearly applies only to complete "weapons" in Section 921(a)(3)(A), and has no application to the point at which an unfinished item becomes a finished "frame or receiver" under Section 921(a)(3)(B).  *See Russello v. United States*, 464 U.S. 16, 23, 78 (1983) ("where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also* A. Scalia and B. Garner, Reading Law: The Interpretation of Legal Texts (Thomson/West: 2012), at 112 ("The omission of words from a statute must be considered intentional on the part of the legislature. Words may not be supplied in a statute where the statute is intelligible without the addition of the alleged omission. Words may not be inserted in a statutory provision under the guise of interpretation.").

217. ATF disagrees that the term "readily" should be used only where it appears, but acknowledges "commenters [who] stated that … the phrase 'may readily be converted' … was included in prong (A) of section 921(a)(3) … but not prong (B), meaning that 'readily' cannot be applied to 'frame or receiver'…."  Final Rule at 24685.

218.  But in spite of its disagreement, ATF has a hard time articulating why it disagrees.

219.  Indeed, the Final Rule responds obliquely that "ATF has *properly* considered concepts concerning when other firearms reach the point at which they are regulated under Federal law. This process is also *appropriate* because the very definition of 'manufacturing' is the process of 'converting' raw materials into finished goods suitable for use."  Final Rule at 24685 (emphasis added).

220.  In other words, rather than wrestle with the structure of the statutory text, ATF defends its misinterpretation with the platitudes "proper[]" and "appropriate."

221.  ATF further opines that "[i]n light of the widespread availability of" 80% receivers and associated kits, "it is *necessary* to deter prohibited persons" from manufacturing their own firearms, "[o]therwise persons could easily circumvent" the law, which "would unreasonably thwart Congress's evident *purpose*…."  *Id*. at 24686 (emphasis added).

222.  On the contrary, courts do not "interpret a statute contrary to the plain meaning of its words if doing so would, in the court's view, better further the purpose it thinks Congress had in mind....  As the Supreme Court recently reminded us, 'law depends on respect for language.' ... We interpret and apply statutes, not congressional purposes. ... ('[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.') ... In any event, '[t]he best evidence of that [legislative] purpose is the statutory text adopted by both Houses of Congress and submitted to the President.'"  *Gordon v. Novastar Mortg., Inc. (In re*

*Hedrick*), 524 F.3d 1175, 1187-1188 (11th Cir. 2008) (emphasis added) (internal citations omitted); *see also* A. Scalia and B. Garner, <u>Reading Law</u> at 56-58 ("the purpose [of a statute] must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires … purpose ... cannot be used to contradict text or to supplement it. … the limitations of a text — what a text chooses not to do — are as much a part of its 'purpose' as its affirmative dispositions.  These exceptions or limitations must be respected, and the only way to accord them their due is to reject the replacement or supplementation of text with purpose.").

223.  For these reasons, the "readily" analysis from subsection (A) has no place when it comes to a determination under subsection (B) whether an 80% frame or receiver constitutes a regulated "frame or receiver."

224.  Making matters worse for ATF, although purporting to copy the "readily" language from Section 921(a)(3)(A) and paste it into subsection (B) where it does not appear, ATF does not actually adopt that language.  Rather, ATF *expands* the language found in subsection (A).

225.  Indeed, while continuing to borrow from the language of Section 921(a)(3) ("will or is designed to or may readily be *<u>converted</u>*"), the Final Rule also adds several verbs to that language: "designed to or may readily be *<u>completed, assembled, restored</u>*, or otherwise converted to expel a projectile by the action of an explosive."  *Id*. at 24735.

226.  None of those words is a synonym for "converted."

227.  This language in the Final Rule uses language from Section 921(a)(3)(A), compiled with language drawn from the National Firearms Act's definition of a "machinegun" in 26 U.S.C. § 5845 ("shoots, is designed to shoot, or can be readily restored to shoot" and "combination of parts from which a machinegun can be assembled") and possibly even 28 U.S.C. § 921(a)(29)'s

language about "handguns" ("any combination of parts from which a [handgun] can be assembled.").

228.  The Final Rule adopts this linguistic concoction, cobbled together from several different sections of two entirely different congressional enactments discussing entirely different types of regulated "firearms," with the clear intent to target 80% receivers and so-called "weapon parts kits" from which a homemade firearm can be manufactured.

229.  The Final Rule's definition of "readily" constitutes an unlawful use of, along with an expansive and improper revision of, the statutory text in Section 921(a)(3)(A).

> **b.  ATF's New Application of "Readily" to 80% Frames and Receivers Represents and Unrealized and Unexplained Change by the Agency.**

230.  Historically, ATF has not applied the statute's "readily" language to 80% receivers, in apparent recognition that this language does not apply for the reasons explained above.

231.  Rather, as early as the 1990s, ATF's classification letters for unfinished GCA firearms focused not on any concept of "readily" or the a*mount of time* needed to finish an item into a firearm, but rather on the *completeness* of the product – the *specific milling operations* that had been performed, as compared to milling operations that had not been performed.  *See* Exhibit "11" ("If you plan to sell a solid bar having the exterior profile of an MP40 submachinegun receiver and having no internal machining, the item would not be a firearm."); Exhibit "12" ("the interior cavity has not been completely machined"); Exhibit "13" ("block of metal … and (2) holes ... must be drilled out … the magazine opening and the receiver cavity are completely machined out…."); *See also* Exhibit "14" (more of the same).

232.  Indeed, even ATF's current website explicitly states that "ATF has long held that … [r]eceiver blanks that do not meet the definition of a 'firearm' are not subject to regulation under

the Gun Control Act (GCA) [because] items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA."[35]

233.  In other words, ATF's examinations of 80% receivers have properly focused on **subsection (B)** of Section 921(a)(3) – whether an item constitutes "the frame or receiver of any such weapon" – rather than on **subsection (A)** – whether an 80% receiver or related parts kit "may readily be converted to expel a projectile."

234.  Based on its historical focus on the completeness of various machining operations, over the course of many letters, industry manufacturers began to figure out which milling operations ATF considered impermissible (and turn an item into a frame or receiver) versus which ones might be permissible (with an item still considered an unfinished 80% frame or receiver).

235.  In January of 2004, ATF approved of a so-called 80% receiver for a "Government 1911A1 type casting," finding that it was *not* a firearm.  Exhibit "14" at ATF0058.  In May of 2004, ATF approved of an "AMT Automag-type casting" which it determined "does not meet the definition of a 'firearm.'"  Exhibit "14" at ATF0064.  And in January of 2005, ATF determined that certain "revolver-type receiver castings … do not meet the definition of a 'firearm'…."  Exhibit "15."

236.  However, manufacturers continued to struggle with the details of how to manufacture an 80% AR-15 receiver that ATF would accept as not being a firearm and thus unregulated under the GCA.

---

[35] https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (using pictures to demonstrate what is not considered a "firearm" and at what stage various objects become a "firearm").

237.  After numerous letters finding that AR-15 castings *were* firearms, in April of 2006 ATF finally began to *specifically instruct* requesters as to how to manufacture an 80% AR-15 receiver that ATF would conclude was *not* a firearm.  *See* Exhibit "16."

238.  Finally, in May of 2009, after numerous findings that such items were firearms, ATF approved of an AR-15 80% receiver, finding that it "does not contain any of these critical [impermissible] features" and is "not yet finished to the point at which it would be classified as a firearm."  *See* Exhibit "17."

239.  Thereafter, ATF continued providing specific instructions about specific milling operations to the industry as to how to achieve compliance with 80% receivers.  *See* Exhibit "18."  ATF continued to examine submission samples based on the presence or absence of specific machining operations.  *See* Exhibit "19."

240.  In 2013, ATF further formalized its focus on machining operations by promulgating ATF Technical Bulletin 14-01, entitled "Unfinished '80%' AR-15 Type Receivers."  In this bulletin, ATF explained that "[t]he ATF Firearms Technology Branch (FTB) has previously determined that an AR-15 type receiver which has <u>no machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)</u> might not be classified as a firearm.  Such a receiver could have **all** other machining operations performed…."  *See* Exhibit "20" (emphasis original).

241.  In other words, ATF's long-existing policy has been to determine if an item is a "frame or receiver" under subsection (B) by looking **only** at whether specific milling operations have been performed, versus which have not been performed, rather than looking at the eight factors proposed by the Final Rule.

242.  GOA/GOF comments pointed out this change in agency analysis in the Final Rule. Exhibit "33" at 4-5.

243.  The Final Rule attempts damage control on this issue, claiming that "ATF disagrees with commenters who stated that ATF changed its position from 2006 to the present … when it determined that specific machining operations had to be performed with respect to certain partially complete frames or receivers."  *Id*. at 24668.

244.  As ATF explains it, "[r]ather than a new or different test, how quickly and easily an item could be made functional is largely determined by which machining operations still needed to be performed."  *Id*. at 24668.

245.  In other words, ATF merely asserts (without providing any evidence or other support) that its longstanding analysis of machining operations under Section 921(a)(3)(B) was, is, and has always actually been a "readily" analysis in disguise, under Section 921(a)(3)(A).

246.  On the contrary, just last year ATF *argued exactly the opposite*, claiming that "ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm … Not one of the above-noted classification letters made reference to the amount of time that would be required…."  *City of Syracuse v. ATF*, 20-cv-06885 (S.D. N.Y. Jan. 29, 2021) ECF #98 at 30-32.

247.  Indeed, the Final Rule now replaces this "frame or receiver" test from subsection (B) of the statute with an amorphous, multi-part, non-exclusive definition of "readily" based on subsection (A) of the statute, upending decades of classification letters to the contrary.  Indeed, President Biden's "Fact Sheet" about the Final Rule states that it is designed specifically "to rein in the proliferation of 'ghost guns.'"[36]

---

[36] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/.

248. The Final Rule does not acknowledge (and actually disputes the existence of) this tectonic shift in policy by the agency, much less does the Final Rule provide a reasoned explanation for the change.  The APA "… ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation[]" and "… may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."  *United States Telecomms. Ass'n v. FCC*, 825 F.3d 674, 706-07 (D.C. Cir. 2016) (citations and punctuation omitted).

249.   Thus, in addition to conflicting with the plain text of the statute, the Final Rule's new application of "readily" to 80% frames and receivers violates the APA, because "where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious."  *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995).

250.   Members and supporters of GOA and GOF include several manufacturers, distributors, and retailers of unfinished 80% frames and receivers, along with gun owners such as Plaintiff Jimenez who purchase and manufacture these items into homemade firearms. *See* Patterson Affidavit at ¶7, Jimenez Affidavit at ¶¶4-6.  Each of these persons will be irreparably harmed by implementation of the Final Rule.  Many companies in this space will be forced entirely to revamp their business practices, forced to stop selling various products or combinations thereof, and may even be forced out of business entirely.  Gun owners who manufacture their own homemade firearms, using unregulated and unfinished parts, will no longer be able to purchase what they need easily and efficiently (if at all) if the Final Rule is implemented.

### c.  The Final Rule Unlawfully Applies "Readily" to So-Called "Weapons Parts Kits."

251.  In addition to its use of "readily" to redefine an 80% frame or receiver *itself* as a "frame or receiver" under Section 921(a)(3)(B), the Final Rule separately claims that an 80% frame or

receiver, when packaged as a "*kit*" together with unregulated firearm parts such as a barrel, trigger, and springs, is a "weapon" under Section 921(a)(3)(A), on the theory that such a so-called "weapon parts kit … contains all component parts necessary to function, whether or not assembled or operable."  Final Rule at 24734.

252.  In the Final Rule, ATF discusses that such "[w]eapon parts kits, or aggregations of weapon parts, some of which contain all of the components necessary to complete a functional weapon within a short period of time, have been increasingly sold to individuals either directly from manufacturers of the kits or retailers…."  *Id*. at 24662.

253.  The Final Rule thus expands the statutory definition of "firearm," proposing to now include at the end that:

> [t]he term shall include a weapon parts kit that is designed to or may readily be **completed**, **assembled**, **restored**, or otherwise converted to expel a projectile by the action of an explosive.  [Final Rule at 24735 (emphasis added).]

254.  The Final Rule similarly creates a new definition of "complete weapon" to appear as 27 C.F.R. § 479.11, as "a firearm other than a muffler or silencer that **contains all the component parts** necessary to function, whether or not assembled or operable."  *Id*. at 24747.

255.  As explained previously, whereas the statute only discusses a "weapon" which "will or is designed to or may readily be converted to expel a projectile," the Final Rule also applies to "kits" that "may readily be *completed, assembled, restored*…."  This is a blatant and unauthorized expansion of the statute.  *See* Final Rule at 24684.

256.  The Final Rule's attempt to turn so-called "weapon parts kits" into firearms under Section 921(a)(3)(A) also fails because, in order to "complete[], restore[], assemble[], or otherwise convert[]" an 80% frame or receiver (plus a collection of parts) into a functioning "weapon," **two steps must occur**.  First, the 80% frame or receiver must be fully *manufactured* into a functioning

frame or receiver governed by the statute.  Second, the functional "weapon" must be *assembled* using that frame or receiver.

257.  Yet under Section 921(a)(3)(B), there is **only one step** that must be taken to turn an item into a firearm "frame or receiver" – *manufacture* of the 80% frame or receiver into a functioning frame or receiver governed by the statute.

258.  In other words, an 80% frame or receiver becomes a Section 921(a)(3)(B) "frame or receiver" long before it ever becomes a Section 921(a)(3)(A) "weapon."

259.  Thus, the addition of parts, jigs, tools, or instructions to an 80% frame or receiver as a "kit" has no bearing on when the item becomes a "firearm," as the 80% frame or receiver within the "kit" will become a "frame or receiver" (and thus a firearm under subsection (B)) long before the kit becomes a functional "weapon" (and thus a firearm under subsection (A)).

260.  The Final Rule attempts to explain the meaning of the term "weapon parts kit," describing such a kit as "contain[ing] all of the necessary components (finished or unfinished), along with jigs, templates, or other tools that allow an individual to complete a functional weapon with minimal effort, expertise, or equipment within a short period of time."[37]  *Id*. at 24692.

261.  According to the Final Rule, such a "weapon parts kit" is now declared a "firearm," even though it has no complete "frame or receiver," and alleges that "[p]ersons who engage in the business of importing, manufacturing, or dealing in weapon and frame or receiver parts kits must be licensed, mark the frames or receivers within such kits with serial numbers and other marks of

---

[37]  The NPRM described two different types of "weapon parts kits," including one type which "contain[s] most or all of the components (finished or unfinished) necessary to complete a functional weapon within a short period of time," and the other which "include[s] jigs, templates, instructions, drill bits, and tools that allow the purchaser to complete the weapon to a functional state with minimal effort, expertise, or equipment."  NPRM at 27726.  For whatever reason, the Final Rule appears to conflate these two concepts.

identification, conduct background checks, and maintain transaction records for them…." *Id*. at 24692.

262.  Then, apparently not content with targeting only complete "kits," ATF claims that a "criminal conspiracy" charge could attach to the sale of *only some* unregulated firearm parts, in that "persons who engage in the business of selling or distributing such weapon parts kits cannot avoid licensing, marking, recordkeeping, or excise taxation by selling or shipping the parts in more than one box or shipment to the same person, or by conspiring with another person to do so," likening the 80% industry to a case "where one defendant sold parts kits containing the component parts of Sten machineguns except receiver tubes, and the other sold customers blank receiver tubes along with detailed instructions on how to complete them."  NPRM at 27726 n.45.  Of course, whereas the end product in that case (a Sten machinegun) would be illegal to possess, the end product here (a semi-automatic homemade firearm) is not illegal for a law-abiding gun owner to manufacture or possess.  Nor is it illegal to manufacture or sell *unfinished and thus unregulated* firearm parts, in any combination or quantity.

263.  In GOA/GOF's comments, Plaintiffs raised concerns about ATF's proposed theory of "conspiracy" to sell unregulated firearm parts.  Exhibit "33" at 25.

264.  The Final Rule responds to these concerns about this vague ATF threat of "conspiracy" by doubling down, "reiterat[ing]" that charges for selling unregulated gun parts could be brought, including "conspiracy" and "aiding and abetting," claiming that "persons who manufacture and sell unassembled weapons or weapon parts kits in 'knockdown condition' (*i.e.*, unassembled but complete as to all component parts) cannot structure transactions … by working with others or

structuring transactions[38] to avoid the appearance that they are not commercially manufacturing and distributing firearms."  *Id*. at 24714.

265.  In other words, even if ATF were to approve of an 80% frame or receiver (for sale by itself), the item could still not be sold without some uncertain risk of criminal prosecution, on the theory that a gun owner could purchase the unregulated 80% frame or receiver from one seller, and then purchase the other unregulated gun parts to finish it from *another* seller.  This means that ATF might claim that someone who sold an unfinished frame or receiver by itself – without any "components" or "tools" that constitute "weapon parts kits" – nevertheless could be considered to have conspired with other dealers or manufacturers to sell a complete "weapon parts kit" that ATF considers to be a "firearm."[39]

266.  In other words, the Final Rule can be viewed as an effort by ATF to eliminate the market for 80% frames and receivers (and DIY homemade firearms) entirely, through arbitrary standards, intimidation, and threats of criminal charges for vague federal crimes.  In fact, ATF admits that

---

[38] The notion in the Final Rule that a set of "all the component parts" with which to construct and manufacture a firearm itself constitutes a firearm will lead to absurd results.  Indeed, there are dozens, if not hundreds (or possibly thousands) of companies across the country and internet which offer for sale "all the component parts" necessary for a customer to manufacture a complete firearm.  For example, virtually any home supply or hardware store, big box retailer, or online marketplace contains materials and components for sale which can be used or repurposed to manufacture a firearm, even without an "80% frame or receiver." *See*, e.g., http://www.thehomegunsmith.com/pdf/BSP-SMG_Book.pdf (providing blueprints on how to build a "9mm submachine gun utilizing off the shelf 'British Standard Pipe' (BSP) Fittings," and "plumbing / hardware products and components which … are readily available from most good trade plumbing outlets.").  The items, available at these ubiquitous retailers (pipes, fittings, rods, sheet metal, tubing, metal plate, nuts and bolts, etc.), are not firearms under federal law and thus are entirely unregulated by ATF.  Just as with 80% frames or receivers and so-called "weapon parts kits," the items available at these retailers do not magically become a firearm on the theory that a person theoretically could walk through a store, add to his cart, and head to the checkout aisle with a "complete set of component parts" necessary to create a firearm.

[39] Yet ATF has recently reached such absurd results.  When asked to classify a *metal water bottle* – along with a piece of paper theorizing how one might be able to turn that water bottle into a firearm – ATF responded that the metal water bottle (*by itself*) might actually be a firearm, or even a machinegun.  Exhibit "42."  That determination, reaching the shocking opinion that a common household object (*with nothing else*) might be a firearm, came from the top subject matter experts at the agency tasked with enforcing this nation's gun laws.  No respect, and certainly no deference, is due to any legal theory, decision-making process, or subject matter "expert" opinion that provides such absurd results.

the Final Rule "will reduce the overall supply and demand for … firearm parts kits," and "estimates it will be unlikely that a significant number of non-FFLs will opt to become FFLs" to continue selling unregulated firearm parts, and that 98% of such companies (including members and supporters of GOA/GOF) "will end up dissolving their businesses," which ATF estimates have "average revenue [of] $2.6 million." *See* Regulatory Impact Analysis at 32, 38.[40]

267.  As a result of the Final Rule, individuals such as Plaintiff Jimenez will not be able to readily purchase all the component parts necessary to manufacture their own firearms, making the process for many much more difficult, if not impossible, without purchasing a federally regulated "firearm" from a licensed dealer.  Because of this, the ATF's Final Rule infringes lawful conduct that is not regulated by federal law, adds significant cost and burden to the process of manufacturing firearms by unlicensed persons, and infringes protected Second Amendment conduct of the Plaintiffs, including members and supporters of GOA and GOF.

268.  Plaintiff Jimenez along with many of GOA's and GOF's members and supporters, currently lawfully manufactures his own firearms using parts acquired from various sources and retailers.  Jimenez Affidavit at ¶¶4-6.  However, when the Final Rule is implemented, such parts dealers will be unable to sell all the parts necessary to complete a firearm.  Heretofore unregulated items will be declared regulated or even unlawful.

269.  There is no way for a parts dealer, selling wholly unregulated parts, to know at what point the ATF will consider it to have engaged in a "conspiracy" to sell wholly unregulated parts with other unregulated parts dealers.  Indeed, members and supporters of GOA/GOF have already been targeted and threatened by ATF based on the unsupported legal theories advanced in the Final Rule

---

[40] The Final Rule's Regulatory Impact Analysis can be found at https://www.atf.gov/file/165811/download.

even prior to its effective date.  *See, e.g., Not an LLC d/b/a JSD Supply v. ATF*, No. 22-cv-747 (W.D. Pa.), Verified Complaint for Declaratory and Injunctive Relief, ECF #1 (May 19, 2022).

