IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

MOREHOUSE ENTERPRISES, LLC )
d/b/a BRIDGE CITY ORDNANCE, ELIEZER )
JIMENEZ, GUN OWNERS OF AMERICA, INC., )
and GUN OWNERS FOUNDATION, )
                                     )     Case No. 3:22-cv-00116-PDW-ARS
     Plaintiffs, )
                                       )
           v. )
                                         )
BUREAU OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES; UNITED )
STATES DEPARTMENT OF JUSTICE; and )
STEVE DETTELBACH, DIRECTOR OF ATF[1] )
                                         )
     Defendants. )
                                         )
_____ )

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY AND/OR PERMANENT INJUNCTION

---

[1] Steve Dettelbach was sworn in as Director of ATF on July 19, 2022, and is automatically substituted pursuant to Fed. R. Civ. Pro. 25(d).

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 65(a), Plaintiffs submit the following memorandum of law in support of their motion for a preliminary and/or permanent injunction.  Plaintiffs ask this Court to enjoin Defendants from enforcing various regulations promulgated as part of an omnibus rulemaking issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on April 26, 2022, 2021R-05F, 87 FR 24652, and scheduled to take effect on August 24, 2022, entitled "Definition of 'Frame or Receiver' and Identification of Firearms" ("Final Rule").  Unless enjoined, the Final Rule will have widespread and deleterious effects on the firearms community, causing varied, significant, and irreparable harm to the individual plaintiffs named herein, along with countless of the members and supporters of the organizational plaintiffs.  The scope of ATF's Final Rule is massive, and ATF has assumed that its cornucopia of regulatory enactments will be subjected to legal challenge.  In fact, the agency has anticipated that portions of the Final Rule might be struck down.  *See id*. at 24730.  An order enjoining implementation of the Final Rule is necessary, until the merits of this extraordinary rulemaking can be evaluated by the Court.

Among its numerous regulatory enactments, the Final Rule redefines the statutory term "frame or receiver" contained in the 1968 Gun Control Act's ("GCA") definition of "firearm" (18 U.S.C. 921(a)(3)), replacing an existing regulatory definition of "firearm frame or receiver" that has existed unmolested for more than five decades (27 C.F.R. 478.11).  Whereas the existing regulation is a fairly simple and straightforward definition of 30 words, ATF proposes to replace it with a nebulous, multi-section definition consisting of nearly 1,700 words, replete with 6 parts, 20 subparts and sub-sub parts, 19 pictures, and several unenumerated "examples" of how the definition should be applied (and, at times, *should not be applied*) to certain firearms.  In no way does the Final Rule "bring clarity to the definition of 'frame or receiver.'"  *Id.* at 24652.

Expanding the statutory text far beyond the limits of what Congress chose to regulate, ATF's new regulatory definition of "frame or receiver" targets for elimination not only unfinished and incomplete 80% frames and receivers, but also assemblages of currently unregulated firearm parts which are popular among law-abiding gun owners who use these precursor items to manufacture their own homemade firearms.  The Final Rule concedes that the time-honored tradition of homemade firearms is perfectly legal, but nevertheless pejoratively terms such firearms as "ghost guns," and maligns them as a threat to law enforcement and as being the weapons of choice of criminals and "terrorists."  In so doing, the Final Rule reverses decades of contrary and consistent guidance from the ATF, including scores of classification letters ruling that various "partially complete or unassembled frames or receivers" (even those including all the parts, tools, and instructions necessary to manufacture a firearm) have not "reached a stage of manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are entirely unregulated by federal law.  Replacing this mountain of prior (and consistent) legal guidance, the Final Rule advances, for the first time, an entirely novel (and entirely wrong) "interpretation" of the GCA that the agency apparently has suddenly now discovered for the first time in 54 years.

Not content with making it difficult (if not impossible) for the average, law-abiding gun owner to manufacture a homemade firearm, the Final Rule blatantly seeks to rewrite the GCA in order to regulate and control any such "privately made firearm" that slips through the regulatory cracks.  Although conceding that ATF cannot outright ban the manufacture of homemade firearms, the Final Rule nevertheless seeks to regulate them in direct contravention of the statute Congress enacted.  The Final Rule thus creates out of thin air a mandate that "federal firearms licensees" ("FFL") who perform work on a "privately made firearm" must take that firearm into inventory, engrave it with a government issued serial number, enter its existence into a government-mandated

record system, store those records in perpetuity on behalf of the government, and eventually transmit those records to a centralized, government-controlled database of guns and gun owners.

Along the way, the Final Rule shamelessly amends numerous federal statutes, creates entirely new federal crimes, invents a new category of federal firearms license, and violates Congress's express ban on the creation or maintenance of a national gun registry.   ATF's regulatory abuses must be viewed in the context of history and, as American gun owners are uniquely aware,[2] that the registration of firearms, always and everywhere, eventually leads to confiscation.   At its core, the Final Rule represents a blatant attempt by ATF to enact, by administrative fiat, many of the restrictions found on the legislative wish lists of the nation's most radical anti-Second Amendment groups – an anti-gun agenda which Congress has never seriously considered (much less enacted).  This Court's immediate intervention is thus necessary, in the form of a preliminary and/or permanent injunction, to halt this rogue agency's attempt to implement an anti-gun political agenda, to wrest the constitutional legislative power from the hands of unelected and unaccountable bureaucrats, and to return it to the people's representatives in Congress, to whom it rightfully belongs.

## ARGUMENT

### I.    PRELIMINARY INJUNCTION STANDARD.

Consideration of a motion for a preliminary injunction requires a court to "weigh[] four factors," including "'(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

---

[2] See Brief *Amicus Curiae* of Gun Owners of America, Inc., Gun Owners Foundation, *et al.* in *District of Columbia v. Heller*, 07-290 (Feb. 11, 2008) (Sec. II.D, discussing how the first shots of the American Revolution were precipitated by threats to the colonists' right to keep and bear arms.), http://www.lawandfreedom.com/site/constitutional/DCvHellerAmicus.pdf.

