**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| MOREHOUSE ENTERPRISES LLC d/b/a BRIDGE CITY ORDNANCE *et al.*, | ) ) ) | Case No. 3:22-cv-00116-PDW-ARS |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY AND/OR PERMANENT INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

I.    Statutory Background .................................................................................................2

II.   Regulatory Background ..............................................................................................2

III.  The Rule .......................................................................................................................3

      A.   Definition of "Firearm" ................................................................................4

      B.   Definition of "Frame or Receiver" ............................................................4

      C.   Definition of "Privately Made Firearm" ...................................................6

      D.   Definition of "Complete Muffler or Silencer Device"..............................6

LEGAL STANDARDS .........................................................................................................7

ARGUMENT ........................................................................................................................7

I.    Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits. ........7

      A.   The Rule Is a Logical Outgrowth of the Notice. ........................................7

      B.   The Rule Is Consistent with the Gun Control Act and Within the Scope of ATF's Delegated Authority................................................................10

      C.   The Rule Is Reasonable. .............................................................................19

            1.   The Rule Is Internally Consistent ................................................19

            2.   The Rule Adequately Explained ATF's Reasons for Its Policy Changes. ......................................................................................22

            3.   The Agency Responded Adequately to Significant Comments .....................28

            4.   Under the APA, ATF Was Not Required to Address a Supreme Court Opinion That Did Not Exist When It Promulgated the Rule.............31

II.   Plaintiffs Have Not Shown That They Will Incur Irreparable Harm Absent a Preliminary Injunction ...............................................................................................33

      A.   Plaintiffs' Delay in Seeking Relief Shows the Lack of Irreparable Harm....................34

      B.   Plaintiffs Fail to Identify Any Irreparable Harm Caused by the Rule .........................35

III.  The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate. .............39

IV.     Any Relief Ordered Should Be Appropriately Limited. .................................................40

CONCLUSION.................................................................................................................................40

# INTRODUCTION

Congress has vested in the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) the authority to promulgate regulations necessary to enforce federal firearms laws, including advising the firearms industry and the public of the agency's understanding of those laws. To explain the application of certain statutory terms to advances in firearms technology, ATF undertook the rulemaking at issue here. As relevant here, the statutory definition of "firearm" includes the "frame or receiver" of a firearm, which is a firearm's primary structural component. Since ATF first promulgated a regulatory definition of that term in 1968, technological advances have led to an increasing variety of frames and receivers. Technological advances have also made it easier for companies to create firearm parts kits, standalone frame and receiver parts, and easy-to-complete frames or receivers, and companies under the mistaken impression that these items do not qualify as "firearms" have sold these items without conducting background checks or maintaining records of such sales. As a result, persons prohibited from possessing firearms have bought these kits and easy-to-complete frames and receivers without undergoing background checks. When such firearms are used in crime, they cannot typically be traced because they lack serial numbers.

To provide clarity to the public and the firearms industry on the proper application of federal law, ATF promulgated a rule updating its definition of "frame or receiver" and other statutory and regulatory terms. Notwithstanding the clear statutory authority underlying ATF's rule and the critical law enforcement need for updated regulations, Plaintiffs brought this pre-enforcement facial challenge that seeks to enjoin the rule, claiming that ATF lacks the statutory authority to update its regulations. Plaintiffs are unlikely to succeed on the merits of this claim, or their claim that the rule is arbitrary and capricious. Plaintiffs also fail to show that they are likely to suffer imminent irreparable harm absent emergency injunctive relief, or that the balance of the equities supports such relief here. The Court should therefore deny Plaintiffs' motion.

## I.      Statutory Background

Congress enacted the Gun Control Act of 1968, *as amended*, 18 U.S.C. §§ 921 *et seq.* (GCA), because "existing Federal controls over [firearms moving in interstate commerce] do not adequately enable the States to control this traffic. . . ." 82 Stat. 197, 225 (1968).[1]   Congress determined that "only through adequate Federal control . . . over *all* persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with." *Id.* at 225 (emphasis added).   Accordingly, Congress enacted requirements for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922-923.

Congress defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." *Id.* § 921(a)(3).   However, Congress did not define the terms "frame" or "receiver." *See id.* § 921.   Congress requires individuals and entities that import, manufacture, or deal in firearms to receive a federal firearms license, *id.* § 923(a), to maintain records of firearm acquisition and transfer as prescribed by regulation, *id.* § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id.* § 922(t).   Congress also requires licensed importers and manufacturers to identify each firearm they import or manufacture by means of a serial number on the receiver or frame of the weapon.  *Id.* § 923(i).   Congress has also vested in ATF the authority to prescribe regulations "necessary to carry out the provisions of" the GCA.  *Id.* § 926(a).

## II.     Regulatory Background

ATF has promulgated regulations implementing the GCA.  *See* 27 C.F.R. parts 478-479.   Over fifty years ago, ATF defined the statutory term "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion."  Final Rule, Commerce in Firearms and Ammunition, 33 Fed. Reg.

---

[1] Throughout this brief, internal alterations and citations are omitted from relevant citations.

18,555, 18,558 (Dec. 14, 1968), *codified at* 27 C.F.R. § 478.11.  This definition was meant to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the weapon's functioning could be traced if the weapon was used in a crime.  Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,652 (Apr. 26, 2022) (Rule).

However, a restrictive application of this definition—as some courts have recently used— would not describe the frame or receiver of most current firearms.  *Id.*  Most modern weapon designs have a split or multi-piece receiver where the relevant fire control components either are housed by more than one part of the weapon or incorporate a striker rather than a hammer to fire the weapon. *Id.*  If the restrictive definition were followed, as many as 90% of all firearms would not have *any* frame or receiver subject to regulation.  *Id.*

Furthermore, technological advances in the decades since the "frame or receiver" definition was adopted have made it easier to create firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers, and some have sold these items to unlicensed persons without being licensed themselves, maintaining any records, or conducting background checks.  *Id.*  These products allow unlicensed persons to make firearms quickly and easily.  *Id.*  Because such privately made firearms typically lack serial numbers, it is extremely difficult for law enforcement to trace them when used in a crime.  *Id.* at 24,652, 24,659.

### III.    The Rule

To update its decades-old definition of "frame or receiver," ATF published a notice of proposed rulemaking.  Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021) (Notice).  ATF promulgated the final rule on April 26, 2022.  87 Fed. Reg. 24,652.  Upon consideration of over 290,000 public comments, ATF explained its responses to the comments, its reasoned basis for the Rule's provisions, and its rationale for updating

3

its regulations. *Id.* at 24,652-734. As relevant here, the Rule contains the following key provisions:

### A.   Definition of "Firearm"

Under the GCA and implementing regulations, a "firearm" includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); 27 C.F.R. § 478.11. This definition thus includes currently inoperable weapons if they are "designed to" or "may readily be converted" to expel a projectile by the action of an explosive. *See* 87 Fed. Reg. at 24,661 nn.42-43. In recent years, weapon parts kits, or aggregations of weapon parts—some of which contain all components necessary to easily complete a functional weapon—have increasingly been sold to persons without background checks or recordkeeping. *Id.* at 24,662. Some of these firearm kits include jigs, templates, and tools that allow the purchaser to easily convert the weapon to a functional state. *Id.* Such weapon parts kits or aggregations of weapon parts that are *designed to* or *may readily be converted to* expel a projectile by the action of an explosive are "firearms" under the GCA and its regulations. *Id.* at 24,662 n.44.

To reflect existing case law, the Rule amends ATF's regulatory definition of "firearm," providing that "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See id.* at 24,662, 24,727, 24,735.

### B.   Definition of "Frame or Receiver"

The Rule provides an updated definition of the term "frame or receiver."[2] *See id.* at 24,652, 24,727. The Rule further defines "frame" for handguns, and "receiver" for rifles, shotguns, and other weapons that expel a projectile. *See id.* at 24,727, 24,735. Unlike the 1968 definition, these updated definitions now describe only a *single* housing or structural component for a *specific* fire control

---

[2] Previously, ATF regulations included definitions for both "firearm frame or receiver" and "frame or receiver." *Id.* at 24,727.

component of a given weapon—including "variants thereof," a term that is also defined. *Id.* For handguns, the frame is the housing or structure for the component—*i.e.*, the sear or its equivalent—designed to hold back the hammer, striker, bolt, or similar primary energized component before initiating the firing sequence. *Id.* For long guns, the receiver is the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *Id.*

The definition of "frame or receiver" includes a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver. *Id.* at 24,739; *see also id.* at 24,663, 24,727-28. However, the definitions of "frame" and "receiver" specifically exclude forgings, castings, printings, or similar articles that have not yet reached a stage of manufacture where they are clearly identifiable as unfinished component parts of weapons—*e.g.*, unformed blocks of metal, and other raw materials. *Id.* at 24,663, 24,728, 24,739.

To provide notice as to how ATF evaluates firearm parts kits when making firearm classifications,[3] the Rule states that in issuing classifications, ATF may consider any templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold or otherwise made available with the item or kit. 87 Fed. Reg. at 24,724-25, 24,739. To provide additional clarity, the Rule includes five non-exclusive examples illustrating the application of the "frame or receiver" definition to a "partially complete, disassembled, or nonfunctional frame or receiver." *Id.* at 24,739.

