EXHIBIT 1

**Proposed Brief**

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA (EASTERN)

------------------------------------------------------- X

MOREHOUSE ENTERPRISES, LLC  :
d/b/a BRIDGE CITY ORDNANCE, *et al.*,  :
                                    :
             Plaintiffs,  :
                                    :
          v.  :
                                    :
BUREAU OF ALCOHOL, TOBACCO,  :
FIREARMS AND EXPLOSIVES, *et al.*,  :
                                    :
             Defendants.  :

------------------------------------------------------- X

No. 3:22-CV-00116-PDW-ARS

Hon. Peter D. Welte

Hon. Alice R. Senechal

**BRIEF OF *AMICI CURIAE* GUN VIOLENCE PREVENTION GROUPS
IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

DANIEL GROOMS
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 776-2042
dgrooms@cooley.com

ADAM M. KATZ
RACHEL H. ALPERT
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
ralpert@cooley.com

August 17, 2022

*Counsel for Amici Curiae Gun Violence Prevention Groups*

# TABLE OF CONTENTS

Disclosure Statement ................................................................................ 1

Statement of Interest............................................................................... 1

Introduction ............................................................................................ 2

Argument ................................................................................................. 5

    I.     The Rule Faithfully Implements the Gun Control Act and
          Prevents its Subversion .......................................................... 5

    II.    The Rule Appropriately Considers the Practical Reality that
          Ghost Guns Can be Quickly and Easily Assembled by
          Nonexperts............................................................................ 14

    III.   The Rule Comports with ATF's Longstanding View that
          Unfinished Frames and Receivers Can Be Firearms ......................... 17

Conclusion.............................................................................................. 20

Certificate of Service.............................................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States,*
    573 U.S. 169 (2014) ................................................................. 2, 9, 12

*Barrett v. United States,*
    423 U.S. 212 (1976) ................................................................. 9

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................. 9

*District of Columbia v. Polymer80, Inc.,*
    No. 2020-CA-002878-B (D.C. Sup. Ct. Aug. 10, 2022) ......................................... 15

*Huddleston v. United States,*
    415 U.S. 814 (1974) ................................................................. 7, 8

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella,*
    350 F.3d 73 (2d Cir. 2003) ................................................................. 6

*Nat'l Shooting Sports Found., Inc. v. Jones,*
    716 F.3d 200 (D.C. Cir. 2013) ................................................................. 13

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
    2022 WL 2251305 (U.S. June 23, 2022) ................................................................. 9

*Shawano Gun & Loan, LLC v. Hughes,*
    650 F.3d 1070 (7th Cir. 2011) ................................................................. 12

*United States v. Cooper,*
    714 F.3d 873 (5th Cir. 2013) ................................................................. 15

*United States v. Fuller-Ragland,*
    931 F.3d 456 (6th Cir. 2019) ................................................................. 13

*United States v. Hardin,*
    889 F.3d 945 (8th Cir. 2018) ................................................................. 14

*United States v. Harris,*
    720 F.3d 499 (4th Cir. 2013) ................................................................. 12

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ................................................................. 12, 14

*United States v. Mobley,*
    956 F.2d 450 (3d Cir. 1992) ................................................................. 13

*United States v. Mullins,*
    446 F.3d 750 (8th Cir. 2006) ............................................................... 15

*United States v. Rivera,*
    415 F.3d 284 (2d Cir. 2005) ................................................................ 14

*United States v. Smith,*
    477 F.2d 399 (8th Cir. 1973) ............................................................... 15

*United States v. St. Hilaire,*
    960 F.3d 61 (2d Cir. 2020) .................................................................. 13

## Statutes and Regulations

18 U.S.C.
    § 921 ................................................................................................*passim*
    § 922 ................................................................................................*passim*
    § 923 ................................................................................................*passim*
    § 924 ............................................................................................... 8, 10

27 C.F.R.
    § 478.73 ................................................................................................. 8
    § 478.92 ............................................................................................... 13
    § 478.99 ................................................................................................. 8
    § 478.101 ............................................................................................... 8
    § 478.102 ............................................................................................... 9
    § 478.121 ............................................................................................... 8

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ...........................*passim*

U.S.S.G. § 2K2.1(b)(4)(B) ....................................................................... 13

## Other Authorities

Administrative Record, *City of Syracuse, et al. v. Bur. of Alcohol,*
    *Tobacco, Firearms & Explosives,*
    1:20-CV-6885, ECF 60 (S.D.N.Y. Dec. 8, 2020) ............................................. 18, 19

*About,* R&B Tactical Tooling (last visited Nov. 19, 2021),
    https://bit.ly/3oNKmZU ........................................................................... 11

Aff. of T. Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80*, 3:20-mj-123 (D.Nev. Dec. 9, 2020) (https://on.wsj.com/3pivOCi) .................................................................. 20

The History of Legally Buying Firearms Without a FFL, 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU ........................................... 11

