IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| MOREHOUSE ENTERPRISES, LLC | ) | |
| d/b/a BRIDGE CITY ORDNANCE, et al., | ) | |
| | ) | Case No. <u>3:22-cv-00116-PDW-ARS</u> |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY AND/OR PERMANENT INJUNCTION**

I.   **Defendants' Contrived Justifications and Post Hoc Rationalizations Confirm that Plaintiffs Are Likely to Succeed on the Merits.**

A.   **The Final Rule Is No "Logical Outgrowth" of the NPRM.**

Defendants' *sole argument* as to why the Final Rule ("Rule") is a "logical outgrowth" of the NPRM is it defined a "fire control component" to include virtually every part of a firearm, resulting in many firearms having numerous frames and receivers, whereas the Rule chooses a specific part of each firearm, resulting (usually) in each firearm having a single frame or receiver. Opp. at 9. Defendants thus assert that the Rule simply chose "only a subset of this broad category," and "the 'possibility' that the agency might adopt a more limited approach than the proposed definition was 'reasonably foreseeable'...." *Id.* at 9-10. But the fact that the Rule uses a few similar words[1] as the NPRM does not prove it is the logical outgrowth thereof, or that the approaches to defining a "frame or receiver" are at all similar. Rather, the Rule professes to "provid[e] new distinct definitions...." *Id.* at 24693. Whereas the NPRM focuses on *any* "fire control component" that is "necessary for the firearm to" operate, the Rule focuses on a *single* part of each firearm that either "hold[s] back the hammer, striker, bolt, or similar" (for handguns) or is "designed to block or seal the breech" (for long guns).[2] In other words, whereas the NPRM focuses on *any* part that performs *any* necessary function, the Rule focuses on *one* part that performs *one* specific function.

Under Defendants' theory, *there is no definition* that ATF could have devised that would *not* be considered a "logical outgrowth" of the NPRM. According to Defendants, since the NPRM was so broad that it applied to *nearly every part of a firearm*, so long as the Rule chose from among

---

[1] The NPRM included in its non-exhaustive list of "fire control components" a "bolt" and a "breechblock," which the Rule now chooses, with respect to long guns, as "the primary component designed to block or seal the breech." But the "sear or equivalent" — the part chosen by the Rule for handguns — does not appear in the NPRM's list of "fire control components" and, in fact, the word appears *nowhere* in the NPRM. *Id.* at 27741.

[2] Additionally, whereas the NPRM focused only on parts that are "visible from the exterior," the Rule provides no such limitation. *Cf.* NPRM at 27741; Rule at 24727.

*nearly everything*, it would suffice.  On the contrary, it is not sufficient that the public might have anticipated that ATF could adopt "*a* more limited approach."  Opp. at 10.  Rather, the test is whether "interested parties 'should have anticipated' that *the* change was possible...."  *CSX Transp*. at 1079-80.  Yet there was no way for the public to anticipate that the Rule would pick *these particular parts* performing *these particular functions* as its focus.[3] The APA does not require the public to "divine" the "unspoken thoughts" of the agency about each iteration of possibilities on which the Rule might focus and submit comments for or against each of these countless potential permutations.[4]  Mot. at 7.  As Plaintiffs noted (Mot. at 7), the Rule's new definition was drawn directly from a comment to the NPRM (Rule at 24,693), and there was no way for the public to anticipate that ATF might adopt suggestions from other commenters, and thus to *comment on other comments*.  Defendants claim "'little purpose would be served by a second round of comment,'" and that "Plaintiffs fail to mention any 'informed criticism and comments' that they were allegedly prevented from submitting ... much less any harm traceable to the more limited definition of 'frame or receiver' the agency adopted."  Opp. at 10.  Yet Plaintiffs' Complaint represents the very "criticism and comments" that Defendants cannot seem to locate, challenging the Rule's modified definition of "frame or receiver" on numerous bases.  Amend. Compl. ("Compl.") ¶¶ 97-171.  Moreover, Plaintiffs are required to make no such showing.  Mot. at 7 n.6.  Nevertheless, even the Rule's revised definition of "frame or receiver" will clearly produce absurd results.[5]

---

[3] The Rule might have defined "frame or receiver" to be <u>the part that houses the trigger</u>, since every firearm has a trigger, meaning that the *frame* of a Glock and *lower* receiver of an AR-15 are the frame or receiver.  Or the Rule might have focused on <u>the part to which the barrel is fitted</u> (since every firearm has a barrel).  Yet this change would produce entirely different results, such that the *slide* of a Glock and *upper* receiver of an AR-15 would be the frame or receiver.  By Defendants' logic, each of these diametric approaches are defensible as the "logical outgrowth."

[4] As Defendants concede, these same arguments apply equally to the Rule's entirely new definition of "firearm muffler or silencer frame or receiver."  Opp. at 8 n.5.

[5] For example, as the Rule explains, ATF will look at a certain part of a *handgun* (sear or

The Rule's keystone definition of "frame or receiver" in no way can be considered the logical outgrowth of the NPRM. Therefore, the Rule should be struck on that basis alone.

### B.      Defendants Offer Little to Justify the Final Rule's Statutory Rewrites.

Defendants agree with Plaintiffs that deference to the agency is not appropriate in this case. As such, it is for the Court to determine which side's position "reflects the best statutory interpretation" of the various statutes at issue.[6] *Cf.* ECF 14-1 at 22-24 *with* Opp. at 10-11. That said, Defendants' attempts to defend the agency's blatant statutory amendments fall flat.

