**No.**

# In the Supreme Court of the United States

---

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

JENNIFER VANDERSTOK, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

ELIZABETH B. PRELOGAR
  *Solicitor General*
    *Counsel of Record*
BRIAN M. BOYNTON
  *Principal Deputy Assistant
    Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
NICOLE FRAZER REAVES
  *Assistant to the Solicitor
    General*
MARK B. STERN
SEAN R. JANDA
   *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## QUESTIONS PRESENTED

In the Gun Control Act of 1968, 18 U.S.C. 921 *et seq.*, Congress imposed licensing, background-check, record-keeping, and serialization requirements on persons engaged in the business of importing, manufacturing, or dealing in firearms. The Act defines a "firearm" to include "any weapon * * * which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as "the frame or receiver of any such weapon." 18 U.S.C. 921(a)(3)(A) and (B). In 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives issued a regulation clarifying that certain products that can readily be converted into an operational firearm or a functional frame or receiver fall within that definition. See 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified in relevant part at 27 C.F.R. 478.11, 478.12(c)). The Fifth Circuit held that those regulatory provisions are inconsistent with the Act. The questions presented are:

1. Whether "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive," 27 C.F.R. 478.11, is a "firearm" regulated by the Act.

2. Whether "a partially complete, disassembled, or nonfunctional frame or receiver" that is "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," 27 C.F.R. 478.12(c), is a "frame or receiver" regulated by the Act.

(I)

## PARTIES TO THE PROCEEDING

Petitioners were the defendants-appellants below. They are the U.S. Department of Justice; the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Merrick B. Garland, in his official capacity as Attorney General of the United States; and Steven Dettelbach, in his official capacity as Director of ATF.

Respondents include the plaintiffs-appellees below. They are Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C.; and Firearms Policy Coalition, Inc. Respondents also include the intervenor plaintiffs-appellees below. They are Blackhawk Manufacturing Group, Inc. (doing business as 80 Percent Arms); Defense Distributed; Second Amendment Foundation, Inc.; Not An L.L.C. (doing business as JSD Supply); and Polymer80, Inc.

(II)

**RELATED PROCEEDINGS**

United States District Court (S.D. Tex.):

*VanDerStok* v. *Garland*, No. 22-cv-691 (July 5, 2023)

United States Court of Appeals (5th Cir.):

*VanDerStok* v. *Garland*, No. 23-10463 (appeal dismissed Aug. 14, 2023)

*VanDerStok* v. *Garland*, No. 22-11071 (appeal dismissed Sept. 6, 2023)

*VanDerStok* v. *Garland*, No. 22-11086 (appeal dismissed Sept. 6, 2023)

*VanDerStok* v. *Garland*, No. 23-10718 (Nov. 9, 2023)

Supreme Court of the United States:

*Garland* v. *VanDerStok*, No. 23A82 (Aug. 8, 2023)

*Garland* v. *Blackhawk Manufacturing Group, Inc.*, No. 23A302 (Oct. 16, 2023)

(III)

**TABLE OF CONTENTS**

Page

Opinions below ............................................................................ 1
Jurisdiction ................................................................................... 2
Statutory and regulatory provisions involved ........................... 2
Statement:
    A.   Legal framework ............................................................ 2
    B.   ATF's 2022 Rule ............................................................. 4
    C.   Procedural history ......................................................... 9
Reasons for granting the petition ............................................ 13
    I.   The decision below is incorrect ................................... 13
        A.  A weapon parts kit falls within the plain
            meaning of the Act's definition of "firearm" ........ 14
        B.  A partially complete or nonfunctional frame or
            receiver that can readily be completed qualifies
            as a "frame or receiver" ......................................... 21
    II.   The decision below warrants review ............................ 28
Conclusion .................................................................................. 31
Appendix A — Court of appeals opinion (Nov. 9, 2023) ...... 1a
Appendix B — District court memorandum opinion
                 and order granting vacatur
                 (June 30, 2023) .......................................... 67a
Appendix C —  District court final judgment
                 (July 5, 2023) ........................................... 115a
Appendix D — Supreme Court order vacating
                 injunction pending appeal
                 (Oct. 16, 2023) ......................................... 118a
Appendix E — Court of appeals order granting in
                 part and denying in part motion
                 to vacate injunction pending appeal
                 (Oct. 2, 2023) .......................................... 119a
Appendix F — District court opinion and order
                 granting injunction pending appeal
                 (Sept. 14, 2023) ....................................... 126a
Appendix G — Supreme Court order granting stay
                 pending appeal (Aug. 8, 2023) ............... 179a

(V)

VI

Table of Contents—Continued:                           Page

Appendix H  —  Court of appeals order partially
                        granting and partially denying stay
                        pending appeal (July 24, 2023).............. 180a
Appendix I   —  District court order denying stay
                        pending appeal (July 18, 2023).............. 184a
Appendix J  —  Declaration of Matthew P. Varisco
                        (July 14, 2023) ......................................... 186a
Appendix K  —  Excerpts from administrative record:
                        ATF letter (Apr. 20, 1978)...................... 209a
                        ATF letter (June 11, 1980) .................... 214a
                        ATF letter (May 3, 1983)....................... 216a
                        ATF letter (Dec. 4, 2020)....................... 218a
                        Excerpts from affidavit of Tolliver
                        Hart (Dec. 9, 2020) ................................ 226a
Appendix L  —  Statutory and regulatory provisions........ 241a

**TABLE OF AUTHORITIES**

Cases:

*Abramski* v. *United States*, 573 U.S. 169 (2014) ...... 3, 20, 29
*Biden* v. *Nebraska*, 143 S. Ct. 2355 (2023) .......................... 30
*Biden* v. *Texas*, 597 U.S. 785 (2022)..................................... 30
*Caraco Pharm. Labs., Ltd.* v. *Novo Nordisk A/S*,
    566 U.S. 399 (2012)................................................................ 20
*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008)................................................................. 8
*Maui* v. *Hawaii Wildlife Fund*,
    140 S. Ct. 1462 (2020) ........................................................ 28
*Morehouse Enters., LLC* v. *ATF*:
    78 F.4th 1011 (8th Cir. 2023), reh'g en banc
        denied, No. 22-2812, 2023 WL 7205512
        (Nov. 2, 2023).............................................................. 30
    No. 22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23,
        2022), aff'd, 78 F.4th 1011 (8th Cir. 2023) ............... 30