### d.   The Cases Cited by ATF Do Not Support the Final Rule's Attack on "Weapon Parts Kits."

270.  As noted above, it is only recently that ATF has attempted to apply the concept of "readily" from subsection (A) to 80% frames or receivers, or to so-called "weapon parts kits" that contain 80% frames or receivers.  Previously, ATF determined under subsection (B) only whether an item constituted (or a kit contained) a complete "frame or receiver."

271.  In a thinly-veiled attempt to bring 80% frames and receivers, along with "weapon parts kits," within the purview of subsection (A)'s "readily" standard, the Final Rule conflates a "weapon parts kits" *which contain **unfinished** 80% frames and receivers* to *fully manufactured* but disassembled/unserviceable/broken firearms *which contain a **complete** frame or receiver*, and which many courts have held to be firearms.  *See* NPRM at 27726 n.39; Final Rule at 24661 n.42, n.43; 24662 n.44; 24684 n.89.

272.  Indeed, not a single one of the government's cited cases provides any support for the Final Rule.  Most involve sentencing enhancements based on the presence of a firearm.  Some involve NFA machineguns rather than GCA firearms.  Most involve factory-made firearms, not DIY homemade firearms.  All but one of them involve firearms that – very much unlike a so-called "weapon parts kit" – *contain a **complete**, finished frame or receiver*.

273.  In *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017), the Fifth Circuit upheld a conviction under the NFA (not the GCA) for selling Uzi parts kits, which were machineguns. As the trial court explained in that case, "[o]ne of the ten firearms listed in Count II is the same firearm underlying the charge in Count I, which the government describes as being readily

restorable to a functioning *machinegun*. Of the nine remaining firearms underlying Count II, four consist of *machinegun receivers* and parts, four consist of just *machinegun receivers*, and one consists of a *complete, operable machinegun*." *United States v. Wick*, No. CR 15-30-M-DLC, 2016 U.S. Dist. LEXIS 200641, *2 n.1 (D. Mont. Mar. 11, 2016) (emphasis added).  In other words, each of the firearms charged in *Wick* contained <u>complete, finished receivers</u>.

274.  Similarly, *United States v. Theodoropoulos*, 866 F.2d 587, 595 n.3 (3d Cir. 1989) involved a disassembled "machine pistol" with a <u>complete, finished receiver</u> found in a trash can outside an apartment, but which "could have easily been made operable."  Likewise, in *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006), a rifle "was missing both the clip and the bolt," but could be made "operational in just a few seconds by putting the bolt in."  In other words, the rifle contained a <u>complete, finished receiver</u>.  *See also United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993) (involving a shotgun with a <u>complete, finished receiver</u> that was disassembled in that "the barrel was removed from the stock [but] it could have been assembled in thirty seconds or less); *Enamorado v. United States*, No. C16-3029-MWB, 2017 U.S. Dist. LEXIS 91113, *15-16 (N.D. Iowa June 14, 2017) (involving a handgun with a <u>complete, finished receiver</u> that "Enamorado had disassembled … for cleaning."); *United States v. Morales*, 280 F. Supp. 2d 262, 272-73 (S.D.N.Y. 2003) (involving a "partially-disassembled Tec-9 pistol" with a <u>complete, finished receiver</u> that could be reassembled "in about five seconds"); and *United States v. Randolph*, 2003 U.S. Dist. LEXIS 4304, *5 (S.D.N.Y. Mar. 18, 2003) (involving a handgun with a <u>complete, finished receiver</u> "consist[ing] of disassembled parts with no ammunition, no magazine, and a broken firing pin, making it incapable of being fired without replacement or repair").

275.  In *United States v. Hardin*, 889 F.3d 945 (8th Cir. 2018), the Eighth Circuit upheld a felon-in-possession conviction based on a ".380 Cobra handgun" with a <u>complete, finished receiver</u> that was "determined to be inoperable 'due to a broken trigger and numerous missing parts.'"  *Id.* at 946.  *See also United States v. Dotson*, 712 F.3d 369, 370 (7th Cir. 2013) (a "Hi-Point .380 caliber semi-automatic" pistol with a <u>complete, finished receiver</u> that had "'corroded, missing and broken components which make it inoperable.'"); *United States v. Davis*, 668 F.3d 576 (8th Cir. 2012) (handgun with "no trigger," but a review of the trial court docket reveals that the firearm involved was "a Ruger, Model P89DC, 9mm semi-automatic pistol, Serial Number 30705833" with a <u>complete, finished receiver</u>) (*USA v. Davis*, 4:10-cr-00095-BCW, W.D. Mo.); *United States v. Counce*, 445 F.3d 1016, 1018 (8th Cir. 2006) ("[t]he firearm in this case was missing the safety, thereby preventing the hammer from operating with a pull of the trigger," and a review of the docket shows the handgun involved was a "Bryco, Model 38, .380 caliber pistol, serial number 1030499" with a <u>complete, finished receiver</u>) (*USA v. Counce*, 04-00303-01-CR-W-FJG, W.D. Mo., ECF #29); *United States v. Rivera*, 415 F.3d 284, 285-86 (2d Cir. 2005) ("a loaded .380 Davis Industries semiautomatic pistol" with a <u>complete, finished receiver</u> and a "broken firing pin"); *United States v. Adams*, 137 F.3d 1298, 1299 (11th Cir. 1998) ("a Winchester 12 gauge pump shotgun" with a <u>complete, finished receiver</u>); *United States v. Brown*, 117 F.3d 353, 354 and 356 (7th Cir. 1997) ("[u]nbeknownst to Brown, the officer had removed the gun's firing pin," the gun having a <u>complete, finished frame</u> because, "were there any doubt as to whether the gun Brown possessed met the definition of firearm, we are satisfied that it qualified as 'the frame … of any such weapon.'"); *United States v. Reed*, 114 F.3d 1053, 1055 (10th Cir. 1997) ("a broken shotgun," but "even without repair the gun worked," meaning it had a <u>complete, finished receiver</u>); *United States v. Hunter*, 101 F.3d 82, 83 (9th Cir. 1996) (Cobray ".380 caliber, SWD M-

12 semiautomatic pistol" with a complete, finished frame and a "firing pin [that] was pulled forward and bent"); *United States v. Yannott*, 42 F.3d 999, 1001 (6th Cir. 1994) ("a .20-gauge sawed-off shotgun manufactured by Harrington and Richardson" with a complete, finished receiver and "a broken firing pin"); *United States v. Ruiz*, 986 F.2d 905, 910 (5th Cir. 1993) ("[e]xcept for the filed-down firing pin, the revolver was functional in every other respect," meaning it had a complete, finished frame);[41] and *United States v. Thomas*, 2019 U.S. Dist. LEXIS 147264, *3 (D.D.C. 2019) (a "Firearms Import and Export Corp. Western Duo .22 caliber revolver" with a complete, finished frame but "'missing its hammer, hammer screw, trigger, cylinder stop, hand, ejector rod housing, base pin, screw, nut, spring, loading gate detent and spring and miscellaneous screws.'").

276. The closest the government gets is with *United States v. Stewart*, 451 F.3d 1071, 1073 (9th Cir. 2006), but that case involved a conviction for machinegun possession under the NFA, and "[n]o charges were brought against Stewart [under the GCA] regarding the advertised parts kits that were initially the subject of the investigation." *Id.* In rejecting an appeal of the district court's denial of a motion to suppress, the Ninth Circuit found only that the trial court had not abused its discretion in finding that "parts kits for … .50 caliber rifles" provided probable cause for a warrant. *Id*. at 1073 n.2. The court's evaluation of probable cause is hardly a finding that the parts kits (which the government never charged) were GCA firearms under Section 923(a)(3).

---

[41] In only one thirty-five-year-old case cited by the government, *United States v. York*, 830 F.2d 885 (8th Cir. 1987) is it unclear as to the precise nature of a firearm, a revolver with "no firing pin, and [] the cylinder did not line up properly with the gun barrel." *Id*. at 891. However, due to the date of the case, the fact that the firearm involved was a revolver, and the fact that "[h]omemade revolvers aren't that common," it seems virtually certain that the firearm involved was a commercially manufactured revolver with a complete, finished frame.

277.  Not one of the numerous cases cited by the government determined that an aggregation of firearm parts or a so-called "weapon parts kit" is a firearm *without a complete, finished frame or receiver*.

278.  Indeed, under a plain reading of Section 921(a)(3), there is no such thing as a firearm that does not contain a frame or receiver.

279.  An unfinished 80% "weapon parts kit," by definition, *does not contain a fully manufactured frame or receiver*.  Indeed, the Final Rule explicitly admits that these types of kits contain "*incomplete* frames or receivers, commonly called '80% receivers'…." *Id.* at 24692.

280.  Quite unlike the cases cited by the government, where the firearm need only be *assembled* or *repaired* or *cleaned* in order to be operable, in order to assemble a "weapon parts kit" into a functional firearm, the 80% frame or receiver must first be ***manufactured*** into a complete frame or receiver, and then *assembled* into a functional firearm.

> **e.  The Final Rule's New Classification of 80% Frames and Receivers and "Weapon Parts Kits" as "Firearms" Reverses Countless ATF Classification Letters to the Contrary.**

281.  By promulgating an incomprehensible definition of "readily" and then misapplying it to 80% frames and receivers and so-called "weapon parts kits," the Final Rule can best be understood as an effort to eliminate entirely the market for DIY firearm parts that can be manufactured into functional firearms by law-abiding, "do-it-yourself" gun owners, including "firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers…." *Id*. at 24655.

282.  The Final Rule thus represents a tectonic policy shift by the agency.  Indeed, prior to the changes enacted in the Final Rule, ATF has never regulated (or formally asserted the authority to regulate) firearm parts, or the manufacture or sale of unfinished, non-firearm 80% frames and receivers (even when sold together with other unregulated gun parts).

### i. ATF Acknowledges the GCA Does Not Regulate Gun Parts.

283. First, the GCA does not regulate firearm parts, something ATF has recognized numerous times.

284. For example, ATF's website answers the question "[d]oes the GCA control the sale of firearms parts?" with the response "[n]o, except that frames or receivers of firearms are 'firearms' as defined in the law and are subject to the same controls as complete firearms."

285. Additionally, in a recent search warrant affidavit, ATF explained that "[p]istol slides are not regulated by ATF, and may be sold, purchased, or transported in interstate commerce fully assembled." Exhibit "43" at ¶12.

286. Similarly, in a recent court filing, ATF admitted that "Congress has chosen to exclude firearms parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm." *California v. ATF*, 3:20-cv-06761 (N.D. Ca.) (ECF # 29, Govt. Motion to Dismiss).

287. Likewise, in the NPRM, ATF explained that "[p]rior to passage of the GCA, the Federal Firearms Act of 1938 ('FFA') regulated all firearm parts," but that "[d]uring debate on the GCA and related bills introduced to address firearms trafficking, Congress recognized that regulation of all firearm parts was impractical." NPRM at 27720.

### ii. ATF Acknowledges the GCA Does Not Regulate 80% Frames and Receivers.

288. Second, ATF has repeatedly approved of incomplete 80% frames and receivers as non-firearms, including in classification letters issued to members and supporters of GOA/GOF. Patterson Affidavit at ¶35.

289. As ATF's website explains, "ATF has long held that … [r]eceiver blanks that do not meet the definition of a 'firearm' are not subject to regulation under the Gun Control Act (GCA)."

290.  Indeed, over the course of many years, ATF has issued numerous classification letters concluding that a wide variety of so-called "80% frames and receivers" are not firearms, because they have not reached a sufficient stage of completion to result in classification as a GCA firearm.

291.  As additional examples, in November of 2015, ATF approved of a "Glock-type 'GC9 Blank'" frame manufactured by Polymer 80, Incorporated, on the basis that this Glock-style unfinished frame did not have certain milling operations performed.  *See* Exhibit "21."

292.  In January of 2017, ATF again approved of a "compact" size Polymer 80 "PF940C" unfinished frame, on the same theory.  *See* Exhibit "22."  Subsequently, millions of this popular DIY frame have been sold to "do-it-yourself" gun owners across the country.

293.  The Final Rule purports to reverse these classifications, including those issued to members and supporters of GOA/GOF.  In fact, while referencing the alleged "need[] to deter the increased sale or distribution of unlicensed and unregulated partially complete or unassembled frames or receivers often sold within parts kits that can readily be completed or assembled to a functional state," the NPRM explicitly mentioned by name "Polymer 80" (the same 80% receivers approved in the preceding paragraphs) as being "completed in under thirty minutes." PR at 27729 n.54.

294.  Indeed, in various places throughout the Final Rule, ATF **explicitly overrules its prior classification letters on 80% frames and receivers**.  *See id.* at 24654 (the Final Rule "does not grandfather partially complete, disassembled, or nonfunctional frames or receivers, including weapon or frame or receiver parts kits, that ATF did not classify as firearm 'frames or receivers' as previously defined."); at 24696-97 ("[t]he only exceptions [to grandfathering] are classifications of partially complete, disassembled, or nonfunctional frames or receivers that ATF had determined did not fall within the definition of firearm 'frame or receiver' prior to this rule. Any such

classifications, including parts kits, would need to be resubmitted for evaluation."); at 24708-709 ("ATF's prior determinations that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a firearm 'frame or receiver' as defined prior to this rule are excluded from the grandfathering clause. Such determinations include those in which ATF had determined that the item or kit had not yet reached a stage of manufacture to be, or include, a 'frame or receiver' under the existing definitions. Because this rule expressly regulates weapon and frame or receiver parts kits, and aggregations of parts with partially complete frames or receivers that are designed to, or may readily be converted to, expel a projectile, these prior ATF classifications (in which the entire kit may not have been presented to ATF at the time of classification) will need to be re-evaluated on a case-by-case basis."); at 24724; 24668; 24673.

295.  ATF's only justification for revocation of its classification letters on 80% frames and receivers is that "[p]rior to this rule, ATF did not examine templates, jigs, or other items and materials in determining whether complete frames or receivers were 'firearms' under the GCA." *Id*. at 24668; *see also* at 24724 ("at the time of classifications of those articles, ATF may not have been provided with, or did not examine, a full and complete parts kit containing those items along with any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials….").

296.  **On the contrary**, in 2014, ATF's Firearms Technology Branch examined a "[s]uspected AR-15 type firearm receiver [along with a] material removal guide, three drill bits, and an end mill," and determined that this combination of items "does not constitute a firearm frame or receiver" because the 80% receiver "is completely solid in the fire-control area, and does not incorporate indexing characteristics, such as locating features for the hammer and trigger pins." *See* Exhibit "45."

297.  In other words, ATF found the presence of the other items to be irrelevant, and focused, as it always had, on the specific milling operations present on the 80% frame or receiver.

### iii.   ATF Acknowledges the GCA Does Not Regulate Parts Kits.

298.  Third, the Final Rule now takes the position that an incomplete 80% frame or receiver (*i.e.*, an *unregulated* non-firearm), when packaged with other *unregulated* gun parts, somehow magically transforms into a GCA regulated firearm.

299.  On the contrary, zero plus zero does not equal one.

300.  In fact, ATF has *expressly and repeatedly approved* of scenarios where unfinished "80% frames and receivers" are sold together with tools, finishing devices, instructions, blueprints, templates, and even "all of the necessary components (finished or unfinished), along with jigs, templates, or other tools that allow an individual to complete a functional weapon." *See* Final Rule at 24692.   In addition to its dozens of classification letters determining that many different types of "80% frames and receivers" are not firearms, ATF has also issued letters approving of the combination of various unregulated items into a "kit" to be sold together with the 80% frame or receiver – *i.e.*, a so-called "weapon parts kit."

301.  In August of 2006, ATF discussed an "incomplete 10/22 Magnum-type receiver." Exhibit "26."  Tellingly, ATF opined that "your incomplete receiver was previously examined by this Branch and was classified as a non-firearm.  Selling this item as a 'kit' with blueprints, parts, *etc*., will not change this classification."  *Id.* (emphasis added).

302.  Likewise, in November of 2011, ATF examined a "sheet-metal replacement [] receiver that has not reached a point in manufacturing to be considered a 'firearm' frame/receiver," and which was coupled with other parts as a "M44-type kit."  Like its 2006 letter above, ATF concluded that even the "*kit*" was not a firearm under the GCA.  Exhibit "46."

303.  In June of 2014, the ATF examined an "unfinished Model P-13 type pistol frame and miscellaneous pistol components, to include a slide and .45 ACP caliber barrel.  Several critical machining operations have yet to be accomplished on the unfinished pistol frame…" which included cutting the slide rails, drilling slide-stop pin holes, sear pin holes and main spring housing pin holes, among other things.  *See* Exhibit "47."  And this, the ATF held, was not a "firearm" and "not subject to regulation under the provisions of the GCA or NFA."

304.  Similarly, in a December 2013 presentation entitled "Identify AR and AK Type Receivers and Assorted Manufacturing Methods and Equipment," ATF explained that "[t]he internet has expanded the availability of unfinished receivers, firearm parts, firearm parts kits, and the tools needed to assemble … complete and functional firearms … *none of the required materials are regulated*, [and] *all may be easily, affordably, and anonymously purchased via the internet*." Exhibit "48" at 52.  Elsewhere in the document, ATF stated that an "unfinished receiver" is "not a firearm," and "***[p]arts kits" that do not contain a finished "firearm receiver, are not regulated by any statute other than for importation.***"  *Id.* at 3, 28 (emphasis added).

305.  Additionally, an "ATF Intelligence Assessment Document," entitled "Increased Possession of Privately Made Firearms (PMFs) by Prohibited Persons" makes clear that none of the items in a so-called "weapon parts kit" is regulated by federal law, explaining that "[i]ndividual components and receiver/frame-shaped components required to complete a PMF generally do not meet the definition of a firearm … ***[t]he individual components can be purchased as '80 percent kits'*** …."  Exhibit "49" at 3.  This ATF document goes on to explain that "[t]he ATF Form 4473 … *is not required* for individual component parts or receiver/frame-shaped components that are not yet considered firearms."  *Id*. at 3-4.

306. Finally, the U.S. Attorneys' Bulletin from November of 2015, entitled "Prosecuting Firearm Offenses," describes the process to make a homemade firearm, and explains that, along with an 80% receiver, a DIY gun owner "can order a lower receiver parts kit, an upper receiver, barrel, and other parts necessary to assemble a completed firearm that will expel a projectile by an explosive. *All of these accessories are readily available, and the purchaser will not be required to go through a background check* to self-complete a firearm. Additionally, the purchaser will not have been required to file an ATF Form 4473…."[42]  *Id*. at 48 (emphasis added).

307. Even self-professed anti-gun Senator Chuck Schumer (D-NY) acknowledged that the parts in a "weapon parts kit" are not covered under the current statute, explaining that "[a] gun is a firearm. It has to be sold by a dealer. But the pieces are not a firearm and don't have to be sold by the dealer. That's what we need to change" – of course, he meant by legislation, not bureaucratic fiat.[43]  *See also* statement of Senator Richard Blumenthal (D-NY) ("they are guns, except under federal law").[44]

308. The Final Rule thus represents a diametric policy shift by ATF, as shown by its recently issued classification letters.  *See ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995). Each of these documents <u>directly contradicts</u> the position taken by ATF in the Final Rule, that unfinished "80% frames and receivers" (which ATF repeatedly has determined to be non-firearms), combined with common firearm parts (which ATF has explained it does not regulate) as a "kit" (which ATF has explained it does not regulate) magically combine to become more than the sum of their parts as a regulated "firearm" – but one that does not contain a complete frame or receiver.

---

[42] https://www.justice.gov/usao/file/794586/download.
[43] https://www.fox13news.com/news/biden-administration-expected-to-crack-down-on-ghost-guns.amp?utm_source=operamini&utm_medium=feednews&utm_campaign=operamini_feednews.
[44] https://twitter.com/senblumenthal/status/1392240697932189705 at 1:35.

### f.   Not Content with Targeting "Weapon Parts Kits," the Final Rule Reverses Course for All 80% Receivers.

309.  After (i) creating an incomprehensible definition of "readily," (ii) claiming it applies to unfinished 80% frames or receivers, and 80% frames or receivers that are packaged with other unregulated parts as so-called "weapons parts kit," and (iii) revoking all its classification letters with respect to both 80% frames and receivers and kits, the Final Rule then creates an entirely new sub-definition of a "frame or receiver" entitled a "partially complete, disassembled, or nonfunctional frame or receiver."  Final Rule at 24739.