(3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (citation omitted) (*en banc*). "The irreparable harm analysis turns on the nature of the injury likely to result from the challenged action, not the number of people who would be injured … an irreparable injury [is] an injury 'of such a nature that money damages alone do not provide adequate relief.'" *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region v. Parson*, 1 F.4th 552, 562 (8th Cir. 2021). Indeed, "money damages" are not available under the APA. *See Dep't of the Army v. Blue Fox*, 525 U.S. 255 (1999). The Eighth Circuit explains that the "likelihood of success on the merits is most significant" factor. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995). Finally, "[t]he balance of harms and public interest factors merge when the government is the opposing party." *Walen v. Burgum*, 2022 U.S. Dist. LEXIS 94978, *6 (D. N.D. May 26, 2022). Each factor weighs heavily in Plaintiffs' favor here.

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APA CLAIMS.

### A.  The Final Rule Violates the APA's Notice and Comment Requirement.

It is a fundamental principle of administrative law that the formal rulemaking process must go through the "notice and comment" process outlined in 5 U.S.C. § 553, part of which is the requirement that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…." *Id.* at (c). That did not occur in this case, and the Final Rule should be enjoined on that basis alone. *See* 5 U.S.C. § 706(2)(D).

In response to the NPRM submitted by ATF in May of 2021, Plaintiffs GOA and GOF, along with tens of thousands of their members and supporters, submitted comments to ATF explaining, among other things, the serious problems with the agency's proposed definition of "frame or receiver," which would have classified countless firearm parts as firearms, resulting in

4

many modern firearms containing numerous different frames and receivers. Compl. ¶¶ 17, 92, 104. In response, the ATF specifically addressed those comments, agreeing with GOA and GOF that the NPRM's definition of "frame or receiver" was flawed, in that firearms cannot contain "as many as ten frames and receivers." Compl. ¶¶ 19, 92, 99-112; compare Exhibit 33 at 17 with Final Rule at 24692. In other words, ATF changed the Final Rule not just in response to comments received, but specifically in response to *these* comments submitted by *these* plaintiffs.

However, rather than amending the NPRM, formally "proposing" a new definition, and seeking public comment thereon, ATF instead simply rewrote the definition of "frame or receiver" from the ground up, taking a different approach entirely, and promulgating that new approach as a final regulation in the Final Rule without any opportunity for notice and comment.[3] As the Final Rule explained, "[w]hereas the proposed rule would have considered *any* housing or structure for *any* fire control component a frame or receiver, the final rule … provid[es] *new distinct definitions* … describing *a* specific housing or structure for *one* specific type of fire control component." *Id.* at 24693 (emphasis added).[4]

---

[3] The same applies to the Final Rule's definition of "firearm muffler or silencer frame or receiver," which dramatically departs from the NPRM which would have resulted in silencers having multiple frames or receivers. *See* Final Rule at 24695.

[4] The NPRM would have defined "frame or receiver" to be

> A part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more *fire control components*, even if pins or other attachments are required to connect those components to the housing or structure," and defined "fire control component" to be "*a component necessary for the firearm to initiate, complete, or continue the firing sequence*…. [86 FR 27741.]

The Final Rule, however, defines "frame or receiver" in an entirely different way, defining "frame" as

> of a handgun, or variants thereof, that provides housing or a structure for *the primary energized component designed to hold back the hammer, striker, bolt, or similar component* prior to initiation of the firing sequence (*i.e.*, sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure…

5

To be sure, [t]o satisfy the APA's notice requirement, the NPRM and the final rule need not be identical," however a final rule must be "a 'logical outgrowth' of its notice." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009). A final rule is such a logical outgrowth "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Id*. at 1079-80. There is no way the Final Rule is a "logical outgrowth" of the NPRM, as it expressly (and numerous times) repudiates the approach taken by the NPRM, based on comments from Plaintiffs. *See CSX* at 1081 ("our cases finding that a rule was not a logical outgrowth have often involved situations where the proposed rule gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had *completely changed its position*.") (emphasis added); *see also North Dakota v. United States EPA*, 127 F. Supp. 3d 1047, 1058 (D. N.D. 2015) (an agency "materially altered the Rule by substituting [certain] concepts with [others] that are different in degree and kind and wholly removed from the original concepts announced in the proposed rule. Nothing in the call for comment would have given notice to an interested person that the rule could transmogrify" in such a way.).

Neither Plaintiffs nor any interested party possibly could have anticipated and commented on how ATF would radically change the Final Rule, after the definition proposed by the NPRM was repudiated by the agency in response to comments. *See Envtl. Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005) ("[w]hatever a 'logical outgrowth' … may include, it certainly

---

and defining "receiver" to be

> the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the *primary component designed to block or seal the breech* prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure. [*Id*. at 24735.]

does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse."). In fact, the Final Rule admits that its definitional language was not even contemplated until well after the NPRM was issued, and was drawn directly from "language … proposed by commenter Sig Sauer, Inc." *Id*. at 24693. Plaintiffs thus could not possibly have been able to "divine [the agency's] unspoken thoughts" (*CSX* at 1080), and submit comments in response to the Final Rule's entirely different and novel approach to defining a "frame or receiver" which was drawn from other comments submitted *during* the same NPRM comment period. Failing to provide notice to the public, including Plaintiffs, and failing to provide the opportunity to submit comments to the agency, the Final Rule violates 5 U.S.C. § 553. Compl. ¶¶ 96-98.[5] What is more, as the agency has already modified this same definition based on input from these same plaintiffs, which it found persuasive, there is every reason to believe ATF may have made further changes to the Final Rule had it first sought public comment.[6] Compl. ¶ 98.

**B. The Final Rule Is Not in Accordance with Law.**

**1. The Final Rule Conflicts with the Statutes Congress Enacted.**

---

[5] To be sure, anticipating this litigation, ATF attempts damage control on the Final Rule, claiming in a section entitled "severability" that, "in the event any provision of this rule, an amendment or revision made by this rule, or the application of such provision or amendment or revision to any person or circumstance is held to be invalid or unenforceable by its terms, the remainder of this rule, the amendments or revisions made by this rule, and the application of the provisions of such rule to any person or circumstance shall not be affected and shall be construed so as to give them the maximum effect permitted by law." *Id*. at 24730. Certainly, many of the Final Rule's more insignificant definitions mirror (or come close to) the definitions proposed in the NPRM. However, the definition of "frame or receiver" is the keystone to the Final Rule, without which the Final Rule – itself entitled "Definition of 'Frame or Receiver' and Identification of Firearms" – collapses. S*ee United Food & Commer. Workers Union, Local No. 663 v. United States Dep't of Agric.*, 532 F. Supp. 3d 741, 777 (8th Cir. 2021) ("the parts of the regulation that remain must be able to 'function sensibly without the stricken provision.'") (citation omitted).