The Rule also defines "[r]eadily" to mean a process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest

---

[3] Exercising its delegated authority to administer federal firearms laws, 28 C.F.R. § 0.130, ATF has provided both formal guidance (regulations) and informal guidance (classification determinations) as to what constitute "firearms." Although a manufacturer or dealer is not legally required to seek an agency determination whether its product constitutes a "firearm" prior to the product's manufacture or sale, ATF provides such determinations to manufacturers or dealers who submit requests for classification. *See Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016).

process, action, or physical state.  *Id.* at 24,735.  With respect to ATF's classification of firearms, relevant factors to making this determination include: (1) time (2) ease, (3) expertise, (4) equipment (5) parts availability, (6) expense, (7) scope, and (8) feasibility.  *Id.* This definition and factors are based on case law interpreting the terms "may readily be converted to expel a projectile" in the GCA and "can be readily restored to shoot" in the National Firearms Act (NFA). 86 Fed. Reg. at 27,730 & n.58.

### C.      Definition of "Privately Made Firearm"

To account for recent technological advances, the Rule clarifies that the GCA's definition of "firearm" includes a "privately made firearm."  87 Fed. Reg. at 24,735.  A "privately made firearm" (PMF) is a firearm (including a frame or receiver) that is assembled or otherwise produced by a person other than a licensed manufacturer, and that does not contain a serial number placed by a licensed manufacturer at the time of production.  *Id.*  The Rule does not restrict the private making of firearms by non-licensees who are not otherwise prohibited by law from possessing them, and requires only that such firearms that are taken into inventory by licensees be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime.  *Id.* at 24,653, 24,742, 24,744.

### D.      Definition of "Complete Muffler or Silencer Device"

In the GCA, Congress defined "firearm" to include "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3)(C).  In turn, the statute defines the terms "firearm muffler" or "firearm silencer" to mean "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." *Id.* § 921(a)(25).  To explain when a frame or receiver of a firearm muffler or silencer—which is a "firearm"—must be marked for identification, the Rule defines "complete muffler or silencer device" to mean a "muffler or silencer that contains all component parts necessary to function, whether or not assembled or operable."  87 Fed. Reg. at 24,747, *see also id.* at 24,664.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  The Court weighs four factors: likelihood of success on the merits, threat of irreparable harm to the movant, the balance between the movant's harm and the harm that granting the injunction would cause to other parties, and the public interest.  *Dataphase Sys., v. C L Sys.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  The balance of harms and public interest factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  A plaintiff seeking an "injunction[] against the enforcement of statutes and regulations" must "show that it is more likely than not to prevail," a heightened standard given that such enactments "are entitled to a higher degree of deference and should not be enjoined lightly."  *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022).  Because Plaintiffs bring a "facial challenge" prior to the Rule's enforcement, Plaintiffs must clear the "high hurdle" of "establish[ing] that no set of circumstances exists under which the [Rule] would be valid."  *United States v. Stephens*, 594 F.3d 1033, 1037-38 (8th Cir. 2010).

## ARGUMENT

## I.     Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits.

### A.     The Rule Is a Logical Outgrowth of the Notice.

Plaintiffs mistakenly contend that the Rule is not a logical outgrowth of the Notice.  Pls.' Mem. in Supp. of Mot. for Prelim. and/or Perm. Inj. at 4-7, Doc. 14-1 (Mot.).[4]  A notice of proposed rulemaking "need not contain every precise proposal which (the agency) may ultimately adopt as a rule."  *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1058 (D.N.D. 2015).  Rather, the notice need only

---

[4] To the extent that Plaintiffs attempt to incorporate legal arguments from their Complaint, those arguments are improper and should not be considered.  *See Stangel v. Johnson & Madigan*, 27 F. App'x 721, 722 (8th Cir. 2001).

"be sufficiently descriptive of the subjects and issues involved so that interested parties may offer informed criticism and comments." *Citizens Telecomm. Co. v. FCC*, 901 F.3d 991, 1005 (8th Cir. 2018).

The Rule satisfies this standard with respect to ATF's regulatory definition of "frame or receiver." The Notice announced ATF's intent to replace the former definition because "most firearms currently in circulation in the United States do not have a specific part that expressly falls within the current 'frame or receiver' regulatory definitions." 86 Fed. Reg. at 27,727. Unlike the prior definition that was "rigidly tied to three specific fire control components," the proposed definition was "intended to be general enough to encompass changes in technology and parts terminology." *Id.* The Notice's proposed definition thus "more broadly describe[d] a 'frame or receiver'" to mean a firearm part "that provides housing or a structure designed to hold or integrate *any* fire control component." *Id.* (emphasis added). In turn, "fire control component" was also defined broadly as "a component necessary for the firearm to initiate, complete, or continue the firing sequence," including such different types of components as a "[h]ammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails." *Id.* at 27,741; *see also id.* at 27,727.

By contrast, in response to comments, the Rule adopted a more limited definition of "frame or receiver." Specifically, some commenters explained that the proposed definition would lead to confusion because a weapon could potentially have multiple "frames" or "receivers," all of which would be subject to regulation. *See, e.g., id.* at 24,692. Thus, ATF agreed that defining "frame or receiver" "to encompass only one single part of a given weapon would greatly reduce the possibility that a modified weapon might have more than one serial number," a possibility that "would make it more difficult and costly for licensees to mark firearms and maintain associated records, and for law enforcement to trace firearms used in crime." *Id.* at 24,683.[5]

---

[5] Similarly, in response to comments on the proposed definition of "firearm muffler or silencer frame or receiver," *see id.* at 24,695, the Rule amended the proposed definition to define a single component of a complete muffler or silencer device as the frame or receiver. *See id.* at 24,727, 24,739.

The Rule thus reflects that there is only a single "frame or receiver"—*i.e.*, a single housing for a single fire control component—of a given weapon. *See id.* at 24,727, 24,735. The Rule defines "frame" as the part of a handgun that provides housing for the component that is designed to hold back the hammer, striker, bolt, or similar primary energized component before the firing sequence is initiated. *See id.* at 24,735. This component—also known as the "sear"—is clearly a "fire control component," as the Notice proposed to define that latter term, because the sear is necessary for the handgun to complete the firing sequence.[6] *See* 86 Fed. Reg. at 27,727. Similarly, the Rule defines "receiver" as the part of a long gun or other projectile weapon that provides housing for the primary component that is designed to block or seal the breech before the firing sequence is initiated. 87 Fed. Reg. at 24,735. This primary energized component—known as the bolt or breechblock—is a "fire control component" under the Notice's proposed definition because it is "necessary to complete[] or continue the firing sequence;" indeed, the Notice's nonexclusive list of "fire control components" included a "bolt" and a "breechblock." 86 Fed. Reg. at 27,741; *see also id.* at 27,727.

The Notice thus made clear ATF's proposal to include in its updated definition of "frame or receiver" any firearm part that provides housing for *any* fire control component. In turn, the Rule defined a "frame" or "receiver" more narrowly to mean only a subset of this broad category. Because the housings identified in the Rule were included in the Notice's proposed definition of "frame or receiver," the Notice was "sufficiently descriptive of the subjects and issues involved so that interested parties [could] offer informed criticism and comments." *Citizens Telecomm.*, 901 F.3d at 1005. Given that the Notice "specifically requested comments on the feasibility of implementing the [proposed]

---

[6] When a handgun's sear is released, it causes the hammer or striker to hit the primer on the cartridge in the chamber, which completes the handgun's firing sequence. In an automatic weapon, the sear is also necessary to continue the firing sequence. Further, after a long gun's firing cycle has been initiated, a bolt or breechblock (or variant thereof) is necessary to seal gases in the chamber to prevent the gases from escaping other than through the barrel. Thus, the bolt or breechblock is necessary to complete or continue the long gun's firing sequence.

definition of firearm 'frame or receiver,'" 86 Fed. Reg. at 27,740, the "possibility" that the agency might adopt a more limited approach than the proposed definition was "reasonably foreseeable," *Long Island Care at Home v. Coke*, 551 U.S. 158, 175 (2007).  The Rule is thus a "logical outgrowth of the proposed rule." *Id.*; *see also id.* at 174-75 (final rule exempting entire category of workers from coverage under statute was logical outgrowth of proposed rule exempting only subset of that category); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299-1300 (D.C. Cir. 2000) (proposed rule sufficient where final rule exempted Indian tribes from certain requirements originally proposed in the notice).

"In most cases, if the agency alters its course in response to the comments it receives, little purpose would be served by a second round of comment." *Id.* at 1299.  That is true here also.  Notably, Plaintiffs fail to mention any "informed criticism and comments" they were allegedly prevented from submitting, *Citizens Telecomm.*, 901 F.3d at 1005, much less any harm traceable to the more limited definition of "frame or receiver" the agency adopted.  Here, "there was more than enough notice for interested parties to offer comments on" ATF's proposal to update the definition of "frame or receiver," and the Rule "was not wholly unrelated or surprisingly distant from what [ATF] initially suggested." *Ariz. Pub. Serv. Co.*, 211 F.3d at 1299.  The Rule is a logical outgrowth of the Notice.

### B.    The Rule Is Consistent with the Gun Control Act and Within the Scope of ATF's Delegated Authority.

Plaintiffs next assert that portions of the Rule conflict with the relevant federal firearms statutes.  Mot. at 7-12.  However, the Rule is a valid exercise of the authority ATF has been expressly granted by Congress.

The Attorney General (AG) is responsible for enforcing the GCA and the NFA, and Congress and the AG have expressly delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF.[7]  18 U.S.C. § 926(a) expressly delegates the authority to prescribe "such

---

[7] *See* 26 U.S.C. § 7801(a)(2); 18 U.S.C. § 926(a); 28 U.S.C. § 599A(c)(1); 28 C.F.R. § 0.130(a)(1)-(2).

rules and regulations as are necessary to carry out the provisions" of the statute. "Because § 926 authorizes the [AG] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *NRA v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). Pursuant to this authority, ATF has issued regulations that define statutory terms, including "firearm" and "frame or receiver." However, existing regulations are not permanent, inflexible rules designed to last indefinitely; instead, agencies "are neither required nor supposed to regulate the present and future within the inflexible limits of yesterday." *Am. Trucking Ass'n v. Atchison, Topeka, and Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967). The question before the Court, then, is whether the definitions challenged by Plaintiffs comport with the language of the statute. They do, for the reasons set forth below.