Complaint, *People v. Blackhawk Mfg. Grp., et al.*, CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) .................................... 17

Decl. of Justin McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 1:20-CV-6885, ECF No. 64-34 (S.D.N.Y. Dec. 9, 2020) ......................... 17

*Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022) ......................................................*passim*

*Definition of "Frame or Receiver" and Identification of Firearms: Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Apr. 2022), https://bit.ly/3PSJxLg, ......................................... 19

*Ghost Gunner*, Ghost Guns (last visited Dec. 14, 2021), https://bit.ly/3pUjDvj ............................................................................. 11

*Ghost Guns Recoveries and Shootings*, Everytown Research (Apr. 8, 2022), https://bit.ly/3bSCcwt ................................................................ 3

Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. Times (Nov. 14, 2021) ................................ 16

*GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Nov. 19, 2021), https://bit.ly/3x6n0T7 ............................................................................. 16

Gun Violence Archive (July 18, 2022), https://bit.ly/3vXsrVa ....................... 3

H. Rep. No. 116-88 (2019) ............................................................................. 14

H. Rep. No. 90-1577 (1968) ............................................................................. 7

*How-To Manuals,* Polymer80 (last visited Dec. 17, 2021), https://bit.ly/3qUwobt ............................................................................. 16

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9 ......................................... 16

*JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply  (last visited Feb. 12, 2022), https://bit.ly/3rKrgqj ......................................... 11

iv

Kathy Reakes, *4 Charged, 31 Ghost Guns Seized in Multi-Agency Yonkers Bust*, Yonkers Daily Voice (Aug. 9, 2022), https://bit.ly/3C757bc ................................................................................. 3

*Lower Receiver*, SS-Arms (last visited Dec. 14, 2021), https://bit.ly/3GAVvVo ......................................................................... 11

Prelim. Inj. Mem., *City of New York v. Arm or Ally LLC, et al.*, 22-CV-5525, ECF No. 9 (S.D.N.Y. June 29, 2022) ............................... 17

S. Rep. No. 89-1866 (1966) ........................................................................ 10

S. Rep. No. 90-1501 (1968) ................................................................. 7, 10

*Trafficking & Straw Purchasing*, Giffords Law Center (last visited Dec. 14, 2021), https://bit.ly/3FBTtnv.......................................................... 12

*Untraceable: The Rising Specter of Ghost Guns*, Everytown Research (May 14, 2020), https://bit.ly/3DTrIWj ................................................... 15

*Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept. of the Treasury (June 2000) https://bit.ly/3JXi6OP ................................................................................ 11

*Webster's Third New International Dictionary* 1889 (1965) ..................... 18

## DISCLOSURE STATEMENT

*Amici curiae* submit that Brady United Against Gun Violence ("Brady"), Everytown for Gun Safety Action Fund ("Everytown"), and March For Our Lives ("MFOL") (the "Gun Violence Prevention Groups") are nonprofit corporations with no parent corporations. No publicly held company owns 10% or more of the stock of Brady, Everytown, or MFOL.

## STATEMENT OF INTEREST

The Gun Violence Prevention Groups submit this *amicus* brief in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction.

Brady is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and advocacy. Brady has researched the prevalence of ghost guns, created resources to demonstrate the ease with which ghost guns can be obtained and assembled, and advocated on behalf of commonsense measures to stop the spread of ghost guns.

Everytown is the nation's largest gun-violence-prevention organization. Everytown has advocated on behalf of measures to limit the proliferation of unserialized firearms and extensively studied the detrimental effects of these firearms on safety and federal and state laws.

MFOL is a nationwide organization of young people who support sensible gun-violence-prevention policies. MFOL has fought to curtail the rapid rise of ghost guns and has focused on the deadly effects of ghost guns on teenagers.

## INTRODUCTION

To advance public safety, the Gun Control Act of 1968 ("Act"), Pub. L. No. 90-618, 82 Stat. 1213, as amended, subjects "firearms" to key requirements: background checks to prevent sales to persons who have committed felonies, who are fugitives, and who are minors, among others; licensing for manufacturers, importers, and dealers to ensure that firearms are built and sold responsibly; and serialization to allow law enforcement to trace guns to their first retail sale. 18 U.S.C. §§ 921–931. Congress intended these requirements to "prevent guns from falling into the wrong hands" and to "assist law enforcement . . . in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 172, 180 (2014).

The recent and rapid proliferation of "ghost guns" has undermined the Act and Congress's law-and-order objectives. A ghost gun is a fully functional, unserialized, and untraceable weapon that can be assembled in an hour or less from components freely available online or at gun shows (including as part of ghost gun "kits") with no background check and no questions asked. Ghost guns thwart the Act by allowing criminals and other prohibited individuals to acquire, use, and traffic weapons, all while remaining undetectable to law enforcement.