First, the parties agree that the Rule now concludes that *most* firearms will have one frame or receiver. Mot. at 9, Opp. at 12. Plaintiffs' problem is that *some* firearms will continue to have multiple serialized parts that are each considered a "frame or receiver." Compl. ¶¶ 122-150. Defendants acknowledge that reality of the Rule, but opine that "multiple modular subparts" can make up a single "part" that is still one "frame or receiver." *See* Opp. at 22. By this logic, ATF could declare numerous parts of a gun to be a firearm, on the theory that they are each "subparts"

---

equivalent), but at different parts of a *long gun* (bolt or breechblock), when determining a firearm's "frame or receiver." The agency apparently has not considered what will happen when a given model of firearm is available in *both* pistol and rifle configurations. If examining a pistol version of an AR-15, the agency would focus on the part that "hold[s] back the hammer," which would mean the sear engagement surface of the AR-15's "trigger." In other words, *the lower receiver* of an AR-15 pistol would be the "frame or receiver." But examining a rifle version of an AR-15, the agency would focus on the part "designed to block or seal the breech," meaning the AR-15's "bolt." In other words, the *upper receiver* of an AR-15 rifle would be "the frame or receiver." This dichotomy would mean that a person could then purchase the *unserialized upper portion of a pistol*, and the *unserialized lower portion of a rifle*, and construct a firearm that is devoid of any serial number at all (*i.e.*, the Rule creates the precise "piecemeal" situation the Rule allegedly seeks to prevent, *see* Opp. at 22).

[6] Ironically, Defendants point the Court to an Eighth Circuit decision for the idea that the agency's position should be given "appropriate 'weight'" based on, among other factors, "its consistency with earlier and later pronouncements." Opp. at 11 (citing *Dominguez-Herrera v. Sessions*, 850 F.3d 411, 415 (8th Cir. 2017)). The fact that the agency has entirely failed even to acknowledge its numerous significant policy shifts, (as explained in Plaintiffs' Complaint) much less to consider or explain away Plaintiffs' dozens of examples of conflicting agency pronouncements, shows a complete lack of "thoroughness evident in its consideration." *Dominguez-Herrera,* at 415.

of some alleged "frame or receiver."  Nor do Defendants support their allegation that a person could make a firearm from two unserialized *left* halves, or explain why the Rule differs from existing ATF guidance which repeatedly chose *only one subpart* of a multi-piece receiver to be the receiver. Opp. at 12; Mot. at 9, 16-17; Compl. ¶¶ 142, 145-46.

Second, Defendants demur that a "weapon parts kit" is a "firearm"[7] because it is a "disassembled weapon."  Opp. at 12.  Yet Plaintiffs explained that the cases cited in the Rule for this proposition involved actual firearms that invariably *contain a complete, finished frame or receiver*, whereas a "weapon parts kit," by definition, does not.  Mot. at 10 n.7; Compl. ¶¶ 272-276.  Defendants concede this, now relying on only two cases (*Wick* and *Stewart*) to support their idea (rather than the 20 cited by the Rule).  But even these two cases do not support the Rule, or show the "courts' longstanding interpretation *of the GCA*" (Opp. at 13), because they both involve

---

[7] Defendants dispute that they have amended the statutory definition of firearm. Opp. at 12. Their *amici*, however, freely admit that "[t]he Rule … adds … language to the definition of 'firearm'…." Brief of Gun Owners for Safety, ECF 52 at 8.  Of course, § 921(a)(3) is a statutory definition, not a regulatory one, and it is axiomatic that only Congress may "add" to statutes.  The same amicus spends little time addressing the issues at hand, but rather goes on repeated tangents about what the Rule does *not* do and how the interests of the organization's members are *not* affected in any way.  *See id*. at 10-20. The States' amicus brief is equally unhelpful, asking the Court to focus on the purported "purpose[]" and "substance" of the GCA, rather than its text.  Brief of District of Columbia, *et. al*. in support of Defendants, ECF 65 at 5-9. These States claim a "dominant interest" in "preventing violence," but admit that most of them *already* have state-level statutes restricting the purchase, possession, or construction of homemade firearms.  *Id*. at 1, 9-11.  According to these States, their laws apparently are entirely ineffective (because criminals always, by definition, break the law), yet theorize that ATF's Rule will have some desired effect.  *Id*. at 12-17.  With respect to the remaining states that *do not regulate* homemade firearms, their anti-gun attorneys general urge this Court to permit federal regulation to accomplish what their citizens and state legislatures are unwilling to do; an attorney general's amicus brief in federal court is no substitute for the will of the people expressed through the legislature.  Finally, suggesting a focus on the "purpose" and inten[t]" and "practical reality" and "pragmatic approach" of the GCA rather than its text, amici seek this Court's blessing for *restrictions even greater than those the Rule seeks*, claiming without precedent that *all* 80% frames and receivers – even without tools, jigs, instructions, or parts – are firearms under the GCA. Brief of Gun Violence Prevention Groups, ECF 66 at 3-4, 6 at n.5 (calling ATF's prior classifications of many 80% receivers as non-firearms to be "divorced from the text of the Act"), 7-17.

machineguns *under the NFA*.  Compl. ¶¶ 273, 276. Whereas the definition of "machinegun" under 26 U.S.C. § 5845(b) includes "any combination of parts from which a machinegun can be assembled," the definition of "firearm" in 18 U.S.C. § 921(a)(3) includes no such language, and the Court should reject attempts to use a standard *from the NFA* to ban "weapon parts kits ... *for purposes of the GCA*."  Opp. at 12; Compl. ¶ 227.  Defendants' claim that "courts have long recognized that ... a weapon parts kit ... constitutes a 'firearm' for the purposes of the GCA" is belied by their repeated inability to reference a single case where any court has reached that conclusion *absent* a complete and finished "frame or receiver."

Finally, Defendants claim that Plaintiffs' argument would require "this Court [to] add a new term — 'complete' or 'fully functional' — to modify the word 'weapon.'" Opp. at 13. On the contrary, the only principle the cases cited by the government *do* demonstrate is that a "weapon" need not be completely assembled or fully functional in order to be a "firearm" under § 921(a)(3)(A).  But while a "weapon" *need not* contain every small part to be a "firearm," it *must always* have a "frame or receiver."  Under the unambiguous text of the statute, *every* firearm *must* have a "frame or receiver," and a weapon parts kit (which contains no such part) cannot be regulated as such — even to advance the ATF's perceived "Congressional intent."  Opp. at 13.