VII

Cases—Continued:                                              Page

*Pugin* v. *Garland*, 599 U.S. 600 (2023) ............................... 21
*United States* v. *Ryles*, 988 F.2d 13 (5th Cir.),
  cert. denied, 510 U.S. 858 (1993) ...................................... 11
*Wolf* v. *Innovation Law Lab*, 141 S. Ct. 617 (2020) ........... 30

Statutes and regulations:

Administrative Procedure Act, 5 U.S.C. 701 *et seq.* ........... 12
Gun Control Act of 1968, 18 U.S.C. 921 *et seq.* ..................... 2
  18 U.S.C. 921(a)(3)(A) ............... 3, 6, 11, 13-17, 19, 20, 26
  18 U.S.C. 921(a)(3)(B) ......................................... 3, 13, 26
  18 U.S.C. 921(a)(4)(C) ...................................................... 19
  18 U.S.C. 921(a)(25) .......................................................... 27
  18 U.S.C. 921(a)(30)(B) .................................................... 27
  18 U.S.C. 922 ...................................................................... 2
  18 U.S.C. 922(t) .................................................................. 2
  18 U.S.C. 923 ...................................................................... 2
  18 U.S.C. 923(a) ................................................................ 2
  18 U.S.C. 923(g)(1)(A) ...................................................... 2
  18 U.S.C. 923(i) ................................................................. 2
  18 U.S.C. 926(a) ................................................................ 3
15 U.S.C. 901(3) (1940) .......................................................... 19
26 U.S.C. 5845(b) .................................................................. 27
26 U.S.C. 5845(c) ................................................................... 27
26 U.S.C. 5845(d) .................................................................. 27
27 C.F.R.:
  Section 478.11 .......................................... 6, 11, 13, 15-17
  Section 478.12(c) ................................... 7, 8, 13, 21, 24, 25
28 C.F.R. 0.130(a) .................................................................. 3

VIII

Miscellaneous:                                          Page

  ATF:

    *National Firearms Commerce and Trafficking
      Assessment (NFCTA):  Crime Guns –
      Volume Two*, Part III (Jan. 11, 2023),
      https://perma.cc/MQB6-4BJX ................................. 30

    *Open Letter to All Federal Firearms Licensees:
      Impact of Final Rule 2021-05F on Partially
      Complete AR-15/M-16 Type Receivers* (Sept.
      27, 2022), https://perma.cc/S685-YJDY ................... 25

    *Open Letter to All Federal Firearms Licensees:
      Impact of Final Rule 2021-05F on Partially
      Complete Polymer80, Lone Wolf, and Similar
      Semiautomatic Pistol Frames* (Dec. 27, 2022),
      https://perma.cc/ZQ9Y-PAWV ........................... 22-24

33 Fed. Reg. 18,555 (Dec. 14, 1968) ....................................... 4

87 Fed. Reg. 24,652 (Apr. 26, 2022) ...... 3-9, 16, 17, 24, 25, 29

Tom Jackman & Emily Davies, *Teens buying
  "ghost guns" online, with deadly consequences*,
  Wash. Post, July 12, 2023, https://perma.cc/
  TJE5-3WF2 ............................................................ 28, 29, 30

*The American Heritage Dictionary of the English
  Language* (1969) .......................................................... 14, 16

*The Random House Dictionary of the English
  Language* (1966) .......................................................... 14, 16

*Webster's Third New International Dictionary of
  the English Language Unabridged* (1968) ..... 14-17, 21, 27

# In the Supreme Court of the United States

————

No.

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

JENNIFER VANDERSTOK, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI**

————

The Solicitor General, on behalf of Attorney General Merrick B. Garland, et al., respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case.

**OPINIONS BELOW**

The court of appeals' opinion (Pet. App. 1a-66a) is reported at 86 F.4th 179. The district court's opinion and order (Pet. App. 67a-114a) is not yet reported but is available at 2023 WL 4539591. This Court's order granting a stay pending appeal (Pet. App. 179a) is reported at 144 S. Ct. 44. The court of appeals' order granting in part and denying in part a stay pending appeal (Pet. App. 180a-183a), is unreported but is available at 2023 WL 4945360. The district court's order denying a stay pending appeal (Pet. App. 184a-185a) is unreported.

(1)

2

This Court's order vacating the injunction pending appeal (Pet. App. 118a) is reported at 144 S. Ct. 338. The court of appeals' order granting in part and denying in part the motion to vacate the injunction pending appeal (Pet. App. 119a-125a) is unreported. The district court's opinion and order granting an injunction pending appeal (Pet. App. 126a-178a) is not yet reported but is available at 2023 WL 5978332.

## JURISDICTION

The judgment of the court of appeals was entered on November 9, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

Pertinent statutory and regulatory provisions are reproduced in the appendix to this petition. Pet. App. 241a-248a.

## STATEMENT

### A. Legal Framework

1. In the Gun Control Act of 1968 (Act), 18 U.S.C. 921 *et seq.*, Congress imposed requirements on persons engaged in the business of importing, manufacturing, or dealing in "firearms." 18 U.S.C. 922, 923. Such persons must obtain a federal firearms license, keep records of the acquisition and transfer of firearms, and conduct a background check before transferring a firearm to a non-licensee. 18 U.S.C. 922(t), 923(a) and (g)(1)(A). Importers and manufacturers are also required to mark firearms with a serial number. 18 U.S.C. 923(i).

"The twin goals" of the Act's "comprehensive scheme" are "to keep guns out of the hands of criminals and others who should not have them" and "to assist law enforcement authorities in investigating serious crimes."

3

*Abramski* v. *United States*, 573 U.S. 169, 180 (2014). The background-check requirement serves "Congress's principal purpose in enacting the statute—to curb crime by keeping firearms out of the hands of those not legally entitled to possess them," including "felon[s]." *Id.* at 181 (citation and quotation marks omitted). And the record-keeping and serialization requirements allow "law enforcement to determine where, by whom, or when" a firearm was manufactured and "to whom [it was] sold or otherwise transferred." 87 Fed. Reg. 24,652, 24,652 (Apr. 26, 2022). That, in turn, "helps to fight serious crime": "When police officers retrieve a gun at a crime scene, they can trace it to the buyer and consider him as a suspect." *Abramski*, 573 U.S. at 182.

Congress broadly defined "firearm" to include "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. 921(a)(3)(A). Congress also included "the frame or receiver of any such weapon," 18 U.S.C. 921(a)(3)(B), thereby ensuring that the key structural component of a firearm is subject to serial-number, background-check, and record-keeping requirements even if it is sold alone. Congress did not, however, define the terms "frame" or "receiver."