310.  The Final Rule defines "*partially complete, disassembled, or nonfunctional frame or receiver*," in pertinent part, as follows:

> The terms 'frame' and 'receiver' shall include a *partially complete*, disassembled, or nonfunctional frame or receiver, *including a* frame or receiver *parts kit*, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver….
>
> The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is *clearly identifiable* as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material).
>
> When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit. [*Id*. at 24739.]

311.  The Final Rule claims that "[t]he crucial inquiry is at what point an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under Federal law." *Id*.

312.  As a purported further explanation, the Final Rule then adds to the definition five examples that purport to show how various items will be treated.

313.  **First**, the Final Rule claims that an unfinished frame or receiver "that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver…."  *Id*. at 24739.

314. **Second**, the Final Rule claims that an unfinished frame or receiver "with one or more template holes drilled or indexed in the correct location is a frame or receiver." *Id.*

315. **Third**, the Final Rule claims that a "not destroyed" frame or receiver "is a frame or receiver." *Id.*

316. **Fourth**, the Final Rule claims that an AR-15 80% receiver, "without critical interior areas having been indexed, machine, or formed," and which "is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools … is not a receiver." *Id.*

317. **Fifth**, the Final Rule claims that "a flat blank of an AK variant receiver without laser cuts or indexing that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools is not a receiver…." *Id.*

### g.   ATF's Definition Produces Absurd Results.

318. Interestingly enough, the Final Rule's focus on the presence of "instructions, jigs, templates, equipment, or tools" – entirely unregulated items that are not even component parts of a finished firearm – has led ATF to the inconsistent and absurd conclusion that a far more incomplete item is a firearm, but a far more complete item is not a firearm. Judged by any standard of reasonableness, or by what ATF apparently intended to achieve, the Final Rule can thus be seen to be both overinclusive, and underinclusive.

319. As ATF has recently explained, a block of cast aluminum which *merely has the outward appearance* of an AR-15 frame or receiver (sometimes known as a "20% lower"[45]), but which has *no machining operations performed*, is a receiver when "sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools."  *See* Exhibit "50."

---

[45] https://www.80percentarms.com/products/20-lower-blank-ar-15-lower-receiver-forging/.

320.  Meanwhile, according to the Final Rule, an 80% AR-15 receiver which has *most milling operations performed*, but which is not "sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools," is not a receiver.  *Id*. at 24739 ("Example 4").

321.  This result is nonsensical.  As an analogy, based on the reasoning advanced by the Final Rule, a random pile of raw steel, plastic trim, copper wire, and computer chips would be properly classified as an automobile if it is sold with instructions on how to construct a handmade Toyota Camry from scratch.  At the same time, an *actual* Toyota Camry would be classified as a non-automobile so long as it was missing its tires and windows and did not come with instructions.

322.  Also problematic is the Final Rule's reference to "possess[ion]," which indicates that ATF intends not only to regulate manufacturers and dealers of 80% frames and receivers, but also in the future intends to *bring criminal charges* against persons who possess or transfer these non-firearm, unregulated items.

### h.  ATF's Definition is Standardless.

323.  Additionally, in making a determination as to what constitutes a firearm, the definition of "*partially complete, disassembled, or inoperable frame or receiver*" states that ATF "may" (but apparently not must) "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."  *Id*. at 24739.

324.  The Final Rule does not explain how these factors will be considered, what weights they will be given, and provides no definitive standards by which a determination will be made. Moreover, the list of considerations does not appear to be exhaustive.

325.  Again, this is precisely the same sort of unmoored and standardless test that landed the ATF in hot water in *Innovator Enters. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C. 2014).

> **i.   ATF's Attempt to Explain "Clearly Identifiable" Is Incomprehensible Gobbledygook.**

326.  In an attempt to explain the term "clearly identifiable" as used in the definition of "partially complete, disassembled, or inoperable frame or receiver," the NPRM offered the following explanation:

> ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a <u>critical stage of manufacture</u>. This is the point at which a <u>substantial step has been taken</u>, or a <u>critical line crossed</u>, so that the item in question may be so classified under the law.  This 'critical stage of manufacture' is when the article becomes <u>sufficiently complete</u> to function as a frame or receiver, or may readily be completed, assembled, converted, or restored to accept the parts it is intended to house or hold.

> Unformed blocks of metal, and other articles only in a <u>primordial state</u> would not — <u>without more</u> — be considered a 'partially complete' frame or receiver.  [*Id*. ".]"

327.  Shockingly, the only assurance that ATF would provide was that it would not deem a raw block of aluminum or steel, or a spool of plastic filament for a 3-D printer, to be a "firearm." NPRM at 27729 (emphasis added) ("unformed blocks of metal, and other articles only in a primordial state would not — *without more* — be considered a 'partially complete' frame or receiver.").

328.  Of course, the ATF caveat "without more" leaves open the question whether, for example, a set of instructions (the distribution of which would seem to be protected by the First Amendment) included with a cubical block of metal, or perhaps a spool of 3-D printer filament accompanied by a flash drive containing a file for a 3-D printed firearm, may in ATF's eyes constitute a "firearm" that needs to be serialized and transferred only after an FBI background check.

329.  Unsurprisingly, ATF's gobbledygook met with significant opposition during the notice and comment period of the NPRM, with commenters including GOA/GOF questioning what any of these terms meant.  *See* Exhibit "33" at 27-28

330.  In the Final Rule, ATF acknowledges these comments, and responds that, "although the Department disagrees that certain terms in this rule were vague, additional clarity has been provided to explain the meaning of those terms. Examples of articles that are 'clearly identifiable as an unfinished component part of a weapon' are unformed blocks of metal, liquid polymers, and other raw materials. The dictionary definition of the term 'primordial' was adopted and explained in footnote 49 of this preamble."[46]  *Id.* at 24690.

331.  Hold the phone.  The statute defines a "firearm" to include a "frame or receiver."  18 U.S.C. Section 921(a)(3)(B).  The Final Rule defines "frame or receiver" to include a "partially complete, disassembled, or inoperable frame or receiver."  *Id.* at 24739.  The Final Rule then defines a "partially complete, disassembled, or inoperable frame or receiver" to be one that is "clearly identifiable as an unfinished component part of a weapon."  *Id.*  Then, in order to explain what "clearly identifiable" means, the Final Rule provides explanatory text (that appears in no regulatory definition) that an item is not "clearly identifiable" if it is an "article[] only in a primordial state."  *Id.*  Then, in order to explain what "primordial state" means, the Final Rule adopts a dictionary definition "in footnote 49 of this preamble."

---

[46] Indeed, footnote 49 of the Final Rule claims that "[a]s used in this rule, the term 'primordial' refers to an item, such as an unmachined block of metal, liquid polymer, or other raw material that is in its original natural form or at an early stage of development without substantial processing." *Id.* at 24663 n.49.  The Final Rule further claims that "firearms manufacturing is a continuum from raw material to a functional item." *Id.* at 24700.  The Final Rule explains that "an item in a primordial state, such as a solid block of metal, liquid polymer, raw material, or other item that is not clearly identifiable as a component part of a weapon, is not a 'frame' or 'receiver' under this rule." *Id.* at 24689.

**332. In other words, ATF has created an informal definition, within another informal definition, within a regulatory definition, within another regulatory definition, within a statutory definition, of a statutory term.**

333. If that does not sum up the problems with this nation's vast and unchecked administrative state, it is hard to see what would.

334. Even more problematically, the Final Rule's explanation of "the point" raw materials become firearms does not appear in the regulatory definition itself, but rather in the agency's musings about the meaning of its incomprehensible definition, contained in the "preamble" to the Final Rule. Since the definition promulgated by the Final Rule apparently needs significant additional explanation in order to understand it, the agency has all but admitted its definition is unlawfully vague and ambiguous.

335. If the regulation was so ambiguous that ATF needed to create multiple further degrees of sub-definitions, then it should have been done in the regulation, not the "preamble." *See, e.g., Bender v. Gutierrez*, Nos. 2:03CV519, 2:04CV300, 2006 U.S. Dist. LEXIS 96720, at *16-17 (E.D. Va. Sep. 19, 2006) ("since the immediately filed language is not contained in the regulation itself … the preamble language is not authoritative."); *Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019) ("while the preamble can inform the interpretation of the regulation, it is not binding and cannot be read to conflict with the language of the regulation itself.).

336. The Final Rule's definition of a "partially complete, disassembled, or inoperable frame or receiver" thus is hopelessly unclear and ambiguous, opening the door to arbitrary and capricious enforcement, and making it unconstitutionally vague under the Fifth Amendment.

337. As explained, numerous of GOA/GOF's members and supporters design, develop, manufacture, distribute, and sell to the public items which are unregulated by federal law, including incomplete and unfinished frames and receivers, firearm parts, and even raw materials (such as blocks of aluminum), along with "templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" to guide law-abiding "do-it-yourself" gun owners as they manufacture these unfinished products into functioning firearms.  Many of GOA/GOF's members and supporters lawfully purchase these items and use them to manufacture their own homemade firearms.  The vague and incomprehensible definitions provided in the Final Rule leaves these entities completely in the dark as to when their products will be considered by ATF to be "clearly identifiable as an unfinished component part of a weapon" and thus regulated by federal law. Patterson Affidavit at ¶33.

338.  Recently, the Nevada legislature enacted AB 286, which banned an "unfinished frame or receiver" and defined this as something having been "formed or machined to the point at which most of the major machining operations have been completed…."  That language is far more clear than the Final Rule yet, in *Polymer80 v. Sisolak*, a state court found this language to use "inherently vague terms" and that "vagueness [] permeates the text" and that the state "could not in any manner explain their meaning(s)."  *See* Exhibit "51."  Granting summary judgment to the plaintiffs, and finding the statute ambiguous, the court concluded that "nor is there any way to know when 'most of the major machining operations have been completed,' and then what 'additional machining' must still occur and when."  *Id*. at 15.  The court noted that "[t]he most any court can glean from the definition is that it is something less than a firearm and more than a block of raw material."  *Id*. at 16.

339.  Such is the case with the Final Rule's definition.[47]

## IV.    ATF Has No Statutory Authority to Regulate What it Calls "Privately Made Firearms."

340.  This section challenges the Final Rule's promulgation of the following regulations:

    a.  27 CFR § 478.11(d) – Gunsmith (87 FR 24734);

    b.  27 CFR § 478.11(?) – Privately made firearm (PMF) (87 FR 24735);

    c.  27 CFR § 478.11(?) – Importer's or manufacturer's serial number (87 FR 24735);

    d.  27 CFR § 478.92(a)(2) – Privately made firearms (PMFs) (87 FR 24742);

    e.  27 CFR § 478.122 – Records maintained by importers (87 FR 24743 to 87 FR 24744);

    f.  27 CFR § 478.123 – Records maintained by manufacturers (87 FR 24744); and

    g.  27 CFR § 478.125(i) – Privately made firearms (87 FR 24745).

341.  The Final Rule upends existing federal gun law, imposing onerous burdens on federal firearms licensees and private gun owners alike, and creating out of thin air a new federal crime with respect to what ATF terms "privately made firearms," all in clear disregard for the statutory text that Congress enacted.

342.  ATF defends its actions on the theory that it "must" rewrite the law in order to give purported effect to the perceived intent of Congress, in violation of the principle that "Congress alone has the institutional competence, democratic legitimacy, and (most importantly)

---

[47] The Nevada court also noted that "the State Legislature received comments during the legislative process that AB 286 was vague, and that the definition of 'unfinished frame or receiver' was particularly uncertain," but that "[r]ather than address the issue through comments or revising the text of AB 286, the Nevada Legislature remained silent."  Exhibit "51" at 13.  Likewise, GOA/GOF submitted comments to ATF during the comment period in the Proposed Rule, arguing that the Final Rule adopts ambiguous and vague definitions, including for "partially complete … frame or receiver."  Exhibit "33" at 27.  But like the Nevada Legislature, here ATF did nothing to address those concerns, leaving the vague language intact.

constitutional authority to revise statutes in light of new social problems and preferences.  Until it exercises that power, the people may rely on the original meaning of the written law." *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018).

343.  First, the Final Rule creates a new definition of what ATF calls a "privately made firearm" (abbreviated as "PMF"), as follows:

> *Privately made firearm (PMF)*. A firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced. The term shall not include a firearm identified and registered in the National Firearms Registration and Transfer Record pursuant to chapter 53, title 26,[48] United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).  [*Id.* at 24735.]

344.  The term "privately made firearm" does not exist, and has not ever existed, within federal law.

345.  That is because there is no federal prohibition on non-prohibited individuals who, like Plaintiff Jimenez, privately manufacture firearms for their own personal use, there is no prohibition on transferring a firearm that originally was made for personal use, and there is no statute that requires such firearms be marked with any serial number, recorded in the books of any dealer, or obtained only after a background check.[49]

---

[48] The Final Rule thus excludes from this definition of "PMF" NFA "firearms" that are regulated and recorded in the National Firearm Registration and Transfer Record ("NFRTR").  The Final Rule also arbitrarily excludes firearms manufactured prior to the effective date of the 1968 Gun Control Act (including PMFs made prior to that date). *Id* at 24735, 24701.

[49] For one thing, there is a Second Amendment right to make a firearm for personal use. Federal cases so far dealing with similar issues are in accord, determining that the right to "keep and bear arms" implies "'a corresponding right' to obtain the bullets necessary to use them." *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (emphasis added). *See Bezet v. United States*, 276 F. Supp. 3d 576, 605 (E.D. La. 2017) (restrictions on "the use of imported parts to assemble a firearm . . . likely impinge on the rights of law-abiding, responsible citizens . . . to acquire" firearms), aff'd 714 F. Appx. 336, 341 (5th Cir. 2017).

346. Thus, ATF's attempt to create a new definition of "privately made firearm" signifies only one thing – the agency's intent to rewrite the statute in order to claim the authority to regulate privately made firearms, where such authority did not previously, and does not currently, exist.

347. In support of ATF's curious theory that it *must* take action to shore up the statutes Congress enacted, the NPRM claimed that, even though ATF could not persuade Congress to regulate privately made firearms, it nevertheless is necessary for ATF to take action to regulate them, "because PMFs do not bear a serial number," and thus "ATF has found it extremely difficult to complete [] traces on behalf of law enforcement…."  NPRM at 27724, *see also* at 27723 (claiming PMFs "hamstring[] law enforcement's ability to investigate crimes," and claiming "terrorists" use PMFs.); *see also* at 27725 ("as unmarked and difficult-to-trace PMFs proliferate through the marketplace," ATF's ability "to prosecute straw purchasers … is likely to become increasingly difficult….").[50]

348. The Final Rule makes corresponding claims, alleging that "technological advancements" have made it easier for gun owners to make their own firearms, which "makes it extremely difficult for law enforcement to" track them.  *Id*. at 24656; *see also* at 24659 ("tracing is an integral tool for … law enforcement … and the proliferation of untraceable firearms severely undermines this process"), ("ATF has found it extremely difficult to successfully complete traces of PMFs").

349. In its comments in response to the NPRM, GOA/GOF explained that "the GCA does not regulate "privately made firearms."  Exhibit "33" at 36-41.  Now, the Final Rule goes so far as to claim that "[t]he GCA provides that all firearms received and transferred by FFLs *must* be traceable" – meaning serialized – "[t]here is no exception for PMFs."  *Id*. at 24687 (emphasis

---

[50] ATF currently prosecutes a tiny number of straw purchasers.  *See* https://www.gao.gov/assets/gao-18-440.pdf at page 14 ("Of the 12,710 referrals ATF sent to its field divisions in fiscal year 2017 for investigation, USAOs considered 50 cases for prosecution, and prosecuted a total of 12 cases (9 delayed denial and 3 standard denial) as of June 2018, according to ATF data… An additional 10 cases were pending or awaiting prosecution as of June 2018.").

added); *see also* at 24706 ("PMFs *must* be marked with a traceable serial number," and permitting otherwise "undermines the entire purpose of maintaining transactions records and other required records.") (emphasis added).

350.  Such changes in technology or society do not permit an agency to change the law, simply because its job purportedly has been made (or possibly may in the future be made) more difficult. Rather, only Congress may change the statute to respond to an agency's perceived need for new or additional authorities that bureaucrats believe they "must" have.  Indeed, the Final Rule acknowledges that, in recent years, "several States and municipalities have banned or severely restricted unserialized or 3D-printed firearms." *Id*. at 24658.  Notably, however, Congress has not acted in a similar manner.

351.  The Final Rule misleadingly claims that "nothing in the [] rule restrict[s] persons who are not otherwise prohibited from possessing firearms from making their own firearms without markings solely for personal use…." *Id*. at 24665.  Similarly, the Final Rule claims that "this implementing rule" does not "require[] unlicensed individuals to mark (non-NFA) firearms they make for their personal use, or to transfer them to an FFL for marking." *Id*. at 24687.

352.  But focusing on what the Final Rule *does not do* (it does not ban the manufacture of homemade firearms outright) is nothing more than a clever way of avoiding admitting what the Final Rule *does do* (it does regulate homemade firearms, items that Congress explicitly chose to leave unregulated and permitted to be unserialized).[51]

### a.   ATF Has No Authority to Require Serialization of Privately Made Firearms.

---

[51] As alleged in other sections of this Complaint, the Final Rule separately attacks the right of gun owners to manufacture their own firearms, attempting to regulate unfinished frames and receivers, along with unregulated parts that accompany them.

353. After creating a new definition of "privately made firearm," the Final Rule creates another new definition of an "importer's or manufacturer's serial number," defined as:

*Importer's or manufacturer's serial number*. The **serial number placed by a licensee on a** firearm, including any full or abbreviated license number, any such identification on a **privately made firearm**, or a serial number issued by the Director. For purposes of 18 U.S.C. 922(k) and § 478.34, the term shall include any associated licensee name, or licensee city or State placed on a firearm.  [*Id.* at 24735 (emphasis added).]

354. Next, the Final Rule creates a requirement that licensees must "identify" privately made firearms by "mark[ing]" them with such a "serial number."  Specifically, the Final Rule adds to 27 CFR § 478.92, creating subsection (a)(2) for "privately made firearms," requiring that:

*(2) Privately made firearms (PMFs)*. Unless previously identified by another licensee in accordance with, and except as otherwise provided by, this section, **licensees must legibly and conspicuously identify each privately made firearm or "PMF" received or otherwise acquired** (including from a personal collection) **not later than the seventh day following the date of receipt or other acquisition**, or before the date of disposition (including to a personal collection), whichever is sooner. **PMFs must be identified** by placing, or causing to be placed under the licensee's direct supervision, an individual serial number on the frame or receiver, which must not duplicate any serial number placed by the licensee on any other firearm. The serial number must begin with the licensee's abbreviated Federal firearms license number, which is the first three and last five digits, as a prefix to a unique identification number, followed by a hyphen, e.g., "12345678-[unique identification number]". The serial number must be placed in a manner otherwise in accordance with this section, including the requirements that the serial number be at the minimum size and depth, and not susceptible of being readily obliterated, altered, or removed. An acceptable method of identifying a PMF is by placing the serial number on a metal plate that is permanently embedded into a polymer frame or receiver, or other method approved by the Director.  [*Id.* at 24742.]

355. The Final Rule permits licensees to "adopt" as the serial number certain already existing markings which have been placed on PMFs, but still requires the licensee to append its abbreviated license number before the existing serial number.  *Id.* at 24743.  The Final Rule also requires licensees to mark PMFs which they have acquired *prior* to implementation of the Final Rule.  *Id.* at 24742.

**b.  No Federal Statute Requires *All* Firearms to Be Serialized.**

356. To support these new definitions and requirements, the NPRM falsely asserted that "the GCA … required *__all__* firearms to be marked under federal law." *Id.*  NPRM at 27746-47 (emphasis added).  Similarly, the Final Rule claims that "PMFs, like commercially produced firearms, *__must be able__* to be traced" – i.e., must be serialized – through the records of licensees when the PMFs are involved in crimes."  *Id*. at 24676 (emphasis added).  Both purported justifications are patently false.

357. On the contrary, 18 U.S.C. Section 923(i) requires only that:

> (i) **Licensed importers and licensed manufacturers shall identify** by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, **each firearm imported or manufactured** by such importer or manufacturer.

358. Similarly, ATF's existing companion regulation makes clear that "a **licensed manufacturer** or **licensed importer** of firearms, must legibly identify **each firearm manufactured or imported**…." 27 CFR § 478.92(a)(1) (emphasis added).

359. In other words, both the statute and existing regulation explicitly confine the licensing requirement and the firearm marking requirement *__only__* to a "licensed **manufacturer** or licensed **importer**."  Moreover, the statute and existing regulation confine the licensing requirement *__only__* to "each firearm **manufactured** or **imported**" by such licensee.