[6] Of course, such a showing is not required. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013) ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.") (citation omitted).

As Justice Gorsuch recently reminded in *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019), "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *Id.* at 2325.  Indeed, agencies are not free to edit statutes at will, either to fit their own policy agendas, or to give meaning to some alleged "purpose" or "intent" that bureaucrats believe they have divined from a fifty-four-year-old Congressional enactment. Rather, "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences.  Until it exercises that power, the people may rely on the original meaning of the written law." *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018).  As the Supreme Court has made abundantly clear, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms ... to suit its own sense of how the statute should operate. ... [the agency's] need to rewrite [the statute] should have alerted [it] that it had taken a wrong interpretive turn."  *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 325-28 (2014).  *See also Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (an agency may not, "under the guise of interpreting a regulation ... create *de facto* a new regulation."); *Dig. Realty Trust, Inc. v. Somers*, 138 S.Ct. 767, 782 (2018) ("[t]he statute's unambiguous ... definition ... precludes the [agency] from more expansively interpreting that term.").

When an agency rewrites a Congressionally enacted statute, or adopts a regulation or "interpretation" in obvious conflict with its plain terms, the agency's actions are "not in accordance with law" under the APA.  5 U.S.C. Section 706(2)(A); *Policy & Research, LLC v. United States HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) ("an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute.").

    **a.   The Final Rule Conflicts with the Plain Text of the Gun Control Act.**

Many, if not most, of the regulations promulgated by the Final Rule conflict with the text of the GCA of 1968.  For example, 18 U.S.C. §921(a)(3) defines as a "firearm" the part that is "**the** frame or receiver of any such weapon[.]" (emphasis added).  This language obviously denotes a *singular* object, whereby each "firearm" contains *only one* "frame" or one "receiver."  The Final Rule, while in one breath acknowledging this statutory reality (Compl. ¶ 109) – conceding that the NPRM was wrong to declare firearms to have multiple frames and receivers – nevertheless continues to take the opposite approach, still claiming that some firearms have *more than one* frame or receiver.  *See* Compl. at ¶¶ 123, 129, 132, 170 (presumption that *all* serialized parts are "frames or receivers"), ¶¶134-141 ("multi-piece frame or receiver" with "left and right half receivers that each must be serialized).  The statute simply will not permit this "interpretation."

Second, the statutory definition found in Section 921(a)(3) consists of two parts pertinent here, with subsection (A) discussing "weapons" which "will" or can be "readily … converted" to fire ammunition, and subsection (B) discussing "the frame or receiver of any such weapon."  The Final Rule, however, conflates these distinct statutory provisions (A) and (B) into a single regulatory glob, claiming that unfinished 80% "frame or receiver" precursors are "firearms" because they allegedly can be "readily" converted through the completion of manufacture and assembly with additional parts.  Compl. ¶¶ 209-229.  As explained below, ATF has never before interpreted the statute this way – and for good reason – because words from one part of a statute cannot be copied and pasted into another section to facilitate the agency's policy agenda.

Third, after misapplying the term "readily" to unfinished frames and receivers (by themselves), the Final Rule claims that "weapon parts kits" (an 80% frame or receiver sold together with other unregulated parts such as a barrel, a trigger, and springs) are "weapons" under § 921(a)(3)(A).  Compl. ¶¶ 251-266.  To cover such kits, the Final Rule unabashedly rewrites and

expands the statutory language "readily … converted" to now be "readily be *completed*, *assembled*, *restored*, or otherwise converted." Compl. ¶¶ 253-254. Even so, an unfinished frame or receiver, when fully manufactured, becomes a "frame or receiver" under subsection (B) long before it becomes a complete "weapon" under subsection (A). Compl. ¶¶ 256-259.[7]

Fourth, to chill the lawful sale and purchase of unregulated, unfinished frames or receivers (without additional parts), or unregulated firearm parts (without unfinished frames or receivers), the Final Rule creates entirely new federal crimes of "criminal conspiracy" to sell and "structuring" to purchase unregulated firearm parts. Compl. ¶ 262-266. Yet neither of these new, vague crimes have ever existed in the context of the GCA, since it is perfectly lawful both to manufacture a homemade firearm and to manufacture and sell the unregulated parts with which to do so. Compl. ¶¶ 262, 269. In other words, there is no prohibition around which to "structure" or "conspire."

Fifth, ATF invents an entirely new term, "privately made firearm" ("PMF"), which has never existed prior to the Final Rule (Compl. ¶¶ 343-344), as there is no federal prohibition on an individual manufacturing his own firearm for personal use. Compl. ¶ 345. Indeed, the GCA does not regulate privately made firearms, and certainly does not require they be marked with serial numbers as the Final Rule now demands. Compl. ¶346-349. Entirely without statutory authority, the Final Rule will require a firearms *dealer* to engrave a serial number on a firearm manufactured by an *individual*. Compl. ¶¶ 353-355. Yet no federal law requires *all* firearms be serialized, and certainly not firearms manufactured by non-licensees. Compl. ¶¶ 356-364. Then, in order to give

---

[7] ATF bootstraps its attack on 80% frames and receivers and weapons parts kits by citation to cases that, without exception, do not support its position. Most involve sentencing enhancements based on presence of an actual, functioning firearm (with a *complete* frame or receiver) or NFA firearms (a different statute entirely), and almost all involve factory-made firearms (with a *complete* frame or receiver). Compl. ¶¶ 272-276. Not a single one of ATF's amassed cases holds that a "weapon parts kits" is a firearm *without* a complete, finished frame or receiver. Compl. ¶ 277.

teeth to its new enactment, the Final Rule creates another new federal crime of obliteration of a PMF serial number – a marking that no statute requires be there in the first place.  Compl. ¶¶ 372-378.  Then, in order to implement its new requirement that privately made firearms be serialized, the Final Rule invents a new category of licensing for "dealer-gunsmiths" to "solely [] provide PMF marking services" (Compl. ¶ 381), thereby expanding the existing regulatory concept of a "gunsmith."  Compl. ¶ 382.   Importantly, no federal statute uses the term "gunsmith" (Compl. ¶ 383), instead defining a "dealer" to include those in the business of "repairing firearms" and similar activities – but nothing so benign as etching a piece of metal.  Compl. ¶ 384.  Finally, by mandating that only licensed gunsmith-markers (a concept that does not exist in the statute) can engrave PMFs (with serial numbers that are not required by the statute), ATF in turn can then mandate that these licensees keep records of the privately made firearms. Compl. ¶¶ 395-397.  This forced firearm registration will link a gun owner to his particular PMF, in or to create a paper trail to be followed by ATF at a later date.  Compl. ¶¶ 400-404.  The statute plainly does not permit any of these new regulations, even if the agency believes that it "must" take action.  Compl. ¶ 342.