As a threshold matter, Plaintiffs argue that the Rule is not entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). The Court need not decide whether the Rule is entitled to *Chevron* deference because it reflects the best statutory interpretation. A court has no occasion to reach the question of deference when an agency rule adopts "not only a reasonable position, but the position that the court would adopt even if there were no formal rule and the court were interpreting the statute from scratch." *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002); *see also Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2362 (2022) (agency's "regulation correctly construes the statutory language at issue" because, *inter alia*, "[t]he provisions are technical" and "[t]he text and context support the agency's reading"). Alternatively, at a minimum, the Court should accord appropriate "weight" to ATF's interpretation in light of "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Dominguez-Herrera v. Sessions*, 850 F.3d 411, 415 (8th Cir. 2017).

Under either standard, ATF acted within its statutory authority in promulgating the Rule. Plaintiffs first challenge the Rule's updated definition of "firearm" as beyond the scope of ATF's

statutory authority.  Mot. at 9.  Plaintiffs contend that the Rule "take[s] the opposite approach" to the statutory definition of firearm, which presumes that each firearm will have a singular frame or receiver. *Id.*  However, Plaintiffs' argument is directly contradicted by the language of the Rule itself.  While the Notice contemplated that a firearm may have multiple components constituting a "frame or receiver," the Rule provides that only a single component for each weapon will constitute the "frame or receiver."  As the Rule states, "[t]he Department agrees with numerous commenters that the context of the singular terms 'frame' and 'receiver' in these provisions suggests that a firearm only has one frame or receiver."  87 Fed. Reg. at 24,683.  Accordingly, the definition of "frame or receiver" in the Rule was amended to "define[] that term to mean a housing or structure for a *single* fire control component."  *Id.*  While the Rule recognizes that the subparts of a multi-piece frame or receiver comprise a single frame or receiver, it requires such components to be marked with a serial number (if sold together, with the same serial number).  *Id.* at 24,739.  This is necessary to avoid someone being able to combine unmarked components from different frame or receiver kits to assemble a complete, functional unmarked frame or receiver with no serial number.  The Rule does not provide that a firearm will contain multiple frames or receivers.

Plaintiffs also argue that the Rule's amended definition of "firearm" is contrary to statutory authority because it includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive."  Mot. at 9-10.  ATF did not "rewrit[e]" the statute, as Plaintiffs contend.  *Id.* at 9.  To the contrary, courts have long recognized that a disassembled weapon constitutes a "firearm" for purposes of the GCA.[8]

---

[8]  *See, e.g., United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993); *United States v. Theodoropoulous*, 866 F.2d 587, 595 n.3d (3d Cir. 1989).  Plaintiffs incorrectly assert that none of the cases cited in the Rule involve a kit "without a complete, finished frame or receiver," Mot. at 10 n.7.  In *Wick*, the receivers in question were "demilled" and therefore not functional.  697 F. App'x at 508.  In *Stewart*, the kits contained incomplete receivers that required someone to cut out a portion of the receiver for it to become functional.  451

Plaintiffs essentially argue that this Court should add a new term—"complete" or "fully functional"—to modify the word "weapon" in the statutory definition of "firearm." This would directly contradict the statutory text, which states that a "firearm" is "any weapon (including a starter gun) which will *or is designed to or may readily be converted to* expel a projectile by the action of an explosive…" 18 U.S.C. § 921(a)(3)(A) (emphasis added). The reference to a starter gun[9] and to weapons that are merely "designed to" or "may readily be converted to" expel a projectile demonstrate a clear Congressional intent for the term "firearm" to encompass more than just fully assembled and functional weapons. Thus, the Rule's definition of "firearm" to include "weapon kits" is consistent with statutory text, Congressional intent, and courts' longstanding interpretation of the GCA.

Plaintiffs next argue that the Rule's definition of "frame or receiver" is invalid because it improperly uses the term "readily" from the statutory definition of "firearm." Mot. at 9. However, "readily" is a widely used word and concept in federal firearms laws and regulations, and there is nothing improper about ATF using that concept in the amended definition of "frame or receiver." The GCA does not define the term "frame or receiver." Therefore, the crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic—which is unregulated under federal firearms law—becomes a "frame or receiver" that is so regulated. The clear Congressional intent, as indicated by the plain language and the statutory scheme of the GCA, was to regulate—as a "firearm"—the frame or receiver of a weapon. By updating the definition of "frame or receiver," ATF has taken a reasonable approach that incorporates well-known and oft-interpreted

---

F.3d at 1072-73. In both cases the court held that the weapon kits could easily be converted into a functional weapon and should therefore be treated as a weapon, despite not containing a "complete, finished frame or receiver."

[9] A "starter gun" is a gun designed for use with "blank" ammunition. Congress was concerned at the ease with which such a device could be converted to expel live ammunition, and cited in the GCA's legislative history the case of an individual who made bulk purchases of starter guns out of state and "would then, at his residence, disassemble them, and . . . bore out the plugged barrel and enlarge the cylinder chambers to accommodate .22-caliber cartridges." *See* S. Rep. No. 88-1340, at 14 (1967).

concepts such as the "may readily be completed, assembled, restored, or otherwise converted" language into the definition. Plaintiffs' argument that ATF's use of the "readily" concept is unlawful and creates a "single regulatory glob," Mot. at 9, has no merit. The Rule differentiates between (1) weapons (including weapon parts kits) that may readily be converted to expel a projectile, and are thus "firearms" under 18 U.S.C. § 921(a)(3)(A); and (2) frames or receivers (including frame or receiver parts kits) that may readily be converted to function as a frame or receiver, and are thus "firearms" under 18 U.S.C. § 921(a)(3)(B). Nothing in the Rule says that a frame or receiver is a weapon—it is the frame or receiver *of* a weapon, and Plaintiffs cite nothing in the Rule to the contrary.

Because the GCA did not define "frame or receiver," Congress did not prescribe what "frame or receiver" should encompass. ATF's use of the term "readily" incorporates a term that Congress used repeatedly in federal firearms laws—not only the GCA, but also elsewhere, *see, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon that shoots, is designed to shoot, or can *readily* be restored to shoot, automatically…")—so that the regulatory definition of "frame or receiver" actually accomplishes what Congress intended it to do. Any other approach would result in persons being able to easily circumvent the requirements of the GCA and NFA by producing or purchasing almost-complete frames or receivers that could easily be altered to produce a functional frame or receiver. This would thwart Congress's purpose in enacting the GCA and NFA. *See New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the Gun Control Act . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner," thus making "possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms.").

Plaintiffs further argue that the Rule exceeds statutory authority by creating new crimes of "conspiracy" and "structuring transactions." Mot. at 10. However, nothing in the Rule could or does create any new criminal offenses. "Conspiracy" and "aiding and abetting" a violation of any underlying criminal offense are well-established statutory violations. *See* 18 U.S.C. §§ 2, 371. Courts

14

have recognized that structuring transactions by agreement among two or more persons to violate the requirements of federal firearms laws can constitute conspiracy and aiding and abetting. *See, e.g.*, *United States v. Evans*, 928 F.2d 858 (9th Cir. 1991). Nor does the Rule create a new crime of "structuring transactions." The preamble of the Rule merely states the obvious: that persons cannot conceal the appearance that they are not commercially manufacturing and distributing firearms without a license by selling their firearms disassembled in more than one box or shipment. *Cf. United States v. Zambrano*, 752 F. App'x 775, 790 (11th Cir. 2018) (unlawfully exported disassembled firearms).[10]

Plaintiffs next argue that the Rule conflicts with statutory authority because it contains a definition for a term, "privately made firearm," which is not mentioned in either the statute or the existing regulations. Mot. at 10-11. According to Plaintiffs, this new definition conflicts with the GCA because "there is no federal prohibition on an individual manufacturing his own firearm for personal use," and the GCA "does not require they be marked with serial numbers as the [Rule] now demands." *Id.* at 10. However, the Rule does not prohibit an individual manufacturing a firearm for personal use. The Rule imposes *no* regulations upon owners of PMFs, but instead requires federal firearms licensees (FFLs) to "legibly and conspicuously identify each" PMF that is taken into the FFL's inventory within seven days of receipt or acquisition. 87 Fed. Reg. at 24,742. The Rule simply requires FFLs who take PMFs into inventory to treat PMFs as they would other firearms. *Id.* at 24,746.

In addition to the broad grant of regulatory authority under 18 U.S.C. § 926(a), 18 U.S.C. § 923(g)(1)(A) provides that "[e]ach licensed importer, licensed manufacturer, and licensed dealer shall

---

[10] Plaintiffs' contrary assertion hinges on a selective quotation from the Rule, which states that persons selling complete unassembled weapons kits "cannot structure transactions *to avoid paying Firearms Excise Tax on their sale price*." 87 Fed. Reg. at 24,713 (emphasis added). This is not a new concept created by the Rule. As the Rule notes, *id.* at 24,713 n.137, extensive precedent supports both the general proposition that sellers may not avoid tax obligations by disassembling a product and selling portions of it in different transactions, and the specific proposition that sellers of weapons components may not do so. Nothing in the Rule creates any sort of new crime of "conspiracy" or "structuring transactions" to avoid tax obligations.

maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business *for such period, and in such form, as the Attorney General may by regulations prescribe*" (emphasis added).  Plaintiffs are correct that "there is no prohibition on an individual manufacturing his own firearm for personal use," Mot. at 10; nothing in the Rule would prohibit or regulate such activity.  As the Rule expressly states, "[t]here are also no recordkeeping requirements imposed by the GCA or the proposed or final rule upon unlicensed persons who make their own firearms, but only upon FFLs who choose to take PMFs into inventory in the manner prescribed.  In sum, this rule does not impose any new requirements on law-abiding gun owners."  87 Fed. Reg. at 24,670.  Under the Rule, individuals may continue to make their own firearms for personal use or occasionally acquire, sell, or transfer them without any new requirements or regulations, and therefore nothing in the Rule infringes upon "an individual manufacturing his own firearm."