In recent years, recoveries of ghost guns in connection with crimes have increased at an alarming rate. Law enforcement reported 19,344 recoveries of ghost guns in 2021, compared to 1,758 recoveries in 2016; 692 ghost guns were recovered

in connection with a homicide or attempted homicide.[1]  The threat posed by ghost guns shows no signs of abating on its own.  Last month, a 17-year-old shot herself in the face with a ghost gun guilt by her cousin—despite that the family was not allowed to have guns due to the victim's mother's felony conviction.[2]  The month before, four individuals were charged with trafficking 31 ghost guns across state lines.[3]

ATF acted prudently and well within its authority in promulgating *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022) (the "Rule"), which confirms that the core building blocks of ghost guns— unserialized, unfinished frames (the core component of pistols) and unfinished receivers (the core component of long guns) and the kits enabling quick and easy conversion of these frames and receivers into operable ghost guns—are "firearms" under the plain language of the Act.  The Act defines "firearm" to include not only fully complete firearms, but also "frame[s]" or "receiver[s]" that are "designed to" be or that "may readily be converted" into operable weapons.  18 U.S.C. § 921(a)(3).  That unambiguously encompasses ghost gun kits and the unfinished frames and receivers they contain, which are designed to be and readily can be converted into operable and

---

[1] *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24656 (Apr. 26, 2022).

[2] Gun Violence Archive (July 18, 2022), https://bit.ly/3vXsrVa.

[3] Kathy Reakes, *4 Charged, 31 Ghost Guns Seized in Multi-Agency Yonkers Bust*, Yonkers Daily Voice (Aug. 9, 2022), https://bit.ly/3C757bc; *see also*, *e.g.*, *Ghost Guns Recoveries and Shootings*, Everytown Research (Apr. 8, 2022), https://bit.ly/3bSCcwt.

unserialized weapons in an hour or less. Indeed, that is their *only* purpose. The Rule is sound and *amici* underscore three of the many reasons why it should be upheld.

***First***, the Rule faithfully implements the Act's language and prevents the subversion of its law-and-order purpose. The Act provides that "firearms" may be sold commercially only *by* licensed dealers and *to* law-abiding and responsible persons who pass a background check. Ghost gun kits and unfinished frames and receivers are "designed to" be and "may readily be converted" into operable firearms, and thus are, by definition, firearms. 18 U.S.C. § 921(a)(3). Were they not regulated as such, they could continue to be sold *by* anyone and *to* anyone—the opposite of what Congress intended. The Act also requires commercial firearms to possess a serial number and criminalizes obliterating that number—all in order to help law enforcement fight crime. Ghost gun kits and unfinished frames and receivers lack serial numbers and, as such, are largely invisible to law enforcement.[4]

***Second***, beyond remaining faithful to the Act's language, the Rule recognizes practical reality in accounting for the ease and speed with which ghost gun kits and unfinished frames and receivers can be completed into deadly firearms. As ghost gun companies' advertising and marketing materials make clear, ghost gun kits and unfinished frames and receivers are designed with the sole purpose of being converted into fully functioning firearms. True to that purpose, such kits and unfinished frames

---

[4] References to background checks and serialization are limited to firearms that are distributed commercially, as the Rule does not require background checks on private firearm sales or restrict persons not otherwise prohibited from possessing firearms from making unserialized firearms for personal use. 87 Fed. Reg. 24652, 24676.

and receivers in fact *do* allow sophisticated and novice purchasers alike to convert these items into operable firearms swiftly and easily.

*Third*, the Rule continues ATF's longstanding view that unfinished frames and receivers can be "firearms." Shortly after the Act's passage, ATF recognized that unfinished frames or receivers that could readily be converted into operable firearms were indeed "firearms," judging by the ease and speed with which they could be rendered functional. That the ghost gun industry has flouted ATF's oversight by *hiding* the ease and speed with which ghost guns can be assembled confirms that the industry knows what the Act has said all along: unfinished frames and receivers "designed" to be or that may "readily be" converted into firearms are "firearms." Plaintiffs' contention that the Rule is "entirely novel" and a "massive shift in policy," ECF No. 14-1 at 2, 18, is thus ahistorical and belied by the industry's own behavior.

## ARGUMENT

### I. THE RULE FAITHFULLY IMPLEMENTS THE GUN CONTROL ACT AND PREVENTS ITS SUBVERSION

#### A. The Rule Implements the Act's Clear Definition of "Firearm."

The Gun Control Act defines "firearm" as follows:

(A) any weapon (including a starter gun) which will or *is designed to or may readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device.