Third, Defendants concede that the term "readily" does not appear in 18 U.S.C. § 921(a)(3)(B), yet defend their importation of that term from § 921(a)(3)(A) on the basis that "'readily' is a widely used word and concept in federal firearms law and regulations," and thus "there is nothing improper about ATF using that concept" to fulfill perceived "Congressional intent" in order to "actually accomplish[] what Congress [allegedly] intended it to do."  Opp. at 13, 14; *see* Mot. at 9.  But "vague notion[s] of the statute's 'basic purpose' are ... inadequate to overcome the words of its text regarding the specific issue under consideration."  *Montanile v. Bd.*

*of Tr. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 150 (2016) (cleaned up).  The fact that ATF believes it "has taken a reasonable approach that incorporates well-known and oft-interpreted concepts" does not justify the Rule's statutory rewrite.  Defendants claim that "[n]othing in the Final Rule says that a frame or receiver is a weapon — it is the frame or receiver *of* a weapon...."  Opp. at 14.  But the term "readily" appears in § 921(a)(3)(A)'s definition of "weapon," and *does not appear* in § 921(a)(3)(B)'s discussion of the frame or receiver of a weapon.  Defendants claim that "ATF's use of the term 'readily' incorporates a term that Congress used repeatedly in federal firearm laws...."  Opp. at 14.  But the fact that Congress used the term "readily" *elsewhere*, but did *not* use it in § 921(a)(3)(B), indicates that the concept it has no place in the "frame or receiver" analysis.  Defendants claim that "the mere fact that Congress included the phrase … in one sub-provision … does not mean that it excluded the possibility that ATF could use the words 'readily' and 'converted' in interpreting another sub-provision…."  Opp. at 30.  This stands basic principles of statutory interpretation on their head because, "when 'Congress includes particular language in one section of a statute but omits it in another' — *let alone in the very next provision* — this Court 'presume[s]' that Congress intended a difference in meaning."  *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (emphasis added).[8]

   Defendants alleged that to reject the Rule's statutory rewrite "would thwart Congress's

---

[8] Defendants respond to this principle by relying on *Clinchfield Coal Co. v. Federal Mine Safety & Health Com.*, 895 F.2d 773 (D.C. Cir. 1990), which provides, as alternate possibilities, "either [Congressional] neglect or [] implied delegation," which "grow more likely as the contrasted contexts grow more remote from each other." *Id.* at 779. But this is not a case where Congress amended one provision years later but neglected to consider another; rather, the GCA's definition of firearm was promulgated as a single statutory enactment in 1968. *See* Compl. ¶¶ 26-28. Nor is this a case of "implied delegation," as the GCA involves provisions with significant criminal implications.  Plus, if it is true that these alternative possibilities "grow more likely as the contrasted contexts grow more remote from each other," then the inverse also must be true; and since there is *absolutely no* "remote[ness]" between subsection (A)'s definition of "weapon" and subsection (B)'s term "frame or receiver," *Clinchfield Coal Co.* provides no help for Defendants.

purpose in enacting the GCA...."  Opp. at 14.  Of course, federal courts "interpret and apply statutes, not congressional purposes," and cannot "interpret a statute contrary to the plain meaning of its words [even] if doing so would, in the court's view, better further the purpose it thinks Congress had in mind.... 'law depends on respect for language.'"  *Gordon v. Novastar Mortg., Inc. (In re Hedrick)*, 524 F.3d 1175, 1187-1188 (11th Cir. 2008).

Fourth, Defendants create a straw man, claiming the Rule merely incorporates existing "conspiracy" and "aiding and abetting" violations already found in federal law.  Opp. at 14.  Of course, that was not at all Plaintiffs' point.  Rather, Plaintiffs explained that the *alleged underlying offense* — manufacture of a homemade firearm, or sale of the unregulated parts with which to do so — is not actually a crime.  Mot. at 10.  As there is no actual federal crime to "conspire" to commit, or to "aid and abet" another in committing, the Rule cannot fill the gap with vague threats of criminal sanction. Defendants attempt to defuse the Rule's threats of "structuring" charges, claiming that *all ATF really meant by that* was "'structuring transactions' to avoid tax obligations." Opp. at 15 n.10.  But that is not *all* that the Rule says about structuring.  Rather, ATF threatens that "[i]t is not the purpose of the rule to provide guidance so that persons may structure transactions to avoid the requirements of the law," including that sellers "must be *licensed*, mark the frames or receivers within such kits with *serial numbers* ... conduct *background checks*, and maintain *transaction records* for them...."  *Id.* at 24713.[9]  Defendants may now regret the Rule's attempt to legislate "structuring" charges into the GCA, but an agency cannot amend a rulemaking during litigation to make it more palatable to the courts.  *See Guedes v. BATFE*, 920 F.3d 1, 20

---

[9] Similarly, after discussing the "tax obligations" of firearm manufacturers, the Rule drops a footnote to *United States v. Evans*, 928 F.2d 858, 859-62 (9th Cir. 1991), a case that dealt not with "structuring" to avoid taxes, but instead with "conspiracy to cause, and aiding and abetting" the acquisition of illegal machineguns (which cannot be registered and on which federal taxes cannot be paid, *see Haynes v. United States*, 390 U.S. 85 (1968)).  *Id.* at 24713 n.138.

(D.C. Cir. 2019) ("The character of a rule depends on the agency's intent when issuing it, not on counsel's description of the rule during subsequent litigation.").

Fifth, Defendants concede that "'privately made firearm' is not a term used in the statute or under existing regulations," yet nevertheless defend the Rule's creation on the theory that "ATF has statutory authority to regulate 'firearms'...."  Opp. at 16.  This broad claim of authority is far in excess of the authority actually possessed by the agency. ATF has no vast repository of authority to devise whatever rules it sees fit, simply because a firearm is involved.  Indeed, the GCA unambiguously requires only that "licensed *importers* and licensed *manufacturers*" —not "*dealers*" — "identify [firearms] by means of a serial number....." 18 U.S.C. § 923(i).  Compl. ¶¶ 357-59.  In response, Defendants claim authority to extend this requirement to "dealers" can be found in § 926(a)'s "broad grant of authority to take actions 'necessary to carry out the provisions' of the statute," along with § 923(g)(1)'s grant of "to issue regulations prescribing an FFL's 'records of … receipt, sale, or other disposition of firearms'...." Opp. at 16-17.  But the authority to require an FFL to "record" the serial number of a firearm in its records does not mean that ATF can require an FFL to "engrave[] or cast" a serial number on a firearm.