2. Congress authorized the Attorney General to prescribe "such rules and regulations as are necessary to carry out" the Act. 18 U.S.C. 926(a). The Attorney General has delegated that authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 28 C.F.R. 0.130(a). In 1968, shortly after Congress passed the Act, ATF's predecessor agency promulgated a regulation defining "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually

4

threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (emphasis omitted).

Although the 1968 regulations did not explicitly address the issue, ATF has "long held" that a frame or receiver need not be complete or functional in order to qualify as a "frame or receiver" under the Act. 87 Fed. Reg. at 24,685. Instead, the agency recognized that "a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a 'critical stage of manufacture'"—that is, when a product "is 'brought to a stage of completeness that will allow it to accept the firearm components [for] which it is designed * * * , using basic tools in a reasonable amount of time.'" *Ibid.* (citation omitted). In a 1978 classification letter, for example, ATF found that a partially machined frame was a firearm because it could "be readily converted to functional condition." Pet. App. 209a-210a. In 1980, ATF explained that "an unfinished receiver" would "likely qualify as a firearm" if it "could be converted to functional condition within a few hours" using "common hand tools." *Id.* at 214a. And in 1983, ATF concluded that a "basically complete" receiver was a firearm because it would require "[a]pproximately 75 minutes" of work to become "functional." *Id.* at 216a.

### B. ATF's 2022 Rule

1. In recent years, "technological advances" have made it easier for companies to manufacture and sell "firearm parts kits" and "easy-to-complete frames or receivers" that allow anyone with basic tools and access to Internet video tutorials to assemble a functional firearm "quickly and easily"—often, in a matter of minutes. 87 Fed. Reg. at 24,652. For example, the "Buy Build Shoot" kit marketed by respondent Polymer80 allows a

5

purchaser to assemble a fully functional Glock-style semiautomatic pistol in as little as 21 minutes. Pet. App. 236a-237a; see p. 18, *infra* (photograph). Similarly, companies have marketed "partially complete or unassembled frames or receivers" that can "readily be completed or assembled to a functional state"—for example, by drilling a few holes or removing temporary plastic rails. 87 Fed. Reg. at 24,663; see Pet. App. 196a.[1]

Some manufacturers of those kits and parts asserted that they were not "firearms" regulated by the Act, and thus sold them without complying with the Act's requirements. 87 Fed. Reg. at 24,655, 24,662-24,663. Those firearms—commonly called "ghost guns" because of their lack of serial numbers—were widely available online. *Id.* at 24,652; see *id.* at 25,665. And the lack of serial numbers, records, and background checks made ghost guns uniquely attractive to people who were legally prohibited from buying guns or who planned to use them in crime. *Id.* at 24,677.

As a result, police departments around the Nation confronted an explosion of crimes involving ghost guns. In 2017, law enforcement agencies submitted roughly 1600 ghost guns to ATF for tracing. Pet. App. 194a. By 2021, that number was more than 19,000—an increase of more than 1000% in just four years. *Ibid.* And those submissions to ATF have been largely futile because the lack of serial numbers and transfer records makes ghost guns "nearly impossible to trace." *Ibid.* Out of 45,240 unserialized firearms recovered from crime scenes from 2016 through 2021 that were submitted for

---

[1] For pictures, see p. 23, *infra*. For a video of the assembly of a frame parts kit that was cited in the Rule's preamble, see https://web.archive.org/web/20200331211935/https://www.youtube.com/watch?v=ThzFOIYZgIg (cited at 87 Fed. Reg. at 24,686 n.106).

6

federal tracing, ATF was able to complete only 445 traces to individual unlicensed purchasers—a success rate of less than one percent.  87 Fed. Reg. at 24,656, 24,659.

2.  In 2022, after notice and public comment, ATF issued the rule at issue here to update its interpretation of the Act's definition of a regulated "firearm" and various related requirements.  See 87 Fed. Reg. at 24,652 (Rule).  The Rule took effect on August 24, 2022.  *Ibid.*

a.  This case concerns two provisions of the Rule that clarify the Act's application to ghost guns.

First, the Rule reaffirms that the Act's definition of "firearm"—which encompasses any weapon that "may readily be converted" into a functional firearm, 18 U.S.C.  921(a)(3)(A)—includes certain weapon parts kits.  Tracking the statutory language, the Rule defines "firearm" to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive."  27 C.F.R. 478.11.  The Rule defines "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy."  *Ibid.* And the Rule draws on judicial decisions to codify "factors relevant in making this determination," including the "[t]ime," "difficult[y]," "knowledge," "skills," and "[e]quipment" needed to complete a firearm.  *Ibid.*; see 87 Fed. Reg. at 24,663.  ATF explained that kits covered by the Rule fit within the natural reading of the statutory definition of "firearm" and that the Rule simply "makes explicit that manufacturers and sellers of such kits" are "subject to the same regulatory requirements applicable to the manufacture or sale of fully completed and assembled firearms."  87 Fed. Reg. at 24,662.

7

Second, the Rule clarifies that the undefined term "frame or receiver" in the Act's definition of "firearm" includes "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. 478.12(c). ATF noted that it had long interpreted the Act to cover partially complete or nonfunctional frames and receivers that can be made functional "using basic tools in a reasonable amount of time." 87 Fed. Reg. at 24,685. ATF acknowledged that, in applying that standard, it had not previously considered "templates," "jigs," or other materials sold with a partially complete frame or receiver. *Id.* at 24,668. But ATF concluded that those materials "serve the same purpose as indexing" or partial machining on the frame or receiver itself, allowing a buyer to "quickly" and "easily" complete a frame or receiver with common tools. *Ibid.*

The Rule thus specifies that, in determining whether a part qualifies as a "frame or receiver," ATF will consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials." 27 C.F.R. 478.12(c). At the request of commenters seeking additional clarity on ATF's interpretation, the Rule explicitly excludes any "forging," "casting," or other "unmachined body" that "has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." *Ibid.* ATF explained that this exclusion makes clear that "[c]ompanies that sell or distribute only unfinished frame or receiver * * * blanks" of the sort typically purchased in bulk by commercial firearm manufacturers "are *not*

8

required to be licensed or to mark those articles" with serial numbers. 87 Fed. Reg. at 24,700.