360. Neither federal law nor existing ATF regulations impose any similar requirement on "dealers" such as Plaintiff Bridge City Ordinance who merely "deal" in firearms (who by definition cannot "manufacture" or "import" firearms) – and certainly not with respect to firearms "manufactured" by a private party such as Plaintiff Jimenez, who is not a dealer.

361. Indeed, private persons, such as Plaintiff Jimenez manufacturing their own firearms for personal use are neither "licensed manufacturers" nor "licensed importers."  Nor is there any statutory duty to become licensed in order to manufacture a privately made firearm.  Likewise,

there is no statutory duty for *anyone* to serialize or "mark" a privately made firearm, which is why ATF, for years, has simply instructed FFLs to record such firearms in their records as "NSN" for "no serial number." *See* Regulatory Impact Analysis ("When PMFs are made for personal use, they are not required by the GCA to have a serial number placed on the frame or receiver.").

362.   ATF's claim that *all* firearms must be serialized (at least when handled by dealers) is also contradicted by other provisions in the Final Rule.  Although creating a serialization requirement for PMFs, the Final Rule expressly *exempts* other firearms without serial numbers from the requirement that they be marked, including pre-1968 firearms, and commercially manufactured firearms with worn and unreadable serial numbers.  *Id*. at 24717 ("neither the NPRM nor this final rule define 'privately made firearm' as including firearms manufactured or made prior to October 22, 1968, and this rule does not affect pre-October 22, 1968, firearms that were not serialized."). If ATF's claim that *all* firearms *must* be serialized actually were true, the Final Rule would have required that.

363.   Further demonstrating that Congress never intended (much less required) privately made firearms to be serialized is the reality that the GCA was enacted in 1968 but, in the intervening six decades, ATF apparently never realized that the statute supposedly contained such a requirement. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation and punctuation omitted) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, … we typically greet its announcement with a measure of skepticism.").

364. This entirely new requirement that FFLs mark privately made firearms is in direct conflict with the statutory text.  Indeed, the NPRM candidly admitted as much, stating that "PMFs are those firearms that were made by **non**licensees **without the markings required** by this

part…."  NPRM at 27730 (emphasis added).  *See also* 27732 ("privately made firearms do not have the identifying markings required of commercially manufactured firearms….").

### c.   The Final Rule Fails to Adequately Address GOA/GOF Comments.

365.  In comments submitted in response to the NPRM, GOA/GOF explained the point that the statute requires only "manufacturers" and "importers" – but not dealers – to serialize firearms, and that *all* firearms need not be serialized under federal law.  Exhibit "33" at 37 ("ATF falsely asserts that 'the GCA … required all firearms to be marked under federal law.' **No. It. Did. Not.")**.  In response to GOA/GOF's comments, the Final Rule provides the weakest of responses.  *Id.* at 24687.

366.  First, ATF relies on its general authority in 18 U.S.C. Section 926(a) "to promulgate regulations necessary to enforce the provisions of the GCA," and claims that "requiring licensees to mark PMFs is such a regulation," because ATF gets "to determine what regulations are in fact 'necessary.'"  *Id.* at 24687.  This is nonsensical.  The entire point here is that requiring dealers to serialize firearms *does not appear* as one of "the provisions of the GCA."  Consequently, *there is no authority for ATF to enact a regulation "to enforce" a provision of law **that does not exist***.

367.  Second, the Final Rule claims that "Congress clearly understood that persons other than licensed manufacturers and importers may need to mark firearms they make or possess privately," pointing to a requirement under the **_NFA_** (not the GCA) that possessors of **_NFA_** firearms mark them so that they may be registered in the NFRTR.  *Id.* at 24687.  Inconsistently, whereas the Final Rule (at 24687) *analogizes* NFA serialization to GCA serialization, the Final Rule also (at 24690) *distinguishes* between serialization of NFA firearms and GCA firearms.  Moreover, the presence of a requirement in one statute (the NFA) does not mean the same requirement exists in an entirely different congressional enactment (the GCA).  On the contrary, the absence of any similar requirement means that Congress *did not intend* the requirement in the statute where it was not

included.  In any event, the Final Rule does not require the *manufacturer* of a PMF (an individual gun owner) to mark his firearm, but rather imposes that requirement on a *dealer* who did not have anything to do with the firearm's creation, a requirement foreign to either the GCA or the NFA.

368.  Third, the Final Rule claims that the limited requirement in Section 923(i) for "licensed importers and manufacturers … to mark firearms … *does not prohibit* others from also doing so," and "*cannot be construed as a prohibition* against any marking requirement through regulation." *Id*. at 24687 (emphasis added).  In other words, ATF ***admits*** that Congress did not actually require any marking of PMFs, but argues that the agency should be permitted the leeway to enact such a requirement through regulation.  On the contrary, "where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

369.  Fourth, ATF claims that "[t]his rule is *necessary* to ensure the continuing fulfillment of the congressional intent to mark and allow for tracing of all firearms," claiming that, "[w]hen Congress enacted the GCA, it likely did not consider that PMFs would enter the business or collection inventories of licensees, at least not in any significant number."  *Id*. at 24687-88.  Of course, as noted above, while changed circumstances after more than 50 years may prompt *Congress* to take another look at a statute, it in no way permits an *agency* to simply modify a statute as *bureaucrats* see fit, in order to do what they believe Congress would have done had it confronted the issue.

370.  Indeed, the Final Rule appears to admit as much, explaining that "privately made firearms … are not required by the GCA to have a serial number placed on the frame or receiver when made for personal use."  *Id*. at 24652, 24655.

371.  In spite of that statutory reality, the Final Rule blatantly rewrites the statute to require firearm "dealers" to serialize any firearm *manufactured by another person* that merely comes into the dealer's *possession*, such as for consignment, trade, or gunsmithing work.

### d.  The Final Rule Creates an Entirely New Federal Crime.

372.  Going even further into unauthorized territory, the Final Rule then attempts to link its new requirement for serialization of PMFs to the existing criminal prohibition on "removal, obliteration, or alteration" of a serial number found in 18 U.S.C. § 922(k).

373.  The Final Rule states that a PMF serial number (not required by statute) will now be "considered the 'importer's or manufacturer's serial number' protected by 18 U.S.C. 922(k), which prohibits possession or receipt of a firearm that has had the importer's or manufacturer's serial number removed, obliterated, or altered."  *Id*. at 24653.

374.  In response to a comment, the Final Rule asserts that "these markings" (*i.e.*, the Final Rule's mandated serialization of PMFs) "are protected by 18 U.S.C. 922(k)."  *Id*. at 24701.

375.  According to the Final Rule, then, it will now become a federal offense to remove a serial number on a PMF, even though no statute requires a PMF to have such a marking in the first place.

376.  In other words, ***the Final Rule purports to create an entirely new federal crime*** that Congress never enacted.

377.   It is axiomatic that ATF does not have the power to create new crimes, as "the Executive Branch, whether through the President or one of its agencies, cannot create criminal statutes; only Congress can do so." *Chavez-Alvarez v. AG United States*, 850 F.3d 583, 589 (3d Cir. 2017).

378.  As noted above, there is no statutory authority for the Final Rule's new requirement that privately made firearms be serialized, and thus no authority for the Final Rule's creation of a new federal crime prohibiting obliteration of a serial number on a privately made firearm.

379.  Plaintiff Jimenez, who makes his own PMFs, would like to take a firearm to a licensed firearm dealer or gunsmith to perform work on that firearm, including customization, fitting, or coating.  Jimenez Affidavit at ¶10.  However, under the Final Rule, Plaintiff Jimenez could not do so without paying to have that PMF serialized and recorded in the records of the dealer or gunsmith.  Plaintiff Jimenez does not wish to have his privately made firearms serialized and placed into a system of records controlled by the federal government.  *Id*. at ¶11.  If the Final Rule is implemented, Plaintiff Jimenez will be irreparably harmed, unable to obtain the services of licensees with respect to his privately made firearms, without submitting to the Final Rule's unlawful and unconstitutional requirement that he have his firearms recorded in a federal system of records.

380.  Plaintiff Bridge City Ordinance from time to time performs various services with respect to the maintenance, repair, fitting, or customization of firearms, including applying various coatings ("Cerakote") to firearms including privately made firearms which were not manufactured by a licensed manufacturer, and which do not contain serial numbers and are not recorded in the records of any licensee.  Morehouse Affidavit at ¶5.  Plaintiff Bridge City Ordinance wishes to continue to offer these services free from the onerous serialization (a service it does not offer) and recordkeeping mandates in the Final Rule, which have no basis in law.  *Id*. at ¶¶7-10.

**e.  The Final Rule Creates a New Category of Federal Firearms License.**

381.  In order to facilitate its mandated serialization of all firearms, the Final Rule creates an **entirely new category** of federal firearms license for "dealer-gunsmiths" who purportedly will "engage in the business of identifying firearms for nonlicensees" and "may become licensed … solely to provide professional PMF marking services."  *Id*. at 24653, 24664.

382.  The Final Rule thus expands the existing definition of "gunsmith" found in 27 CFR § 478.11, which will now be defined as:

> *(d) Gunsmith*. A person who, as a service performed on existing firearms not for sale or distribution, devotes time, attention, and labor to repairing or customizing firearms, making or fitting special barrels, stocks, or trigger mechanisms to firearms, **or placing marks of identification on privately made firearms in accordance with this part**, as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who occasionally repairs or customizes firearms (including identification), or occasionally makes or fits special barrels, stocks, or trigger mechanisms to firearms. In the case of firearms for purposes of sale or distribution, such term shall include a person who performs repairs (*e.g.*, by replacing worn or broken parts) on complete weapons, or places marks of identification on privately made firearms, but shall not include a person who manufactures firearms (*i.e.*, frames or receivers or complete weapons) by completion, assembly, or applying coatings, or otherwise making them suitable for use, requiring a license as a manufacturer.  [*Id.* at 24734.]

383.  Although ATF has called those engaged in this type of activity "gunsmiths" (*see* 27 CFR § 478.11; ATF Rul. 2010-10[52]), no federal statute uses the term "gunsmith."

384.  Rather, 18 U.S.C. § 921(a)(11) defines "dealer" to include "(B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms…."

385.  Moreover, the existing definition of "gunsmith" contained in the regulation (27 CFR § 478.11) has referred to "gunsmith[ing]" only as one of the ways to be "engaged in the business," and has otherwise mirrored the language of the statute (*see* 18 U.S.C. § 921(a)(21); 27 CFR § 478.11):

> *(d) Gunsmith*. A person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such a term shall not include a person who makes occasional repairs of firearms or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms.

386.  ATF regulations have never further defined the *specific activities* of a "gunsmith."

---

[52]   https://www.atf.gov/firearms/docs/ruling/2010-10-manufacturing-operations-maybe-performed-licensed-gunsmiths-under/download.

387.  Rather, it is through a series of classification letters and letter rulings that ATF has defined the types of activities in which a "gunsmith" engages.

388.  The Final Rule claims to expand the definition of "gunsmith" in order to "provid[e] greater access to professional marking services," and claims that persons "may become licensed as dealer-gunsmiths solely to provide professional PMF marking services."  *Id*. at 24664.

389.  On the contrary, the Final Rule does not create an option to become licensed that someone "**may**" choose.  Rather, if a person is defined as a "gunsmith" under the Final Rule, he **must** become licensed in order to serialize privately made firearms, otherwise he is "engaged in the business" without a license, a federal crime.

390.  Yet under the statute that Congress enacted, it is not necessary for a person to obtain a license simply to mark, engrave, or serialize firearms. Indeed, as noted above, 18 U.S.C. § 923(i) requires only *manufacturers* and *importers* to mark firearms, but not *dealers*.

391.  Moreover, 18 U.S.C. § 921(a)(11) defines "dealer" with respect to being "engaged in the business" only to include (with respect to what ATF has called a "gunsmith") "(B) any person engaged in the business of **repairing** firearms or of **making** or **fitting** special barrels, stocks, or trigger mechanisms to firearms…." (Emphasis added.)

392.  None of those listed activities could possibly be interpreted to include **engraving** services.

393.  Nevertheless, over the years, ATF has expanded upon the statutory definition, claiming that a gunsmith is anyone who, among other things, "appl[ies] special coatings and treatments to firearms (*e.g.*, bluing, anodizing, powder-coating, plating, polishing, heat/chemical treating)." ATF Ruling 2010-10. *See also* ATF Ruling 2009-1.[53]

---

[53]     https://www.atf.gov/firearms/docs/ruling/2009-1-firearms-manufacturing-activities-camouflaging-or-engraving-firearms/download.

394.  Now, the Final Rule would stretch the statutory language beyond the breaking point, creating a new type of federal firearms license imposed upon a so-called "gunsmith" who engages in the business of marking *privately made firearms* – requiring that such a person be licensed in order to perform an action (serializing PMFs) which federal law does not require *anyone* to perform.

### f.   The Final Rule Requires Registration of PMFs.

395.  The Final Rule's demand that anyone serializing privately made firearms become a licensed gunsmith-dealer reveals a political agenda at work.

396.  That is, once a person is a licensee, he can be forced by ATF to engage in ***recordkeeping***.

397.  Indeed, the Final Rule creates a new recordkeeping obligation of firearm "dealers," to become 27 CFR § 478.125(i) and state, in pertinent part:

> Licensees must record each receipt or other acquisition (including from a personal collection) and disposition (including to a personal collection) of a privately made firearm [and] [o]nce the privately made firearm is so identified, the licensee shall update the record of acquisition entry with the serial number … and shall record its disposition….  [*Id*. at 24746.]

398.  The Final Rule creates corresponding requirements to "record" PMFs for "importers" (27 C.F.R. § 478.122) and for "manufacturers" (27 C.F.R. § 478.123).  *Id*. at 24743, 24744.[54]

399.  Next, whereas FFLs historically have been instructed by ATF to list firearms that have no serial number (*i.e.*, pre-1968 firearms, firearms with worn and unreadable serial numbers, or privately made firearms) in their dealer records as "NSN" for "no serial number," the Final Rule

---

[54] The NPRM proposed to require recordkeeping of PMFs "whether or not the licensee keeps the PMF overnight." NPRM at 27731.  As GOA/GOF noted in its comments (Exhibit "33" at 7) to ATF, requiring FFLs to "record" their handling of privately made firearms any time they come into contact with one would repeal ATF's "overnight" rule as stated in ATF Ruling 77-1, which made clear that "a firearm need not be entered in the bound acquisition and disposition record if the firearm is brought in … and the owner waits while it is being adjusted or repaired or if the gunsmith returns the firearm to the owner during the same business day it is brought in."  Apparently in response to GOA/GOF's comments, the Final Rule does away with this requirement, requiring recordkeeping "[e]xcept for adjustment or repair of a firearm that is returned to the person from whom it was received on the same day…." *Id*. at 24745, 24746.  As the Final Rule admits, "ATF has long maintained that if a firearm is brought in … where the person waits … or if the gunsmith is able to return the firearm to the person during the same business day, it is not necessary to list the firearm in the gunsmith's A&D records…." *Id*. at 24707, *see also* at 24719.

requires that FFLs specifically record either "'privately made firearm' (or abbreviation 'PMF') … as the name of the manufacturer." *Id*. at 24745.

400.  As the NPRM explained further, "PMFs would first need to be recorded by the dealer-gunsmith as an acquisition in the licensee's A&D records upon receipt from the private owner … and once marked, the licensee would update the acquisition entry with the identifying information, and then record its return as a disposition to the private owner."  NPRM at 27731.[55]

401.  This requirement is designed either to link (register) a privately made firearm (which, under the Final Rule, now must bear a serial number) to its owner should that person seek gunsmithing services for the PMF, or to link a privately made firearm to an eventual purchaser should the FFL "acquire" the PMF for resale.

402.  Requiring serialization of PMFs, plus demanding record keeping of that information, the Final Rule thus creates a registration scheme for privately made firearms, which the ATF now believes to be useful and necessary to performing its mission, but which Congress did not enact.

403.  Plaintiff Jimenez does not want to have his privately made firearms serialized and recorded in the federally controlled records of a dealer, as an unlawful and unconstitutional condition of receiving repair, customization, or other services with respect to those privately made firearms.  Jimenez Affidavit at ¶¶11-12.  Plaintiff Jimenez will be irreparably harmed if the Final Rule is implemented, unable to exercise of his Second Amendment right to manufacture his own firearm free from government oversight and control, without being forced into a government-controlled system of firearm records should his firearms need repair, fitting, customization, coating, etc. (services Plaintiff Jimenez has sought in the past and intends to seek in the future). *Id*. at ¶10.

---

[55] The Final Rule would not, at this time, require a NICS background check and a Form 4473 in order to return a firearm to its original owner.  *See* NPRM at 27731.

404.  Moreover, once a "gunsmith marker" is forced to become a licensee, he is required to engage in recordkeeping, regarding which he becomes subject to random, warrantless compliance inspections.  *See* 27 C.F.R. § 478.23(b) ("Any ATF officer, without having reasonable cause to believe a violation of the Act has occurred or that evidence of the violation may be found and without demonstrating such cause before a Federal magistrate or obtaining from the magistrate a warrant authorizing entry, may enter during business hours the premises, including places of storage, of any licensed manufacturer, licensed importer, or licensed dealer for the purpose of inspecting or examining the records, documents, ammunition and firearms referred to in paragraph (a) of this section…").

405.  In summation: First, the Final Rule creates an entirely new definition of "privately made firearm" in order to regulate personal firearms that Congress explicitly chose not to regulate.

406.  Second, the Final Rule creates entirely new marking requirements for PMFs that are "acquired" by *any* dealer, rewriting the statutory text in the process.

407.  Third, the Final Rule creates a new crime and penalties for removal or obliteration of a PMF serial number that the statute never required to be there in the first place.

408.  Fourth, the Final Rule creates an entirely new category of licensee that is outside the statutory text, in order for such persons to do the work of forced serialization of privately made firearms.

409.  Fifth, the Final Rule imposes a new recordkeeping requirement upon these new licensees, in order to create a *registration and tracking system* for privately made firearms.  As the Final Rule admits, "ATF cannot agree … that there may be up to 20 million PMFs in private circulation because ATF does not maintain any data that would allow for an estimate of the number of PMFs."

*Id*. at 24716.  Of course, that is what the Final Rule is designed to do – provide ATF more "data" (registration) about the exercise of constitutional rights by American gun owners.

410.  Unsurprisingly, the Final Rule denies that ATF is creating a gun registry by mandating serialization of PMFs, on the theory that "neither the GCA nor this implementing rule requires unlicensed individuals to mark (non-NFA) firearms they make for their personal use…."  *Id*. at 24690.  Moreover, ATF claims that "Federal law has long prohibited ATF from consolidating or centralizing licensee records" (*id.* at 24690) as if a statutory prohibition on ATF doing something is somehow proof that ATF is not doing the prohibited thing.  In fact, the opposite is the case.  *See* A. Johnston, "ATF's Illegal Gun Owner Registry," Gun Owners of America, Inc. (May 2022).[56]

411.  However, regardless of the design and intent behind the Final Rule, each of its new requirements relating to privately made firearms is in direct violation of the statutory text, changing and adding to the laws that Congress enacted, and thus is promulgated without statutory authority.

### V.    The Final Rule's Definition of "Complete Muffler or Silencer Device" Reads Design and Intent Out of the Statute.

412.  This section challenges the Final Rule's promulgation of the following regulations:

a)  27 CFR § 478.11 – "complete muffler or silencer device;" and

b)  27 CFR § 479.11 – "muffler or silencer."

413.  The Final Rule creates a new regulatory definition for what ATF terms a "complete muffler or silencer device."  Final Rule at 24734, 24747.  The following definition will now appear in 27 C.F.R. § 478.11: "[a] firearm muffler or firearm silencer that contains all component parts necessary to function, whether or not assembled or operable."  Final Rule at 24734.

---

[56] https://www.gunowners.org/wp-content/uploads/GOA-ATFs-Illegal-Gun-Owner-Registry.pdf.

414.  The Final Rule creates a similar definition of "muffler or silencer" to appear in 27 C.F.R § 479.11, but omitting the word "firearm" from that definition: "[a] muffler or silencer that contains all component parts necessary to function, whether or not assembled or operable."  Final Rule at 24747.

415.  In both definitions, the Final Rule eliminates language from the definition that ATF initially proposed in the NPRM, removing the words "as designed" from the proposed language "necessary to function as designed."  Compare Final Rule at 24664 with 24734, 24747.

416.  ATF claims that deletion of the words "as designed … was necessary to ensure that firearms are not designed to avoid marking time limits by eliminating a nonessential component in the manufacturing process."  Final Rule at 24728.