Sixth, in creating a new definition for a "complete muffler or silencer device," the Final Rule in effect deletes the statutory requirements that a combination of parts constituting a silencer be "designed" and "intended" for that purpose.  Compl. ¶¶ 412-429.  Instead, the Final Rule would classify as a silencer any group of parts that merely "contains all the component parts necessary to function," potentially criminalizing innocent ownership of countless innocuous household items Compl. ¶ 413, 419.  Relatedly, the Final Rule conflicts with the statute in creating and defining a new statutory term "firearm muffler or silencer frame or receiver," an entirely unnecessary and nonsensical concept.  Compl. ¶¶ 489-503.  Whereas federal gun laws use the language "frame or receiver" to define a GCA "firearm" or a National Firearms Act ("NFA") "machinegun," that

language is not used to describe a "silencer," meaning ATF is entirely without authority to add such language to the statute.  Compl. ¶¶ 495-498.  In fact, directly contradicting the Final Rule, ATF has opined that "there is no specific frame/receiver to a silencer…."  Compl. ¶ 501.

Finally, the Final Rule directly conflicts with 18 U.S.C. § 926(a)(3), which prohibits ATF from demanding more records from FFLs than it did as of 1986.  Compl. ¶¶ 602-618.  By now instructing that FFLs may *never* destroy their records (even after 20 years), ATF has made it so that all such records eventually will be transferred to the ATF out-of-business records center, "a facility owned, managed, [and] controlled by the United States…."  Compl. ¶ 607.  This new recordkeeping requirement is part of the agency's larger scheme which violates the Section 926(a)(3) prohibition on creation or maintenance of a national gun or gun owner registry.  Compl. ¶¶ 612-617.  For each of these numerous reasons, the Final Rule is "not in accordance with law."

### 2. The Final Rule Was Justified Based on a Now-Repudiated Legal Test.

In the Final Rule, ATF reports that comments were received from "[a] majority of commenters opposed to the NPRM" to the effect that ATF's "new requirements that undermine the Second Amendment are unconstitutional," and that 'the NPRM failed to include relevant Second Amendment analysis."  *Id*. at 24676.  In response, the Final Rule includes this absent "Second Amendment analysis," but boldly asserts that "this final rule is consistent with the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)" because "[t]here are compelling governmental interests in [regulating] privately made firearms…."  *Id.*  The Final Rule goes on to specifically invoke the two-step test concocted by various federal courts of appeals to analyze Second Amendment challenges.[8]  Summing up, the Final Rule broadly defends that its

---

[8] *See id*. at 24676-24677 (citing cases from various circuit and district courts discussing "strict scrutiny" and "governmental interest[s]" that are "substantial" or "important" or "compelling," looking at the "burden" on a Second Amendment right and whether it is "severe," analyzing

regulatory changes do not violate Second Amendment rights on the theory that "this rule serves the *compelling governmental interest* of preventing unserialized firearms from proliferating throughout the country, as recognized by [a Fourth Circuit] decision … this rule … imposes a *minimal burden* on the possession of firearms."  *Id*. at 24677 (emphasis added).

There is just one problem – the Supreme Court has decimated the legal foundation on the ATF Final Rule expressly relies.  Since the Final Rule was published in April of 2022, the Supreme Court in June of 2022 handed down its decision in *NYSRPA v. Bruen*, 597 U.S. ___, 2022 U.S. LEXIS 3055 (2022).  In that opinion, the Court "decline[d] to adopt that two-part approach" used in the lower federal courts and relied on by ATF in the Final Rule, "decline[d] to engage in means-end scrutiny generally," and "specifically ruled out the intermediate-scrutiny test…."  *Id*. at *21, *28.  In doing so, the Court made clear that the level of severity of a "burden" on Second Amendment rights is immaterial – any "burden" will do.  *Id.* at *22-*23 (finding step-two, which looks at "the severity of the law's burden on that right," to be "one step too many").  The Court similarly rejected the ubiquitous "public-safety" talisman waved by governments to justify Second Amendment infringements, reiterating that "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications."  *Id*. at 21 n.3 (citation omitted).  In light of *Bruen*'s express holdings that "public safety" is an insufficient justification for an infringement, and that even a "minimal burden" on protected rights is still an unconstitutional infringement, the dual pillars offered by ATF in defense of the Final Rule crumble.  Since the Final Rule is justified on the basis of a legal theory that has been soundly rejected by the Supreme Court, it is "not in accordance with law" under the APA.  *See* 5 U.S.C. §

---

whether an ordinance "is a reasonable fit for achieving the City's objectives," and claiming that governmental interests such as "decreasing the threat that ghost guns pose" and "public safety and crime prevention" can justify infringements of Second Amendment rights.).

706(2)(A).  At a minimum, then, Plaintiffs are likely to succeed on their claim in that the Final Rule should be remanded to the agency for further consideration,[9] if not vacated entirely.

### C.  The Final Rule is Arbitrary and Capricious.

As the Supreme Court explains, "an agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Final Rule has each of these characteristics in spades. [10]

### 1.  The Final Rule Does Not Represent "Reasoned Decisionmaking."

The APA requires agency action to be "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n* at 52.  By definition, a promulgated regulation which is internally conflicting, advances two diametric approaches to solve the same problem, or which reaches dissimilar results for nearly identical items, does not meet that standard.  *See AFGE, Local 2924 v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is 'illogical on its own terms,' the [agency's] order is arbitrary and capricious."); *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) ("An agency cannot meet the arbitrary and capricious test by

---

[9] *See, e.g.*, *NLRB v. Food Store Employees Union, Local 347*, 417 U.S. 1, 10 n.10 (1974) ("a court reviewing an agency decision following an intervening change of policy by the agency should remand to permit the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act."); *National Fuel Gas Supply Corp. v. FERC*, 283 U.S. App. D.C. 259, 899 F.2d 1244, 1249-50 (D.C. Cir. 1990) (referring to the "general principle that an agency should be afforded the first word on how an intervening change in law affects an agency decision pending review.").