Moreover, while "privately made firearm" is not a term used in the statute or under existing regulations, it is simply a subset of the larger definition category of "firearm."  *See id.* at 24,735.  As described above, ATF has statutory authority to regulate "firearms" within the purview of the GCA, and ATF has provided a definition for what constitutes a "firearm" for many years.  The clear goal of defining "privately made firearm" is to treat PMFs that enter into commerce by being accepted into the inventory of an FFL the same as any other firearms.  The difference between a PMF and any other firearm is the lack of a serial number, and the Rule therefore includes requirements that a PMF entering commerce through an FFL be given a serial number to assist law enforcement in being able to identify the origin of any PMF that is later used in a crime.

Plaintiffs incorrectly assert that ATF lacks statutory authority to require an FFL to apply a serial number to a PMF it chooses to accept into inventory.  This requirement is consistent with both the broad grant of authority to take actions "necessary to carry out the provisions" of the statute, 18 U.S.C. § 926(a), and the more specific delegation of authority to issue regulations prescribing an FFL's

"records of importation, production, shipment, receipt, sale, or other disposition of firearms," *id.* § 923(g)(1). In enacting the GCA, Congress clearly understood that in some circumstances persons and entities other than licensed manufacturers and importers may be required to mark firearms with a serial number. *See* 26 U.S.C. § 5842(a)-(b) (requiring unlicensed makers and possessors to mark certain types of firearms with serial numbers as may be prescribed by regulations). The GCA expressly requires FFLs to record certain information for any firearms taken into and disposed from their inventory, regardless of the origin of the firearms, for purposes of tracing and assistance to law enforcement. 18 U.S.C. § 923(g). The statute contains no exception for privately made firearms, and this statutory requirement necessary for tracing would be completely frustrated if PMFs taken into FFLs' inventory were not marked with a serial number like other types of firearms.[11]

Plaintiffs further argue that the Rule conflicts with the statute in the Rule's definition of the term "complete muffler or silencer device." Mot. at 11-12. First and foremost, Plaintiffs fail to allege that they are manufacturers of muffler or silencer devices and thus would be burdened in any way by this definition, so they lack standing to assert this claim, or any injury for a preliminary injunction. Even if they did have standing, their claim would fail. Under the NFA, ATF is specifically charged with issuing regulations regarding the identification of firearms: "[e]ach manufacturer and importer and anyone making a firearm shall identify each firearm . . . by a serial number which may not be readily removed, obliterated, or altered . . . *as [ATF] may by regulations prescribe.*" 26 U.S.C. § 5842(a) (emphasis added). The purpose of this defined term in the Rule is "to clarify for manufacturers and makers . . . that they need only mark the one part of the device defined as the frame or receiver under

---

[11] Plaintiffs incorrectly argue that the Rule is invalid because it creates a "new federal crime." Possessing a firearm with an obliterated or altered serial number has long been a federal crime, *see* 18 U.S.C. § 922(k); 26 U.S.C. § 5861(h), and nothing in the Rule purports to amend those existing criminal statutes. The Rule simply requires PMFs that come into commerce by being accepted into inventory by a licensee (not just licensed gunsmiths, as Plaintiffs suggest) to have a serial number applied so they can be treated just as any other firearm under federal firearms laws.

the proposed rule." 87 Fed. Reg. at 24,662.  The statutory definition of "firearm" includes "any firearm muffler or firearm silencer," 18 U.S.C. § 921(a)(3), and any importer or manufacturer of a firearm "shall identify by means of a serial number engraved or cast *on the receiver or frame of the weapon*, *in such manner as the Attorney General shall by regulations prescribe*," *id.* § 923(i) (emphasis added).  Contrary to Plaintiffs' claims, a muffler or silencer, as a "firearm," *must* have some component identified as a "frame or receiver" so manufacturers and importers can identify it with a serial number as required by law on a single component, rather than having to mark each small individual "part intended only for use in assembling or fabricating a silencer." *Id.* § 921(a)(25).

Plaintiffs' assertion that the definition rewrites the statutory definition by omitting the "as designed" language that was included in the Notice from the definition fares no better.  The definition for "complete muffler or silencer device" specified that it only applies to "[a] *firearm muffler or firearm silencer* that contains all component parts necessary to function. . . ." 87 Fed. Reg. at 24,734 (emphasis added).  In other words, it only applies to devices that are already considered to be a "firearm muffler" or "firearm silencer" under 18 U.S.C. § 921(a)(25), which specifically defines those terms in part as "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler."  So the "designed" and "intended" concepts are incorporated into the Rule's definition, and Plaintiffs' contention that the Rule could result in an assortment of household items being a "complete muffler or silencer device" is simply incorrect.

Plaintiffs' argument that the Rule creates an unlawful national gun registry is no more persuasive.  *See* Mot. at 12.  Plaintiffs invoke 18 U.S.C. § 926(a), which provides that the AG may not promulgate any new regulations requiring that the records that must be maintained under the GCA "be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof," or establishing any "system of registration of firearms." *Id.* Under this provision, such regulations that were in effect when Congress passed the Firearm Owners

Protection Act remain valid, but the AG may not impose subsequent regulations requiring the recording or transferring of records to a government facility or establishing a registration system. *Id.*

The Rule does neither of these. Its only provision relating to firearm records extends the time period for which an FFL must maintain its own records of its own firearm sales from 20 years to the duration of the FFL's business. 87 Fed. Reg. at 24,690. That amendment neither creates a new regulation requiring the recording or transfer of firearms records to a government facility nor creates a new system of firearms registration. The Rule merely extends the time period during which the FFL—not the government—must maintain the records already required. That change is authorized under 18 U.S.C. § 923(g)(1)(A) and (g)(2) and is consistent with the limitations of 18 U.S.C. § 926(a).

### C.     The Rule Is Reasonable.

Plaintiffs' arbitrary-and-capricious claims fare no better. The arbitrary and capricious standard "is a highly deferential standard of review." *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 803 (8th Cir. 2021). "[T]he role of courts in reviewing arbitrary and capricious challenges is to simply ensure that the agency has acted within a zone of reasonableness." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022). The reviewing court "defers to agency action so long as an agency examined the relevant data and articulated a satisfactory explanation for its action." *Adventist Health Sys./SunBelt*, 17 F.4th at 803. "A court cannot substitute its judgment for that of the agency," especially when, as here, "analysis of the relevant information requires a high level of technical expertise by an agency acting within its sphere of expertise." *Id.* "If an agency's determination is supportable on any rational basis, a court must uphold it." *Org. for Competitive Mkts. v. USDA*, 912 F.3d 455, 459 (8th Cir. 2018).

Here, ATF carefully reviewed over 290,000 comments, examined the relevant data, and articulated a satisfactory explanation for its decision-making. The APA requires no more.

### 1.     The Rule Is Internally Consistent.

Although Plaintiffs present three arguments in support of their contention that the Rule is not

internally consistent, *see* Mot. at 14-16, all three proceed from a misunderstanding of the Rule.  First, Plaintiffs mistakenly allege that the Rule presumes that *any* serialized part of a firearm is the firearm's frame or receiver.  This is incorrect.  The Rule agreed with many commenters that there should be only one "frame" for a handgun, and only one "receiver" for a long gun.  Though the Rule presumes the marked subparts of a multi-piece frame or receiver to be *parts* of a weapon's "frame" or "receiver," when these subparts are assembled, they comprise just one frame or receiver.  *See supra* I.A, I.B.  In other words, a single frame or receiver may have multiple modular subparts that are marked with a serial number.  Plaintiffs' contention that the Rule is self-contradictory thus rests on a mistaken understanding of the Rule.

Second, Plaintiffs mistakenly argue (citing no authority) that when ATF grandfathered existing complete frame or receiver designs previously determined by the agency to be the firearm "frame or receiver" of a given weapon, and gave four examples of such designs, the APA required the agency to list all such designs.  Initially, because this is a facial, pre-enforcement challenge, Plaintiffs must establish that no set of circumstances exists under which the Rule would be valid, *see supra* Legal Standards, and the Rule is plainly lawful as applied to these four enumerated examples of grandfathered designs, by contrast with other grandfathered designs.  In any event, there is nothing confusing about this grandfathering provision.  The Rule clearly provides that all ATF classifications of existing complete frame or receiver designs that the agency determined before April 26, 2022, to be the firearm "frame or receiver" remain effective.  87 Fed. Reg. at 24,739.  As representative illustrations, ATF provided the four most common examples of particular types of weapons whose existing complete frame or receiver designs were previously determined to be the firearm "frame or receiver" of those weapons.  *See id.* at 24,739-40.  For other types of weapons, manufacturers need only determine whether the classification was issued before April 26, 2022, and whether the weapon was complete and assembled when it was submitted for the agency's examination.  *See id.* at 24,739.