18 U.S.C. § 921(a)(3) (emphases added).

Taken together, (A) and (B) classify as "firearms" unfinished frames and receivers and ghost gun kits that are "designed to" be or may "readily be converted" into operable firearms. That is because "firearm" is defined as the "frame or receiver

5

of any *such weapon*," with "*such weapon*" in (B) referring back to "weapon" in (A), which in turn encompasses "any weapon" that is "designed to or may readily be converted to expel a projectile by the action of an explosive." In other words, when (B) refers to "the frame or receiver of any such *weapon*," it incorporates the description of "*weapon*" in (A), which covers items presently configured to fire *and* items that are "designed to [be] or may readily be converted" into operable firearms. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 81 (2d Cir. 2003) ("any such action" "refers back to" the phrase providing a right to "*institute* an *action*") (citation omitted). Because (A) includes not-yet-operable and not-yet-finished weapons, it follows that the "frame or receiver of any *such weapon*" in (B) includes unfinished frames or receivers as well (so long as they are "designed to" be or may "readily be converted" into the frame or receiver of an operable firearm).[5] Tellingly, Plaintiffs do not try to reconcile the phrase "such weapon" with their reading. ECF 14-1 at 9.

Under a straightforward application of that definition, unfinished frames and receivers, and the ghost gun kits used to assemble such frames and receivers into operable weapons, are "firearms" whenever they are "designed to" be or may "readily be converted" into operable firearms. The sole purpose for which these frames,

---

[5] Plaintiffs implicitly concede that at least some unfinished frames and receivers can qualify as firearms. That is because Plaintiffs endorse the so-called "80% rule," ECF 14-1 at 2, 9, 10, 17, 18, 19, 20, which posits that a frame or receiver that is "80%" complete has not yet reached a stage of manufacture to be a "firearm." Even that rule—which is divorced from the text of the Act—assumes that an unfinished frame or receiver can at some point qualify as a firearm (*e.g.*, an "85% complete" frame).

receivers, and kits are made, marketed, and sold, is to be converted into firearms, and the actual conversion can be done without difficulty or expertise.  Failing to regulate these items as "firearms" would ignore the Act's plain language.

### B.   The Rule Advances the Act's Purpose.

The Act's purpose demands the same interpretation.  The Act has two principal ends and two principal means, all which are directly served by the Rule's approach. The ends:  (1) promoting public safety by keeping guns out of the hands of persons who have committed felonies, have been convicted of domestic abuse, and are otherwise dangerous, and (2) assisting law enforcement in fighting crime.  S. Rep. No. 90-1501, at 22 (1968) ("Senate Report") ("The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them . . . and to assist law enforcement . . . in combating . . . crime."); H. Rep. No. 90-1577, at 4412 (1968) (explaining the "need" to combat "the growing use of firearms in violent crime").  Because unregulated ghost gun kits and unfinished frames and receivers allow dangerous and prohibited individuals to obtain deadly and untraceable firearms, failing to regulate these items as "firearms" undermines the Act's ends.  The means:  (1) regulating who may buy or sell firearms; and (2) imposing strict rules on how firearms and firearm transactions are documented and tracked. *Infra*.  Because the Act's tight limits on purchase, sale, and distribution apply to frames and receivers designed to be or readily convertible into operable weapons, the Rule's coverage of ghost gun kits and near-complete frames and receivers is faithful to the means enshrined in the Act's language.  Indeed, as detailed *infra*, failing to

7

regulate these items as what they are—firearms—would undermine both the Act and other safety regulations that cross-reference or otherwise rely upon the Act's definition of "firearm."

***Federal firearms licensees.*** The Act designates federal firearms licensees ("FFLs")—those who manufacture, sell, or import firearms—the "principal agent of [law] enforcement" in "restricting . . . access to firearms." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). If ghost gun kits and unfinished frames and receivers were not treated as firearms (as the Act requires), the effect would be to continue to sideline FFLs with respect to the sale and acquisition of a rapidly growing source of crime firearms across the country.

Under the Act, FFLs—and only FFLs—may "engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A); *see id.* § 923(a). In exchange for this right to engage in the firearms business, FFLs must serve as the Act's frontline mechanism for implementation:

- FFLs may not "sell or deliver" firearms to individuals who, *inter alia*, are underage, reside out-of-state (with limited exceptions), or have a criminal history. 18 U.S.C. §§ 922(b), 922(d); *see* 27 C.F.R. § 478.99.

- FFLs must keep extensive inventory and transaction records and must report suspicious purchasing patterns. 27 C.F.R. §§ 478.101 (record-keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple guns within a short timeframe).

- FFLs must make their records accessible to law enforcement officials, who can and often do access these records to monitor, investigate, and combat firearm-related crimes. *See infra*.

FFLs that fail to meet these or other duties may lose their license, 27 C.F.R. § 478.73, and become susceptible to both civil and criminal liability, 18 U.S.C. §§ 922, 924.

The Act and its implementing regulations thus enshrine FFLs as scrutinizing gatekeepers at the point of sale, subject to harsh penalties for noncompliance.[6]  But FFLs' functions and enforcement mechanisms attach only to "firearms."  If ghost gun kits and unfinished frames and receivers are not treated as "firearms," FFLs would continue to be removed from their post as the "principal agent of [law] enforcement" for this rapidly expanding source of crime guns.  *Huddleston*, 415 U.S. at 824.