In a final effort to justify the Rule's regulation of privately made firearms, Defendants again appeal to legislative intent arguing that, "[i]n enacting the GCA, Congress clearly understood that in some circumstances persons and entities other than licensed manufacturers and importers may be required to mark firearms with a serial number."  Opp. at 17.  Misleadingly, however, ***Defendants cite not to the GCA, but to the NFA***, and its requirement that "[e]ach manufacturer and importer ***and anyone making a firearm*** shall identify each firearm ... manufactured, imported, or made by a serial number...."  *Id.* (citing 26 U.S.C. § 5842(a)); *see also* 5842(b) which applies to "***[a]ny person*** who possesses" an NFA firearm.  The NFA's requirement applies to "any

8

person," completely unlike the GCA's requirement in § 923(i).  Had Congress intended to require "dealers" to serialize firearms, it would have included that language in § 923(i).  The fact that Congress created an express requirement for *manufacturers* and *importers* but not *dealers* — and certainly not for "any person" — indicates that the requirement is not intended to cover dealers.

Sixth, in an attempt to justify ATF's curious new theory that a silencer has a "frame or receiver," Defendants posit that "[t]he statutory definition of 'firearm' includes 'any firearm muffler or firearm silencer, 18 U.S.C. § 921(a)(3)." Opp. at 18. While § 921(a)(3)(C) certainly includes "any firearm muffler or firearm silencer" as a "*firearm*," that does not mean such items have a "frame or receiver."  Rather, the "frame or receiver" language found in subsection (B) describes "the frame or receiver of any such ***weapon***," an obvious reference back to the "any ***weapon***" in subsection (A), not to "any firearm muffler or firearm ***silencer***" in subsection (D).

Making matters worse, Defendants *still* do not offer any explanation as to why ATF's prior conclusion, that "there is no specific frame/receiver to a silencer," is now incorrect.  *See* Mot. at 12.  Defendants claim that silencers "*must* have some component identified as a 'frame or receiver'" so that it can be serialized.  On the contrary, as already noted, 26 U.S.C. § 5842(a) merely requires that a silencer be "identif[ied] ... by a serial number" – it does not say where.  *See* Compl. ¶ 500.[10]  Finally, Defendants claim that the Rule does not actually eliminate the statutory

---

[10]  Defendants claim "Plaintiffs fail to allege that they are manufacturers of muffler or silencer devices" and "they lack standing to assert this claim...." Opp. at 17.  Yet Plaintiffs alleged that "the members and supporters of GOA and GOF ... includ[e] ... manufacturers of NFA firearms including silencers...." Compl. ¶ 9. Plaintiffs also alleged that they represent "include law-abiding gun owners across the country," including "makers of homemade firearms ... including those regulated by both the National Firearms Act and the Gun Control Act." Compl. ¶ 9.b; *see also* Patterson Affidavit at ¶¶ 7, 9. The organizational plaintiffs thus represent the interests not only of *numerous* industry members who are licensed and engaged in the business of manufacturing silencers, along with their customers, but also of law-abiding gun owners who lawfully manufacture privately made silencers.

*mens rea* elements of design and intent, arguing that, somewhere, somehow, "the 'designed' and 'intended' concepts are incorporated into the Rule's definition." This Court should decline Defendants' invitation to save the Rule by reading into it concepts absent from its text.

Seventh, Defendants claim they have not violated 18 U.S.C. § 926(a)'s prohibition of new regulations that require FFL records "maintained under this chapter … [to] be recorded at or transferred to a facility owned, managed, or controlled by" the federal government.  Even though the Rule's new demand that dealers maintain records forever clearly has this result, Defendants misdirect, claiming the Rule "merely extends the time period during which the FFL — not the government — must maintain the records already required."  Opp. at 19.  But that is the whole point — by now requiring that dealers maintain certain records indefinitely, those records eventually will be transferred to the federal government.

### C.    The Final Rule Is Arbitrary and Capricious.
#### 1.    Plaintiffs Have Not "Misunderstood" the Final Rule, and this Court Should Not Accept Defendants' "Post Hoc Rationalizations."

Defendants claim the Rule is not inconsistent with itself, arguing Plaintiffs have simply "misunderst[ood]" it.  Opp. at 20.  First, Defendants dispute that firearms can have more than one frame or receiver based on the Rule's definition in 27 C.F.R. § 478.12(f)(1), which states that "[a]ny such part that is identified with an importer's or manufacturer's serial number shall be presumed ... to be the frame or receiver of the weapon."  *Id.* at 24,739.  Defendants contend this language *should be read only with respect to* "presum[ing] the marked subparts of a multi-piece frame or receiver" must all be serialized.  Opp. at 20.  Defendants reach this conclusion despite the fact that the definition of "multi-piece frame or receiver" appears in § 478.12 subsection (d), while the presumption language appears in subsection (f).  Subsection (f) does not discuss "multi-piece" receivers, and does not reference subsection (d), or vice versa. The serialization language

is a clearly mistaken holdover from the NPRM that should have been excised.  *See* NPRM at 27,741; *see also* Compl. ¶¶ 124-133.  Subsection (d) has nothing to do with subsection (f), and this Court should not accept Defendants' *post hoc* rationalization when there is literally nothing supporting their explanation.  *See Coal. for Common Sense in Gov't Procurement v. United States*, 671 F. Supp. 2d 48, 55-56 (D.D.C. 2009) ("[t]he Court [] cannot credit the explanations the Department offers in its briefing and at the motions hearing – 'those [arguments] cannot save the rule' ... courts may not accept … counsel's post hoc rationalizations.'").

Second, Defendants argue that nothing in "the APA" required them to "list all such designs" of firearms whose classifications are to be followed *in conflict with* the Rule.  Opp. at 20. Defendants claim that "there is nothing confusing" here and that "manufacturers need only determine whether the classification was issued before April 26, 2022...."  *Id.*  Yet Defendants gloss over the fact that ATF classification letters are *nonpublic* documents, generally are *not shared* outside the agency, and that ATF claims they apply only to the *specific* requester and only to the *specific* firearm.  *See* Compl. ¶¶ 116-120.  Nor does the Rule announce any intention to make these letters public, essentially directing the industry to "follow the convoluted test in the Rule, unless there is a secret ATF letter (which you won't know about) saying the opposite, in which case follow that secret letter, which previously you couldn't rely on, but now you can."