The Rule also lists examples of products that fall within its interpretation of "frame or receiver." A kit containing the necessary parts and "a compatible jig or template" so that "a person with online instructions and common hand tools may readily complete or assemble" the parts "to function as a frame or receiver" is covered. 27 C.F.R. 478.12(c). So is a "partially complete billet or blank of a frame or receiver"—that is, a machined, molded, or manufactured frame or receiver structure— "with one or more template holes drilled or indexed in the correct location" so that "a person with common hand tools may readily complete the billet or blank to function as a frame or receiver." *Ibid.* In contrast, a "billet or blank" that lacks "index[ing], machin[ing], or form[ing]" on "critical interior areas"—and is sold without associated "instructions, jigs, templates, equipment, or tools" that would enable it to "readily be completed"— "is not a receiver." *Ibid.*

b. The Rule's interpretation of the Act does not prohibit the manufacture of any firearm or the sale of a firearm to any individual lawfully entitled to possess one. Nor does it prohibit such a person from making a firearm at home. Instead, the Rule simply clarifies that the Act requires commercial manufacturers and sellers of covered weapon parts kits and partially complete frames or receivers to obtain licenses, mark their products with serial numbers, conduct background checks, and keep transfer records. Those are the same "conditions and qualifications on the commercial sale of arms," *District of Columbia* v. *Heller*, 554 U.S. 570, 627 (2008), that around 80,000 manufacturers and distributors of

9

firearms comply with in millions of transactions each year, Pet. App. 203a.

c. In addition to the two clarifications at issue here, the Rule made a variety of other updates to ATF's regulations implementing the Act, such as tweaks to serialization requirements, adjustments to record-keeping timelines, and updates to other regulations to ensure that they reflect recent developments in firearms technology. 87 Fed. Reg. at 24,735-24,739, 24,742-24,744, 24,746-24,747; see Pet. App. 6a-7a & 9a n.8. ATF specified that if "any provision" of the Rule "is held to be invalid or unenforceable," the remaining provisions "shall not be affected" and should be given "the maximum effect permitted by law." 87 Fed. Reg. at 24,730.

### C. Procedural History

1. Respondents—two individuals, two advocacy organizations, and five entities that manufacture or distribute products that may be covered by the Rule—filed or intervened in this suit. Pet. App. 74a-77a. As relevant here, they challenged the provisions of the Rule clarifying that certain weapon parts kits fall within the Act's definition of "firearm" and that the statutory term "frame or receiver" includes certain partially complete frames or receivers. *Id.* at 10a, 78a.

The district court granted respondents' motions for summary judgment, concluding that the two challenged provisions of the Rule contradict the Act. Pet. App. 67a-114a. The court held that the Act's definition of "firearm" does not "cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile." *Id.* at 107a. And it held that "[a] part that has yet to be completed or converted to function as [a] frame or receiver is *not* a frame or receiver." *Id.* at

10

103a. The court vacated the entire Rule, including its unchallenged provisions. *Id.* at 111a-114a; see *id.* at 116a.[2]

2. The government appealed and sought a stay pending appeal. The Fifth Circuit stayed the district court's vacatur of the unchallenged portions of the Rule but otherwise denied relief. Pet. App. 180a-183a. This Court then stayed the district court's judgment in its entirety pending appeal and, if necessary, the Court's consideration and disposition of a petition for a writ of certiorari. *Id.* at 179a.

3. After this Court entered a stay, the district court granted respondents Defense Distributed and Blackhawk Manufacturing Group an injunction prohibiting the government from applying the Rule to them and their customers pending appeal, and, if necessary, this Court's consideration and disposition of a petition for a writ of certiorari. Pet. App. 126a-178a. The Fifth Circuit narrowed the injunction to the parties but otherwise left it in place. *Id.* at 119a-125a. This Court then vacated the injunction in its entirety. *Id.* at 118a.

4. After briefing and argument, the Fifth Circuit affirmed in part and vacated in part the district court's judgment. Pet. App. 1a-66a.

a. The Fifth Circuit held that the Act's definition of "firearm" does not encompass "weapon parts kit[s] that [are] designed to or may readily be completed, assembled, restored, or otherwise converted to expel a

---

[2] The district court had previously entered preliminary injunctions prohibiting the government from enforcing the challenged provisions of the Rule against some respondents and their customers. Pet. App. 10a-11a. The government appealed those injunctions, but dismissed the appeals after they were rendered moot by the district court's final judgment. *Id.* at 11a-12a.

11

projectile by the action of an explosive," 27 C.F.R. 478.11. See Pet. App. 19a-28a. The court noted that other provisions of the federal firearms laws contain, or previously contained, language expressly addressing "parts" or "combination[s] of parts." *Id.* at 20a-22a (citation omitted). That, in the court's view, indicated that Congress did not intend to include "aggregations of weapon parts" in the definition of "'firearm.'" *Id.* at 22a.

The Fifth Circuit acknowledged that it had previously held that a firearm is still covered by the Act even if it is "disassembled" into its component parts. Pet. App. 25a-26a (citing *United States* v. *Ryles*, 988 F.2d 13 (5th Cir.), cert. denied, 510 U.S. 858 (1993)). But the court stated that "[a]ssembling a weapon parts kit takes much longer than [the] thirty seconds" required to reassemble the weapon at issue in that case and "involves many additional steps." *Id.* at 26a. And the court held that "[b]ecause of these differences," weapon parts kits cannot be "readily converted" into a functional firearm and thus are not covered by the Act. *Ibid.* (citation and internal quotation marks omitted).

b. The Fifth Circuit also held invalid the provision of the Rule defining "frame or receiver" to include a partially complete, disassembled, or nonfunctional frame or receiver. Pet. App. 15a-19a. The court noted that although "the first subsection" of the Act's "definition of 'firearm'" includes "flexible language such as 'designed to or may readily be converted to expel a projectile by the action of an explosive,' * * * the subsection immediately thereafter, which contains the term 'frame or receiver,' does not include such flexibility." *Id.* at 17a (quoting 18 U.S.C. 921(a)(3)(A)). And the court believed that the Rule improperly treated as "frames or

12

receivers" items that are "not yet frames or receivers but that can easily become frames or receivers" because "'a part cannot be both *not yet* a receiver and a receiver at the same time.'" *Id.* at 17a-18a (citation omitted).