417.  The NPRM claims that this new definition of "complete muffler or silencer device" is "needed to explain when a frame or receiver of a firearm, including a firearm muffler or silencer, as the case may be, must be marked."  86 FR at 27730.

418.  On the contrary, ATF's new regulatory definition exceeds its authority under the relevant statute, asserting control over parts and categories of parts that heretofore have not been regulated under the law enacted by Congress.

419.  The Final Rule's new definition would classify as a silencer any group of items that happens to "contain[] all the component parts necessary to function…."

420.  That is not what the statute says.  Rather, 18 U.S.C. § 921(a)(24) defines "firearm silencer" and "firearm muffler" as: "any **device** *for* silencing, muffling, or diminishing the report of a portable firearm, including any **combination of parts**, designed or redesigned, and intended *for use in* assembling or fabricating a firearm silencer or firearm muffler, and any **part** intended *only for use in* such assembly or fabrication."  (Emphasis and italics added.)

421.  By its very terms, a group of items which merely "contains all component parts necessary to function, whether or not assembled or operable" is not a finished "**device** for silencing" under the statute.  Nor is a group of "component parts" a single silencer "**part**."  Rather, the Final Rule's definition of "complete muffler or silencer device" refers to the point when ATF considers a "**combination of parts**" to cross the line and become regulated under the statute.

422.  However, whereas each aspect of the statutory definition requires purpose and intent, the Final Rule's definition contains no similar requirement.

423.  First, under the statute, a "**combination of parts**" may be regulated only if it is "designed or redesigned, and intended use in assembling or fabricating…" a silencer.

424.  Second, under the statute, a "**part**" may be regulated only if it is "intended only for use in such assembly or fabrication…" of a silencer.

425.  Third, under the statute, a "**device**" (*i.e.*, a complete silencer) must be a "device *for* silencing…."  (Emphasis added.)  Thus, a device that is intended *for* an entirely different purpose – for example, a part designed to be a flash hider even if has the incidental effect of lessening the report of a gunshot – is not a silencer, because it is not a device "for silencing."  *See Innovator Enters. v. Jones*, 28 F. Supp. 3d 14, 29-30 (D.D.C. 2014) (a muzzle device designed to reduce recoil and redirect blast noise away from a shooter "is not 'for diminishing the report' of a portable firearm.").

426.  The First Circuit has previously rejected ATF's attempt to read intent of the statute with respect to "a device for silencing," finding instead that "the statute does not refer either to capability or adaptation; it speaks of a device 'for' silencing or muffling. The ordinary connotation of the word is one of purpose. … The government does not argue that the evidence proved that either Crooker or the maker of the airgun silencer intended that it be used to silence a firearm, but

rather that 'for' does not entail purpose but only knowledge of capability." *United States v. Crooker*, 608 F.3d 94, 97 (1ˢᵗ Cir. 2010). The Court continued that, to read intent out of the statute as the government urged, "the use of a 'capability' and 'knowledge' definition – as applied to a home-made silencer – could also extend to a soda bottle or even a potato."

427. However, adopting the reasoning the First Circuit rejected, the Final Rule reads intent out of the statute, replacing the language "designed or redesigned, and intended" with the phrase "necessary to function."

428. The Final Rule *goes even further* to remove the intent requirement than the NPRM's proposed language, deleting the language "as designed" from the definition. In other words, *the Final Rule eliminates both design and intent from the statute*.

429. Under the Final Rule, simple possession of a group of unrelated items which "contains" the components from which someone *could* construct a silencer, even without any intent to do so, places the possessor (such as the members and supporters of GOA/GOF) unwittingly in felonious possession of a silencer.

430. ATF has recognized many times that silencers can be constructed from everyday household objects, including "cleaning solvent traps, automotive oil/fuel filters, flashlights, bottles, rubber washers, copper pads, and steel wool…." *See* ATF letter 3311/302080, Aug 4, 2014, Exhibit "52." *See also* ATF letter of September 27, 2012 (3311/2021-931) ("certain commercially available items such as bottles, rubber washers, copper pads, and steel wool may be used to assemble firearm silencers." Exhibit "23."

431. However, in spite of their potential uses, ATF has explained that "such items are unregulated *until* a possessor assembles, accumulates, or otherwise intends to use an item of this type to make a silencer. Once such an item(s) is possessed with the intent to use in assembling or

repairing a firearm silencer, it comes within the purview of the NFA and is properly classified as a 'firearm silencer.'" *Id.* (emphasis original).

432.  Likewise, ATF Technical Bulletin 17-02 explicitly states that "the statutory definition of silencer does not include otherwise unregulated items simply because they have a capability, or may be adapted, to be used as silencers.  Instead, the statute speaks of a device 'for' silencing or muffling.  Therefore, mere possession of a 'solvent trap' or components which *could* be used in the assembly of a firearm silencer does not necessarily constitute possession of a firearm silencer." Exhibit "24."

433.  The language in these letters and publications (recognizing intent is a necessary component of the statute) has appeared in numerous ATF classification letters, over the years.

434.  Additionally, ATF has acknowledged that even complete **devices** such as "devices called 'solvent traps' may have a legitimate purpose as a firearm accessory," even if they theoretically could be converted into a silencer.  *See* Exhibit "24."

435.  In 2016, ATF's Firearms Technology-Criminal Branch issued a Report of Technical Examination (2016-181-GR/EXP 304537) wherein it examined a "modified oil filter" and "metal adapter which is threaded with a 1/2x28 TPI thread pitch…."  *Id*. at 2.  Exhibit "28."  ATF concluded that this oil filter – even though it could be attached to a firearm – was not a silencer unless "intent was demonstrated to use the device *for* silencing…."  *Id*. at 5 (emphasis added).

436.  Likewise, in a February 2015 Report of Technical Examination, ATF concluded that a "pneumatic power tool silencer/muffler manufactured by Gast manufacturing, Inc." was not a silencer, even though it "can be used as a firearm 'silencer'" and even though it had "a front end cap with a hole … a rear end cap with a hole [and] an expansion chamber which is lined with sound absorbent mesh."  *See* Exhibit "53."  In other words, even though the item in question would

have made a perfect firearm silencer, ATF did not classify it as such, because it was not a device "for silencing" a firearm, but instead a device for silencing a power tool.

437.  In other words, under the statute, a person's *intent matters very much*, and ATF has long recognized as much.  For example, in another proposed rulemaking (later withdrawn by the agency) on pistol stabilizing braces, ATF claimed that "[w]hen classifying a part as a firearm silencer, the statute imposes an intent requirement."[57]

438.  The Final Rule, however, would make intent irrelevant in the definition of "complete muffler or silencer device," essentially removing the requirement from the statute and potentially criminalizing possession if all sorts of items, such as any home mechanic who keeps some spare oil filters handy, or anyone found in possession of some combination of a MagLite, wire screen, steel wool, rubber plugs, ¾ inch washers, or a multitude of other innocuous items.

439.  Indeed, every homeowner no doubt possesses many combinations of items that theoretically *could* be used to manufacture a suppressor, but that does not mean they *intend* to do so.  Indeed, members and supporters of GOA and GOF own numerous common household items that could be used to construct a suppressor.  However, such items are not designed for such purpose, nor do such persons have any intent to manufacture an unregistered silencer.

440.  For example, in the past, ATF has prosecuted cases where persons have taken spark arrestors from a lawnmower muffler, and drilled a hole through them.  Under the Final Rule, which removes the design or intent requirement, mere possession of a lawnmower with a spark arrestor could constitute a felony.

---

[57] *See* https://public-inspection.federalregister.gov/2020-27857.pdf (quoting *Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 370 (D.N.H 2015)).

441.  Quite literally, a plastic soda bottle, some cotton and duct tape "contains all component parts necessary to function" as a silencer.  https://shootingmystery.com/make-silencer-water-bottle/.

442.  As the First Circuit noted in *Crooker*, "[t]he peculiar problem of silencers is that many objects, including relatively innocent ones, have some capacity to muffle the sound of a shot." *Id*. at 97.

443.  Of course, as the First Circuit recognized, the mere "capability" to diminish the report of a gunshot does not make innocent objects into silencers.  Yet that is the standard that the Final Rule adopts, with its claim that a device is a silencer if it "contains all component parts necessary to function."  The Final Rule's definition of "complete muffler or silencer device" does not discriminate, eliminating any reference to the statutory requirement of intent, in clear violation of the statutory text.

444.  As such, ATF's action is "not in accordance with law" and should be held unlawful and set aside.  *See* 5 U.S.C.S. § 706(a)(2).  Moreover, the Final Rule departs from the numerous ATF publications above which state that innocuous everyday items are not silencers, without explaining or justifying the agency's policy change.

### a. The Final Rule's Removal of "Design" and "Intent" from the Statute Is "Designed and Intended" to Target Solvent Traps.

445.  It appears that one of ATF's purposes in promulgating its new definition of "complete muffler or silencer device," which eliminates the statutory elements of design and intent, is to further the agency's agenda against popular accessories known as "solvent traps."  Certainly, the new definition has that effect.

446.  A "solvent trap" is a device screwed onto the end of a firearm's barrel during the cleaning process in order to catch cleaning fluids to avoid spills.

447.  Such devices range in complexity and style, from a simple device designed to adapt from a firearm barrel to a plastic soda bottle, to a repurposed oil or fuel filter, to a specifically designed kit with a metal tube and internal screens, cups, filtering material, etc.  At first glance, some of these items might have the outward physical appearance of a firearm silencer, or even share other characteristics.

448.  Importantly, however, in order to provide catchment for cleaning fluid and, very much unlike a silencer, a solvent trap by definition does not have a hole in the end to allow a bullet to pass through.  If a solvent trap had such a hole, it would not catch cleaning fluids or solvents, defeating the intent and purpose of a solvent trap.

449.  However, due to the inherently similar characteristics between some firearm silencers and some solvent traps, some gun owners have discovered the ability to repurpose some solvent traps as firearm silencers.

450.  Such individuals, including GOA and GOF's members and supporters, thus routinely submit to the ATF an "Application to Make and Register a Firearm" on an ATF Form 1, seeking permission to manufacture a silencer under the NFA after payment of the $200 tax.  See Jimenez Affidavit at ¶¶17, 19-20.

451.  Once approved, these individuals have been able to lawfully purchase and convert a solvent trap or solvent trap kit into a firearm silencer, often by drilling a hole through the device.

452. This process is often cheaper than purchasing a purpose-made silencer from a manufacturer on an ATF Form 4.  This process historically has also been much faster to accomplish, with ATF approving Form 1s in as little as 60 days, while taking many months (and

often reportedly longer than a year) to approve Form 4s.  See, e.g., ATF NFA Division "Current Processing Times" (60 days for e-Form 1 versus 8 months for Form 4).[58]

453.  In that sense, the "solvent trap" industry is a product of ATF's own making, having infringed the ability of law-abiding gun owners to manufacture firearm silencers through absurdly-long delays in the NFA approval process – a process which itself is already patently unconstitutional by requiring seeking governmental preclearance to exercise an enumerated right.

454.  In the past, ATF has issued classification letters approving of various solvent traps and their intended use, finding these devices not to be silencers under federal law.  *See* Exhibit "57", (finding that a "muzzle device marketed as a 'solvent trap,' manufactured by Cadiz Gun Works (CGW)," is "not controlled by either the GCA or NFA.").[59]  *See also United States v. Salas*, No. CR 16-01555 WJ, 2017 WL 3207804, at *1 (D.N.M. May 11, 2017), aff'd, 729 F. App'x 644 (10th Cir. 2018) ("the government explained that the other suspected silencer that was ultimately ruled out was an oil filter that had been modified, but could also have been a solvent trap used for cleaning firearms.  A firearms technology testing lab concluded the oil filter was not intended for use as a silencer because it did not have a hole drilled out of the end.").

455.  In the past, ATF has also issued various internal technical bulletins, attempting to differentiate between legitimate solvent traps and unregistered firearm silencers.

456.  For example, ATF Technical Bulletins 17-02 and 20-01 provide instructions to agency personnel as to how numerous different items (including solvent traps) are to be recognized and classified, and making clear that many such items "are recognized as having a legitimate purpose" other than a silencer.  *See* Exhibits "24" and "35", respectively.

---

[58] https://www.atf.gov/resource-center/current-processing-times (last accessed June 21, 2022).
[59] *See* Steven Seagal in "On Deadly Ground" using a Tipton Patch Trap adapter and soda bottle. http://www.imfdb.org/images/3/3f/Odg3sil.jpg.

457. ATF has not seen fit to make either its technical bulletins or the agency's relevant classification letters available to the public, claiming the technical bulletins to be "law enforcement sensitive" even though they merely inform as to ATF's view on legal compliance.

458. Rather, it has been up to organizations like Plaintiffs GOA and GOF to unearth these internal agency documents through Freedom of Information Act requests and associated litigation, in order to inform and educate the public about ATF's secret standards.

459. ATF Technical Bulletin 17-02, recently obtained by and released to the public by GOA and GOF, explains ATF's position that a "solvent trap" or other similar device crosses the magic line and becomes a silencer if it contains a hole, dimple, indexing, or other mark indicating where a hole should be drilled.  Exhibit "24" at 5.

460. ATF had never previously made the public aware of this standard.

461. Yet "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

462. In response to the NRPM, ATF reports that it received comments questioning how the legality of solvent traps would be analyzed under the new regulatory scheme.  Final Rule at 24699.

463. In response, the Final Rule, like ATF Technical Bulletin 17-02, takes the position that "[a] so-called 'solvent trap' that has been indexed for the purpose of allowing the end user to drill a hole for the passage of a projectile … is intended only for use in fabricating a silencer."  Final Rule at 24700.  It would appear that the Final Rule now once again relies on intent when it is convenient, after having discarded the concept when it was not.

464.  ATF claims that the presence of index markings indicate a silencer "without regard for the definition of the term 'readily' or the application of the term 'may readily be converted.'" *Id*.

465.  According to the Final Rule, then, the only ATF criteria for when a solvent trap becomes a silencer is the presence of a hole, mark, or indexing for future drilling of a hole.

466.  If this were really the case, this would be a clear test and an easy rule to follow and for gun owners and the industry to avoid running afoul of the law.

467.  Unfortunately, ATF's actions have not comported with this standard.

468.  Rather, in recent weeks, ATF has begun to deny Form 1 applications en masse (most of which no doubt seek permission to convert a solvent trap into a silencer), on the theory that "the part from which you intend to make a silencer already meets the NFA's definition of silencer." Exhibit "38."

469.  Additionally, the NFA branch has threatened these Form 1 applicants, including members and supporters of GOA/GOF who have contacted Plaintiffs seeking guidance, claiming that "it is unlawful for you to possess a silencer made or transferred in violation of the NFA." Exhibit "38."  It thus would appear that ATF is now refusing to approve Form 1 applications if a person intends to later use a "solvent trap kit" to complete a silencer, and implicitly threatening the person filing such an application for admitting possession of a solvent trap.

470. Likewise, in response to questions posed by AmmoLand News, ATF provided a statement that is even more concerning.  First, ATF claimed that "a Form 1 shall not be approved if the making or possession would place the person in violation of the law. It is unlawful for a person to make a silencer from a device or part" – presumably a solvent trap kit – "that falls under

the federal definition of silencer and was transferred to the applicant without complying with the tax, transfer, and registration requirements of the NFA."[60]

471.  ATF's alarming response even went so far as to allege that a Form 1 applicant may be accused of *perjury* in the filing of a Form 1 application, stating that "[t]he maker must certify on the Form 1 application under penalties of perjury that the maker is the person who will make the silencer."

472.  These implicit threats of criminal prosecution by ATF are greatly disturbing, especially since Form 1 applicants are law-abiding gun owners, including members and supporters of GOA/GOF, who are attempting in good faith to comply with the law (albeit an unconstitutional one), including the NFA's registration provisions and $200 tax.

473.  In fact, GOA and GOF have heard from members and supporters who have had their Form 1 applications denied by ATF, for vague reasons which ATF's denials have not made clear. *See* Patterson Affidavit at ¶49.

474.  Some such persons have intended to convert into silencers solvent trap kits that did not include any hole, mark, or indexing.  ATF's denial of their applications thus stands in stark contrast to the Final Rule which, aside from such indexing marks, provides no other indication as to what ATF believes constitutes an unregistered silencer.

475.  Other such Form 1 applicants have not intended to use any sort of solvent trap at all, but rather manufacture their silencer out of raw materials.  Nevertheless, ATF's shotgun pattern approach has resulted even in Form 1 applications filed by such persons being denied.

476. Making matters worse, ATF recently has begun even to attempt entrapment of law-abiding Form 1 applicants, including members and supporters of GOA/GOF.

---

[60] https://www.ammoland.com/2022/03/atf-banning-homemade-firearms-silencer-applications/.

477.  Specifically, ATF has begun demanding that Form 1 applicants "confirm that the making or possession of a firearm would not place the applicant in violation of law."  Exhibit "39."

478.  ATF has demanded that Form 1 applicants submit: (1) "pictures of the parts that you will use to make the silencer"; (2) "a description of the process you will use"; (3) "the product model, or kit name, of each device and/or part"; and (4) "the source from which the parts were obtained…." *Id*.

479.  ATF claims that, "[w]ithout the additional descriptive information, NFA Division will be unable to determine whether the eForm 1 application to make a silencer may lawfully be approved," which "will result in your application being disapproved and your $200.00 making tax refunded." *Id*.

480.  Naturally, ATF demands have a chilling effect on firearms owning Americans, by demanding a person provide *evidence* to ATF that he has purchased parts intended to construct a suppressor *prior* to Form 1 approval.

481. In other words, ATF has demanded that Form 1 applicants do something that ATF considers a crime as a condition of having their NFA Form 1 applications processed.

482.  Moreover, these new ATF threats against Form 1 applicants are in direct contradiction of previous statements by the agency that use of solvent traps as Form 1 silencers is entirely permissible.

483. For example, in 2017 the agency approved of a "proposed scenario" where "a non-licensed individual applies for and received an ATF Form 1," and then "purchase[s] a commercially available 'solvent trap kit' with the intention of using it to manufacture a firearm silencer."  Specifically, ATF stated that "[a]n individual, with an approved ATF Form 1, would

not be violating the NFA by modifying a solvent trap and manufacturing parts to complete the registered silencer." Exhibit "36" at 2.

484.  Likewise, ATF has responded to a question in 2017 asking "when can you purchase parts, such as tubing, end-caps, solvent traps, etc., intended for use in the silencer?" by stating that "[i]n order to have parts intended for use in the manufacturing of a firearm silencer, you must first have an ***approved*** ATF Form 1." Exhibit "37" (emphasis original).

485.  In other words, ATF has specifically instructed that a person may convert a solvent trap into a silencer after obtaining approval on a Form 1.

486.  ATF's recent actions to deny Form 1 directly conflict with these prior assurances that the use of solvent traps to manufacture silencers is permissible.

487.  The Final Rule has the effect of giving ATF the latitude needed to threaten, persecute, and prosecute law-abiding gun owners for their lawful use of solvent traps for non-silencer purposes, as well as conversion of solvent traps and other parts into NFA silencers (something that is entirely lawful after receiving an approved ATF Form 1).

488.  The Final Rule and its new definition thus further what many gun owners conclude to be ATF's agenda to unlawfully target and entrap solvent trap companies and their customers.

### b.  ATF's Definition of "Silencer Frame or Receiver" Conflicts with the Statute.

489.  Next, the Final Rule creates out of whole cloth an entirely new definition of "firearm muffler or silencer frame or receiver," similar to its new definition for a "firearm frame or receiver," as follows:

*(b) Firearm muffler or silencer frame or receiver.* The terms "frame" and "receiver" shall mean, in the case of a firearm muffler or firearm silencer, the part of the firearm, such as an outer tube or modular piece, that provides housing or a structure for the primary internal component designed to reduce the sound of a projectile (*i.e.*, baffles, baffling material, expansion chamber, or equivalent). In the case of a modular firearm muffler or firearm silencer device with more than one such part, the terms shall mean the principal housing attached to

the weapon that expels a projectile, even if an adapter or other attachments are required to connect the part to the weapon. The terms shall not include a removable end cap of an outer tube or modular piece. [Final Rule at 24739.]

490. As with its definition of "firearm frame or receiver," the Final Rule represents a significant change from the definition proposed in the NPRM, which indicated that a silencer could have multiple frames and receivers:

> a part of the firearm that, when the complete device is assembled, is visible from the exterior and provides housing or a structure, such as an outer tube or modular piece, designed to hold or integrate one or more essential internal components of the device…. [NPRM at 27728.]