[10] For example, the Final Rule promulgates numerous arbitrary and capricious, vague tests and standardless standards into law.  *See* Compl. ¶¶ 117-121 and n.22, 133, 169, 171, 179-202, 323-339, 445-481, 526-527, 539-555.

treating type A cases differently from similarly situated type B cases … The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent. That is the very meaning of the arbitrary and capricious standard."); *see also Simmons v. Smith*, 888 F.3d 994, 1001 (8th Cir. 2018); *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").  Numerous portions of the Final Rule conflict with these principles.

For example, the Final Rule provides both (i) that firearms without an existing classification letter should be analyzed under the definition of "frame or receiver," but also provides (ii) that firearms without an existing classification letter should have "any [serialized] part … presume[ed]" to be a frames or receiver.  Compl. ¶¶126-129.  Which is it?  These approaches will lead to conflicting results, and both cannot be followed simultaneously. Moreover, the latter approach (resulting in *multiple* frames and receivers) conflicts with the Final Rule's determination (as well as the statute) that each firearm has *only one* frame or receiver.

Similarly, after laying out the new regulatory definition of "frame or receiver," the Final Rule reports that there is some vague "nonexclusive list" of firearms whose classifications *conflict with* that definition, yet are not overruled.  Although this provision is presumably intended to minimize the disruption caused by the Final Rule, ATF fails to identify all such firearms, which will lead to confusion and uncertainty among the industry and the public about whether to follow the Final Rule, or some unspecified conflicting classification letter.  Compl. ¶¶ 116-120, 133.

Finally, the Final Rule does not even begin to explain its dissimilar treatment of functionally identical items, such as top/bottom "split" receivers where only *one* portion is serialized versus left/right "multi-piece" receivers where *both* portions are serialized (Compl. ¶¶ 139-141), and its conclusion that certain "multi-piece" receivers will need two serial numbers while other such models need only one.  Compl. ¶¶ 147-150.[11]  These examples demonstrate that the Final Rule is not the product of reasoned decisionmaking, but rather a continuation of the arbitrary and capricious actions that have plagued the ATF for decades.  *See Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 461 (6th Cir. 2021) (vacated by grant of e*n banc* review) (noting "ATF's frequent reversals on major policy issues….") (petition for cert. pending, No. 21-1215).

### 2.  The Final Rule Fails to Acknowledge the Agency's Seismic Policy Shifts, Much Less Explain Why It Has Departed from Existing Rules and Guidance.

In 2018, then-judge Ketanji Brown-Jackson noted that "[a]s far as the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, is concerned, this much is clear: a federal agency that changes course abruptly without a well-reasoned explanation for its decision or that acts contrary to its own regulations is subject to having a federal court vacate its action as 'arbitrary [and] capricious….'" *Policy & Research* at 67.  Indeed, an agency changing its position must "display awareness that it is changing position … and may sometimes need to account for prior factfinding or certain reliance interests created by a prior policy…." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 503 (2009); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Numerous parts of the Final Rule fail on this basis, the agency failing even to recognize tectonic policy departures from its existing guidance and classifications, much less clearly revoking existing guidance and classifications or providing a reasoned explanation for the change.

---

[11]  *See also* the CZ Scorpion Evo, whose upper receiver splits into left and right sides, but where only one is serialized, https://www.youtube.com/watch?v=8AIMO9onCXs at 6:15.

For example, the Final Rule's definition of a "multi-piece frame or receiver," wherein each "piece" of the frame or receiver must be marked with the identical serial number (Compl. ¶¶ 134-150), conflicts not only with the Final Rule's promise that each firearm will have only one frame or receiver (Compl. ¶ 109), but also with the Final Rule's claim that "[h]aving more than one serial number per firearm would make it more difficult … for law enforcement to trace firearms used in crime" (*Id*. at 24683), and existing ATF classification letters which have chosen a particular part of certain firearms to be "the frame or receiver," even though the firearm contains more than one similar part (*i.e.*, left and right-side receiver plates).  Comp. ¶ 145.  So too does the Final Rule's "presum[ption]" language contained in the definition of frame or receiver, whereby any part marked by a serial number is to be "presumed … to be the frame or receiver."  Compl. ¶¶ 116, 124-133.  The Final Rule fails to adequately explain why *any* firearm needs more than one serialized part, fails to explain how such a result would even be permissible under the statute, and fails to explain why the Final Rule has chosen to depart from ATF's prior guidance on this issue.

With respect to the Final Rule's "grandfathering" of various frame or receiver classifications, ATF points to existing classification letters, and claims they can be relied on by *other* manufacturers and importers of *similar* products, as long as they "fall[] within one of these designs."  Compl. ¶¶ 151-164, Final Rule at 27729.  This statement constitutes a complete 180-degree switch from ATF's prior consistent position that classification letters have *no* precedential value and cannot be relied on by *anyone* but their recipient.  Compl. ¶¶ 155-160.  The Final Rule does not acknowledge or explain this dramatic policy shift, or explain whether *other* such ATF classification letters can now be relied on generally by the public.

The Final Rule's application of its hopelessly vague definition of the statutory word "readily" in 18 U.S.C. Section 921(a)(3)(**A**) to unfinished 80% frames and receivers under Section

921(a)(3)(**B**), in addition to being in obvious conflict with the statute, also represents a massive shift in policy, which never before has utilized the concept of "readily" (the amount of time necessary to complete) to such products.  Compl. ¶¶ 230-249.  On the contrary, ATF has consistently looked at the presence or absence of *specific machining operations* in order to determine whether a particular product constitutes a regulated "frame or receiver."  Compl. ¶¶ 231-232, 238-241.  Rather than acknowledging the policy shift, the Final Rule actually disputes that one has even occurred, claiming that ATF's focus on machining operations is really a focus on the time necessary to complete a product.  Compl. ¶¶ 243-245.  But this claim is entirely disingenuous since, just a year ago, *ATF argued precisely the opposite*, claiming that its focus has *always* been "the degree of machining" of a product, and that it has *never* "made reference to the amount of time that would be required" to finish a product.  Compl. ¶ 246.  The agency's own representations thus belie the Final Rule.  The agency has failed to adequately explain its decision to revoke all existing classification letters and guidance on 80% frames and receivers.  Compl. ¶¶ 509-519.