Third, contrary to Plaintiffs' contention, the Rule explains the difference between "split" and "multi-piece" frames and receivers, and how its requirements apply to both types of frames and receivers. A "split" frame or receiver typically has two different parts that house one or more fire control components, which are commonly referred to as the "upper" and "lower" portions of the receiver. *See id.* at 24,652, 24,654-55; Ex. 1 (examples of split frames or receivers). Under the Rule's definition of "frame" and "receiver," only one of these two parts is the "frame" or "receiver": namely, the part that provides housing for the sear (for handguns) or for the bolt or breechblock (for long guns). 87 Fed. Reg. at 24,735. The Rule also includes illustrative examples of which portion of a split frame or receiver has been designated the "frame" or "receiver." *Id.* at 24,740 figs. 11-13.

By contrast, a "multi-piece" frame or receiver is one that can be "disassembled into multiple *modular* subparts, *i.e.*, standardized units that may be replaced or exchanged." *Id.* at 24,671, 24,739; *see also* Ex. 2 (examples of multi-piece frames or receivers). These types of receivers are relatively uncommon. 87 Fed. Reg. at 24,671. Although defining the terms "frame" and "receiver" to focus on a single component provides clarity as to which part of a "split" frame or receiver is regulated, it does not provide such clarity with respect to multi-piece frames and receivers that are designed to be disassembled into multiple modular subparts, more than one of which may provide a structure for the sear (for handguns) or the bolt or breechblock (for long guns). *Id.* To avoid confusion, the Rule includes a definition of "multi-piece frame or receiver," *id.* at 24,739, and explains which portion(s) of a multi-piece receiver needs to be serialized: namely, the *outermost* housing designed to house either the sear or the bolt or breechblock. *Id.* at 24,747; *see also id.* at 24,671. And if *more* than one outermost subpart is similarly designed to provide a structure for these components (*e.g.*, left and right halves), each of those subparts must be identified with a serial number. *Id.* at 24,671, 24,747. This requirement is necessary because otherwise, multi-piece frames or receivers could be easily sold piecemeal in individual subparts and replaced by the end buyer without any traceable marks of identification. *Id.* at

24,672.  The Rule thus explains the difference between split and multi-piece receivers, and its reasons for treating these two types of receivers differently for purposes of serialization.

### 2.    The Rule Adequately Explained ATF's Reasons for Its Policy Changes.

"When an agency reverses its prior policy, 'it need not demonstrate . . . that the reasons for the new policy are *better* than the reasons for the old one.'"  *Northport Health Servs. v. HHS*, 14 F.4th 856, 875 (8th Cir. 2021).  "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.*  Plaintiffs advance six abbreviated arguments under this rubric, but none represent claims that are likely to succeed.  Mot. at 16-20.

1.    Though Plaintiffs incorrectly contend that the Rule does not consider a multi-piece frame or receiver to be a "frame" or "receiver," in fact, the Rule's definition of "multi-piece frame or receiver" plainly includes this subcategory within the definition of "frame" or "receiver."  *See* 87 Fed. Reg. at 24,739 (defining "multi-piece frame or receiver" to mean "*a frame or receiver* that may be disassembled into multiple modular subparts. . . .") (emphasis added).  Firearms with a multi-piece frame or receiver thus have only one "frame" or "receiver."  However, because of the distinct nature of a multi-piece frame or receiver—that it is divisible into modular subparts that may be sold separately—if any of those subparts is in fact sold separately, then it must be identified with an individual serial number.  *Id.* at 24,672.  Otherwise, these frames or receivers could be sold piecemeal in individual subparts and replaced by the end buyer without any traceable marks of identification.  *See supra* I.C.1.  And Plaintiffs are simply mistaken that the Rule adopted a presumption that all serialized parts of firearms are "frames" or "receivers."  *See supra* I.C.1.

2.    Plaintiffs incorrectly argue that, in grandfathering some prior classification determinations, the Rule allows for those determinations to apply more broadly than to the specific item as to which a particular manufacturer or importer requested the classification, in contrast with

ATF's past practice.  To the contrary, in grandfathering existing complete frame or receiver designs previously determined by ATF to be the firearm "frame or receiver" of a given weapon, the Rule does not purport to extend these classifications more broadly than the specific item or items that had been classified.  *See* 87 Fed. Reg. at 24,739 (stating that except as provided otherwise, "the terms 'frame' and 'receiver' shall include the specific part of a complete weapon, including variants thereof, determined (classified) by [ATF] to be defined as a firearm frame or receiver prior to April 26, 2022").[12] In contending otherwise, Plaintiffs cite a sentence in the proposed rule describing a definitional supplement that was not adopted in the Rule.  *Compare* 86 Fed. Reg. at 27,728-29 (describing definitional supplement of "split or modular frame or receiver") *with* 87 Fed. Reg. at 24,727 (explaining that the Rule does not include this supplement).

       3.       The Rule explains that there are good reasons to utilize the term "readily" to determine when the critical stage of manufacture has occurred in which an unfinished component part of a weapon becomes a "frame" or "receiver," and that the agency believes the use of this standard to be better than its prior policy, which is all that the APA requires.  *Northport Health Servs.*, 14 F.4th at 875. ATF's use of the term "readily" simply incorporates a term that Congress has used repeatedly in federal firearms laws so that the regulatory definition of "frame or receiver" accomplishes what Congress intended it to do: to prevent easy circumvention of federal law.  *See supra* I.B.  Plaintiffs err in contending that ATF has changed its position regarding whether specific machining operations had to be performed in order for partially complete frames or receivers to be classified as a "frame or receiver."  87 Fed. Reg. at 24,668.  ATF maintains that a partially complete frame or receiver is not a

---

[12] The use of the term "variant" does not extend the scope of these classifications to items by different manufacturers or importers; it means only that if a manufacturer or importer received a classification designating a specific item as a "frame" or "receiver," the same holds true with respect to items produced by that same manufacturer or importer "utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments." *Id.* at 24,735.

"frame or receiver" if it still requires performance of certain machining operations. *Id.*

In the past, incomplete frames or receivers have been sent to ATF for classification without the other parts, jigs, templates, or materials that are sold or distributed with the item or kit. *Id.* at 24,673. Thus, the entire kit may not have been presented to the agency when it made its classification, *id.* at 24,709, despite the fact that these items and materials are necessary for ATF to make a proper firearm classification. *Id.* at 24,725.[13] To the extent that ATF's prior approach focused on the specific degree of machining of a partially complete frame or receiver without examining other materials sold with the item or kit, that approach was less effective than one that considers these items to determine whether the item or kit may be readily converted into a functioning frame or receiver, and ATF has explained its reasons for shifting its approach.[14]

Furthermore, Plaintiffs are mistaken in contending that in a prior case, ATF stated that it has never taken any account of the time required to convert a partially complete frame or receiver into a functional frame or receiver when making classifications. In the brief cited by Plaintiffs, ATF disputed a "claim" that the agency had "changed its standard from a temporal-*based* approach to one based on the degree of machining completed on the frame or receiver."[15] The agency rebutted the claim that it had previously focused solely on a single criterion—the time required for conversion—by noting instances in which it had not taken this factor into account. *See id.* at 30-32. However, despite

---

[13] For this reason, ATF chose not to grandfather partially complete, disassembled, or nonfunctional frames or receivers (including weapon or frame or receiver parts kits) that it had previously classified as not being "frames or receivers." *See id.* at 24,673, 24,739.

[14] For example, the purpose of jigs and templates is to provide indexing to let a buyer know where to drill or mill holes on the partially complete frame or receiver, so that it can accept fire control components. *See id.* at 24,739. There is thus little practical difference between a partly complete frame or receiver that has the necessary indexing itself, or its being included in a kit with a jig or template that can provide this indexing. Furthermore, written instructions and guidance included with a kit can allow a buyer with little or no expertise to readily convert a partially complete frame or receiver into a functional frame or receiver. *See id.* at 24,678.

[15] Mem. in Supp. of Defs.' Mot. for Summ. J. at 30, *City of Syracuse v. ATF*, No. 1:20-cv-6885 (S.D.N.Y. Jan. 29, 2021), Doc. 98 (emphasis added).

rebutting the claim that ATF had previously focused *solely* on this criterion, ATF reiterated that it did take time-of-conversion into consideration as a relevant factor. *See id.* at 33 (discussing ATF's limited "reli[ance] on temporal considerations in its classification letters"). This remains true under the Rule, which considers time as one of several factors relevant to classifying firearms. 87 Fed. Reg. at 24,747.

4. Plaintiffs incorrectly state that the Rule changes ATF's position as to whether "solvent traps"—devices intended for use in fabricating firearm silencers—constitute "firearms" under the GCA. The Rule does not change the legal status of solvent traps. The GCA defines "firearm" to include "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3)(C). In turn, it defines the terms "firearm muffler" or "firearm silencer" to mean "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, *and any part intended only for use in such assembly or fabrication*." *Id.* § 921(a)(25) (emphasis added). Devices labeled "solvent traps" have been indexed by a seller for the purpose of allowing the buyer to drill a hole for the passage of a projectile, in order to diminish the report of a portable firearm. 87 Fed. Reg. at 24,700. It is intended only for use in fabricating a firearm silencer. *Id.* A solvent trap is thus a "firearm muffler" or "firearm silencer" because it is a "part intended only for use in . . . fabricati[ng]" "a firearm silencer." 18 U.S.C. § 921(a)(25). And as a "firearm silencer," it is also a "firearm." *Id.* § 921(a)(3)(C). The Rule does not alter the fact that a solvent trap is both a "firearm silencer" and a "firearm." *See* 87 Fed. Reg. at 24,700 (noting that a solvent trap is, by statutory definition, a "firearm silencer" "without regard for the [Rule's] definition of the term 'readily' or the application of the [Rule's] term 'may readily be converted'"). Nor does the Rule alter the status of solvent traps under the NFA. *See id.* at 24,699 (observing that "some individuals file an ATF Form 1 under the NFA to make solvent traps silencers," which remains possible under the Rule).