***Background checks.***  The Act requires every individual who purchases a firearm from an FFL to submit to a background check.  18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a).  Absent recognizing ghost gun kits and unfinished frames and receivers as firearms—as the Act requires and the Rule confirms—untraceable and functional firearms could be acquired by anyone, regardless of background:  criminals, domestic abusers, minors, and persons with severe mental illness, to name a few.

Allowing unfettered access to dangerous weapons is the opposite of what Congress envisioned.  In tightly regulating who may purchase a firearm under the Act, "Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."  *Barrett v. United States*, 423 U.S. 212, 218 (1976).  That approach is consistent with a "longstanding" historical tradition of "prohibitions on the possession of firearms" that further public order, such

---

[6] In monitoring the point of sale, the Act keeps firearms out of dangerous hands in the first place, rather than forcing law enforcement to restrict possession after the firearms have entered circulation.  The Rule furthers this prophylactic premise: public safety is better served by preventing a violent criminal from purchasing a gun than it is by recovering a gun after a crime has already occurred.

as limiting possession by "felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 2022 WL 2251305, at *5, *13–14 (U.S. June 23, 2022) (the Constitution protects "the right of an ordinary, *law-abiding* citizen . . . .") (emphasis added). The Act continues that tradition by "establish[ing] a detailed scheme to enable the dealer to verify . . . whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the identity of the purchaser that it is a crime for an FFL to sell a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); for a buyer to "make any false or fictitious oral or written statement" concerning their identity, *id*. § 922(a)(6); and for FFLs to make any "false" statement in records relating to a buyer's identity, *id*. §§ 922(m), 924(a)(3). The Rule faithfully implements Congress's calibration of who may possess a firearm and the scheme for preventing circumvention of those rules. Plaintiffs' position would breathe life into the exact dangers the Act was designed to address. Congress saw "the ease with which any person can anonymously acquire firearms" as "a matter of serious national concern," and responded accordingly. Senate Report at 22. For instance, to curtail anonymous purchases, Congress barred "the commercial mail-order traffic in firearms to unlicensed persons." *Id*. at 23. In fact, Congress *rejected* earlier proposed legislation because such legislation failed to "prohibit the mail-order sale" of firearms known for "their susceptibility to crimes." S. Rep. No. 89-1866, at 34, 100 (1966).

Absent regulation as firearms, ghost gun kits and unfinished frames and receivers are the modern incarnation of mail-order guns: they allow anonymous

buyers (including criminals) to purchase a gun remotely and have that gun shipped across state lines to facilitate crime.  In recent years, this has occurred regularly, nationwide.  And ghost gun kit manufacturers, for their part, advertise anonymity and the avoidance of background checks as reasons to purchase their wares.[7]

**Straw purchases.**  Failing to classify ghost gun kits and unfinished frames and receivers as firearms would dilute the Act's ban on "straw purchases," *i.e.*, gun purchases made by someone who can pass a background check on behalf of someone else—often a prohibited buyer.  Purchasers of ghost gun kits or unfinished frames and receivers would not even need to cloak their identities with straw purchases if these items were not recognized as firearms.

The Act aims to prevent the diversion of firearms to the black market through several means, including by prohibiting "straw purchases."  Straw purchases have long fueled illegal gun trafficking.  *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept. of the Treasury at 10 ("Nearly 50 percent of the ATF investigations involved firearms being trafficked by straw purchasers.") (June 2000), https://bit.ly/3JXi6OP; *Trafficking & Straw Purchasing*, Giffords Law

---

[7] *See*, *e.g.*, *Are Felons Restricted from Owning a Firearm that Was Built from an 80% Receiver?*, Polymer80 Blog (Oct. 21, 2020), *formerly at* https://bit.ly/3DDzXGo ("Convicted felons are not restricted from purchasing and owning 80% frames . . . ."); *The History of Legally Buying Firearms Without an FFL,* 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU (no background check or serial number required); *JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply (last visited Feb. 12, 2022), https://bit.ly/3rKrgqj (same); *Ghost Gunner*, Ghost Guns (last visited Dec. 14, 2021), https://bit.ly/3pUjDvj (same); *Lower Receiver,* SS-Arms (last visited Dec. 14, 2021), https://bit.ly/3GAVvVo (same); *About,* R&B Tactical Tooling (last visited Nov. 19, 2021), https://bit.ly/3oNKmZU (same).

Center (last visited Dec. 14, 2021) https://bit.ly/3FBTtnv (noting "30,000 attempted straw purchases each year").

Through several interlocking requirements, the Act forbids straw purchases. Gun buyers must fill out "Form 4473," attesting to their identity as the "actual transferee/buyer," ATF Form 4473 (5300.9), https://bit.ly/3CAv5Rl, and it is a crime to misrepresent—on Form 4473 or elsewhere—"any fact material to the lawfulness of the sale," 18 U.S.C. § 922(a)(6); *see Abramski*, 573 U.S. at 171. Further, any FFL that does not take steps to stop straw purchases at the point of sale can lose its license and face both civil and criminal liability. *See, e.g., Shawano Gun & Loan, LLC v. Hughes,* 650 F.3d 1070, 1077–79 (7th Cir. 2011).