## 2. Defendants Deny, Rather than Explain, the Final Rule's Policy Changes.

Defendants offer justifications in response to each of Plaintiffs' six challenges to the Rule for having departed from existing guidance and standards without acknowledging, much less justifying, its seismic policy shifts.  Mot. at 16-20, Opp. at 22-28.  Plaintiffs have already addressed the first issue, multi-piece frames or receivers, in Section I.B, *supra*.  Second, Defendants claim that ATF has not actually changed course with respect to the precedential value of its classification

letters.  Opp. at 22-23; *see* Mot. at 17, Compl. ¶¶ 151-164.  Rather, Defendants claim that "the Rule does not purport to extend these classifications more broadly than the specific item or items that had been classified." *Id.* at 23.  In claiming the Rule formally adopts ATF's existing position (that classification letters have no precedential value), however, Defendants hoist themselves on their own petard, violating the principle that "[a]n agency cannot meet the arbitrary and capricious test by treating type A cases differently from similarly situated type B cases … The treatment … where the two cases are functionally indistinguishable, must be consistent. That is the very meaning of the arbitrary and capricious standard." *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).  The Rule also conflicts with Defendants' rationalization to this Court, as the Rule defines "variant" and "variants thereof" to be "a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments." *Id.* at 24,735; *see also* at 24,672, 24,697, 24,704, 247,10 ("an ATF classification ... is applicable to or authoritative with respect to any other sample, design, model, or configuration of the same weapon so that the requestor does not need to submit additional requests for future variants.").  Each of these references to "variants" applies "more broadly than the specific item or items that had been classified." *See* Opp. at 23.

Third, with respect to the Rule's importation of the term "readily" from § 921(a)(3)(A) into "the frame or receiver" in § 921(a)(3)(B) Defendants make the mutually exclusive claims (i) that ATF has *not* changed its policy but also (ii) contrast "ATF's prior approach" with "the one that considers ... whether the item or kit may be readily converted," opining that the Rule's new and revised policy is "better than [ATF's] prior policy." Opp. at 23. Both of these diametric claims cannot simultaneously be true.  Either way, the agency cannot be said to have "reasonably"

explained its position, when it appears that ATF is still confused about what that position is. Moreover, as Plaintiffs have explained, it was the Rule that failed to recognized or "explain[] its reasons for shifting its approach" (Opp. at 24), and the agency's lawyers may not do so now. *See Independent Petroleum Ass'n of Am.* at 1260.

Fourth, Defendants offer a bizarre defense of the Rule's definition of "complete muffler or silencer device" to include any group of items that can function as a silencer, targeting (among other things) homemade Form 1 silencers lawfully manufactured using "solvent traps." Mot. at 18-19. Although ATF in the past has stated it is perfectly legal to use a solvent trap to make a lawfully registered silencer, in recent months the agency has denied Form 1 applications and threatened applicants with criminal prosecution. *See* Compl. ¶¶ 445-481. Rather than grapple with these conflicting positions, Defendants' brief paradoxically *adopts both opposite approaches*. Claiming that "[t]he Rule does not change the legal status of solvent traps," Defendants allege broadly that "a solvent trap is both a 'firearm silencer' and a 'firearm,'" despite ATF guidance that solvent traps have non-silencer uses. *See* Opp. at 25, Compl. ¶¶ 456, 459. But Defendants then claim that "[n]or does the Rule alter the status of solvent traps under the NFA," and "'some individuals file an ATF Form 1 under the NFA to make solvent trap silencers,' which remains possible under the Rule." But it cannot be the case that (i) solvent traps are *unlawful, unregistered* silencers and also that (ii) they can be used to *lawfully* make and *register* silencers.

Fifth, Defendants justify ATF's recent refusal to classify items that are not attached to a firearm, "because when attached to a firearm, *accessories* can affect the firearm's classification." Opp. at 26. Yet the Rule itself conflicts with this claim, promising that the classification of a frame or receiver will be the same for any "'weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features,

components, *accessories*, or attachments.'"  *Id.* at 24,693.  *Accessories cannot both affect a classification of a firearm, and simultaneously be irrelevant to its classification*.  Regardless, one of the goals behind ATF's refusal to issue certain classifications is to further its unfounded claim that unregulated and unfinished frames or receivers can magically become firearms when combined with unregulated "accessories" such as parts or tools.  Opp. at 28.  But as Plaintiffs have explained, even a "kit" that contains all the unfinished precursor parts to *manufacture* a firearm is not a firearm until it contains a complete and finished "frame or receiver."  Mot. at 19-20.

Defendants also defend the Rule's addition of a statement, "executed under penalty of perjury," to the ATF classification process, claiming that this requirement already impliedly exists pursuant to 18 U.S.C. § 1001.  But even if a violation of that vague and nebulous statute could be charged *already* with respect to a mere request to have ATF classify a product, that cuts against ATF's *professed need* to demand a signed statement.  Rather, the agency is merely engaging in a thinly veiled attempt to *manufacture evidence* of a crime, which it can then use to threaten or criminally charge those participating in the classification process.  Moreover, simply because it is a federal crime to lie to the executive branch in certain instances does not mean ATF has the authority to demand a person submit some sort of written statement under penalty of perjury. Indeed, the GCA already sets forth violations for making materially false statements (18 U.S.C. § 922(a)(6)) and provides associated penalties (18 U.S.C. § 924).  Had Congress intended there to be similar punishments in different contexts, then it could have so legislated.