The Fifth Circuit also viewed the Rule's definition of "frame or receiver" as "materially deviat[ing] from past definitions of these words to encompass items that were not originally understood to fall within the ambit of the [Act]." Pet. App. 16a. The court acknowledged that ATF's prior "understanding of 'frame or receiver'" had "closely tracked the public's common understanding of such terms at the time of enactment." *Ibid.* But the court rejected the government's reliance on ATF's 50-year history of classifying certain partially complete frames or receivers as frames or receivers, asserting that "because ATF may have acted outside of its clear statutory limits in the past does not mandate a decision in its favor today." *Id.* at 18a.

c. The Fifth Circuit acknowledged the government's argument "that the district court's universal vacatur of the entire Final Rule (i.e., not just the two challenged portions) was overbroad." Pet. App. 31a. The Fifth Circuit noted that its "precedent generally sanctions vacatur under the" Administrative Procedure Act, 5 U.S.C. 701 *et seq.*, but it vacated the judgment and remanded "for further consideration of the remedy" in light of its "holding on the merits." Pet. App. 31a-32a.

d. Judge Oldham concurred to discuss what he perceived as "additional problems" with the Rule's challenged provisions, including issues that had not been raised by respondents or addressed by the district court. Pet. App. 33a; see *id.* at 33a-66a.

13

**REASONS FOR GRANTING THE PETITION**

The Fifth Circuit's decision warrants review because it contradicts the Act's plain text and effectively nullifies Congress's careful regulatory scheme. Under the Fifth Circuit's interpretation, anyone could buy a kit online and assemble a fully functional gun in minutes—no background check, records, or serial number required. The result would be a flood of untraceable ghost guns into our Nation's communities, endangering the public and thwarting law-enforcement efforts to solve violent crimes. This Court has previously recognized the legal and practical significance of this case by twice granting emergency relief to allow ATF to continue enforcing the Act as interpreted in the Rule. The Court should now grant certiorari and reverse.

## I. THE DECISION BELOW IS INCORRECT

Congress recognized that limiting the Act's serialization, recordkeeping, and background-check requirements to completed or functional firearms would invite evasion. It thus broadly defined "firearm" to include "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as "the frame or receiver of any such weapon." 18 U.S.C. 921(a)(3)(A) and (B). Consistent with that text, the Rule makes clear that a weapon parts kit that allows a purchaser to readily assemble an operational weapon is a "firearm." 27 C.F.R. 478.11. And the Rule clarifies that a "frame or receiver" includes "a partially complete, disassembled, or non-functional frame or receiver" that may be readily converted into a functional frame or receiver—by, for example, drilling holes or removing plastic rails. 27 C.F.R. 478.12(c).

14

Those provisions of the Rule reflect the plain meaning of the relevant provisions of the Act. In holding otherwise, the Fifth Circuit failed to meaningfully analyze the statutory text, misread the Rule, and misunderstood ATF's longstanding practices. And the Fifth Circuit's interpretation would frustrate the Act's design and make it trivially easy to circumvent the central requirements of the federal firearms laws.

### A. A Weapon Parts Kit Falls Within The Plain Meaning Of The Act's Definition Of "Firearm"

1. Statutory text and context make clear that the weapon parts kits covered by the Rule are "firearms" under the Act. The Act defines "firearm" to encompass "any weapon  * * *  which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."   18 U.S.C. 921(a)(3)(A).   The plain meaning of "convert" is "to change or turn from one state to another:  alter in form, substance, or quality: transform, transmute." *Webster's Third New International Dictionary of the English Language Unabridged* 499 (1968) (*Webster's*) (capitalization and emphasis omitted).[3] The Act thus includes items that may readily be "transform[ed]" into a working firearm—or, put differently, items that may readily be "change[d]" into a functional firearm from a different "state" or "form." *Ibid.*

---

[3] The definitions of "convert" in other contemporary dictionaries are of a piece. See, *e.g.*, *The American Heritage Dictionary of the English Language* 291 (1969) (*American Heritage*) ("To change into another form, substance, state, or product; transform; transmute.") (emphasis omitted); *The Random House Dictionary of the English Language* 230 (1966) (*Random House*) ("[T]o change (something) into something of different form or properties; transmute; transform.").

15

The Rule's inclusion of parts kits follows directly from that plain-text reading. The Rule defines "firearm" to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. 478.11. The terms "complete[]," "assemble[]," and "restore[]," *ibid.*, fit comfortably within the plain meaning of "convert": all are a type of transformation or change from one state or form to another. When a buyer "complete[s]" a parts kit, he transforms it from an unfinished state into a "finished" state. *Webster's* 465 (defining "complete" as "to bring to an end often into or as if into a finished or perfected state") (emphasis omitted). When he "assemble[s]" a parts kit, he "fit[s] together various parts" of the weapon to make it into "an operative whole." *Id.* at 131 (defining "assemble" as "to fit together various parts of so as to make into an operative whole") (emphasis omitted). And when he "restore[s]" a parts kit, he "brings [it] back" to its "former or original state" as a usable weapon. *Id.* at 1936 (defining "restore" as "to bring back to or put back into a former or original state") (emphasis omitted). A weapon parts kit that "may readily be completed, assembled, restored, or otherwise converted" into an operational firearm, 27 C.F.R. 478.11, is thus a weapon that "may readily be converted" into an operational firearm, 18 U.S.C. 921(a)(3)(A).

The Rule also mirrors the Act in its use of the term "readily." In the Act, the term "readily" modifies the phrase "be converted." 18 U.S.C. 921(a)(3)(A). In the Rule, it modifies the equivalent phrase "be completed, assembled, restored, or otherwise converted." 27 C.F.R. 478.11. And the Rule's definition of "readily" to mean

16

"fairly or reasonably efficient, quick, and easy," *ibid.*, reflects both that word's plain meaning and relevant precedent.  The plain meaning of "readily" is "with fairly quick efficiency:  without needless loss of time: reasonably fast:  speedily" and "with a fair degree of ease:  without much difficulty:  with facility:  easily." *Webster's* 1889 (capitalization and emphasis omitted).[4] And the factors listed in the Rule to guide the application of that standard are "based on case law interpretating" the term "readily" in Section 921(a)(3)(A) and another similarly worded firearms statute.  87 Fed. Reg. at 24,663.

Even setting aside the Act's express inclusion of items that can "readily be converted" into usable firearms, a covered weapon parts kit qualifies as a firearm as a matter of ordinary usage.  If a State placed a tax on the sale of home goods, such as tables, chairs, couches, and bookshelves, IKEA surely could not avoid that tax by claiming that it does not sell any of those items and instead sells "furniture parts kits" that must be assembled by the purchaser.  So too with guns:  An ordinary speaker of English would recognize that a company in the business of selling kits that can be assembled into firearms in minutes—and that are designed, marketed, and used for that express purpose—is in the business of selling firearms.