491. The Final Rule thus responds to comments, such as those made by Plaintiffs in response to the NPRM (Exhibit "33" at 32-36), asserting that a silencer "device" does not contain numerous sub-parts that each must be serialized and registered in the NFRTR. In response, the Final Rule acknowledges this concern, conceding that "the Department agrees with commenters that the term 'frame or receiver' is best read to mean a singular frame or receiver," and each silencer (including one comprised of modular parts[61]) will have only one marked and serialized component. Final Rule at 24695.

492. But since ATF now agrees that a silencer does not have multiple registered parts, there is absolutely no need to define a "firearm frame or receiver" of a silencer. Nevertheless, this definition was included in the Final Rule.

493. The Final Rule asserts that the *one* serialized component of a silencer should be called the "frame or receiver."

494. On the contrary, the statute never defines a silencer by reference to any "frame" or "receiver," but rather includes only: (i) a complete "device;" (2) a "combination of parts "designed

---

[61] *See, e.g.*, https://www.sigsauer.com/modx-9.html.

… and intended" for use in a silencer; or (3) a "part intended only for use" in a silencer. 18 U.S.C. Section 921(a)(24).

495. The statutory text thus provides no support for the Final Rule's entirely new and confusing concept of a silencer "frame or receiver." Whereas "the frame or receiver" language is used to define a "machinegun" in 26 U.S.C. Section 5845(b), and is used to define a "firearm" in 18 U.S.C. Section 921(a)(3), similar language does **not** appear in Section 921(a)(24's) definition of "silencer." And "it is familiar law that a specific statute [Section 921(a)(24)] controls over a general one [Section 921(a)(3)]…." *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (citation and punctuation omitted).

496. Moreover, the reference to "the frame or receiver" found in the definition of "firearm" in Section 921(a)(3)(B) refers specifically to "any such weapon" – *referring back* to the gun-type firearm found in subsection (A), not a "firearm muffler or firearm silencer" found in subsection (C). Indeed, "such" is a pronoun meaning "that or those; having just been mentioned." Black's Law Dictionary, Eighth Ed., West Publishing Co., p. 1473 (1999); *see also* A. Scalia and B. Garner, Reading Law, Thompson/West at 144 (2012) (discussing the "last-antecedent canon").

497. If "frame or receiver" had been meant to apply to all types of firearms, subsection (B) would read "the frame or receiver of any firearm," but that is not the law Congress enacted. In other words, ATF's new regulatory definition conflicts with the statutory structure.

498. Moreover, "where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

499. Existing ATF regulations provide further support for rejecting the Final Rule's entirely new concept of a silencer "frame or receiver." *See* 27 C.F.R. § 479.102(f)(2) (delineating between

the "frames or receivers" of machineguns and "parts defined as mufflers or silencers"); *see also* 27 C.F.R. § 479.11 (defining "frame or receiver" to be the part of a "firearm" which "provides housing for the hammer, bolt, or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel").  A silencer does not have a hammer, bolt, or firing mechanism, and it is usually threaded at its *rearward* (not forward) portion to receive the barrel.

500.  Additionally, whereas the Gun Control Act requires serialization of GCA "firearms" "on the receiver or frame of the weapon" (18 U.S.C. Section 923(i)), the National Firearms Act contains no specific location requirement for manufacturers of NFA "firearms" (including silencers), who merely "shall identify each firearm … by a serial number which may not be readily removed, obliterated, or altered" (26 U.S.C. Section 5842(a)).  Again, the absence of "frame or receiver" language in Section 5842(a) directly conflicts with the Final Rule's notion that a silencer has a "frame or receiver."

501.  Finally, and perhaps most tellingly, ATF's past classification letters *directly conflict* with the Final Rule's new concept of a silencer "frame or receiver."  In a March 13, 1986 ATF classification letter issued to Mrs. Sylvia Daniel, ATF opined that "**there is no specific frame/receiver to a silencer**…."  Exhibit "25" (emphasis added).  According to the Final Rule, however, there is a frame or receiver.

502.  In addition to the Final Rule's conflict with this March 13, 1986 ATF letter, the Final Rule neither acknowledges the agency's shift in position to claim that a silencer now has a "frame or receiver," nor explains why the conclusion reached in the 1986 letter is wrong and provide justification for the agency's changed claim.

503.  ATF's need to create a definition for language not found in the statutory text, and thus to "rewrite [the statute,] should have alerted [it] that it had taken a wrong interpretive turn."  *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 325-28 (2014).

## VI.   "Voluntary Classification of Firearms."

504.  This section challenges the Final Rule's promulgation of 27 CFR § 479.102(c), entitled "voluntary classification of firearms, and 27 CFR § 478.92(c), entitled "voluntary classification of firearms and armor piercing ammunition." 87 FR 24743; 24748.

### a.   ATF's Existing Classification System Is Horribly Flawed.

505.  For many years, ATF has suggested that those within the firearms industry may voluntarily submit samples of products to the agency for testing and classification.

506.  As ATF explains it, "[t]here is no requirement in the law or regulations for a manufacturer to seek an ATF classification of its product prior to manufacture.  Nevertheless, a firearms manufacturer is well advised to seek an ATF classification before going to the trouble and expense of producing it. Perhaps the manufacturer intends to produce a GCA firearm but not an NFA firearm. Submitting a prototype of the item to ATF's Firearms Technology Branch (FTB) for classification in advance of manufacture is a good business practice to avoid an unintended classification and violations of the law."  ATF National Firearms Act Handbook, 7.2.4, p. 41 (Apr. 2009).[62]

507.  When products are submitted for review, ATF may (but does not always) provides private "classifications" or "private letter rulings" (*see* NFA Handbook 7.2.4.1) to requesters, opining as

---

[62] https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.

to ATF's position about the proper classification of a particular item (such as whether a firearm is a rifle or a handgun, whether it is regulated under the GCA or NFA, *etc*.).

508.  This complaint references many such ATF classification letters that have been issued over many decades.

509.  Indeed, numerous of the members and supporters of GOA and GOF have sought ATF classification letters with respect to various firearms and products.  Patterson Affidavit at ¶8, ¶31, ¶35..

510.  Historically,[63] ATF has refused to make these classification letters available to the public, claiming that they are directed only to the recipient, and may be relied on only by the particular persons or entities who request them.

511.  As ATF explains it, "ATF letter rulings classifying firearms may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws."  NFA Handbook 7.2.4.1.

512.  ATF's position is that only the particular person or company which requested a classification letter can rely on it, even when it comes to a functionally identical product.  *See* Final Rule at 24691 ("letter rulings are applicable only for the precise sample submitted to ATF….").

513.  ATF's policy that a classification letter does not govern classification of functionally identical products violates the APA's requirement of "reasoned decisionmaking," which requires "[t]he treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).

514.  Unfortunately, ATF classification letters have been anything but "consistent."

---

[63] In recent years, ATF has agreed to begin making classification letters available in response to Freedom of Information Act requests filed by groups such as Plaintiffs GOA/GOF.

515.  Moreover, ATF asserts the unreviewable discretion to revisit any classification, at any time, for any reason, and even to reverse its position 180 degrees and even revoke prior letters, should the agency believe an existing classification determination was erroneous, or simply have a newfound political desire to change course (as it did with bump stocks, *see Gun Owners of America, Inc. v. Garland*, 19 F.4th 890 (6th Cir. 2021) (petition for certiorari pending in U.S. Supreme Court).

516.  As ATF explains it, "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations."  NFA Handbook 7.2.4.1. (Or, of course, a change in the agency's agenda.)

517.  Since, over the years, the majority of ATF's rulings about firearms have been made through informal classification letters, rather than any sort of formal rulemaking process under the APA, the agency has been able to frequently reverse itself without any formal notice, hearing, or opportunity for the public to comment.  *See Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 461 (6th Cir. 2021) (vacated by grant of *en banc* review) (noting "the ATF's frequent reversals on major policy issues").

518.  Moreover, ATF claims that even a classification letter issued with respect to a particular product can be reversed, without divesting any property interest or violating any reliance interest on the part of the person or company whose classification letter is being revoked.  *See McCutchen v. United States*, No. 2020-1188, 2021 U.S. App. LEXIS 29660, at *28 (Fed. Cir. Oct. 1, 2021) ("Given the clear provisional character of a classification letter, plaintiffs cannot be said to have a compensable property right in the classification letters … which have been properly corrected. … ATF 'must necessarily retain the power to correct [an] erroneous approval[.]'").

519.  Indeed, as detailed throughout this complaint, the Final Rule reverses ATF policy in numerous areas, implicitly revoking *countless* prior classification letters without even so much as acknowledging (much less explaining) the agency's changed policy.  In other instances, the Final Rule explicitly reverses existing classification letters, such as for all 80% frames and receivers, in direct conflict with the plain text of the statute.  *See* Final Rule at 24673, 24696.  Some of these revoked classification letters were issued to members and supporters of GOA and GOF.  Patterson Affidavit at ¶8, ¶32.

520.  Finally, in recent years, ATF has taken the entirely new[64] position that it no longer will perform "accessory classifications" of items that are not attached to complete and functioning firearms, leading to further industry uncertainty, severely constraining its ability of requesters to use the system that ATF created allegedly to provide "guidance" about "products."

521.  Upon information or belief, within ATF numerous classification letters are housed not electronically, but in paper files, largely inaccessible and thus ignored by those within the Firearms and Ammunition Technology Division who issue classification letters and conduct similar criminal technical examinations, with no effective way for ATF employees to find older but relevant prior letters when issuing new classifications.

522.  This lack of any usable retrieval system within ATF has led to absurd results, such as where ATF classification letters have been in open conflict with one another – even letters written by the same examiner.

523.  For example, ATF has concluded that the Tac-Con "3MR" forced reset trigger is "not a part or combination of parts that will convert a semiautomatic firearm into a machinegun," but rather functions "<u>only semi automatically</u>…."[65]  Meanwhile, ATF has issued cease and desist

---

[64] https://www.atf.gov/firearms/notice-discontinuance-accessory-classifications.
[65] https://www.vpc.org/wp-content/uploads/2017/10/ATF-3MR-trigger-letter-same-as-Tac-con.pdf.

letters to other manufacturers of forced reset triggers, and initiated criminal investigations with respect thereto, even though those triggers function the same and, mechanically, are nearly identical to the 3MR trigger.[66,67]

524.  ATF Firearm Examiners who work within the Firearms Technology Industry Services Branch and Firearms Technology Criminal Branch receive no formal scientific or mechanical training, follow few (if any) standard operating procedures when classifying items, and do not employ the scientific method in reaching their decisions.

525.  This charade of a classification system has even led to introduction of legislation in Congress to crack down on the process and require formalized testing procedures, and even the videotaping of examinations.  See H.R.3998, "Fairness in Firearm Testing Act," 117th Congress (2021-2022).

### b.  The Final Rule Codifies ATF's Flawed Classification System

526.  In spite of these flaws in the existing ATF classification system, which was neither contemplated nor authorized by Congress, the Final Rule would "codify" (*see* Final Rule at 24666) this system, and in fact adds additional regulatory provisions making the system even worse.

527.  Thus, the Final Rule purports to enact ATF's existing informal classification system into law, as follows:

> (c) Voluntary classification of firearms. The Director may issue a determination (classification) to a person whether an item, including a kit, is a firearm as defined in this part upon receipt of a written request or form prescribed by the Director. Each such voluntary request or form submitted shall be executed under the penalties of perjury with a complete and accurate description of the item or kit, the name and address of the manufacturer or importer thereof, and a sample of such item or kit for examination. A firearm sample must include all accessories and attachments relevant to such classification as each classification is limited to the firearm in the configuration submitted. Each request for classification of a partially complete,

---

[66]   https://www.thetruthaboutguns.com/biden-pulls-a-trump-card-rare-breed-frt-15-trigger-now-classified-as-a-machine-gun/.

[67]   https://www.scribd.com/document/569518230/Vasquez-Rbt-Report.

disassembled, or nonfunctional item or kit must contain any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit, and any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit. Upon completion of the examination, the Director may return the sample to the person who made the request unless a determination is made that return of the sample would be or place the person in violation of law. Except for the classification of a specific component as the frame or receiver of a particular weapon, a determination made by the Director under this paragraph shall not be deemed by any person to be applicable to or authoritative with respect to any other sample, design, model, or configuration.  [27 CFR § 479.102(c).[68]]

528.  First, the Final Rule purports to formalize ATF's 2018 decision to cease performing what it terms "accessory classifications," stating that "a firearm sample must include all accessories and attachments relevant to such classification," and claiming that "each classification is limited to the firearm in the configuration submitted."

529.  ATF created this policy in 2018 on the theory that it does not regulate accessories, only firearms, even though the way in which accessories are used on firearms affects those firearms' classifications.  *See, e.g.*, Notice of Proposed Rulemaking Factoring Criteria for Firearms with Attached "Stabilizing Braces," 86 FR 30828.[69]

530.  Moreover, the limitation that a classification letter applies only "to the firearm in the [particular, unique] configuration submitted" is unworkable for the firearms industry, as it means that a person cannot sell a firearm accessory (such as a pistol brace) to customers without submitting to ATF for review each and every possible type of firearm and every possible configuration thereof with the device or accessory attached.

531.  Such a nonsensical task would be impossible, not to mention cost-prohibitive.  For example, an ATF classification that a type of trigger does not convert a semi-automatic rifle into

---

[68] *See also* 27 C.F.R. § 478.92(c): "Voluntary classification of firearms and armor piercing ammunition."  Final Rule at 24743, 24749.

[69] https://www.federalregister.gov/d/2021-12176/p-26.

a machinegun *should not change* when that trigger is swapped from an AR-15 with a 16-inch barrel to an AR-15 with an 18-inch barrel.  Yet the Final Rule would appear to require that both firearms be separately submitted, or else the classification letter could not be relied on from one firearm to the next.

532.  In other words, ATF's decision to halt classifying firearm accessories seems to have been made to allow products unpopular at the ATF (like pistol braces and 80% receivers) in legal limbo, with ATF free to avoid the issue by refusing to classify a so-called "accessory."

533.  Second, as the Final Rule explains, "[e]ach such voluntary request or form submitted shall be executed ***under the penalties of perjury*** with a complete and accurate description of the item or kit, the name and address of the manufacturer or importer thereof, and a sample of such item or kit for examination."  (Emphasis added.)

534.  The Final Rule does not provide any legal basis for the agency's entirely new demand of a form executed *under penalty of perjury*.  Nor does the Final Rule explain why there is any need at all for a classification submission to be submitted on a signed form "under penalty of perjury." Indeed, the submitter of a product under the current system *merely asks for ATF's opinion* as to proper classification, and does not typically make any affirmative legal statements of his own about the product.

535.  The Final Rule's inclusion of a "perjury" requirement, then, seems to be nothing more than an attempt by ATF to discourage product submissions, and to create more technical paperwork violations that can lead to selectively bringing trumped up criminal charges, such as for making a "false statement" on unnecessary government paperwork.

536.  Additionally, the Final Rule's creation of a perjury requirement constitutes a departure from ATF's current system (classification letter requesters have never been required to submit

anything under penalty of perjury) without even acknowledging (much less explaining) the need or reasons for the agency's policy shift.[70]  *See Air Transp. Ass'n of Am. v. USDA*, 2021 U.S. Dist. LEXIS 57806, *36 (D.D.C. 2021) (finding, in the context of a rulemaking, that an agency "must 'show that there are good reasons for the new policy' and 'display awareness that it is changing position.'").

537.  Plaintiffs GOA and GOF explicitly brought the perjury issue to the agency's attention when they submitted comments in opposition to the proposed rule.  *See* Exhibit "33" at 45.  Other commenters also expressed concern and raised legal objections to the NPRM's perjury requirement.  *See* Comments of the Firearms Regulatory Accountability Coalition at 18-22.[71]

538.  However, the Final Rule does not consider or respond to these comments about its perjury requirement, choosing to completely ignore the issue when responding to various comments about the proposed classification system.  *See* Final Rule at 24709-24710.  Failure to consider and respond to these serious problems about the NPRM renders the Final Rule both arbitrary and capricious.  *See Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (2019) (citation omitted) ("an agency must respond to comments 'that can be thought to challenge a fundamental premise' underlying the proposed agency decision" and violates the arbitrary and capricious "standard if it 'entirely fail[s] to consider an important aspect of the problem.'").

539.  Third, whereas the NPRM claimed that "ATF's decision whether to classify an item voluntarily submitted is entirely discretionary," the Final Rule removes that bold language, but keeps more subtle language to preserve ATF's unlimited and unreviewable power of discretion.

---

[70] *See MediNatura, Inc. v. FDA*, 998 F.3d 931, 940-41 (D.C. Cir. 2021) ("When an agency changes policy, it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'").

[71] https://downloads.regulations.gov/ATF-2021-0001-238995/attachment_8.pdf.

Indeed, the regulation promulgated by the Final Rule states that "[t]he Director **_may_** issue a determination (classification)…."

540.   Indeed, preserving the agency's prerogative to *refuse* to respond to submissions, and to pick and choose *which* responses to issue to the industry, allows ATF to respond to favored applicants, while leaving disfavored companies and products hanging in legal limbo for years upon end.  That is not the rule of law.  The Final Rule might as well have said that "the agency reserves to itself the prerogative to act arbitrarily and capriciously."

541.   Indeed, GOA/GOF comments to the ATF specifically raised this concern (no duty to respond) to the agency.  *Id*. At 45.  And, although acknowledging that such critical comments had been received (*see* Final Rule at 24709) (acknowledging comments critical of the fact that the rule "does not obligate ATF to respond" and that "ATF's classification process allows the agency to play favorites, pick technologies, and influence court decisions without going through the APA").  Nevertheless, the Final Rule *does not actually respond* in any way to these concerns.  This glaring omission renders the Final Rule invalid under the APA, because the agency failed to consider and respond to important concerns with the classification process the Final Rule blindly enacts.  *See Carlson* at 344.

542.   Indeed, the agency's existing modus operandi for its classification system is such that, if ATF does not like the product, or does not like the submitter, it reserves the right to *ignore* the classification request and silently *refuse* to issue a determination letter.

543.   Moreover, even when ATF does issue a classification letter, turn around can be delayed well over a year – or at times even much longer – creating an impossible situation for many manufacturers whose technological advances and product developments need to be brought to

market quickly, and who cannot delay production for month after month of bureaucratic foot dragging, without risk of their new product becoming obsolete.

544. Some manufacturers have seen their classification requests acted upon quickly, while other manufacturers have waited for years (or longer) to have the ATF classify their products, raising the obvious inference that some manufactures are favored and some are not.

545. Indeed, members and supporters of GOA and GOF have reported having submission samples pending with ATF for **as long as four years**. Patterson Affidavit ¶63. But apparently that is not even the tip of the iceberg.

546. In February of 2021, a Freedom of Information Act ("FOIA") request was submitted to ATF, seeking copies of any classification submissions that were pending for longer than 15 months. *See* Exhibit "29."

547. In response, in November of 2021, ATF provided 390 pages of responsive documents and on April 14, 2022, ATF provided 131 pages. *See* Exhibit "54."

548. Those documents provide evidence that ATF has entirely refused to issue classification letters with respect to popular "pistol braces" and "80% receivers" (*i.e.*, disfavored products) for several years.[72]  Moreover, one company has nearly a dozen such letters pending ATF response (*i.e.*, a disfavored requester).

549. Strikingly, the longest pending submission request to ATF was submitted in September of 2011 – meaning that it has been **pending for more than a decade**. See Exhibit "58." ATF records show that numerous other submissions were sent in 2012, 2013, and 2014 – and similarly have not been acted on by ATF. See Exhibit "59." *Cf. Saleem v. Keisler*, 520 F. Supp. 2d 1048, ____ (W.D. Wi. 2007) (concluding that an "'unreasonable delay' under [5 U.S.C.] § 706(1) …

---

[72]  *See*  https://www.scribd.com/document/569256206/Final-Response-Packet-2021-0245-Rolling-Production-Number-1.

may be found even if the 'agency has no concrete deadline establishing a date by which it must act,'" and finding a "prima facie showing of unreasonableness" when "defendants have had five years to perform three background checks….").

550.  Several years ago, ATF has reported to members of Congress that "FTISB strives to maintain a customer service response time of within 90 days," and "we also adhere to the First In, First Out (FIFO) method for organizing, handling, and prioritizing … to ensure fair and equal treatment of all of our customers."  *See* Exhibit "55."  However, by 2021, ATF reported an "FTISB Processing Time Goal[]" for "Industry Evaluations" of "6 to 9 months," a three-fold increase.  *See* Exhibit "56."