Likewise, the Final Rule defines what it calls a "complete muffler or silencer device" to include any group of items "that contains all the component parts necessary to function, whether or not assembled or operable."  Compl. ¶ 413.  Again, aside from the definition's obvious statutory conflicts (Compl. ¶¶ 418-437), and the obvious problems with an agency's attempt to criminalize innocent possession of common household objects (Compl. ¶¶ 438-443), this definition represents a blatant attempt to crack down on the entirely lawful use of so-called "solvent trap" kits to manufacture and register Form 1 suppressors under the NFA.  Compl. ¶¶ 445-481.  Not only is the Final Rule's targeting of law-abiding gun owners who seek to use the process to *lawfully* register and manufacture NFA weapons illogical, but also it is in direct contravention to prior existing ATF guidance on the issue, which has repeatedly stated in no uncertain terms that a person *may* purchase

a "solvent trap kit" and use it to manufacture a silencer, after receiving an approved Form 1 from ATF.  Compl. ¶¶ 482-488.  The Final Rule neither acknowledges these prior conflicting statements from the agency, nor admits they are being overruled, nor explains why the agency has significantly departed from its existing guidance on the subject.

Similarly, the Final Rule both embraces and worsens the existing, horribly flawed ATF classification system, which permits the agency to act arbitrarily and capriciously.  Compl. ¶¶ 504-569.  As Plaintiffs have explained, this system not only violates the law (Compl. ¶ 513), but also it facilitates systematic discrimination by the agency, proved by having produced perverse, conflicting, and inconsistent results.  Compl. ¶¶ 522-525, 542-555.  Unfortunately, the Final Rule makes the existing bad classification system even worse, formally adopting a recent ATF policy change to refuse to classify numerous firearms related items (Compl. ¶ 520, 528-532), and also creating a new requirement that the industry seek ATF guidance through submissions filed "under the penalties of perjury."  Compl. ¶¶ 533-538.  The Final Rule does not acknowledge that currently there is no threat of "perjury" hanging over the head of those who submit samples, explain why these departures from prior agency practice are lawful or authorized (Compl. ¶ 556-564), much less justifiable or necessary, or explain why additional procedural safeguards, such as those contained in pending congressional legislation (Compl. 554-555), are unneeded.

Finally, the Final Rule claims that parts kits consisting of unfinished 80% frames and receivers, along with other unregulated firearm parts, magically become more than the sum of their parts, and are properly classified as "firearms," on the theory that these kits can be "readily" manufactured into functioning firearms.  Compl. ¶¶ 281-282.  To be sure, the Final Rule appears to revoke all existing classification letters on 80% frames and receivers.  Compl. ¶¶ 293-294, 519. But that is not all that the Final Rule would now regulate, since an unfinished frame or receiver is

merely one component in a now-regulated "weapon parts kit," the rest being unregulated firearm parts, tools, jigs, instructions, etc.  Indeed, ATF has recognized numerous times that the GCA does not regulate "firearm parts."  Compl. ¶¶ 283-286.  Moreover, ATF has repeatedly approved the unregulated manufacture and sale of the very "weapon parts kits" it now purports to regulate, having opined that the addition of parts, tools, jigs, instructions, etc. to a "kit" with an 80% frame or receiver *does not change its classification* into a "firearm."  Compl. ¶ 300-306.  The Final Rule fails to acknowledge this prior conflicting guidance, does not purport to overrule it, much less explain why the existing guidance got it wrong and why the Final Rule gets it right.

For all of these reasons, the Final Rule violates the APA.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) ("we insist that an agency ... articulate a satisfactory explanation for its action."); *U.S. Telecomms. Ass'n v. FCC*, 825 F.3d 674, 706-07 (D.C. Cir. 2016) (an agency's "depart[ure] from a prior policy sub silentio" and without acknowledgment and explanation is arbitrary and capricious); *see also ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) (same); *see also Northport Health Servs. of Ark., LLC v. United States HHS*, 14 F.4th 856, 875 (8th Cir. 2021) (applying the same standard).

### 3. The Final Rule Fails to Address Important Comments Raising Substantive Problems with ATF's Regulations.

As part of the APA's notice and comment process an agency is required to, "[a]fter consideration of the relevant matter presented ... incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  Implicit in this duty is the requirement to consider and address relevant comments.  Moreover, "although an agency 'need not address every comment' … 'it must respond in a reasoned manner to those that raise significant problems,'" and "the failure to respond to comments is significant [because] it demonstrates that the agency's decision was not based on a consideration of the relevant factors."  *Huntco Pawn Holdings, LLC*

*v. United States DOD*, 240 F. Supp. 3d 206, 219 (D.C. Cir. 2016) (citations omitted); *see also Champion v. Shalala*, 33 F.3d 963, 966 n.4 (8ᵗʰ Cir. 1994) (conducting the same analysis).  Several components of the Final Rule fail on this basis.

The Final Rule falsely claims that federal law demands that "all firearms" must be serialized, requiring that licensed "dealers" serialize firearms that were privately manufactured by non-licensee gun owners.  Compl. ¶¶ 353-356.  In response to that proposal in the NPRM, Plaintiff GOA/GOF explained in comments to ATF that no federal law requires that "*all*" firearms be marked, and the GCA imposes a serialization duty only on "manufacturers" and "importers" (Section 923(i)), but not on "dealers."  Compl. ¶¶ 357-365.  In response, ATF addresses everything but the relevant statute.  Compl. ¶¶ 366-371 (relying on ATF's general authority, examining a different statute entirely, and claiming the new requirement is "necessary" even if not lawful).  The Final Rule thus deliberately avoids (rather than confront and address) Plaintiff GOA/GOF's comments that ATF lacks statutory authority to mandate serialization of private firearms.

Likewise, although Plaintiff GOA/GOF raised legal concerns over the NPRM's creation of a "perjury" penalty in order merely to obtain the ATF's opinion on an item's proper classification, the Final Rule does not even acknowledge the comment, much less address it.  Compl. ¶¶ 533-538.  Similarly, while acknowledging Plaintiff GOA/GOF's comments that the new regulatory classification system would be designed from the ground up to provide arbitrary and capricious results, the Final Rule redirects, responding to *entirely different comments*.  Compl. ¶¶ 539-541, 567.  The fact that the agency thought Plaintiffs' comments important enough to acknowledge, but thereafter failed to respond, further evidences the blatant APA violation.  Compl. ¶ 568.  Finally, in response to comments (including from Plaintiffs, *See* Exhibit 33 at 32), which explained that the term "readily" in Section 921(a)(3)(A) has no application in Section 921(a)(3)(B), ATF does

not wrestle with Plaintiffs' explanation of the statutory text, but instead responds that its statutory rewrite is "proper" and "appropriate" and "necessary."  Compl. ¶¶ 217-221.