5. As Plaintiffs concede, the Rule does not represent a change of course by ATF as to

whether consideration of a firearm accessory affects ATF's classification.  Instead, ATF announced years ago that such requests must include the firearm with the accessory already installed.[16]  The Rule thus does not constitute a policy change by ATF but instead simply formalizes a previously-adopted change.  *See* 87 Fed. Reg. at 24,743.  In any event, the Rule explains why ATF took this approach.  The purpose of ATF classifications is to determine for a particular manufacturer or dealer whether a specific product is or is not a regulated item under federal firearms laws.  *See Sig Sauer*, 826 F.3d at 599.  Thus, if the firearm for which classification is requested is sold with an accessory, then to determine properly whether the firearm is or is not a regulated item, ATF must inspect the accessory as installed on the firearm in the configuration for which the accessory was designed.  *See* 87 Fed. Reg. at 24,710.  As explained elsewhere, this is because when attached to a firearm, accessories can affect the firearm's classification; the accessory's design and likely use may be relevant in assessing the manufacturer's purported intent with respect to the firearm's design, and an accessory's design may result in a firearm falling within a particular statutory definition.  *See* 86 Fed. Reg. 30,826, 30,828 (June 10, 2021).

Plaintiffs also incorrectly state that the Rule's requirement that written requests for firearm classifications shall be executed under penalty of perjury represents a change from existing law. Federal law already prohibits persons from "mak[ing] any materially false, fictitious, or fraudulent statement or representation" or "mak[ing] or us[ing] any false writing or document knowing the same to contain" such a statement or representation "within the jurisdiction of the executive . . . branch" of the United States.  18 U.S.C. § 1001.  Persons who make false statements in written requests for firearm classifications are thus already subject to federal criminal prosecution for an offense with similar possible punishment.  *Compare id.* (punishing false statements with fines or imprisonment up to five years absent mitigating circumstances) *with id.* § 1621 (punishing perjury with fines or

---

[16] ATF, Notice: Discontinuance of Accessory Classifications (last reviewed Dec. 11, 2018), https://www.atf.gov/firearms/notice-discontinuance-accessory-classifications

imprisonment up to five years).  In any event, given the need for accuracy in requests for firearm classifications, it makes eminent sense for such statements to be made under penalty of perjury.

6.    Finally, Plaintiffs state incorrectly that ATF has not previously considered weapon parts kits that may readily be converted to functioning firearms to constitute "firearms" under the GCA.  As noted above, *see supra* Regulatory Background, the Rule defines "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive."  87 Fed. Reg. at 24,735.  But the notion that the GCA definition of "firearm" encompasses something other than a completely assembled and functional weapon is a longstanding, widely-held interpretation of the statute.  *See supra* I.B.  Federal courts that have addressed the issue have held that disassembled collections of weapon parts and parts kits that may readily be converted to expel a projective are "firearms" under 18 U.S.C. § 921(a)(3)(A).[17]

Moreover, although ATF has decided not to grandfather disassembled frames or receivers—including weapon parts kits—that ATF had classified as *not* being "frames" or "receivers" prior to the Rule, the agency has explained its reasons for doing so.  *See supra* page 24 & n.13.  In addition to not grandfathering these particular classifications, individuals seeking classifications prospectively must submit any associated templates, jigs, molds, equipment, or tools that are made available by the seller of the item or kit to the end buyer, together with any instructions, guides, or marketing materials if they will be made available by the seller with the item or kit.  This ensures that a proper classification

---

[17] *See, e.g.*, *Wick*, 697 F. App'x at 508 (defendant "was selling complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting [18 U.S.C. § 921(a)(3)(A)'s] definition of a firearm"); *Stewart*, 451 F.3d at 1073 n.2 (ATF agent's affidavit "support[ed] a finding of probable cause" that defendants' rifle parts kits "could 'readily be converted,' as defined in 18 U.S.C. § 921(a)(3)(A)"); *see also Theodoropoulos*, 866 F.2d at 595 n.3; *United States v. Morales*, 280 F. Supp. 2d 262, 272-73 (S.D.N.Y. 2003) (partially-disassembled pistol was a "firearm" under 18 U.S.C. § 921(a)(3)(A) because "[w]hether in pieces or whole, it is clear to this Court that the item . . . was clearly 'designed to,' and could 'readily be converted to' expel a projectile"); *see also* Application for Search Warrant ¶¶ 36-48, *In re Polymer80, Inc.*, No. 3:20-mj-123-WGC (D. Nev. Dec. 9, 2020), https://www.documentcloud.org/documents/21112212-ghostraid-121420-warrant (determining that two specific weapons kits met the GCA's definition of a firearm).

decision can be made that considers the entire kit.  87 Fed. Reg. at 24,673.

Plaintiffs also err in contending that regulating disassembled frames and receivers—or other types of disassembled firearms—in the form of firearm parts kits is inconsistent with ATF's policy of not regulating individual firearm parts other than frames or receivers.  With the exception of frames and receivers, and parts of machineguns and silencers, ATF does not generally regulate individual firearm parts.  But a weapon parts kit that may readily be completed to expel a projectile by the action of an explosive is merely a weapon in an unfinished or unassembled form or configuration.  Further, ATF is not regulating the individual tools, jigs, templates, or instructions sold with firearm parts kits.  Rather, *see supra* I.B, when classifying such kits, ATF looks to these items to determine whether the kit as a whole is readily converted to function as a frame or receiver (a "firearm" under 18 U.S.C. § 921(a)(3)(B)) and/or to expel a projectile as a complete, assembled weapon (a "firearm" under 18 U.S.C. § 921(a)(3)(A)).  Therefore, although for the most part ATF does not regulate individual firearm parts, the Rule does regulate firearm parts kits that may be readily completed to constitute "firearms."

### 3.     The Agency Responded Adequately to Significant Comments.

The APA "requires agencies to provide the public with notice of a proposed rulemaking, an opportunity to comment, and, after consideration of the relevant matter presented, a concise general statement of the rule's basis and purpose."  *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012).  The requirement to "respond to relevant and significant public comments" is not "particularly demanding."  *Pub. Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  "[T]he agency's response to public comments need only enable courts to see what major issues of policy were ventilated and why the agency reacted to them as it did."  *Id.*  Moreover, an agency "need only respond to comments that can be thought to challenge a fundamental premise underlying the proposed decision."  *Transp. Div. v. Fed. R.R. Admin.*, 40 F.4th 646, 663 n.4 (D.C. Cir. 2022).

ATF's responses easily satisfy this standard.  The agency sufficiently responded to three points

made in the 47-page comment submitted by the organizational plaintiffs, and it declined to respond to a comment not challenging a fundamental premise underlying the Rule. *See* Mot. at 20-22. First, in response to the contention that the GCA authorizes licensed manufacturers and importers—but not licensed dealers—to mark firearms, ATF explained that in enacting the GCA, Congress clearly understood that persons other than licensed manufacturers and importers might need to mark firearms. 87 Fed. Reg. at 24,687. Thus, the NFA (which the GCA amended) requires unlicensed makers and possessors to place serial numbers on NFA firearms as prescribed by ATF regulations. *Id.* Moreover, ATF has the authority to promulgate regulations necessary to enforce the GCA, and requiring licensed dealers to mark privately made firearms is such a regulation. *Id.* The GCA requires FFLs to record firearm information for purposes of tracing, but licensed dealers have no serial number marked on the frame or receiver of a privately made firearm that they can record in cases where a licensed manufacturer does not produce the firearm or an importer does not import the firearm. *Id.* Requiring licensed dealers—like licensed manufacturers and importers—to mark firearms is thus necessary to fulfil Congress's intent to mark and allow for tracing of all firearms. *Id.*

Second, ATF responded adequately to a comment noting that the Rule does not require the agency to notify the submitter of a voluntary classification request that the agency has accepted or rejected the request. *See id.* at 24,709; *see also supra* Regulatory Background (explaining ATF classification requests). ATF responded to, and disagreed with, comments advocating for a requirement that classification determinations be rendered within a particular time frame, or that the submitted product be deemed compliant if the agency does not respond within a specified time frame. 87 Fed. Reg. at 24,709. As the agency explained, it has long accepted voluntary classification requests in furtherance of its mission to assist persons in complying with the GCA's and NFA's requirements. *Id.* However, no statute requires individuals or entities to submit such requests, or requires ATF to act on any such requests (or to act on them within a prescribed time frame). *Id.*

Third, ATF responded adequately to comments arguing that the agency lacks the authority to include the phrase "may readily be converted" in the Rule's definition of "partially complete frame or receiver" because the phrase "may readily be converted" appears in one sub-provision of the GCA but not another.  *See id.* at 24,685-86.  Congress defined "firearm" to include, *inter alia*, "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A), and also "the frame or receiver of any such weapon," *id.* § 921(a)(3)(B).  However, Congress did not define the terms "frame" or "receiver," *see id.* § 921, instead leaving a gap for the agency to fill by defining these terms.  Nor did Congress address at what point of manufacture an item that is not regulated becomes a "frame or receiver" that is so regulated.  The Rule fills these gaps by defining "frame" and "receiver," 87 Fed. Reg. at 24,735, and also specifying that these terms "include a partially complete, disassembled, or nonfunctional frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," *id.* at 24,739.