As the Supreme Court has recognized, protections against straw purchases are essential because, "[p]utting true numbskulls to one side, anyone purchasing a gun for criminal purposes would avoid leaving a paper trail by the simple expedient of hiring a straw." *Abramski*, 573 U.S. at 183. Yet if ghost gun kits and unfinished frames and receivers were wrongly deemed not to be firearms, then none of the tools that ATF employs to combat straw purchases would be available to this segment of the market, leaving criminal buyers with few roadblocks to obtaining firearms.

***Serialization, record-keeping, and public safety.*** Ghost guns contravene the Act's serialization and record-keeping provisions, making it more difficult for law enforcement to fight crime. *See, e.g., United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) ("[W]e think it plain that [serialization] serves a law enforcement interest."); *United States v. Harris*, 720 F.3d 499, 502 (4th Cir. 2013) (same). By their

very nature, ghost guns—easily assembled from the unfinished frames and receivers that Plaintiffs would carve out of the Act—are fully operational, unmarked, and *untraceable* firearms, which impede law enforcement's ability to prevent and prosecute violent crime by tracing illegal weapons to their source.

The Act mandates that every firearm possess a unique serial number and makes it a crime to tamper with a serial number or even "receive" a firearm with an already-tampered-with serial number. 27 C.F.R. § 478.92; 18 U.S.C. §§ 923(i), 922(k). Serialization allows ATF "to link a suspect to a firearm." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013). Possessing a firearm with an altered serial number triggers a sentencing enhancement—even if law enforcement can reconstruct the number. U.S.S.G. § 2K2.1(b)(4)(B); *see United States v. St. Hilaire*, 960 F.3d 61, 64 (2d Cir. 2020); *United States v. Fuller-Ragland*, 931 F.3d 456, 467 (6th Cir. 2019).

The Act also assists law enforcement by subjecting FFLs to record-keeping duties to track firearm sales and inventory. 18 U.S.C. § 922(g)(1)(A); 27 C.F.R. §§ 478.121–134. Law enforcement may "examine the inventory and records of [FFLs] . . . without . . . reasonable cause or warrant," "in the course of a reasonable inquiry during the course of a criminal investigation." 18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R. § 478.121(b). "FFL records" allow ATF to "trace a firearm" and identify its "path through the distribution chain." *Nat'l Shooting Sports*, 716 F.3d at 204 (cleaned up).

Without serialization and record-keeping, these law enforcement mechanisms break down. *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (it is "no secret

13

that a chain of custody for a firearm greatly assists in the difficult process of solving crimes," and that, without "serial numbers," reconstructing that chain is "virtually impossible"); *Marzzarella*, 614 F.3d at 98 ("Firearms without serial numbers are of particular value to those engaged in illicit activity.").  Indeed, while Plaintiffs signal indignation at the possibility of any connection between "criminals," "terrorists," and "ghost guns," ECF 14-1 at 2, a House Committee report warned that "[g]host guns" pose a "homeland security challenge" because they "hamstring[] law enforcement's ability to investigate crimes," as such crimes are "committed with untraceable weapons."  H. Rep. No. 116-88, at 2 (2019).  That tracks common sense:  would-be criminals naturally prefer untraceable ghost guns to traceable options.

## II.   THE RULE APPROPRIATELY CONSIDERS THE PRACTICAL REALITY THAT GHOST GUNS CAN BE QUICKLY AND EASILY ASSEMBLED BY NONEXPERTS

The Act defines "firearm" in practical terms, covering not only fully complete weapons, but also frames and receivers that are designed to be or may readily be converted into operable firearms—thus regulating items that almost certainly *will* become operable firearms.  18 U.S.C. § 921(a)(3).  The Rule is faithful to this statutory definition and Congress's pragmatic approach, recognizing that ghost guns can be assembled from ghost gun kits and unfinished frames and receivers easily and without any technical expertise, in an hour or less.

Courts have widely agreed that, under the Act, a "weapon designed to fire a projectile" that is "temporarily incapable of effecting its purpose," is not "removed from" the definition of a "firearm."  *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005); *see, e.g., United States v. Hardin*, 889 F.3d 945, 949 (8th Cir. 2018) (rejecting

argument that the "disrepair" of a gun, which rendered it inoperable, changed that the gun was "manufactured to be . . . a gun") (quotation marks omitted); *United States v. Cooper*, 714 F.3d 873, 881 (5th Cir. 2013) ("[W]e have consistently held that inoperable firearms can support convictions [under section 921(a)(3).]").  Likewise, as the Eighth Circuit has recognized, an object that must be "modified" to function as a firearm, is no less a firearm in the eyes of the Act.  *See United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (gun that could be "modified," "without any specialized knowledge, in less than an hour," is "'readily convertible'"); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (gun that required "8-hour working day in a properly equipped machine shop" was "readily" convertible into a gun).  And last week, the D.C. Superior Court held that unfinished frames, receivers, and kits sold by a ghost gun manufacturer are "firearms" as they are "readily converted into firearms."[8]

Not only is the statutory language dispositive, but a mountain of evidence confirms that ghost gun kits and unfinished frames and receivers ***are*** designed to be and may readily be converted into operable firearms, and thus are "firearms" under the Act.  Manufacturers and distributors have advertised that these kits, frames, and receivers are designed for the sole purpose of being assembled into functional guns.  And—consistent with that purpose—these items can in fact be easily assembled into functional weapons by the most novice gun-builder, even a child.