Sixth, with respect to the Rule's crackdown on "weapon parts kits," Defendants claim that Plaintiffs were wrong to claim "that ATF has not previously considered weapon parts kits [without a finished frame or receiver] ... to constitute 'firearms'...."  Opp. at 27.  Yet Plaintiffs supported their statement with evidence from ATF, including numerous classification letters which

specifically opine that the addition of unregulated items such as "templates, jigs, molds, equipment, [] tools ... instructions, guides, or marketing materials" (Opp. at 27) to a "kit" does not change the classification of an unfinished frame or receiver, somehow making a collection of unregulated components transform into a unicorn "firearm" that does not have any frame or receiver.  Compl. ¶¶ 298-308.  Defendants do not wrestle with Plaintiffs' contrary evidence, but merely offer the unsupported *ipse dixit* that Plaintiffs are wrong.[11]

Then, in something of a Freudian slip, Defendants concede that the Rule improperly attempts to regulate firearm parts, something that Congress explicitly chose not to regulate.  Compl. ¶¶ 24-29, 283-87.[12]  Indeed, Defendants opine that "ATF does not ***generally*** regulate ***individual*** firearm parts."  Opp. at 28.  Later, Defendants claim that "***for the most part***, ATF does not regulate ***individual*** firearm parts...."  *Id.*  By doubly qualifying what should otherwise be a broad, definitive statement,[13] Defendants seek to pave the way for the Rule's regulation of firearm parts when packaged as part of "a weapon parts kit that ... as a whole ... may readily be completed...."  *Id.*  In other words, Defendants' brief is a stark admission of the Rule's blatant attempt to regulate parts that Congress repeatedly, directly, and explicitly chose *not* to regulate.

### 3.   The Final Rule Fails to Address Important Comments.

First, in response to Plaintiffs' claim that the Rule dodges the issue of precisely who must serialize firearms (only manufacturers and importers under § 923(i)), Defendants merely parrot the same avoidance offered by the Rule.  Opp. at 29.  Despite what Defendants think "Congress clearly

---

[11] Defendants' cases in footnote 17 fail for the same reasons discussed in Section I.B, *supra*.

[12] Defendants claim that it is "ATF's *policy* of not regulating individual firearm parts other than frames or receivers."  Opp. at 28 (emphasis added).  While it may be the agency's "policy," more importantly <u>it is the law</u>.  ATF has no more authority to regulate the domestic manufacture, sale, and use of firearm *parts* than it does to regulate commerce in metal water bottles – although, as Plaintiffs have noted, ATF has tried that too.  *See* Compl. ¶ 265 n.39.

[13] *See also* Compl. ¶¶ 283-87.

intended," Congress *did not actually require* dealers to serialize firearms. *Gordon*, 524 F.3d at 1187-88; *Montanile*, 577 U.S. at 150. The fact that 923(i) does not explicitly exempt dealers from its serialization requirement does not provide ATF with the authority to enact that requirement. Congress need not exempt dealers from text that, by its very terms, does not apply to them.

Second, while the Rule acknowledges Plaintiffs' comment that the ATF classification system is designed to provide arbitrary and capricious results, the Rule fails to respond. Rather than explain why the agency failed to address Plaintiffs' comments, Defendants' brief continues to sidestep *Plaintiffs'* comments by rehashing the agency's responses to *other* comments received from *other* commenters. Opp. at 29 (neither GOA/GOF's comments, nor their motion, suggested a notice of accepting or rejecting a request, ATF rendering a decision within a certain time frame, or deeming samples compliant if ATF does not respond within a certain window).

### 4. Defendants Cannot Use Their Opposition Brief to Cure the Final Rule.

As Plaintiffs have explained, the Rule was improperly justified on the basis of a now-repudiated legal test, involving judge-empowering interest balancing that was soundly rejected by the Supreme Court in *NYSRPA v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111 (2022). In response, Defendants acknowledge that *Bruen* "rejected 'means-end scrutiny'" used to justify the Rule, but claim (i) that the Rule can be independently justified by its reference to language in *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) about "conditions and qualifications on the commercial sale of arms," and (ii) that the Rule is still justifiable even under *Bruen*. Both of these arguments fail for the same reason. The question is not whether Defendants' counsel is able to craft a *post hoc* justification for the Rule. Rather, the question is the record before the agency, the decisionmaking process used, and the result reached in the Rule. *Guedes*, 920 F.3d at 20; *People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 23 n.7 (D.C. Cir. 1999) (unlike

appellate review of lower court opinions, "[o]rders issued by agencies are treated differently.  In administrative law, we do not sustain a 'right-result, wrong-reason' decision of an agency.  We send the case back to the agency …..") (*citing SEC v. Chenery Corp*., 318 U.S. 80, 88 (1942)).

## II.     Plaintiffs Will Incur Irreparable Harm Absent a Preliminary Injunction.

Not only have Plaintiffs properly asserted that they will suffer irreparable harm —even if through efficient references to documents already before the Court—Defendants *admit* that such harm will occur. *See, e.g.*, 86 Fed. Reg. at 27,736 ("For non-FFL manufacturers … there would be a significant impact"); 87 Fed. Reg. at 24,719 ("ATF revised its estimates to reflect companies that could dissolve their business"); and *id.* at 24,731 (estimating costs to industry and public).

Defendants return to their claim that Plaintiffs somehow have "delay[ed]" seeking injunctive relief against the Rule (an omnibus rulemaking of extraordinary length and massive in regulatory scope), referencing the much shorter NPRM (which is not final agency action) issued "more than a year ago," concluding that Plaintiffs cannot show irreparable harm.  Opp. at 34; ECF 15 at 2-3.  On the contrary, Plaintiffs hardly have been sitting on their rights, for reasons already stated (ECF 18 ¶ 10), having brought a comprehensive challenge to a nearly-100-page regulation spanning multiple topics and that, as discussed in Part I.A., *supra*, departs in significant and unforeseeable ways from the NPRM.  And it was Defendants who chose the relatively short implementation window for a complex rulemaking.  *Id*. ¶ 11.[14]  Indeed, Plaintiffs GOA and GOF were the first gun rights advocacy groups to challenge the Rule, although others promised to do so.  Defendants' comparison to the "parallel Texas case," Opp. at 34, is apples to oranges, as that

---

[14] *Pals Grp., Inc. v. Quiskeya Trading Corp*., 2017 U.S. Dist. LEXIS 18567 (S.D. Fla. Feb. 9, 2017) is of no help to Defendants, because that case involved a "three-month delay" between filing the complaint and seeking injunctive relief.  *Id*. at *15.  In contrast, the Complaint here was filed in *the same month* that the motion for preliminary injunction was filed.  Additionally, Plaintiffs have explained the reason for the short delay – the sweeping size and nature of the Rule.

case challenges only limited portions of the Rule; this litigation challenges nearly every aspect thereof. *Div. 80 LLC v. Garland*, No. 3:22-cv-00148 (S.D. Tex.), ECF 1 (Compl., May 9, 2022).