2.  The Fifth Circuit failed to justify its contrary conclusion.

a.  As an initial matter, the Fifth Circuit misread the Rule.  It accused ATF of "strip[ping] the word 'readily' of its meaning" by "includ[ing] any objects that could, if

---

[4]  See *American Heritage* 1085 (defining "readily" as "[p]romptly" and "[e]asily") (emphasis omitted); *Random House* 1195 (defining "readily" as "promptly; quickly; easily") (emphasis omitted).

17

manufacture is completed, become functional at some ill-defined point in the future" and regulating "minute weapon parts that might later be manufactured into functional weapons." Pet. App. 23a-24a, 27a. But the Rule does not include "any objects" or "minute weapon parts." *Id.* at 23a, 27a. It does not extend to weapon parts writ large, such as standalone triggers, barrels, stocks, and magazines because those parts cannot "readily be completed, assembled, restored, or otherwise converted" into an operational weapon. 27 C.F.R. 478.11. Instead, the relevant part of the Rule reaches only weapon parts kits that may "readily"—that is, by a process that is "fairly or reasonably efficient, quick, and easy"—"be completed, assembled, restored, or otherwise converted" into a functional weapon. *Ibid.* Such kits fall squarely within the statute because they can "readily be converted" into operational firearms. 18 U.S.C. 921(a)(3)(A).

To the extent the Fifth Circuit suggested that the weapon parts kits covered by the Rule cannot be "readily" assembled, see Pet. App. 23a-24a & n.19, that is incorrect. As discussed, the Rule expressly incorporates the Act's "readily" limitation. And as ATF explained, many weapon parts kits include all the parts and tools necessary to assemble "a functional weapon within a short period of time," 87 Fed. Reg. at 24,662; see *id.* at 24,692—in some instances under 30 minutes, *id.* at 24,686 n.106. Such a kit undoubtedly can be converted into a functional firearm "with fairly quick efficiency" and "a fair degree of ease." *Webster's* 1889.

That weapon parts kits can readily be converted into fully functional firearms is apparent from pictures of covered parts kits, which show how few parts need to be assembled to build a functional firearm. For example,

18

the first picture below is of respondent Polymer80's "Buy Build Shoot" Kit that enables a purchaser to assemble a fully functional Glock-style semiautomatic pistol in as little as 21 minutes, while the second picture shows that pistol after assembly:



19

Pet. App. 232a, 238a; see *id.* at 236a-238a.

b. The Fifth Circuit's reliance on other statutory provisions was likewise misplaced. The court noted that the Act's predecessor statute regulated "any part or parts of" a firearm and that Congress removed that language when it adopted the Act. Pet. App. 20a (quoting 15 U.S.C. 901(3) (1940)). But, as already explained, the Rule does not include "any part or parts of" a firearm; instead, it includes only those aggregations of parts that are designed to or may readily be assembled into a functional firearm.

The Fifth Circuit also relied on other provisions of the federal firearms laws, including a provision in the Act defining "destructive device." Pet. App. 21a-22a. The Act defines "destructive device" to include "any combination of parts either designed or intended for use in converting any device into any destructive device * * * and from which a destructive device may be readily assembled." 18 U.S.C. 921(a)(4)(C). In the court's view, because that provision explicitly refers to combinations of parts but Section 921(a)(3)(A) does not, the latter provision cannot be read to include weapon parts kits. Pet. App. 21a.

That is doubly wrong. First, Section 921(a)(4)(C) serves a different function by expanding the definition of "destructive device" to include parts "designed or intended for use in *converting* any device into any destructive device," not just combinations of parts that themselves constitute a destructive device. 18 U.S.C. 921(a)(4)(C) (emphasis added). Second, and in any event, Section 921(a)(3)(A)'s plain text encompasses weapon parts kits because completing or assembling a kit is a type of "conver[sion]" under the Act. 18 U.S.C. 921(a)(3)(A). It was thus unnecessary (and would have

20

been superfluous) for Congress to include additional language in Section 921(a)(3)(A). "Congress's use of more detailed language in another provision" provides no reason to depart from the statute's "most natural reading." *Caraco Pharm. Labs., Ltd.* v. *Novo Nordisk A/S*, 566 U.S. 399, 416 (2012). The same is true of the other statutory provisions that on which the Fifth Circuit relied. See Pet. App. 21a-22a & n.15.

Ultimately, even the Fifth Circuit acknowledged that the Act's definition of "firearm" includes some collections of firearm parts: The court reaffirmed its precedent holding that a shotgun that had been "disassembled" into its component parts was still a firearm. Pet. App. 25a-26a (citation omitted). The only distinction the court drew between that shotgun and the weapon parts kits covered by the Rule is that assembling the kits "takes much longer than thirty seconds" and "involves many additional steps." *Id.* at 26a. But the court made no effort to ground that distinction in the statutory text, and it could not plausibly have done so: Dictionary definitions, ordinary usage, and common sense confirm that a kit can "readily be converted" into a functional firearm, 18 U.S.C. 921(a)(3)(A), if the conversion can be accomplished with common tools in less than half an hour.

c. Finally, the Fifth Circuit's reading of Section 921(a)(3)(A) would thwart the Act's careful design. It would allow respondents and others to circumvent the Act's serialization, recordkeeping, and background-check requirements while producing and broadly distributing kits that anyone can easily assemble into fully functional firearms. That would "undermine—indeed, for all important purposes, would virtually repeal—the gun law's core provisions." *Abramski* v. *United States*,

21

573 U.S. 169, 179-180 (2014). Courts "should not lightly conclude that Congress enacted a self-defeating statute." *Pugin* v. *Garland*, 143 S. Ct. 1833, 1841 (2023) (citation omitted).

### B. A Partially Complete Or Nonfunctional Frame Or Receiver That Can Readily Be Completed Qualifies As A "Frame Or Receiver"

1. The Rule also correctly interprets the term "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. 478.12(c).

a. A "frame" or "receiver" need not be fully complete or functional to fall within the meaning of those terms. A "frame" is "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm." *Webster's* 902 (emphasis omitted). And a "receiver" is "the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached" or "the main body of the lock in a breech mechanism." *Id.* at 1894 (emphasis omitted). A product that is missing "a single hole necessary to install the applicable fire control component, or that has a small piece of plastic that can easily be removed to allow installation of that component," Pet. App. 196a, does not cease to be "the basic unit of a handgun" or its "receptacle or container," *Webster's* 902, 1894. The Act likewise lacks any language specifying that a "frame" or "receiver" must be "complete," "operable," or "functional."