551.  Of course, ATF's "goal" of 6 to 9 months is little consolation to members and supporters of GOA and GOF who have had their classification request pending for *years*.  And, as the FOIA production above demonstrates, contrary to its claims, ATF *does not follow* the FIFO method, or "ensure fair and equal treatment," refusing to issue classifications on dozens of submissions for unpopular products and companies.

552.  This ability, essentially to act through inaction, permits ATF to exercise control over a company or product without ever having to take a position that could be challenged in a court of law as "final agency action" under the APA.

553.  Moreover, it is unlikely that a company which requests an ATF classification will bring a product to market after ATF has refused to classify it.

554.  Recognizing these inherent problems with the ATF classification system, members of Congress have introduced H.R. 1961 and S. 1920, the ATF Accountability Act of 2021, 117th Cong. 2021, which would require that ATF "shall make a ruling" with respect to any "question regarding the legal status or classification of a product…."  Moreover, the proposed legislation

would create an appeal process for an unfavorable ATF classification, and a legal cause of action to challenge the agency's determinations.

555.  The Final Rule provides no such safeguards to the ATF classification process similar to those in H.R. 1961 and S. 1920 And, as noted above, the Final Rule glaringly fails to address important issues raised by commenters.

556.  Fourth, the Final Rule provides absolutely no statutory or other legal authority for ATF to "codify" its bureaucratically created classification system, which has been operated in an arbitrary and capricious manner.

557.  In another notice of proposed rulemaking, issued in June of 2021 and entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" (2021R–08, 86 FR 30826), ATF *did make a claim of delegated authority for its classification system*.

558.  In that proposed rule, the agency claimed:

> The Attorney General is responsible for enforcing the NFA, GCA, and the Arms Export Control Act ("AECA"). The Attorney General has delegated the responsibility for administering and enforcing these statutes to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. See 28 CFR 0.130(a)(1)-(2). The **ATF Director delegated the authority to classify firearms pursuant to the GCA and NFA to ATF's Firearms Technology Criminal Branch ("FTCB") and the Firearms Technology Industry Services Branch ("FTISB")**, within the Firearms and Ammunition Technology Division ("FATD"), Office of Enforcement Programs & Services ("EPS"). [Emphasis added.]

559.  In support, that proposed rule referenced ATF Order 1100.168C, entitled "Delegation Order – Delegation of Authorities within the Bureau of Alcohol, Tobacco, Firearms, and Explosives."[73]

---

[73] *See* https://omb.report/icr/202007-1140-001/doc/102898201.

560.  That Order 1100.168C, in turn, claims that "[t]his order provides a single repository for all delegations of authority … within the Bureau of Alcohol, Tobacco, Firearms and Explosives…."

561.  An examination of Order 1100.168C, however, does not indicate that any "authority to classify firearms" has been issued to FTCB or FTISB.  Indeed, the only references to those components appear on pages 49 to 52 of the order.  While FTISB and FTCB are delegated authority to, among other things, "determine whether a particular firearm is a curio or relic," to "approve applications to import firearms," and to "exempt certain armor piercing ammunition from [various] requirements," there is no broad delegation of any "authority to classify firearms."

562.  Rather, the *specificity* with which FTISB and FTCB have been delegated various discrete tasks indicates that they are not delegated *general* "authority to classify firearms."[74]

563.  Indeed, specific delegations implicitly contraindicate general delegation.  *See Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (citation and punctuation omitted) ("[I]t is familiar law that a specific statute controls over a general one without regard to priority of enactment.").

564.  Moreover, since the Final Rule's promulgation is premised on the existence of a delegation of power which it appears *has not actually been made*, the Final Rule is unauthorized.

565.  The Final Rule thus, without any delegation at all, would formalize a system designed from the ground up to vest unelected and unaccountable government officials with unbridled latitude and unreviewable discretion to do virtually whatever they want in any particular case.

566.  This system violates the APA, because it is by definition arbitrary and capricious, not in accordance with law, in excess of statutory jurisdiction, authority, and contrary to constitutional

---

[74] *See* https://omb.report/icr/202007-1140-001/doc/102898201.

right (5 U.S.C. § 706(2)), violating the Due Process clause of the Fifth Amendment.  The Final Rule also runs afoul of § 706(1), as it codifies a system wherein "agency action" may be "unlawfully withheld or unreasonably delayed."

567.  The Final Rule also fails to respond to important comments raised by Plaintiffs in opposition to the codification of the ATF classification system (*cf.* Final Rule at 24709 with 24710) (listing no fewer than **10** different comments received, then responding with three paragraphs that do not address any of those comments, and finally responding specifically only to **five** of the ten comments the agency acknowledged receiving but failing entirely to address:  (1) the claim that ATF has no obligation to issue determination; (2) the claim that ATF no duty to notify a requester that is processing a submitted request; (3) a suggestion ATF be required to  issue decision within three months or a submission be deemed approved; and (4) the assertion that, under the Final Rule, ATF will be free to continue using the classification system to pick favorite companies and technologies).  Additionally, as noted above, the Final Rule entirely omits any response to criticism of its perjury requirement.

568.  Nor does ATF have any excuse for its failure to specifically address certain comments that the Final Rule acknowledged as having been made.  The agency obviously deemed certain comments important enough to reference them in the Final Rule, and there is no need to rehash every comment in the Final Rule, as all comments are already a matter of public record and publicly available at   https://www.regulations.gov/document/ATF-2021-0001-0001.   On the contrary, the inclusion of certain comments in the Final Rule represents an admission that those comments raised substantive issues with the Final Rule and thus "challenge a fundamental premise" that should be addressed by the agency.  *See Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (2019) ("an agency must respond to comments 'that can be thought to challenge a

fundamental premise' underlying the proposed agency decision").  The agency's failure to wrestle with the thorny issues above renders the Final Rule invalid under the APA's requirement for "reasoned decisionmaking."

569.  The Final Rule's unlawful and inappropriate codification of ATF's flawed classification system will irreparably harm the members and supporters of GOA and GOF in numerous ways. First, as ATF reserves to itself the decision whether to issue a classification letter, this system will permit ATF to act arbitrarily and capriciously against the members and supporters of GOA and GOF, as has already occurred.  Second, ATF's refusal to examine items that do not "include a firearm" leaves the homemade firearm industry in the lurch, because incomplete and unfinished 80% frames and receivers, along with firearm parts, jigs, templates, tools, and instructions are not "firearms" under federal law.  Thus, ATF may decide not to examine these products (although inviting the industry to submit such products for examination).  Third, members and supporters of GOA and GOF have been on the receiving end of ATF's conflicting classification letters, where the agency adopts diametric positions about identical items.  Codifying such a system will irreparably harm these persons and entities.  Fourth, the Final Rule's requirement that product samples be submitted *under penalty of perjury* creates a deterrent effect on (and potential criminal liability for) those who would ask ATF to examine their products, as it is entirely unclear from the Final Rule what a product submitter is being asked to certify, and the legal authority for ATF to make such a demand.

## VII.   The Final Rule Adopts an Unlawful Record Retention Policy.

### a.   The Final Rule's Permanent Recordkeeping Requirement Violates the APA.

570.  As its final regulatory change, the Final Rule amends 27 C.F.R. § 478.129(b) and (e), which governs the period that Federal Firearms Licensees are required to keep their business records.

571.  The Final Rule radically changes the rules governing firearms dealer retention of firearms transaction records.  The current regulation requires licensed dealers to keep all ATF Forms 4473 "for a period of not less than 20 years,"[75] "after which records of transactions over 20 years of age may be discarded."  The Final Rule, however, amends Section 478.129(b) and (e) to require *permanent* retention by dealers "until business or licensed activity is discontinued."[76]  *See* 87 FR 24746, 24747.

572.  The Final Rule similarly extends record retention requirements by amending Section 478.129(d) to require importers and manufacturers to retain their disposition records *forever*, and amends Section 478.129(e) to require private collectors holding curio and relic licenses to maintain both acquisition and disposition records *forever*.

573.  As ATF explains, the Final Rule "amend[s] 27 CFR 478.129 to require FFLs to retain all records until business or licensed activity is discontinued…."  Final Rule at 24667.

574.  Of course, since all FFLs including Plaintiff Bridge City Ordinance can be expected to go out of business at some point in the future, this change means that, eventually, *all* FFLs including Plaintiff Bridge City Ordinance will be required to send *all* records of *all* licensed gun sales to ATF, pursuant to the existing out-of-business records requirement found in 18 U.S.C. §923(g)(4) and 27 C.F.R. § 478.127.

---

[75] This 20-year rule has been in effect since 1985 (then Section 178.128).  50 FR 26704.  From 1968 to 1985, FFLs were required to maintain their records permanently. https://archives.federalregister.gov/issue_slice/1985/6/28/26702-26707.pdf#page=3.

[76] Prior to the Final Rule's requirement that licensees keep records forever, the ATF "strongly recommended" that licensees send the ATF records over twenty years old.  *See* ATF Ruling 2016-1, https://www.atf.gov/firearms/docs/ruling/2016-1-requirements-keep-firearms-records-electronically/download, ¶ 13. Of course, the Final Rule does not claim to supersede Ruling 2016-1, and does not reference the previous Ruling's strong recommendation, instead it ignores existing policy and simply states a new requirement which will undoubtedly lead to additional industry confusion as to what the ATF requires.

575.  The administration, in fact, openly admits to this scheme to create a permanent national database of persons purchasing firearms.  *See* White House "Fact Sheet" on the Final Rule ("the final rule requires federally licensed firearms dealers to retain key records until they shut down their business or licensed activity. At that time, these dealers must transfer the records to ATF").[77]

576.  ATF justifies this change from temporary to permanent record preservation based on the increasing ease to create this registry: "[g]iven advancements in electronic scanning and storage technology," on the theory that this had led to "reduced costs of storing firearm transaction records."  Final Rule at 24667.

577.  Of course, ATF's rationale claiming "reduced costs of storing" records electronically is wholly inapplicable to firearms dealers who store paper records (the majority of them), since the Final Rule made no corresponding regulatory change governing the form in which dealers must keep paper records.  Moreover, the Final Rule implements no rule change permitting a licensee to scan and store paper records electronically, apparently unaware of prior ATF guidance on this very topic.

578.  For instance, ATF Ruling 2016-1 vaguely authorized "an alternate method or procedure to the paper bound firearms acquisition and disposition recordkeeping requirements,"[78] but was wholly silent as whether an FFL may digitize *existing* records and store them, as the Final Rule claims.

579.  Under current and guidance which the Final Rule does not purport to supersede, an FFL that wished to implement electronic storage of its records would need to comply with all of the

---

[77] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/.

[78] *See* https://www.atf.gov/firearms/docs/ruling/2016-1-requirements-keep-firearms-records-electronically/download.

requirements of ATF Ruling 2016-1, which includes 14 separate requirements, some with multiple subparts, before the FFL would be deemed to be compliant with that Ruling.  This hardly seems like much of an "advancement" in storage technology.

580. But even if FFLs were *permitted* to expend time and expense to digitize their paper records and store them more easily in digital form, this is no justification for ATF's permanent recordkeeping scheme premised on the idea that digital record storage is cheaper than paper.

581. As an additional rationale for the change to permanent recordkeeping, the Final Rule further relies on "[t]he durability and longevity of firearms," which means they "can be in circulation for many decades or even beyond 100 years."  Final Rule at 24667, 24725.

582. But "durability and longevity" are characteristics that firearms have *always* had (including when the rule mandating storage for 20-years was enacted), and an *unchanged* trait of firearms does not justify a regulatory *change*.

583. The Final Rule then offers as a third justification an allegation that permanent recordkeeping will "enhance public safety," on the theory that some "firearms have been traced to retailers who destroyed numerous records that were older than 20 years, but those traces could not successfully be completed."  Final Rule at 24564, 24712.

584. However, the supporting evidence ATF provides is entirely unconvincing, stating that "1,360 on average per year, could not be completed…."[79]  Final Rule at 24712.  Likewise, President Biden's "Fact Sheet" on the ATF Final Rule claims that "on average more than 1,300 firearms a year are untraceable because the federally licensed firearms dealer destroyed the relevant records that were more than 20 years old."[80]

---

[79] This number does not appear to take into account pre-1968 firearms which do not have a serial number requirement, and thus, could not be traced.

[80] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/.

585. But even if true, this statistic *undermines* (rather than supports) the Final Rule's regulatory change. As ATF reports, it conducted 490,800 traces in 2020.[81] This means that *at most* only 0.2 percent (1,360/490,800) of traces were incomplete because of records older than 20 years.

586. Moreover, 1,360 incomplete traces do not equate to 1,360 violent crimes (or even 1,300 crimes of any sort) as trace requests are conducted for any of a variety of reasons. Indeed, the Final Rule concedes that only 4,237 (26% of 16,324, and ***0.007 percent*** of annual traces) "were related to 'Violent Crime.'" Final Rule at 24712.

587. And, of course, just because such a trace is "completed" does not mean a violent criminal is apprehended. For example, in many cases law enforcement has already apprehended the perpetrator, meaning a successful trace does not help catch a bad guy. In many other cases, a successful trace merely leads to identification of a law-abiding victim who previously had his gun stolen, and who has absolutely no connection to the crime. For all these reasons, the older the records (over 20 years), the less likely they will provide successful leads for law enforcement.[82]

588. In fact, in 1985, ATF specifically moved away from a permanent record retention requirement when it adopted its 20-year limit, on the grounds that "[a] study conducted by ATF established that relatively few requests for traces of guns involved transactions older than 20 years." 50 FR 26702.

589. In making its 1985 change, ATF concluded that "a 20 year record retention period would not have a significant impact on ATF's capability to trace crime-related firearms." *Id.* In other

---

[81] *See* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-tracing-center.
[82] *See* https://www.realclearpolitics.com/articles/2022/02/04/democrats_pushing_gun_registry_as_precursor_to_gun_ban_147139.html.

words, ATF concluded in 1985 that there was no public safety benefit to a permanent record keeping requirement, contradicting and undermining its claims in the Final Rule.

590. But when Plaintiff GOA sought via the Freedom of Information Act, a copy of this 1985 study on which ATF had relied ATF reported that it was "not able to locate" it. *See* Exhibit "30."

591. In other words, ATF's only proffered evidence actually undermines its claim that the Final Rule's change to permanent recordkeeping will enhance public safety in any meaningful way. Meanwhile, the agency claims it cannot find evidence that disproves its public safety rationale.

592. Certainly, since the agency purportedly was not able to find its 1985 study and produce it in response to a FOIA request, it must be concluded that ATF did not consider or rely on that clearly pertinent study when promulgating the Final Rule, leading to the conclusion that the agency has not considered all the relevant information as required by the APA. The Final Rule certainly does not explain why the conclusions from ATF's 1985 study no longer apply.

593. The Final Rule's change to permanent recordkeeping serves no legitimate public safety purpose, is unsupported by the evidence, and contradicts other available evidence the agency cannot produce.

594. The change to permanent recordkeeping made in the Final Rule is arbitrary and capricious, because ATF has failed to "examine the relevant data and articulate a satisfactory explanation for its action," and indeed has "offered an explanation for its decision that runs counter to the evidence" the agency apparently has misplaced or destroyed. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). *See also Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("'an agency's refusal to consider evidence bearing on the issue

before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.'").

595.  Whereas "ATF ... has previously issued variances to licensees permitting the offsite storage of ATF Forms 4473, excluding those executed (generally) within the most recent three-year timeframe,"[83] the Final Rule would require records kept under Sections 478.129(b), (d) and (e) to be stored "at the business premises readily accessible for inspection" unless they are "over 20 years of age" whereupon they "may be stored at a separate warehouse...."

596.  This regulatory change presumably revokes (without saying so) all previously issued variances for offsite storage, requiring (by design) FFLs to keep mountains of paper files at their business premises.  This, in turn, forces them into a situation where they must either (a) incur the expense of digitizing these paper files in order to make them easier for ATF to search, copy, or seize during annual compliance inspections; or (b) be financially drained on an ongoing basis by paying additional rent for additional retail space for storage that is not required for retail purposes; or (c) voluntarily relinquish the paper files to ATF for early entry into the agency's centralized out-of-business records database.[84]

597.  Additionally, whereas the current regulation in Section 478.129(b) requires an FFL to retain Forms 4473 where the "transfer did not take place ... for a period of not less than 5 years,"[85] the Final Rule removes this time limit, thus requiring such Forms 4473 to be retained forever.

_____

[83] https://www.ammoland.com/2021/12/leak-shows-atf-is-trying-to-force-ffls-into-digitizing-4473/

[84] Indeed, ATF admits that certain "FFLs ... currently voluntarily ship records older than 20 years" to ATF for entry into the out-of-business records database.  Final Rule at 24722-24723.  The Final Rule's response to comments promises that "[u]pon promulgation of this rule, these FFLs will no longer be able to ship their records to ATF that are older than 20 years without discontinuing business or licensed activity."  *Id.*  ATF also posits that FFLs can get around this by "voluntarily choos[ing] to discontinue ... business [and] subsequently obtain[] a new license."  Final Rule at 24712.  As stated previously, this new advice contradicts previous ATF Ruling 2016-1, but the Final Rule does not acknowledge that ruling has been superseded.

[85] This five-year rule has been in effect since 1998.  63 FR 58280. https://www.govinfo.gov/content/pkg/FR-1998-10-29/pdf/98-28986.pdf.

598.  The original purpose of this five-year retention requirement was generally understood to reflect the five-year statute of limitations for federal crimes found in 18 U.S.C § 3282.  Thus, if a felon attempted to purchase a firearm and was denied, prosecutors could need to obtain the original Form 4473 to support a charge for making a false statement.

599.  As the Final Rule acknowledges, "[t]he form [4473] is typically the key evidence that the straw purchaser who bought the firearm (and who can pass a background check) made a false statement to the FFL concerning the identity of the actual purchaser when acquiring that firearm, in violation of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A)…."  Final Rule at 24660.

600.  A Form 4473 where a "transfer did not take place" by its very nature is not associated with any firearm that ATF could trace and since, after five years, no false-statement prosecution may take place, there is absolutely no need for an FFL to keep such records longer than five years.

601.  Thus, this requirement of the Final Rule is arbitrary and capricious, serving no legitimate government purpose, and doing nothing more than imposing unnecessary "paperwork" type requirements together with related financial burdens on FFLs, and creating additional risk of minor paperwork violations that can be used even years later by ATF to revoke licenses.

**b.  The Final Rule's Permanent Recordkeeping Requirement Violates 18 U.S.C. § 926(a)(3).**

602.  Pursuant to 18 U.S.C. § 923(g)(1)(A), ATF has certain limited authority to require licensees to maintain certain records: "Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe."

603.  However, 18 U.S.C. § 926(a)(3) puts a significant limit on that authority, mandating that "[n]o such rule or regulation prescribed after the date of the enactment of the Firearms Owners'

Protection Act [May 19, 1986] may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States."

604.  The existing regulation set out in 27 C.F.R. § 478.129, which permits FFLs to destroy records after 20 years, was promulgated in 1985, prior to FOPA.  *See* 50 FR 26702.[86]

605.  By contrast, the 2022 Final Rule is being promulgated decades after enactment of Section 926(a)(3) in 1986.

606.  Thus, the Final Rule constitutes a "rule or regulation" within the meaning in Section 926(a)(3).

607.  By requiring that licensees keep records permanently (instead of only for 20 years), and demanding that out-of-business licensees transfer those records to the ATF, the Final Rule "require[s] that records required to be maintained under this chapter … be … transferred to a facility owned, managed, [and] controlled by the United States," and allows ATF to engage in a dragnet sweep of all firearms records that never previously existed.

608.  As such, the Final Rule's requirements for permanent records storage violates the ban contained in 18 U.S.C. § 926(a)(3), which states:  "No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established."

---

[86] https://archives.federalregister.gov/issue_slice/1985/6/28/26696-26704.pdf#page=7.

609.  ATF pretends the Final Rule does not constitute a significant change, on the theory that "ATF estimated that most FFLs currently store records beyond 20 years…."  Final Rule at 24721. But even if that were true, this does not make the Final Rule issued after 1986 lawful under § 926(a)(3), for several reasons.

610.  If ATF were to demand that an FFL complete a "**trace**" request for a firearm that had been sold more than 20 years prior, the FFL would be required to transfer those records (which ATF required the FFL keep) to the ATF, similarly in violation of § 926(a)(3).

611.  Likewise, if an ATF inspector conducted an administrative "**inspection**" of an FFL's records, pursuant to 18 U.S.C. § 923(g)(1)(B), and made photocopies, took pictures, or otherwise obtained a copy of records older than 20 years (which ATF required the FFL keep), those records would then return with the inspector to a "facility owned, managed, [and] controlled by the United States," in violation of § 926(a)(3).