As noted above, when the Final Rule *did* bother to substantively confront comments made by Plaintiffs, ATF generally was *forced to agree*, and made *substantial amendments* to the Final Rule on that basis.  Compl. ¶¶ 97, 107-109, 490-491.  But responding to *some* comments and making *some* changes is not sufficient.  Rather, the APA requires ATF to acknowledge and address *all* comments that raise serious issues with its proposed rulemaking – a standard that the agency failed to meet here.  *See Carlson v. PRC*, 938 F.3d 337, 344 (D.C. Cir. 2019) (failure to address comments raising legitimate and serious problems violates the APA).

### D.  The Final Rule Is Not Entitled to Deference.

This is not a case where this Court should afford any deference to the promulgations of the Final Rule.  Regardless of whether the Final Rule (or various parts thereof) is interpretive or legislative in nature, no deference is appropriate.  In the former case, "interpretive rules . . . enjoy no *Chevron* status as a class." *Guedes v. BATFE*, 920 F.3d 1, 17 (D.C. Cir. 2019) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001)). And, in the latter case, judicial deference is appropriate only where Congress has "delegated[12] authority to the agency generally to make rules

---

[12] There is no express or implied delegation to the agency by Congress to enact the Final Rule. Certainly, the GCA and the NFA delegate certain *limited* authority to ATF to issue regulations which *administer* and *enforce* the statute Congress enacted. *See* 18 U.S.C. § 926(a), 26 U.S.C. § 7805(a). But ATF cannot simply rely on a general grant of authority or an implied power as providing specific authority to greatly expand the scope of a statute.  Congress's general grants of authority for ATF for matters such as creating forms and inspecting licensed dealers do not demonstrate a legislative intent that ATF "speak with the force of law" as to what items constitute a firearm, to create new criminal liabilities, or to expand the scope of the statutory text to regulate items that the agency *presumes* Congress would have regulated *had it considered the issue*.  As the Supreme Court explains, "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014); *see also West Virginia v. EPA*, Nos. 20-1530, 20-1531, 20-1778 & 20-1780, 2022 U.S. LEXIS 3268, at *8 (June 30, 2022) ("[p]recedent teaches that there are

carrying the force of law" (*Mead* at 226–27), and where Congress has not "directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). On the other hand, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id; see also Northport Health Servs. of Ark., LLC v. United States HHS*, 14 F.4th 856, 870 (8th Cir. 2021). That is generally the case with the Final Rule – ATF has chosen to enact regulations which directly conflict with the statutory text. Although Judge Kethledge has claimed that "[t]here is nothing so liberating for a judge as the discovery of an ambiguity,"[13] there is no need for the Court to consider any questions of deference here, as the ordinary tools of statutory construction are more than sufficient to the task, and it is evident that the agency's regulations conflict with the plain text of the laws that Congress enacted.[14]

---

'extraordinary cases' in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority" in the first place). In such extraordinary cases, under the major questions doctrine, "the agency must point to 'clear congressional authorization' for the authority it claims." *Id.* The Final Rule represents such as case – indeed, the majority of its provisions purport to implement statutes carrying criminal penalties – where the authority for ATF to do what it has done through regulation cannot be presumed absent *explicit* direction from Congress.

[13] *See* R. Kethledge, *Ambiguities and Agency Cases: Reflections After (Almost) Ten Years on the Bench*, 70 VAND. L. REV. *EN BANC* 315, 316 (2017).

[14] Alternatively, even if there were some reason to consider the application of deference to the Final Rule, there is no evidence that ATF believed itself to be making a decision which would be eligible for deference. *Cf.* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,527 (Dec. 26, 2018) ("The Department believes that this rule's interpretations of 'automatically' and 'single function of the trigger' in the statutory definition of 'machinegun' accord with the plain meaning of those terms. Even if those terms are ambiguous, this rule rests on a reasonable construction of them.") *with* the Final Rule at 24,652–749 (entirely sanitized of any claim of ambiguity, any reference to *Chevron*, and any claim of an entitlement deference); and *see HollyFrontier Cheyenne Refinery, LLC v. Renewable Fuels Ass'n*, 141 S.Ct. 2172, 2180 (2021) ("the government does not ... ask [for deference] here.... We therefore decline to consider whether any deference might be due....").

It is also significant that the Final Rule at its core involves reinterpretation (or rewriting) of federal criminal statutes which carry significant penal sanction.  And as the Supreme Court has repeatedly explained, "[t]he critical point is that criminal laws are for courts, not for the Government, to construe....  ATF's old position [is] no more relevant than its current one — which is to say, not relevant at all.  Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly.... a court has an obligation to correct its error."  *Abramski v. United States*, 573 U.S. 169, 191 (2014); *see also United States v. Apel*, 571 U.S. 359, 369 (2014) ("we have never held that the Government's reading of a criminal statute is entitled to any deference.").  Finally, where, as here, "an agency claims to discover in a long-extant statute an unheralded power to regulate" items that heretofore were unregulated, "we typically greet its announcement with a measure of skepticism."  *Utility Air* at 324.[15]  There is simply no reason to defer to the Final Rule in this case.

## III.    Plaintiffs Will Suffer Irreparable Harm If the Final Rule Becomes Effective.

As stated throughout the Complaint, Plaintiffs (including the members and supporters of the organizational plaintiffs) will suffer irreparable harm in a variety of specified ways if the Final Rule is permitted to take effect.  *See* Compl. ¶119 (lack of precision leaves industry, plaintiffs, public in position of uncertainty how frame or receiver will be classified); ¶¶ 37, 203 (Plaintiffs will not know what unfinished items and parts are firearms under federal law); ¶¶ 207, 250, 337

---

[15]  *See also Pfaff v. United States Dep't of Housing & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996) ("[r]adically inconsistent interpretations of a statute by an agency, relied upon in good faith by the public, do not command the usual measure of deference to agency action."); *Young v. Reno*, 114 F.3d 879, 883 (9th Cir. 1997) ("[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view."); *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 155 (3rd Cir. 2004) (an agency's "internally conflicting positions … militate against affording deference to the interpretive rule.").