And ATF responded to—and disagreed with—comments suggesting that the agency could not use the concepts of "readily" or "converted" in specifying when an item becomes a "frame" or "receiver" simply because the terms "readily" and "converted" appear in 18 U.S.C. § 921(a)(3)(A), and not in 18 U.S.C. § 921(a)(3)(B).  *Id.* at 24,685-86.  The agency explained that in drafting the Rule, it appropriately considered concepts concerning when firearms other than frames and receivers reach the point at which federal firearms law regulates them.  *Id.* at 24,685 & n.103.  Such an analysis is appropriate because manufacturing, by definition, is the process of "converting" raw materials into finished goods suitable for use.  *Id.* at 24,685 & n.104.  Moreover, the mere fact that Congress *included* the phrase "may readily be converted" in one sub-provision of the GCA (generally defining "firearm") does not mean that it *excluded* the possibility that ATF could use the words "readily" and "converted" in interpreting another sub-provision (expressly including a firearm's "the frame or receiver" within

the definition of "firearm").  *See, e.g., Clinchfield Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 895 F.2d 773, 779 (D.C. Cir. 1990) (explaining that "[t]he difficulty with" the argument that "explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second context" is that "it disregards several other plausible explanations for an omission"); *Creekstone Farms Premium Beef v. USDA*, 539 F.3d 492, 500 (D.C. Cir. 2008) (holding that when a statute "contains broad language authorizing the agency to promulgate regulations necessary to 'carry out' the statute," the negative-implication canon "has minimal, if any, application").

Finally, there was no need to respond directly to a portion of the organizational plaintiffs' comment contending that the agency did not "explain the need for" persons seeking ATF firearm classifications to submit a "signed form to accompany submission samples" and accusing ATF of attempting "to create more technical paperwork violations that can then lead to selectively bringing trumped up criminal charges for 'perjury.'"  Doc. 1-33, at 45.  This generalized statement—made in passing near the end of a 47-page comment—is not a "significant" comment, *Pub. Citizen*, 988 F.2d at 197, and does not "challenge a fundamental premise underlying" the Rule, *Transp. Div.*, 40 F.4th at 663 n.4; *see also COMPTEL v. FCC*, 978 F.3d 1325, 1332 (D.C. Cir. 2020).  Moreover, persons who make false statements in written requests for firearm classifications are already subject to federal prosecution.[18]  *See supra* I.C.1.5.

### 4.  Under the APA, ATF Was Not Required to Address a Supreme Court Opinion That Did Not Exist When It Promulgated the Rule.

Plaintiffs' claim that the Rule is "not in accordance with law" in light of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which, as Plaintiffs acknowledge, was issued after ATF promulgated the Rule, is also without merit.  *See* Mot. at 12-14.

---

[18] Furthermore, even if the Court were to agree with Plaintiffs that further explanation is warranted, the "proper course" would not be vacatur but instead "to remand to the agency for additional investigation or explanation."  *Cent. S.D. Coop. Grazing Dist. v. USDA*, 266 F.3d 889, 895 n.8 (8th Cir. 2001).

Plaintiffs' arguments on this score appear to conflate two distinct issues: *first*, the adequacy of ATF's response to comments; and, *second*, the substantive validity of the Rule.

Turning first to the substantive validity of the Rule under *Bruen*, Plaintiffs do not argue in their Motion that that decision renders the Rule unconstitutional, but merely that the decision casts doubt on the Rule's "[j]ustifi[cation]."  Mot. at 12.[19]  That is for good reason: *Bruen* did not alter established Supreme Court precedent holding that longstanding regulations, including restrictions on the commercial sale of firearms, do not violate the Second Amendment.[20]  As the Rule falls squarely within that category, any claim that it violates the Second Amendment fails.

With respect to ATF's response to comments regarding the validity of the Rule under the Second Amendment, it is well established that arbitrary and capricious review does not permit courts to apply "hindsight derived from matters occurring after the adoption" of the challenged agency action.  *SIH Partners LLLP v. Comm'r*, 923 F.3d 296, 301 (3d Cir. 2019); *see also Fearin v. Fox Creek Valley Watershed Conservancy Dist.*, 793 F.2d 1291 (6th Cir. 1986) (holding that a court may not "substitute [its] judgment, improved by the luxury of hindsight, for that of the [agency]").

The cases on which Plaintiffs rely to argue otherwise are inapposite.  *See* Mot. at 14 n.9.  In *NLRB v. Food Store Employees Union*, 417 U.S. 1 (1974), the Supreme Court held that an agency, not the courts, should have the first opportunity to decide whether an intervening policy change *of the agency* applies retroactively in enforcement proceedings.  *See id.* at 10 & n.10.  Here, ATF has not changed its policy in any relevant respect since the Rule was promulgated, nor is this an enforcement proceeding. Meanwhile, in *National Fuel Gas Supply Corp. v. FERC*, 899 F.2d 1244 (D.C. Cir. 1990), the D.C. Circuit

---

[19] Although Plaintiffs do bring a Second Amendment claim in their Complaint, *see* Compl. ¶¶ 657-76, they do not argue that they are likely to succeed on the merits of that claim as a basis for their Motion. Nor does a "single sentence" of their Motion in the section addressing irreparable harm suffice to develop the argument.  *Merechka v. Vigilant Ins. Co.*, 26 F.4th 776, 788 n.4 (8th Cir. 2022); *see* Mot. at 26.

[20] *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Bruen*, 142 S. Ct. at 2133; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

remanded without vacatur an agency order that was rendered invalid by a subsequent judicial decision. As explained above, Plaintiffs here have not argued in their Motion, much less established, that *Bruen* likely invalidates the Rule. [21]

In any event, even if the Court could evaluate the adequacy of ATF's response to comments with the benefit of hindsight, *Bruen* does not render ATF's explanation arbitrary and capricious. Plaintiffs take issue with ATF's statements in the Rule that the Rule serves "compelling governmental interests." Mot. at 12 (quoting 87 Fed. Reg. at 24,676). To be sure, *Bruen* rejected "means-end scrutiny," as a framework for deciding Second Amendment claims. 142 S. Ct. at 2125. But ATF did not justify the constitutionality of the Rule solely by reference to compelling governmental interests. It also stated that, under *Heller*, laws "imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." 87 Fed. Reg. at 24,676. As noted above, that statement remains good law and is sufficient to establish the constitutionality of the Rule.

In sum, nothing in the Supreme Court's decision in *Bruen* casts doubt on either the substantive validity of the Rule or the adequacy of ATF's response to comments.

## II.   Plaintiffs Have Not Shown That They Will Incur Irreparable Harm Absent a Preliminary Injunction.

"The movant must show that irreparable injury is *likely* in the absence of an injunction, not merely a possibility of irreparable harm before a decision on the merits can be rendered." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear

---

[21] Moreover, and in any event, even if Plaintiffs could establish that the Court should remand the Rule for further consideration in light of *Bruen*, that showing would not support the issuance of a preliminary injunction barring enforcement of the Rule. A preliminary injunction must not be "broader than necessary to remedy the underlying wrong." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004). An alleged violation that would, at best, warrant remand therefore cannot support a preliminary injunction that prevents the action from taking effect in the first instance.

and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012).  "The absence of irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Tumey*, 27 F.4th at 667 (citation omitted).  Plaintiffs have failed to meet their burden of showing a likely threat of imminent irreparable injury.

### A.     Plaintiffs' Delay in Seeking Relief Shows the Lack of Irreparable Harm.

Plaintiffs' delay in seeking preliminary relief weighs heavily against their assertion that they would suffer irreparable harm absent a preliminary injunction.  "Without question, a long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." *Adventist Health Sys./SunBelt*, 17 F.4th at 805 (8th Cir. 2021).[22]

Here, ATF issued the Rule on April 26, 2022, but Plaintiffs did not move for a preliminary injunction until three months later, on July 25, 2022.  That delay is inexplicable.  The Notice was issued more than a year ago, *see* 86 Fed. Reg. 27,720 (May 21, 2021), and the organizational plaintiffs publicly announced in April 2022 that they would be filing this lawsuit.[23]  By contrast, the plaintiff in the parallel Texas case filed suit less than two weeks after the Rule was issued and moved for preliminary injunctive relief nearly two months before Plaintiffs did.  *See Div. 80 LLC v. Garland*, No. 3:22-cv-00148 (S.D. Tex.), Docs. 1 (Compl., May 9, 2022), 11 (Emergency Mot. for Prelim. Inj., June 6, 2022).

Courts regularly hold that such delays refute, or at least weigh against, a finding of irreparable harm.  *See Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at *6 (S.D. Fla.

---

[22] *See also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) ("It has long been recognized that delay in seeking relief vitiates much of the force of . . . allegations of irreparable harm.").

[23] https://www.gunowners.org/no-compromise-gun-lobby-group-to-challenge-bidens-ghost-gun-rule-in-court/ (quoting Beth Brelie, "*No-Compromise" Gun Lobby Group to Challenge Biden's Ghost Gun Rule in Court*, The Epoch Times (Apr. 29, 2022)). *See also GOA Fighting Biden's Attempt to Expand the Gun Registry*, https://www.gunowners.org/new-rule-to-expand-atf-gun-registry/ (Apr. 10, 2022) (announcing, prior to the Rule's issuance, that "[a] lawsuit is in the works" and that "[w]e've known this was coming, since they announced this rule as a proposed rule back in May of 2021").

Feb. 9, 2017) ("Plaintiff sat on its rights for three months. . . . Accordingly, Plaintiff's delay is by itself sufficient grounds to deny its request for an injunction."); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) (finding that a "three-month delay . . . undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction").[24]  Plaintiffs' delay undercuts any notion that they face imminent irreparable harm.

### B. Plaintiffs Fail to Identify Any Irreparable Harm Caused by the Rule.

Even without considering Plaintiffs' delay, they fail to show that any aspect of the Rule will likely cause them "certain and great and . . . imminen[t]" irreparable harm.  *S.J.W. ex rel. Wilson*, 696 F.3d at 778.  Plaintiffs' irreparable harm argument consists of scattershot parenthetical citations to various allegations in their Complaint, with almost no supporting case law.  But the allegations highlighted by Plaintiffs do not amount to irreparable harm.