---

[8] *District of Columbia v. Polymer80, Inc.*, No. 2020-CA-002878-B, at 5 (D.C. Sup. Ct. Aug. 10, 2022) ("On Polymer80's website, they provide instructions to consumers on how to build firearms with these unfinished frames, receivers, and . . . kits."), https://bit.ly/3A1f4EN.

Specifically, through a single website, one can buy a complete, all-in-one kit that "package[s] the unfinished frame or receiver with all the other parts needed to complete the firearm." *Untraceable: The Rising Specter of Ghost Guns,* Everytown Research (May 14, 2020), https://bit.ly/3DTrIWj. Once the kit is delivered, assembly is simple. As the head of ATF's Los Angeles field office observed:

> If you can go to one of these big-box stores and put that type of furniture together, if you're putting together your kids Christmas toys, you can make a homemade gun. It's that easy.

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9. Plaintiffs accuse the Rule of supposing that all-in-one kits are "magically" assembled into ghost guns, ECF 14-1 at 19—but there is nothing magical about a process akin to putting together children's toys.

Ghost gun kits are not only designed to be converted into firearms: they are designed to be converted ***quickly***. Kit manufacturers and distributors tout this speed in marketing materials. *See, e.g.*, *GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Nov. 19, 2021), https://bit.ly/3x6n0T7 ("Our goal was for you to be able to go from opening the mail, to a competition or defense ready pistol in under 15 minutes."). Manufacturers and distributors also publish how-to guides to walk novices through the fast-and-easy assembly. *See*, *e.g.*, *How-To Manuals,* Polymer80 (last visited Dec. 17, 2021), https://bit.ly/3qUwobt.

Amateurs and experts alike have assembled kits in around an hour or less. *See* Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*,

N.Y. Times (Nov. 14, 2021), https://nyti.ms/3EYiedv ("[An] amateur can . . . turn [a kit] into a working firearm in *less than an hour*." (emphasis added)); Compl. at ¶¶ 74, 115, *People v. Blackhawk Mfg. Grp., et al.*,  CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) (officer assembled kit in "*less than 25 minutes*" with tools from a hardware store (emphasis added)); *id.* at ¶ 73 (ATF agent finished kit "in *less than nineteen minutes*" (emphasis added)); Prelim. Inj. Mem., *City of New York v. Arm or Ally LLC, et al.*, 22-CV-5525, ECF No. 9, at 11 (S.D.N.Y. June 29, 2022) (ghost gun assembled "in *approximately an hour and a half*") (emphasis added).  In earlier ghost gun litigation, one individual who had "never attempted to build a firearm using an unfinished frame or receiver," watched "videos on *YouTube* for thirty minutes," then built "a complete pistol from [a] handgun kit in *86 minutes*."  Decl. of J. McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 1:20-CV-6885 ("*City of Syracuse*"), ECF 64-34, at ¶¶ 8, 10, 11 (S.D.N.Y. Dec. 9, 2020) (emphasis added).  The reality correctly recognized by the Rule is that anyone with an internet connection, an hour or less of free time, and basic household tools can convert ghost gun kits and unfinished frames and receivers into operable and untraceable firearms.

## III.   THE RULE COMPORTS WITH ATF'S LONGSTANDING VIEW THAT UNFINISHED FRAMES AND RECEIVERS CAN BE FIREARMS

Plaintiffs mistakenly contend that the Rule upends ATF's historical practice. ECF 14-1 at 1–3, 9, 16–20.  To the contrary, for years after the Act's passage, ATF understood that Congress defined "firearm" to include some unfinished frames and receivers, and that the operative question is how quickly and easily—*i.e.*, how "readily"—a frame or receiver can "be converted" into an operable weapon.  18 U.S.C.

§ 921(a)(3).   That some purveyors of ghost gun kits and parts have tried to affirmatively *hide* from ATF the ease with which their wares can be assembled only reinforces that an unfinished frame or receiver that can quickly and easily be converted into a firearm is indeed a "firearm" under the Act.