Next, Defendants outlandishly claim that Plaintiffs will not suffer harm from the numerous vague and ambiguous portions of the Rule because ATF *may* (but need not) answer requests for classifications. Opp. at 35. Defendants claim "any purported uncertainty is not irreparable but can be remedied through the administrative process." Opp. at 36. But an agency cannot escape judicial review by reserving unto itself the dictatorial power to resolve ambiguities it creates.

Defendants next claim that the companies affected by the Rule will not actually be forced out of business (even though the Final Rule concludes some will), but instead can become licensed dealers (even though the Final Rule admits that many won't). Opp. at 36. Of course, the ATF's recent agenda is to put as many FFLs as possible out of business under its new "zero tolerance" policy, with license [revocations up 500%](). And while Defendants argue that "ordinary compliance costs" are not "typically" irreparable harm, obtaining a federal firearms license is not ordinary for businesses (like a big box store) that do not sell actual *firearms*.[15] Moreover, as Defendants acknowledge, there is legitimate appeal for many law-abiding gun owners to manufacture their own firearms. Opp. at 37. The Rule will make the products of the affected DIY firearms industry far less competitive, nearly guaranteeing some businesses will be forced to close their doors.

Defendants next claim that "Plaintiffs do not contend that ATF has threatened prosecution against any Plaintiff," and nothing "indicate[s] that 'ATF already has attempted to enforce" the Rule. Opp. at 37-38. On the contrary, just today ***ATF served criminal search warrants*** against an employee of JSD Supply (a GOA industry partner who sells 80% products, *see* Compl. ¶ 269),

---

[15] Defendants' description of "structuring transactions," Opp. at 14-15, leaves one questioning whether hardware stores should obtain an FFL lest they sell to one individual the wood, wire, tape, and pipe to make the sort of homemade gun that [killed Shinzo Abe]().

seeking "evidence" of numerous federal crimes allegedly for ***selling firearms in the form of kits***. Thus, not only are Plaintiffs at risk of suffering irreparable harm, but it appears the harm may already have begun.  ATF's actions today all but set Plaintiffs' irreparable harm in stone.

Further, the Rule impacts Plaintiff States' tax revenues.  Dkt. 22, ¶11.  The Amended Complaint establishes that individuals may decide not to purchase regulated weapon parts, depriving the States of associated taxes.  *See Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (State suffers harm when it shows "a loss of specific tax revenues"); *North Dakota v. U.S. E.P.A.*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (same).  Even if individuals merely delay purchases during this litigation, such delay will irrevocably harm some businesses that are unable to pay employees or cover overhead while they wait for litigation to conclude.[16]

The States will also suffer sovereign injury to their desired permissive policies.  States that wish to ban or otherwise regulate receiver blanks have done so.  *See* n.7, *supra*.  Plaintiff States, by comparison, have purposefully chosen permissive policies as evidenced by the history of their laws deregulating Second Amendment activities.  All Plaintiff States have established shall-issue licensing regimes,[17] and many require no carry permit, reinforcing their citizens' rights and bolstering protections for already-legal activities.  Further, many Plaintiff States have enacted Second Amendment Protection Acts, which specifically make it those States' policy to fight

---

[16] *See, e.g.*, *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (States showed harm by pointing to increased costs due to new regulations); *see also Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (finding the inability to recover monetary damages constitutes irreparable harm).

[17] *See, e.g.*, Ariz. Rev. Stat. § 13-3112 (1998); W. Va. Code § 61-7-4 (1989); Alaska Stat. § 18.65.700(a) (1999); Ark. Code Ann. § 5-73-309 (1995); Idaho Code Ann. § 18-3302(20) (2016); Ind. Code Ann. § 35-47-2-3  (1990); Kan. Stat. Ann. § 75-7c03 (2005); Ky. Rev. Stat. Ann. § 237.110(4) (1996); La. Rev. Stat. § 40:1379.3(A)(1) (1996); Mo. Rev. Stat. §§ 571.101.2, 571.101.7 (2003); Mont. Code Ann. § 45-8-321 (1991); Neb. Rev. Stat. § 69-2430(3) (2006); Okla. Stat. Ann. tit. 21, § 1290.12(A)(13) (1995); S.C. Code Ann. § 23-31-215(A) (1995); Tex. Gov't Code § 411.177 (1997); Utah Code Ann. § 53-5-704 (1993); Wyo. Stat. § 6-8-104 (1982).

federal government overreach.[18]  Valid reasons exist for such policies.  Plaintiff States have strong interests in promoting public safety, preventing crime, and reducing the harmful effects of violence while ensuring their citizens can freely exercise their constitutional right to bear arms.  The Rule thus infringes on the States' positive policy choices, undermining important state interests.

### III.    The Balance of Equities and Public Interest Favor Injunctive Relief.

The balance of equities and public interest favor granting injunctive relief, as "law enforcement and public safety" (Opp. at 39) are not magic talismans to be waived by agencies to avoid judicial scrutiny.  Indeed, the NPRM was issued nearly a year before the Rule, and the effective date set for an additional 120 days after that. Opp. at 34.  If the public and law enforcement truly were in such grave danger, ATF would have moved more quickly.  In contrast, allowing this novel, unprecedented, and improperly noticed Rule to take effect will impact millions of dollars in business, cost jobs, damage state economies, and infringe sovereign choices of States.

For the reasons stated, this Court should enjoin implementation of the Rule.[19]

Respectfully submitted,

---

[18] *See, e.g.*, Ariz. Rev. Stat. § 1-272 (2021); W. Va. Code § 61-7B-2 (2021); Idaho Code Ann. § 46-1008 (2021); Kan. Stat. Ann. § 50-1201 (2013); Mo. Rev. Stat. §§ 1.410–1.485 (2021); Mont. Code Ann. § 45-8-368 (2021); 21 Okl. St. § 1289.24d (2021); Tex. Penal Code § 1.10 (2021); Utah Code Ann. § 78B-6-2301–303 (2022); Wyo. Stat. § 9-14-201–203 (2022).