Nor does ordinary usage support reading those missing adjectives into the Act. A bicycle is still a bicycle even if lacks pedals, a chain, or some other component

22

needed to render it complete or allow it to function. So too if the bicycle is shipped with plastic guards attached to the gears or brakes that must be removed before operation, or with a seat tube that the user must cut to length before installing. No one would deny that a company selling and shipping products in any of those conditions was engaged in selling "bicycles."

Again, there is no reason in language or logic to treat firearm frames and receivers any differently. Consider images of two frames from a recent ATF document implementing the Rule, which can be accessed at ATF, *Open Letter to All Federal Firearms Licensees: Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames* 4 (Dec. 27, 2022), https://perma.cc/ZQ9Y-PAWV (*Polymer80 Open Letter*).

23





*Figure 6*

**FIREARM** - Poly80 with Temporary Rails

The top two pictures depict the frame of a Glock-variant handgun; no one disputes that it is a "frame" covered by the statute. The bottom two pictures depict a partially complete frame sold by respondent Polymer80. *Id.* at 7. The primary difference between the two is the presence of the "temporary rails or blocking tabs" that are circled in red and highlighted in green in the bottom

24

pictures. *Id.* at 6. Those plastic tabs "are easily removable by a person with novice skill, using common tools, such as a Dremel-type rotary tool, within minutes." *Ibid.* Once the tabs are removed, the Polmer80 product is "immediately capable of accepting" the remaining parts of a firearm. *Ibid.* And once a few holes are drilled for the pins that hold those parts in place— again, a task that anyone can complete in minutes—the Polmer80 product is a fully functional frame. It is entirely natural to refer to the Polymer80 product as a "frame." In fact, it is hard to know what else to call it.

The Rule thus accords with the natural reading of the statute and ordinary usage. As ATF explained, "the crucial inquiry is at what point an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under Federal law." 87 Fed. Reg. at 24,685. That is inevitably a question of degree that cannot be reduced to bright-line rules that address every firearm design. But the Rule's focus on whether a frame or receiver can "readily" be converted to functional status incorporates a concept that is familiar in the law and that accords with ordinary usage.

Some examples illustrate the point. On the one hand, the Rule includes frames and receivers missing a single hole or including an unnecessary piece of plastic that can easily be removed. Pet. App. 196a. The Rule also covers kits containing all necessary parts to rapidly assemble a frame or receiver using tools that are part of the kit and common hand tools. 27 C.F.R. 478.12(c). That includes "'partially complete' pistol frame products" like the Polymer80 pistol frame pictured above that "incorporate temporary rails or blocking tabs that are easily removable by a person with novice skill, using common tools, * * * within minutes." *Polymer80 Open*

25

*Letter* 6. On the other hand, the Rule does not cover products that are precursors to frames or receivers, but lack indexing, tabs, or tools that would allow an individual to easily make the products functional (and are not otherwise readily convertible to a functional frame or receiver). See ATF, *Open Letter to All Federal Firearms Licensees: Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), https://perma.cc/S685-YJDY. For example, the Rule does not treat as a "frame or receiver" a standalone "partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity." *Id.* at 1; see *id.* at 3-4 (photographs of products that are not frames or receivers under the Rule) (emphasis omitted); see also 27 C.F.R. 478.12(c) (identifying additional examples of the Rule's treatment of products).

b. The Rule's understanding of "frame or receiver" is consistent with ATF's longstanding interpretation and implementation of the Act. "ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a 'critical stage of manufacture'"—that is, when a product "is 'brought to a stage of completeness that will allow it to accept the firearm components [for] which it is designed * * * , using basic tools in a reasonable amount of time.'" 87 Fed. Reg. at 24,685 (citation omitted). Indeed, since shortly after Congress adopted the Act, ATF has consistently determined that various products should be treated as "frames or receivers" based on the manufacturing stage that those products have reached. See p. 4, *supra* (discussing ATF classification letters going back to the 1970s).

26

2. In concluding that the Act reaches only fully complete or functional frames and receivers, the Fifth Circuit did not meaningfully engage with the Act's text or ATF's historical practice.

a. The Fifth Circuit first emphasized that, when Congress defined "firearm," it expressly included items that are "'designed to or may readily be converted to'" function as a firearm, but that Congress did not include a similar phrase for frames and receivers. Pet. App. 17a (quoting 18 U.S.C. 921(a)(3)(A)). In the court's view, that omission indicates that "frame or receiver" cannot include readily completable frames and receivers. See *ibid.* But that inference does not follow. Section 921(a)(3)(A) is part of the express statutory definition of the term "firearm." If Congress had limited that definition to weapons that "*will* * * * expel a projectile by the action of an explosive," 18 U.S.C. 921(a)(3)(A) (emphasis added), it would have departed from ordinary meaning by including only *functional* firearms. Express language broadening the definition to include a weapon that is "designed to or may readily be converted" to expel a projectile, *ibid.*, was needed to avoid that result.

In contrast, Congress did not define "frame or receiver" in Section 921(a)(3)(B) or elsewhere. Accordingly, those terms should be interpreted consistent with their ordinary meaning, which is not limited to complete or functional frames or receivers. And the fact that Congress has repeatedly defined "firearm" and other weapons-related terms to include non-operational weapons or items that can easily be converted or restored to an operational state only underscores that ATF properly took the same approach in interpreting the undefined terms "frame" and "receiver." See, *e.g.*,

27

18 U.S.C. 921(a)(25) and (a)(30)(B); 26 U.S.C. 5845(b), (c), and (d).

The Fifth Circuit also noted that "'a part cannot be both *not yet* a receiver and a receiver at the same time'" and faulted the Rule for treating items that are "not yet frames or receivers" as frames or receivers. Pet. App. 17a-18a (citation omitted). But the Rule does no such thing. Instead, it defines the point in the manufacturing process at which an item becomes a "frame or receiver"—and thus ceases to be a not-yet frame or receiver. Indeed, although the court acknowledged that the dictionary definitions of "frame" and "receiver" discussed above are the "set, well-known definitions" of those terms, *id.* at 15a, it failed to explain how those definitions exclude the partially complete frames and receivers the Rule covers. For example, the court never explained how a frame missing a single hole necessary to install a fire control component—or including a small piece of plastic that must be removed before its installation—is not "the basic unit of a handgun." *Webster's* 902, 1894. Nor did the court explain how the Polymer80 product pictured above, see p. 23, *supra*, could be anything other than "the basic unit of a handgun," *Webster's* 902.

b. Although the Fifth Circuit acknowledged that ATF's previous regulatory definition of "frame or receiver" reflected the ordinary meaning of those terms, see Pet. App. 15a-16a, the court did not meaningfully grapple with ATF's decades-long practice of applying that definition to include certain partially complete frames and receivers. ATF's recognition that certain not-yet-functional frames and receivers have reached a stage of manufacturing that permits them to be treated as "frames or receivers" under the Act both comports

28

with the Act's plain meaning and is consistent with ATF's longstanding regulatory approach. See pp. 21-25, *supra*. Contrary to the court's conclusion, ATF has acted within its "clear statutory limits" both "in the past" and "today" in regulating partially complete frames and receivers. Pet. App. 18a.

c. Finally, the Fifth Circuit's reading of "frame or receiver" would again thwart the Act's manifest design and invite circumvention through trivialities. It would entirely excuse from the Act's coverage products that, but for a single hole or piece of plastic, are fully functional frames and receivers. That would frustrate one of the Act's principal goals: ensuring that firearms transfers are adequately vetted and recorded so that weapons do not fall into the hands of prohibited persons (and, when they do, that such persons can be prosecuted). See pp. 2-3, *supra*. The Act should not be read "to create such a large and obvious loophole" in its core provisions. *Maui* v. *Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020).

## II. THE DECISION BELOW WARRANTS REVIEW

This Court's review is warranted because the Fifth Circuit declared invalid key provisions of an important regulation and adopted an interpretation of the Act that would effectively nullify its central provisions by allowing criminals and other prohibited persons to obtain untraceable firearms without background checks, serial numbers, or transfer records.

A. The recent exponential increase in the availability and use of ghost guns is a grave threat to public safety. Ghost gun kits are available online to anyone with a credit card—or, for that matter, an anonymous pre-paid "debit card" bought at "7-Eleven." Tom Jackman & Emily Davies, *Teens buying "ghost guns" online, with*

29

*deadly consequences*, Wash. Post, July 12, 2023 (*Teens Buying Ghost Guns*) (citation omitted), https://perma.cc/ TJE5-3WF2.  Minors in particular "have discovered the ease with which they can acquire the parts for a ghost gun" and "have been buying, building[,] and shooting the homemade guns with alarming frequency." *Ibid.*

Ghost guns provide a ready means for felons, minors, and others who are prohibited from buying firearms to circumvent the law—thwarting Congress's "compre-hensive scheme" intended to "verify a would-be gun purchaser's identity," "check on his background," and thereby "keep guns out of the hands of criminals and others who should not have them." *Abramski*, 573 U.S. at 180.  And on the back end, the lack of records and serial numbers means that ghost guns have "severely undermine[d]" law enforcement's ability to "determine where, by whom, or when" a firearm used in a crime was manufactured and "to whom [it was] sold or otherwise transferred."  87 Fed. Reg. at 24,652, 24,659; see *id.* at 24,655-24,660.  That, in turn, has impaired law enforce-ment's ability to apprehend violent individuals who may pose an ongoing threat to public safety.  By ensuring that ghost guns are regulated as what they actually are—firearms—the two challenged provisions of the Rule "prevent easy circumvention of the [Act's] entire regulatory scheme" and are thus "critical to public safety."  Pet. App. 195a.

If left in place, the Fifth Circuit's decision would give the manufacturer and distributer respondents the green light to resume unfettered distribution of ghost guns without background checks, records, or serial numbers.  That would pose an acute threat to public safety.  Tens of thousands of ghost guns are being re-covered by law enforcement each year—more than

30

19,000 in 2021, a 1000% increase from 2017.  Pet. App. 194a.  And the public-safety harms caused by ghost guns have only become more apparent as this litigation has progressed:  Between March 2023 and July 2023, for example, 13,828 suspected ghost guns were recovered by law enforcement and reported to ATF.  C.A. Doc. 196, at 6 (Sept. 26, 2023).  Police departments are also confronting "the soaring use of ghost guns in violent crimes." *Teens Buying Ghost Guns*; see 87 Fed. Reg. at 24,656-24,658.

B. The absence of a conflict in the courts of appeals does not counsel against certiorari here.[5]  Even in the absence of a circuit conflict, this Court has often granted certiorari to review decisions invalidating important federal regulations or policies.  See, *e.g.*, *Biden* v. *Nebraska*, 143 S. Ct. 2355 (2023); *Biden* v. *Texas*, 597 U.S. 785 (2022); *Wolf* v. *Innovation Law Lab*, 141 S. Ct. 617 (2020).  And here, there are especially strong practical reasons to grant review without delay.  Respondent Polymer80 appears to have manufactured and sold more than 80% of identifiable ghost guns that have been recovered at crime scenes in recent years.  See ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns – Volume Two*, Part III, at 22 (Jan. 11, 2023), https://perma.cc/MQB6-4BJX.  If

---

[5]  The Eighth Circuit affirmed the denial of a preliminary injunction to other parties challenging the Rule, finding that none of those parties had demonstrated irreparable harm; it therefore did not address the merits.  See *Morehouse Enters., LLC* v. *ATF*, 78 F.4th 1011, 1016-1018 (2023), reh'g en banc denied, No. 22-2812, 2023 WL 7205512 (Nov. 2, 2023).  The district court in that case found that the challengers were unlikely to succeed on the merits of their challenges to the Rule's definition of "firearm" and "frame or receiver." *Morehouse Enters., LLC* v. *ATF*, No. 22-cv-116, 2022 WL 3597299, at *5-*6 (D.N.D. Aug. 23, 2022), aff'd, 78 F.4th 1011 (8th Cir. 2023).

31

the decision below remained in place, Polymer80—along with the four other respondents that manufacture or distribute products regulated by the Rule—would be able to continue to manufacture and sell ghost guns online without complying with the Act's serialization and background-check requirements. That would dramatically undermine the Act nationwide.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
NICOLE FRAZER REAVES
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
SEAN R. JANDA
  *Attorneys*

FEBRUARY 2024