612.  Finally, it has been recently reported by the press that ATF's Out-of-Business Records Center has recently begun using high-speed scanners to digitize all "out of business" records obtained by the agency.[87]

613.  Additionally, ATF recently reported to members of Congress that it has obtained nearly one billion records related to firearm sales within its Out-of-Business Records Center, almost all of which have been converted to digitized form.[88]  *See* Exhibit "34."

614. This practice violates 18 U.S.C. § 926(a)(3) which states that "[n]o[] system of registration of firearms, firearms owners, or firearms transactions or dispositions [shall] be established," including by using "records required to be maintained under this chapter…."

---

[87] https://www.ammoland.com/2020/12/signs-suggest-walmart-turn-over-customers-4473-gun-records-atf/.

[88] https://freebeacon.com/guns/biden-admin-has-records-on-nearly-one-billion-gun-sales/.

615.  ATF for years has flirted with the boundaries of this prohibition[89] – relying on the fact it was allowed by one statute to retain out of business records, while ignoring that it is prohibited by another statute from using these records to establish a national gun registry (by creating a searchable digital database of gun sales and owners).

616.  Under the Final Rule, ATF seeks to vacuum up even more records of gun sales, by mandating that *no* records of any gun sale (or even non-sales) may *ever* be destroyed, and that *all* records of all sales (and non-sales) must eventually be turned over to ATF for inclusion in its digital database of firearm sales.

617.  The Final Rule thus operates to enable ATF to create a prohibited National Gun Registry, in violation of § 926(a)(3).

618.  In addition to creating various new regulatory burdens for FFLs including Plaintiff Bridge City Ordinance, the Final Rule unlawfully creates a system to acquire and maintain the records of firearms owned by Plaintiff Jimenez, not only with respect to commercially made firearms Plaintiff Jimenez acquires from an FFL, but also with respect to privately made firearms that Plaintiff Jimenez brings to a licensee for customization, repair, fitting, coating, etc., and which the licensee must now enter into ATF's federal system of firearm records.  Unsurprisingly, Plaintiff

---

[89] Other recent ATF actions help to confirm the agency's conspiracy to create a prohibited gun registry. **First**, in Minnesota, Michigan, and Alabama, ATF recently revoked state concealed carry permits as alternatives under 18 USC Section 922(t)(3), thereby funneling more and more gun sales through the NICS system. **Second**, during ATF "compliance" inspections pursuant to 18 U.S.C. 923(g)(1)(A)-(C), many dealers have reported in recent years that ATF inspectors have been caught taking cell phone pictures of the dealers' bound books and Forms 4473, often en masse – not because of any problem with the records or suspicion of wrongdoing of any kind, and in violation of the Section 923(g)(1)(D) prohibition that "[t]he inspection and examination authorized by this paragraph shall not be construed as authorizing the Attorney General to seize any records or other documents other than those records or documents constituting material evidence of a violation of law." **Third**, ATF has sought to make unlawful seizure even easier for its inspectors, by amending the ATF Form 4473 to put the section with make, model, and serial number on the very same page as the section about identity of the transferee, changing from Exhibit 31 to Exhibit 32. **Fourth**, ATF recently approved software that will permit a dealer to maintain his physical "bound book" of acquisitions and dispositions in electronic form, meaning that ATF inspectors can simply copy the bound book to a thumb drive, giving them an easily accessible record of the FFL's entire business.

Jimenez does not want his ownership of firearms to be catalogued, maintained, and retained by the federal government in perpetuity, and nothing in federal law permits (much less requires) that to occur.  For those reasons, Plaintiff Jimenez – along with every one of GOA/GOF's members and supporters who possess firearms acquired from licensed dealers – will be irreparably harmed in the Final Rule is implemented.

## VIII.    Causes of Action and Prayer for Relief.

### FIRST CAUSE OF ACTION
### (VIOLATION OF APA 5 U.S.C. § 706(2)(A))
### ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW

619.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

620.  The Final Rule challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

621.  Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §706(2)(A).

622.  A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

623.  An agency's departure from prior practice can serve as an additional basis for finding an agency's action to be arbitrary and capricious.  In this case, ATF has dispensed with countless of its prior determinations and classifications, and adopted entirely new approaches and practices with respect to interpreting and applying the statutes it is tasked with enforcing.  Typically, the

agency has not even acknowledged its prior positions, or conceded that it is changing its position.  Much less has ATF provided a reasoned explanation for these tectonic policy shifts.

624.   Additionally, the Final Rule adopts various vague and arbitrary standards and tests that invite future arbitrary and capricious actions on the part of ATF.

625.   At times, as detailed above, the Final Rule adopts self-conflicting definitions.

626.   Finally, the Final Rule in numerous instances conflicts with the plain text of the statutes it purports to interpret and implement, making it not in accordance with law.

## SECOND CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 706(2)(C))
## IN EXCESS OF STATUTORY JURISDICTION OR AUTHORITY

627.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

628.   Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

629.   The Final Rule constitutes a final agency action that is *ultra vires* and should be set aside by the Court.

630.   Defendants may only exercise the authority conferred upon them by statute, and may not legislate through regulation in order to implement the perceived intent of Congress or congressional purpose behind federal gun control statutes.  Attempts by an agency administratively to regulate and control the sale of items that federal law does not regulate violates the APA.

## THIRD CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. §§ 553(b) and 706(2)(D))
## WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

631.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

632.  The APA at times requires that agencies engage in notice and comment rulemaking.  5 U.S.C. § 553(b).

633.  This requirement applies to the Final Rule.

634.  The Final Rule, however, did not abide by this requirement, as its definition of "frame or receiver" is not the "logical outgrowth" of the original definition from the agency's proposed rulemaking.

635.  The purpose of notice and comment rulemaking is to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…."  5 U.S.C. § 553(c).

636.  The organizational plaintiffs herein, along with tens of thousands of their members and supporters, submitted comments critical of the definition of "frame or receiver" as originally proposed by ATF.  Indeed, these comments were instrumental in the agency's decision to abandon that definition, and propose an entirely new one.

637.  However, the new definition is nothing like the original definition.

638.  By failing to provide the opportunity for comment its most recent attempt to define "frame or receiver" in the Final Rule, the agency has failed to consider all the relevant arguments and important aspects of the problem.

639.  The Final Rule thus violated 5 U.S.C. § 706(2)(D).

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF APA 5 U.S.C. § 706(2)(B))**
**CONTRARY TO CONSTITUTIONAL RIGHT, POWER, PRIVILEGE OR IMMUNITY**

640.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

641.  The APA requires agency action be set aside if it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

642.  Plaintiffs Gun Owners of America, Inc. and Gun Owners Foundation have representational standing to assert the interests and protect the rights of their members and supporters.

643.  The Final Rule is contrary to the First Amendment, in that it abridges and chills the freedom of speech by claiming that forms of communication such as "templates" or "instructions" or "marketing materials" or "guides" have the potential to turn inanimate objects into firearms.

644.  The Final Rule is contrary to the Second Amendment, in that it purports to regulate (and infringe) the ability to manufacture a private, homemade firearm, an activity which has existed unimpeded since the founding era.

645.  The Final Rule is contrary to the Fifth Amendment, which requires that the criminal law be clear and unambiguous, so that persons of ordinary intelligence may understand it, comprehend what is proscribed, and remain law abiding.

646.  The Final Rule is contrary to the constitutional separation of powers, which lays out the only legitimate process for the enactment of legislation.  *See, e.g., Terkel v. CDC*, 521 F. Supp. 3d 662, (2021).

### FIFTH CAUSE OF ACTION
### (CONSTITUTION ARTICLE I, SECTIONS 1 AND 7)
### SEPARATION OF POWERS

647.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

648.  Article I, § 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

649.  Article I, § 7, Clause 2 of the Constitution mandates that "[e]very Bill … shall have passed the House of Representatives and the Senate" and "shall ... be presented to the President of the United States … before it become a Law…."

650.  The Final Rule violates these provisions, usurping legislative powers.  The Final Rule represents an attempt by an administrative agency to implement policy change and enact omnibus federal gun control legislation through bureaucratic regulation, rather than through legislation.

**SIXTH CAUSE OF ACTION**
**(FIFTH AMENDMENT DUE PROCESS)**
**VOID FOR VAGUENESS**

651.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

652.  The Fifth Amendment prohibits the deprivation of life, liberty or property without due process of law.  U.S. Const. Amend. V.

653.  Implicit in the Due Process Clause is the principle that the law (including agency regulation) must be clear so that persons of ordinary intelligence may understand it.

654.  As the Supreme Court has held, "the prohibition of vagueness in criminal statutes…is 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.'"  *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018).

655.  As alleged above, numerous definitions implemented by the Final Rule are unconstitutionally vague, failing to provide notice as to what items are regulated and what conduct is proscribed.

656.  The Final Rule several times actually admits its vagueness, inviting members of the public to ask for ATF's opinion "to the extent there is uncertainty about a particular item…." *Id*. at 24679; *see also* at 24672, 24696 ("If persons remain unclear which specific portion of a weapon or device falls within the definitions of 'frame' or 'receiver,' then they may voluntarily

submit a request to ATF…."). The Fifth Amendment, however, requires that the law be clearly written so that persons of ordinary intelligence can understand it, without being forced to seek dispensations or indulgences from bureaucratic overlords.

**SEVENTH CAUSE OF ACTION**
**(SECOND AMENDMENT)**
**RIGHT TO KEEP AND BEAR ARMS**

657.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

658.  The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

659.  To be sure, federal courts generally have sanctioned (rightly or wrongly) "laws imposing conditions and qualifications on the commercial sale [but not private manufacture] of arms." *District of Columbia v. Heller*, 554 U.S. 570 (2008); *see* Final Rule at 24676.

660.  However, Congress has explicitly chosen not to regulate the manufacture, distribution, or sale of firearm parts, or unfinished 80% frames and receivers, which are (at best) unregulated precursors to components regulated by the GCA.

661.  Moreover, Congress has explicitly chosen not to regulate the private manufacture of homemade firearms for personal use by law-abiding persons.

662.  Defendants' attempts to regulate by administrative fiat that which Congress has explicitly determined should be left unregulated violates the Second Amendment right to keep and bear arms.

663.  The U.S. Supreme Court has recognized that the Second Amendment protects each individual citizen's right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570 (2008).

664.  In order to engage in the constitutionally protected activities of "keeping" and "bearing" firearms, weapons first must be acquired.

665. It is thus beyond serious debate that the Second Amendment protects the right of individuals, including the individual plaintiffs along with the members and supporters of GOA/GOF, to make their own privately made firearms, and thus to acquire the parts and materials with which to do so.

666. Likewise, the Constitution protects the corresponding right to sell firearm components, magazines, ammunition, and accessories, just as the freedoms of speech and press protect the right to buy and sell newspapers, books, paper, and ink. Indeed, it would not mean much if there was a right to make a firearm, but no ability to purchase the materials necessary to do so.

667. It is beyond reasonable debate that lawful firearm ownership necessarily includes the ability to acquire arms. Other courts have recognized the connection between the right to keep and bear arms, and the ability to commercially purchase and sell weapons. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use[.]"); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."); *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (Second amendment preserves "a corresponding right to obtain' the 'necessary' arms and ammunition[.]"); and *Elhert v. Settle*, CL20000582, 2020 Va. Cir. LEXIS 119, *7 (July 14, 2020) ("The lack of a right to buy and sell arms would negate the right to keep arms as well as defeat the purpose of the right stated in the prefatory clause….") (emphasis added).

668.  Moreover, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *NYSRPA v. Bruen*, 597 U.S. ___, 2022 U.S. LEXIS 3055, *20-*21 (2022).

669.  There is no historical tradition, or founding or ratification era analogue, for the regulation of firearm parts, or restrictions on the manufacture of homemade firearms.

670.  Rather, it is enough that Plaintiffs (members of "the people") wish to manufacture firearms (protected "arms") for lawful purposes (such as to "keep" and "bear"), their right to do so "shall not be infringed."

671.  Nor is the government permitted any longer to provide a public safety rationale as justification for a challenged restriction, such as the Final Rule's appeal to the alleged "problem of untraceable firearms being acquired and used by violent criminals and terrorists," or the Final Rule's gnashing of teeth that the law as it currently exists makes it "more difficult for law enforcement to trace firearms, including PMFs." *Id*. at 24688-89. *See also* Regulatory Impact Analysis at 27, 47 (justifying the Final Rule, even though "[w]hen PMFs are made for personal use, they are not required by the GCA to have a serial number," but "because PMFs do not bear a serial number … ATF has found it extremely difficult to complete [] traces on behalf of law enforcement."

672.  On the contrary, it is no answer to "invoke[] all of these statistics presumably to justify granting … greater leeway in restricting firearm ownership and use … '[t]he right to keep and bear arms .. is not the only constitutional right that has controversial public safety implications.'" *Bruen* at 21 n.3.

673.  Further, it is no answer for Defendants to be able to violate the Plaintiffs' rights simply to make it easier "for law enforcement to trace firearms, including PMFs."  If this were the law, then there would be no need to give Miranda warnings, because it would be easier for police to question individuals without advising them of their rights.  *See Miranda v. Arizona*, 86 S. Ct. 1602 (1966).

674.  Likewise, the Fourth Amendment's prohibition against unreasonable searches and seizures could be ignored because it makes it "more difficult for law enforcement" to search "persons, houses, papers, and effects…"  U.S. *Const. amend.* IV.

675.  Perhaps, to make it easier for law enforcement, individuals could simply be presumed guilty, rather than being presumed innocent.  But this is not the way our law works.

676.  Because the Final Rule violates the Second Amendment, it is unconstitutional.

## EIGHTH CAUSE OF ACTION
### (VIOLATION OF APA 5 U.S.C. § 706(2)(A))
### NOT IN ACCORDANCE WITH LAW (*NYSRPA v. BRUEN*)

677.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

678.  The Final Rule is invalid because it represents "agency action, findings, and conclusions found to be … not in accordance with law" as recently announced by the U.S. Supreme Court.  *See* 5 U.S.C. § 706(2)(A).

679.   The Final Rule specifically and expressly justifies ATF's regulatory promulgations on the basis that they do not violate the Second Amendment, on the theory that "[t]here are compelling governmental interests in [regulating] privately made firearms," relying on the two-step test concocted by federal courts of appeals, applying intermediate or strict scrutiny.  Final Rule at 24676; *see also* at 24677 (relying on cases discussing whether a restriction "severely burden[s] Second Amendment-protected conduct" and is a "reasonable fit for achieving the

City's objectives of "public safety and crime prevention," and upholding another restriction because "the 'burden imposed by the law does not severely limit the possession of firearms.'")

680.  However, the Supreme Court's decision in *NYSRPA v. Bruen*, 597 U.S. ___, 2022 U.S. LEXIS 3055 (2022) "decline[d] to adopt that two-part approach" used in the lower courts, and "decline[d] to engage in means-end scrutiny generally," and "specifically ruled out the intermediate-scrutiny test…." *Id*. at *21, *28.

681.  In other words, the legal precedents on which the Final Rule relies have been soundly repudiated by the Supreme Court.  The legal tests on which the Final Rule relies have been resoundingly rejected by the Court.

682.  Thus, as the Final Rule's "findings and conclusions" are contrary to the law as recently announced by the U.S. Supreme Court, the Final Rule must be struck down.

683.  Certainly, ATF is free to try again, and to re-promulgate the Final Rule, once it considers the Second Amendment implications thereof using the appropriate legal test as announced in *Bruen*.

### NINTH CAUSE OF ACTION
### (VIOLATION OF 18 U.S.C. § 926)
### NO NATIONAL GUN REGISTRY

684.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

685.  Defendants are prohibited by 18 U.S.C. § 926(a) from creating a national registry of firearms, firearm owners, or firearm transfers, or from creating new requirements that licensees transfer records to the federal government.

686.  The Final Rule's requirement that dealers maintain records in excess of 20 years, and subsequently transfer them to the ATF out-of-business records center, represents a "rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act [that] require[s] that records required to be maintained under this chapter or any portion of the

contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States…."

687.  The Final Rule's requirement that privately made firearms be marked and serialized, that records of those markings, serializations, and records of the owners of privately made firearms be kept by licensees, and that all of the foregoing records may never be destroyed and must eventually be transferred to the ATF's out-of-business records center, represents an attempt by ATF to "establish[] [a] system of registration of firearms, firearms owners, or firearms transactions or dispositions…."

<u>TENTH CAUSE OF ACTION</u>
<u>(VIOLATION OF FIRST AMENDMENT)</u>
<u>FREEDOM OF SPEECH</u>

688.  All of the foregoing allegations are repeated and realleged as if fully set forth herein.

689.  The First Amendment of the Constitution of the United States forbids government actions abridging the freedom of speech.

690.  In determining when a partially complete frame or receiver reaches a stage where it is classified as a firearm, the Final Rule indicates that "the Director may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials."  86 FR at 27729, 27746.

691.  Instructions, guides, templates, marketing materials and other similar information all constitute speech, whether printed on a piece of paper included in a product box, or contained in, for example, a YouTube video.  *Sorrell v. IMS Health Inc.* 564 U.S. 552 (2011).

692.  Notably, not all information accompanying an unfinished frame or receiver transforms an unregulated item into a firearm pursuant to the Final Rule.

693.  Rather, some available speech accompanying an unfinished frame or receiver "may" be considered by the Director in determining that unfinished frame or receiver to be a firearm.

694.  Likewise, the NPRM and Final Rule indicated that "raw materials" (such as a spool of plastic filament for a 3D printer) when possessed along with something "more" (such as a flash drive with data files for the 3D printer) might transform into a firearm.  NPRM at 27729.

695.  Because, under the Final Rule, ATF can determine which speech affects the classification of the item, this consideration violates the First Amendment doctrine regarding content neutral speech restrictions. *See, e.g., McCullen v. Coakley*, 134 S. Ct. 2518 (2014).

696.  In determining that an object – which might otherwise fall outside the definition of a firearm – *becomes* a firearm through the accompaniment of included information, the Final Rule seeks impermissibly to prevent the spreading of protected information, thereby chilling speech.

697.  The mere fact that speech accompanies an object cannot change the nature of the object.  Communicating with someone about how to use an item does not turn it into a different item.

698.  Yet that is what the Final Rule indicates, and what ATF recently has concluded.  See Exhibit "42" (finding that an otherwise innocuous metal water bottle might be a firearm because it contained a piece of paper with instructions on how to turn that water bottle into a firearm).

**WHEREFORE**, Plaintiffs respectfully request that the Court:

(1) Declare that the Final Rule is unlawful and an *ultra vires* agency action and of no force and effect;

(2) Declare that the Final Rule is an act "not in accordance with law" and of no force and effect;

(3) Declare that the Final Rule violates the Administrative Procedure Act as it is arbitrary and capricious and is of no force and effect;

(4) Declare that the Final Rule violates the Administrative Procedure Act as it is not the logical outgrowth of the NPRM and does not abide by the requirements of the Act;

(5) Declare that the Final Rule violates the Administrative Procedure Act insofar as it is contrary to constitutional right, power, privilege, or immunity;

(6) Declare that the Final Rule violates the Separation of Powers doctrine embodied in the United States Constitution;

(7) Declare that the Final Rule violates the Fifth Amendment's Due Process clause by being void for vagueness;

(8) Declare that the Final Rule violates rights protected by the Second Amendment and is of no force and effect;

(9) Declare that the Final Rule violates the Administrative Procedure Act and is invalid because it was promulgated not in accordance with law and is of no force and effect;

(10) Declare that the Final Rule violates 18 U.S.C. § 926(a) in that it creates a prohibited national gun registry and is of no force and effect;

(11) Declare that the Final Rule violates the First Amendment and chills protected speech and is of no force and effect;

(12) Issue an injunction prohibiting Defendants from enforcing the Final Rule;

(13) Issue an injunction prohibiting Defendants and anyone acting in concert with them from taking any action inconsistent with the rescision of the Final Rule;

(14) Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action; and

(15) Grant Plaintiffs such other relief as the Court deems just and proper and as justice so requires.

Dated: July 4, 2022

Robert J. Olson (VA # 82488)          Stephen D. Stamboulieh (MS # 102784)
William J. Olson, PC                   Stamboulieh Law, PLLC
370 Maple Ave. West, Suite 4           P.O. Box 428
Vienna, VA 22180-5615                  Olive Branch, MS 38654
703-356-5070 (T)                       601-852-3440 (T)
703-356-5085 (F)                       stephen@sdslaw.us
wjo@mindspring.com

Robert B. Stock (ND # 05919)
Vogel Law Firm
218 NP Avenue
Fargo, ND  58107-1389
701-237-6983 (T)
701-237-0847 (F)
rstock@vogellaw.com
For service: rbslitgroup@vogellaw.com