(companies will be forced to entirely revamp business practices and stop selling products or combinations of products; individuals privately manufacturing homemade firearms using unregulated parts will be unable to purchase all the parts necessary to do so); ¶¶ 450, 469, 473, 476 (unable to use solvent trap kits to manufacture Form 1 suppressors); ¶¶ 429, 439 (risk of charges for unregistered silencers based on innocent possession of innocuous household items); ¶¶ 9.a, 288, 509, 519 (members and supporters whose classification letters revoked by the Final Rule);

Worse, the Rule threatens vague application of federal conspiracy and "structuring" crimes wholly untethered from the GCA (*see* Compl. ¶ 263) meaning that individuals, like Plaintiff Jimenez, will not be able to purchase all the component parts from retailers. Compl. ¶¶ 267-269. Indeed, some of these harms already have occurred, as ATF already has attempted to enforce the Final Rule through a Cease-and-Desist Order sent to retailer JSD Supply for allegedly selling "kits" (meaning, offering for sale all the various unfinished and unregulated parts necessary to manufacture a homemade firearm). *See, Not an LLC d/b/a JSD Supply v. ATF*, No. 22-cv-747 (W.D. Pa.), Verified Complaint for Declaratory and Injunctive Relief, ECF #1 (May 19, 2022).

Next, Plaintiff Jiminez, along with members and supporters of the organizational plaintiffs, will be required to have their PMFs serialized simply when taking their firearms to a gunsmith, for example, to be Cerakoted, and will be irreparably harmed by not being able to obtain these necessary services unless they acquiesce to the ATF's illegal and unconstitutional serialization, recordkeeping, and registration requirements. Compl. ¶¶ 379, 403. Dealers, such as Bridge City, who do not offer these serialization services, and who do not wish to serialize PMFs and consequently be required to keep records of those firearms indefinitely, will be unable to continue providing services to their customers due to the Final Rule. Compl. ¶ 380.

Finally, in perhaps the most nefarious portion of the Final Rule, ATF seeks to unlawfully create a system to acquire and maintain records of the firearms owned by Plaintiff Jimenez and other members and supporters of the organizational plaintiffs, irreparably harming them, violating their Second Amendment rights, and violating 18 U.S.C. § 926(a)(3).  Compl. ¶¶ 617-618. Likewise, because there is no historical tradition of restricting homemade firearms or regulating firearm parts, the Final Rule violates the Second Amendment and the Supreme Court's teachings in *NYSRPA v. Bruen*, 597 U.S. ___, 2022 U.S. LEXIS 3055 (2022).

### IV.     The Balance of Equites and the Public Interest Factors Favor Plaintiffs.

The question here is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981).  When the "government is the opposing party," the balance of equities and public interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Moreover, "the public interest is served when administrative agencies comply with their obligations under the APA."  *N. Mariana Islands v. United States*, 686 F. Supp.2d 7, 21 (D.D.C. 2009). Indeed, "[t]here is an overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1997).  Finally, "[i]t is in the public interest for ... an agency to implement properly the statute it administers." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000).

As explained above, there is certainty of substantial irreparable harm to vast swaths of the firearms industry and Second Amendment community if the Final Rule takes effect.  For example,

individuals have been able to manufacture their own firearms since the founding of this country, without government preclearance, serialization, recordkeeping, or registration.  But if the Final Rule becomes effective, individuals who manufacture their own firearms, along with the manufacturers, distributors, and retailers who sell the unfinished parts to enable that activity, will risk "conspiracy" and "structuring" crimes that do not exist in the GCA, simply for engaging in constitutional conduct.  Protected Second Amendment activity will grind to a halt, numerous companies will falter or go out of business, and jobs will be lost.  On the other hand, the persons, items, and activities now regulated and the policies changed by the Final Rule have existed for (at minimum) a number of years, unregulated and unmolested.  Temporarily maintaining the status quo, and deferring implantation of the Final Rule's substantial and radical changes until the Court can properly consider the merits, will cause little risk to the public (or to the agency).[16]

## III.   Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin implementation of the Final Rule until such time as a decision on the merits can be reached.

Respectfully submitted, this the 25th of July, 2022.

*/s/ Stephen D. Stamboulieh*                    Robert J. Olson (VA # 82488)
Stephen D. Stamboulieh (MS # 102784)    William J. Olson, PC
Stamboulieh Law, PLLC                        370 Maple Ave. West, Suite 4
P.O. Box 428                                 Vienna, VA 22180-5615
Olive Branch, MS  38654                      703-356-5070 (T)
(601) 852-3440                               703-356-5085 (F)
stephen@sdslaw.us                            wjo@mindspring.com

---

[16]  Were there any grave risk to the public that the Final Rule was necessary to address, then the agency would have proceeded with a far greater sense of urgency.  Indeed, the NPRM was issued in May of 2021, and comments were accepted until August of 2021.  The agency thereafter spent the next eight months leisurely crafting the Final Rule, publishing it in the Federal Register in April of 2022, with an additional lengthy 120-day implementation period until August 24, 2022.  In other words, there is no reason to believe that an additional delay, to give the Court the opportunity to properly consider the merits of the Final Rule, will be in any way problematic.

Robert B. Stock (ND # 05919)
Vogel Law Firm
218 NP Avenue
Fargo, ND  58107-1389
701-237-6983 (T)
701-237-0847 (F)
rstock@vogellaw.com
For service: rbslitgroup@vogellaw.com

## <u>CERTIFICATE OF SERVICE</u>

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be mailed by United States Postal Service first-class mail, postage pre-paid, to the following non-ECF participants:

Director of ATF
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Ave, NE
Washington, DC 20226

United States Attorney General
Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

Civil Process Clerk
U.S. Attorney's Office
655 First Avenue North, Suite 250
Fargo, ND 58102-4932

<u>And by electronic mail to:</u>

Daniel Riess (TX Bar #24037359)
Trial Attorney
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, D.C. 200005
Phone: 202-353-3098
Fax: 202-616-8460
Email: Daniel.Riess@usdoj.gov

Dated: July 25, 2022.


                                        */s/ Stephen D. Stamboulieh*
                                        Stephen D. Stamboulieh

29