Plaintiffs first complain that the Rule's supposed "lack of precision" will cause "uncertainty" about what constitutes a firearm, frame, or receiver.  Mot. at 24.  However, the Rule is not vague.  The Rule contains detailed definitions with clarifying examples and pictures, and Plaintiffs point to no specific ambiguity that will cause harm to any particular plaintiff.  But to the extent Plaintiffs consider certain applications of the Rule to be ambiguous, the Rule provides a regulatory mechanism to resolve any such ambiguity: parties may submit requests for voluntary classifications as to whether a particular item is a "firearm" within the meaning of the GCA and its regulations.  *See* 87 Fed. Reg. at 24,743; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (noting that "the ability to clarify the meaning of the regulation . . . by resort to an administrative process" ameliorates harm

---

[24] *See also Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) ("three month delay"); *Millennium Funding, Inc. v. 1701 Mgmt. LLC*, No. 21-CV-20862, 2021 WL 3618227, at *10 (S.D. Fla. Aug. 16, 2021) ("it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months") (collecting cases); *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 467 (M.D. Fla. 2022) (same).

from claimed vagueness). Therefore, any purported uncertainty is not irreparable but can be remedied through the administrative process.

Plaintiffs also complain, again without specificity, that "companies will be forced to entirely revamp business practices and stop selling products or combinations of products." Mot. at 25. But the Rule does not forbid Plaintiffs from selling products that they claim to want to sell; the Rule merely provides that those who deal in products that the Rule determines to be firearms must comply with the same regulatory framework that all federally licensed firearms dealers must comply with. Plaintiffs fail to show that these ordinary regulatory requirements constitute irreparable harm. The cost of complying with these regulations amounts to the cost of a federal firearms license—$200 for three years—and of conducting background checks and maintaining certain business records.[25] Such costs are consistent with maintaining a company's normal business operations; indeed, there are more than 52,000 federally licensed firearms dealers (excluding dealers in destructive devices), and 450 in North Dakota alone, all of whom are able to carry such costs.[26] "[O]rdinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *accord Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980).

Nor does the Rule impose any meaningful burden on the ability of individuals to obtain firearms or build their own finished guns. There is no dispute that the Rule will not prevent individuals legally permitted to own firearms from obtaining the parts necessary to build a gun, but Plaintiffs assert that it might make it more difficult for individuals to obtain an untraceable gun without a serial number, and without undergoing a background check. Even if that were true, it would not constitute

---

[25] The cost of a three-year license to be a dealer in firearms other than destructive devices is $200, and the cost of renewal is $90 for three years. 18 U.S.C. § 923(a)(3)(B); 27 C.F.R. § 478.42(c)(2). Licensed dealers must conduct background checks before transferring firearms to non-FFLs, 18 U.S.C. § 922(t), and maintain records of firearms acquisition and disposition.

[26] ATF, *Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees (last accessed August 8, 2022).

irreparable harm.  In *Bruen*, the Supreme Court affirmed the constitutionality of regulatory regimes under which individuals must "undergo a background check" as a condition of exercising Second Amendment rights, "to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also id.* at 2162 (Kavanaugh, J., concurring) ("shall-issue licensing regimes are constitutionally permissible").  And the Supreme Court has likewise held that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (plurality opinion); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).  And any burden from the placement of a serial number on a weapon or part of a weapon "is arguably *de minimis*. . . . Because a firearm with a serial number is equally effective as a firearm without one, there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm.  These weapons would then have value primarily for persons seeking to use them for illicit purposes." *United States v. Marzzarella*, 614 F.3d 85, 94-95 (3d Cir. 2010).  That is not to suggest that Plaintiffs wish to own untraceable, unmarked firearms for illicit purposes.  But the incidental burdens of a background check or having a serial number on a firearm are neither a cognizable constitutional injury nor the type of "great" harm that constitutes irreparable harm.  *S.J.W. ex rel. Wilson*, 696 F.3d at 778.

Plaintiffs also fail to show irreparable harm by contending that a "vague" threat exists that ATF will criminally enforce the Rule against them.  Mot. at 25.  Plaintiffs do not contend that ATF has threatened prosecution against any Plaintiff, or even that Plaintiffs intend to engage in behavior that the ATF deems to be criminal.  Therefore, any threat is neither "*likely*," *Tumey*, 27 F.4th at 665, nor "imminen[t]," *S.J.W. ex rel. Wilson*, 696 F.3d at 778, as required for irreparable harm.  "Speculative harm does not support a preliminary injunction." *Id.* at 779.

Plaintiffs' citation of a cease-and-desist letter that ATF issued to another entity and subsequently rescinded does not render the threat any less speculative.  *See* Mot. at 25.  As an initial

matter, a court recently held that the very cease-and-desist letter on which Plaintiffs rely "does not determine rights or obligations and otherwise has no direct legal consequences, either civil or criminal." *Not an LLC v. ATF*, No. 2:22-cv-747, 2022 WL 2073340, at *7 (W.D. Pa. June 9, 2022). Therefore, even if any Plaintiff received a similar letter, it would suffer no cognizable harm.

In any event, however, the letter does not indicate that "ATF already has attempted to enforce the [Rule]," Mot. at 25, as Plaintiffs contend.  The letter addresses the sale of "complete" firearm kits, or "kits which include all components necessary to produce a functional firearm." *Not an LLC*, 2022 WL 2073340, at *2.  The letter is clear that it reflects ATF's longstanding position that complete firearm kits—by contrast to certain incomplete frames and receivers—"have always been firearms pursuant to statute[,] . . . notwithstanding the recently announced regulations and definitions" pursuant to the Rule.  *Id.*  Whereas the Rule amends ATF's prior classification of some incomplete receivers, complete weapon parts kits have long been understood to be "firearm[s]," because such kits "may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,692; 86 Fed. Reg. at 27,726 & nn.39-40 (citing case law).

Finally, the States' joinder fails to establish that the States will suffer any irreparable harm.  The States claim that the Rule "will diminish their tax revenues," Doc. 36 at 2, but that assertion is unsubstantiated and speculative.  It hinges on the notion that people who would have purchased unregulated weapon parts will decide not to purchase regulated weapon parts.  Even if that were true, it is not clear that state tax revenues would be reduced.  It is at least as likely that reducing the proliferation of untraceable weapons would lead to a decrease in violent crime, which would therefore increase commerce that generates tax revenues for the states.  Moreover, any speculative loss of tax revenues is not irreparable.  If residents delay purchasing products because the Rule is in effect, it follows that if the Rule is later set aside, those residents will likely purchase those products at that time, and the States will then receive those tax revenues.  Although the States claim that the Rule

injures "sovereign and quasi-sovereign interests" by "infringing on the States' more permissive laws," *id.* at 2-3, the States identify no such state law. At most, the States contend that the Rule will injure their citizens. *See* Am. Compl. ¶ 11.5. But a state lawsuit to vindicate citizens' rights is a *parens patriae* lawsuit, and "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982); *accord Oklahoma v. Biden*, __ F. Supp. 3d __, 2021 WL 6126230, at *3 (W.D. Okla. Dec. 28, 2021).

## III. The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate.

Although the balance of the equities and the public interest typically are considered as separate factors, "[t]hese factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, these combined factors strongly counsel against issuing the requested preliminary injunction. ATF has exercised its authority to issue regulations to effectuate laws enacted by Congress to reduce violent crime. Under such circumstances, if the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Moreover, granting Plaintiffs' requested preliminary injunction would significantly harm the government's interests in law enforcement and public safety. When it takes effect, the Rule will "increase public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime." 87 Fed. Reg. at 24,654. The government has a "compelling interest[]" in protecting "public safety." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989). The public consequences of permitting unlicensed merchants to sell firearms without serial numbers, without keeping purchase records, and without confirming purchasers' eligibility to possess firearms weighs heavily against granting an injunction.

On the other side of the balance, the harms claimed by Plaintiffs are speculative or modest. *See supra* II.B. Even if Plaintiffs alleged that the Rule would impose substantial costs on them, which

they do not, that would not outweigh the government's compelling interest in preventing violent crime.  *See, e.g.*, *Slocum v. City of Cleveland Heights*, No. 1:14CV532, 2014 WL 1237534, at *5 (N.D. Ohio Mar. 25, 2014) (holding that "the interest in protecting the public from . . . gun violence" outweighed allegedly "substantial damage to [the plaintiffs'] financial condition and loss of goodwill").

In sum, the balance of the equities and the public interest both weigh in favor of denying Plaintiffs' motion.  Accordingly, Plaintiffs are not entitled to a preliminary injunction, and the Court need not reach the merits of their claims.  *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009); *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016).

## IV.    Any Relief Ordered Should Be Appropriately Limited.

In the event the Court were to disagree with Defendants, any relief ordered should be no broader than necessary to remedy any demonstrated harms of any specific plaintiffs in this case.  *See St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) ("[A] preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law.").  Furthermore, the Rule contains an express severability clause.  *See* 87 Fed. Reg. at 24,730.  Because "the APA defines an 'agency action' as including "the whole *or a part of an agency rule*,'" it "permits a court to sever a rule by setting aside only the offending parts of the rule." *United Food & Com. Workers Union v. USDA*, 532 F. Supp. 3d 741, 777 (D. Minn. 2021).  Here, the Rule's severability clause makes clear ATF's intentions with respect to severability. *See Alaska Airlines v. Brock*, 480 U.S. 678, 686 (1987).  Thus, any "objectionable provision[s]" should be "excised" from the rest of the Rule.  *Id.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary and/or permanent injunction.

Dated:  August 15, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
MARTIN M. TOMLINSON
TAISA M. GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email:  Daniel.Riess@usdoj.gov
*Attorneys for Defendants*