The Act was enacted in 1968.  In 1976, ATF's Assistant Chief Counsel issued an opinion with a framework for assessing whether an "unfinished" frame or receiver is a "firearm."  Admin. Record, *City of Syracuse*, ECF 60 (S.D.N.Y. Dec. 8, 2020), at ATF0265.  The opinion explained that if "unfinished frames" or "castings" *"may readily be converted"* into firearms, "they are firearms."  *Id*. at ATF0266 (emphasis added).   The opinion concluded that unfinished frames and receivers must be reviewed "case-by-case" to gauge if they are "readily convertible" into firearms:

> [W]e view the current Bureau procedure in classifying "firearms" on a case-by-case basis as consistent with the letter and spirit of the [] Act. It is obvious that what constitutes "readily convertible" depends upon the nature of each firearm.  That there may be cases where it is difficult to determine the side on which a particular "firearm" falls is not a sufficient reason to establish a rigid criterion for … "readily convertible."

*Id*. at ATF0267.

For decades, ATF followed that in classification letters that turned on whether an unfinished frame or receiver could "readily be converted" into an operable firearm. *Id*. at ATF0001, ATF0014, AATF0020, ATF0023, ATF0050, AATF0051, AATF0053, ATF0065.  Consistent with "readily" meaning "without much difficulty" or "with fairly quick efficiency,"[9] several of these letters referenced the ease and speed with which

---

[9] *Webster's Third New International Dictionary* 1889 (1965) (defining "readily").

18

unfinished frames and receivers could be assembled into operable firearms. *Id.* at ATF0020 (receiver was a "firearm" because it required "75 minutes" of assembly); *id.* at ATF0024 (frame was a "firearm" because it required "20 minutes" of assembly).[10]

Notwithstanding this history, Plaintiffs complain that the Rule's focus on ease and speed of assembly marks a "tectonic" shift. ECF 14-1 at 16. That complaint is belied by the industry's behavior. The ghost gun industry has seemingly tried to hide from ATF the extent to which ghost gun kits and parts can "readily" be converted into firearms—a clear sign that, even before the Rule, the industry knew that the Act reaches these items. In an affidavit to support a warrant to search a facility operated by Polymer80 (the nation's largest public seller of ghost gun kits and parts), an ATF agent stated that, in 2017, Polymer80 sought an ATF determination that an unfinished pistol frame is not a firearm by misleadingly submitting just the unfinished frame without the rest of the kit sold with the frame, which included other parts and tools to complete the frame of a ghost gun. Aff. of T. Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80*, 3:20-

---

[10] This history illustrates one of many ways in which Plaintiffs' invocation of *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), is misplaced. ECF 14-1 at 22 n.12. In *West Virginia*, the Court vacated an EPA rule "claim[ing] to discover" a power in the Clean Air Act for the first and only time in four decades. 142 S. Ct. at 2610 (cleaned up). By contrast, here, the Rule follows a reading of the Act that ATF adopted in 1976. Notably, *West Virginia*'s reliance on the "major questions doctrine" also turned on the EPA rule risking "billions" in costs and "tens of thousands of jobs," under an "obscure . . . section of the law." *Id.* at 2602, 2604-05. Here, the predicted annualized cost of the Rule is "14.3 million"; only "252" jobs could be "affect[ed]," *Definition of "Frame or Receiver" and Identification of Firearms: Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* (Apr. 2022), https://bit.ly/3PSJxLg; and the source of authority is 18 U.S.C. § 921, the definitional lynchpin of federal firearms regulation.

mj-123, ¶¶ 42–43 (D. Nev. Dec, 9, 2020) (https://on.wsj.com/3pivOCi).  ATF responded to Polymer80 in a letter noting that, "the submitted sample is simply a component of a larger product," and directing Polymer80 to "submit the complete . . . [k]it."  *Id.* at ¶¶ 43–44.  As of December 2020, Polymer80 had not "resubmitted the . . . kit."  *Id.* at ¶ 45.  ATF eventually obtained a kit through an informant who bought the "Buy Build Shoot" kit—advertised as having "all the necessary components" for a gun—with no background check, and assembled it into an operable gun in 21 minutes.  *Id.* at ¶ 69.

In short, ATF has long recognized that unfinished frames and receivers that can quickly and easily be assembled into operable firearms are "firearms."  That the ghost gun industry appears to have hidden the nature of its products from ATF only confirms that the industry knows it has been operating on borrowed time.

## **CONCLUSION**

This Court should deny Plaintiffs' motion for a preliminary injunction.

August 17, 2022

Respectfully Submitted,

By:   */s/ Kathleen R. Hartnett*

KATHLEEN R. HARTNETT\*
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

ADAM M. KATZ
RACHEL ALPERT\*
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
ralpert@cooley.com

DANIEL GROOMS\*
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 776-2042
dgrooms@cooley.com

*\*pro hac vice forthcoming*

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of August 2022, a true and accurate copy of the foregoing brief was electronically filed with the Court using the CM/ECF system.   Pursuant to District of North Dakota Administrative Policy Governing Electronic Filing and Service § IX(A)(2), service on counsel for all parties will be accomplished through the Court's electronic filing system.

August 17, 2022                                    Respectfully Submitted,
                                                   By: */s/ Kathleen R. Hartnett*