[19] Defendants reiterate the Rule's *ipse dixit* that its provisions should be severable.  Opp. at 40, Rule at 24730.  Yet "the agency's views on severability should be most persuasive when: (1) the agency includes its severability proposal in the text of the *proposed* rule and the agency's initial *rationale* for severability *is explained* in … the *proposed* rule; (2) these initial positions are *made available for comment* … (4) the agency addresses the *rationale* for severability in … the final rule … and (5) the agency explains *how* specific portions of the rule would operate independently." Administrative Conference of the United States, "Severability in Agency Rulemaking," June 29, 2018; *see also MD/DC/DE Broads. v. FCC*, 253 F.3d 732, 734–36 (D.C. Cir. 2001) (declining to honor an agency's severability clause because the agency did not adequately explain how the remaining portion of the rule would have served the goals for which the rule was designed).  *All* of those factors counsel against severability here, as the NPRM never discussed severability at all, and neither the Rule nor Defendants' opposition brief elaborate on why or how the Rule could be severed into parts.

Date:   August 19, 2022

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

Robert B. Stock (ND # 05919)
Vogel Law Firm
218 NP Avenue
Fargo, ND  58107-1389
701-237-6983 (T)
701-237-0847 (F)
rstock@vogellaw.com
For service: rbslitgroup@vogellaw.com
*Counsel for Morehouse Enterprises, LLC d/b/a Bridge City Ordnance, Eliezer Jimenez, Gun Owners of America, Inc., and Gun Owners Foundation*


/s/ Anthony R. Napolitano
MARK BRNOVICH
Attorney General of Arizona

MICHAEL CATLETT*
  *Deputy Solicitor General*
ANTHONY NAPOLITANO
  *Assistant Attorney General*
ARIZONA ATTORNEY GENERAL'S OFFICE
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-8860
Michael.Catlett@azag.gov
Anthony.Napolitano@azag.gov
*Counsel for Plaintiff State of Arizona*

PATRICK MORRISEY
Attorney General of West Virginia

LINDSAY SEE*
  *Solicitor General*
MICHAEL R. WILLIAMS*
  *Senior Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov
*Counsel for Plaintiff State of West Virginia*


TREG R. TAYLOR
Attorney General of Alaska

AARON C. PETERSON
  *Senior Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Avenue #200
Anchorage, AK 99501
Aaron.peterson@alaska.gov
(907) 269-5165
*Counsel for Plaintiff State of Alaska*


LESLIE RUTLEDGE
Arkansas Attorney General

NICHOLAS J. BRONNI*
Arkansas Solicitor General
DYLAN L. JACOBS*
Deputy Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov
*Counsel for Plaintiff State of Arkansas*

LAWRENCE G. WASDEN
Attorney General of Idaho

DAYTON REED
  *Deputy Attorney General*
OFFICE OF THE IDAHO ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
dayton.reed@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*


THEODORE E. ROKITA
Indiana Attorney General

BETSY M. DENARDI*
Director of Complex Litigation
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6201
Betsy.DeNardi@atg.in.gov
*Counsel for Plaintiff State of Indiana*


DEREK SCHMIDT
Attorney General of Kansas

BRANT M. LAUE*
  *Solicitor General*
OFFICE OF KANSAS ATTORNEY GENERAL
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
(785) 368-8435 Phone
Brant.Laue@ag.ks.gov


DANIEL CAMERON
Attorney General of Kentucky

AARON J. SILLETTO
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601

Phone: (502) 696-5300
Aaron.Silletto@ky.gov
*Counsel for Plaintiff Commonwealth of Kentucky*


JEFF LANDRY
Attorney General of Louisiana

ELIZABETH B. MURRILL*
  *Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
murrille@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*


ERIC S. SCHMITT
Attorney General of Missouri

D. JOHN SAUER
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF MISSOURI
Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for Plaintiff State of Missouri*


AUSTIN KNUDSEN
Attorney General of Montana

DAVID M.S. DEWHIRST
  *Solicitor General*
KATHLEEN L. SMITHGALL
  *Assistant Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
david.dewhirst@mt.gov
kathleen.smithgall@mt.gov

*Counsel for Plaintiff State of Montana*


DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES A. CAMPBELL*
  *Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*


JOHN M. O'CONNOR
Attorney General of Oklahoma

BRYAN CLEVELAND
  *Deputy Solicitor General*
OKLAHOMA ATTORNEY GENERAL'S OFFICE
313 NE 21st St.
Oklahoma City, OK 73105
(405) 522-1961
Bryan.cleveland@oag.ok.gov
*Counsel for Plaintiff State of Oklahoma*


ALAN WILSON
Attorney General of South Carolina

J. EMORY SMITH, JR.
Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
Email: ESmith@scag.gov
*Attorneys for Plaintiff State of South Carolina*


KEN PAXTON
Attorney General of Texas

AARON F. REITZ

*Deputy Attorney General for Legal Strategy*
CHARLIE ELDRED
 *Special Counsel for Legal Strategy*
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Charlie.Eldred@oag.texas.gov
*Counsel for Plaintiff State of Texas*


SEAN D. REYES
Attorney General of Utah

MELISSA A. HOLYOAK*
 *Solicitor General*
OFFICE OF THE UTAH ATTORNEY GENERAL
350 N. State Street, Suite 230
Salt Lake City, UT 84114
(801) 366-0260
Email: melissaholyoak@agutah.gov
*Counsel for Plaintiff State of Utah*


BRIDGET HILL
Attorney General of Wyoming

RYAN SCHELHAAS
Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov
*Counsel for Plaintiff State of Wyoming*


* Application for Admission Forthcoming

<u>**CERTIFICATE OF SERVICE**</u>

I, Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be filed with this Court's CM/ECF system, which caused a notice of the filing and a true and correct copy of the same to be delivered to all counsel of record.

Dated: August 19, 2022.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh